*U.S. Department of Justice*

*United States Attorney
Southern District of New York*

*The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007*

January 2, 2019

<u>Via ECF (Redacted) & Email</u>
The Honorable P. Kevin Castel
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    *United States v. Juan Antonio Hernandez Alvarado*,
              S2 15 Cr. 379 (PKC)

Dear Judge Castel:

      The Government respectfully submits this letter relating to the bail hearing scheduled for January 4, 2019 at 3:00 p.m.

      The defendant is a former Honduran Congressman and the brother of the current President of Honduras.  For more than a decade, the defendant abused his privilege and power in order to enrich himself by distributing massive amounts of cocaine in connection with staggering levels of political corruption.  In October 2016, he boldly traveled to the United States to categorically and falsely deny any wrongdoing during a counseled proffer session.  Now, having been arrested and facing charges that carry a mandatory minimum sentence of 40 years, it appears that the defendant will ask the Court to accept a promise that he will not flee or endanger anyone if released pending trial.  The request should be swiftly rejected.  Because there are no conditions that could address the significant flight risk and danger to the community posed by the defendant, he should be detained pending trial.

## BACKGROUND

### I. Honduras: A Major Transshipment Point for U.S.-Bound Cocaine and Plagued by Violence

This investigation by the Drug Enforcement Administration ("DEA"), and others like it, have demonstrated that Honduras is one of the principal transshipment points in the world for cocaine that is produced in South America and imported into the United States. Beginning in at least 2004, multiple drug-trafficking organizations operating in Honduras worked with politicians, law enforcement officials, and military personnel to receive multi-ton loads of cocaine sent to Honduras from Venezuela and Colombia via air and maritime routes, and to transport the drugs westward in Honduras toward the border with Guatemala and eventually to the United States.

Drug traffickers paid bribes—sometimes styled as "campaign contributions"—to Honduran politicians holding and running for office, on the understanding that the politicians would support trafficker-friendly policies regarding matters such as investigative priorities and extradition policy. Prior to 2012, the Honduran constitution did not permit the extradition of Honduran citizens to face criminal charges in the United States. For further protection from official interference, and in order to facilitate the safe passage through Honduras of huge cocaine shipments, drug traffickers also paid bribes to public officials for access to information about ongoing investigations, military and law-enforcement checkpoints, and planned narcotics interdictions. This extensive drug-trafficking system contributed to Honduras becoming one of the most violent places in the world.[1] The perpetrators of this violence, as well as corrupt officials who facilitated it and permitted traffickers to operate, often acted with impunity.

In response, the Government has prosecuted numerous traffickers, politicians, and high-ranking police officials who contributed to an environment of lawlessness in Honduras and elsewhere. *See, e.g.*, *United States v. Fredy Renan Najera Montoya*, S1 15 Cr. 378 (PGG) (Honduran Congressman facing mandatory minimum sentence of 40 years' imprisonment after pleading guilty without a plea agreement to conspiring to import cocaine and related weapons offenses); *United States v. Fabio Lobo*, 15 Cr. 174 (LGS) (son of former Honduran President pleaded guilty to conspiring to import cocaine and sentenced to 24 years' imprisonment); *United States v. Zelaya Romero, et al*. S1 15 Cr. 174 (LGS) (seven members of the Honduran National Police pleaded guilty to conspiring to import cocaine); *United States v. Rosenthal, et. al.*, S2 13 Cr. 413 (JGK) (a former Honduran Congressman and presidential candidate, and a former Honduran Congressman and cabinet official in current administration, both pleaded guilty to money-laundering charges); *United States v. Midence Oqueli Turcios Martinez,* 18 Cr. 499 (LAK) (Honduran Congressman charged with conspiring to import cocaine and related weapons

---

[1] *See* U.S. Dept. of State, *Honduras 2014 Human Rights Report* at 1 ("Pervasive societal violence persisted. Organized criminal elements, including local and transnational gangs and narcotics traffickers, were significant perpetrators of violent crimes and committed acts of murder, extortion, kidnapping, torture, human trafficking, and intimidation of journalists and human and worker rights defenders.").

The Honorable P. Kevin Castel  Page 3
January 2, 2019

offenses); *United States* v. *Arnaldo Urbina Soto, et al.*, 18 Cr. 497 (DLC) (former Honduran mayor and others charged with conspiring to import cocaine and related weapons offenses).

## II.   The Defendant's Offense Conduct

In connection with the foregoing investigation, a grand jury in this District has found, as set forth in Superseding Indictment S2 15 Cr. 379 (PKC), that the defendant was involved in processing, receiving, transporting, and distributing multi-ton loads of cocaine that arrived in Honduras via planes, go-fast vessels, and, on at least one occasion, a submarine. The defendant was a long-term participating in these activities; the Indictment alleges that the offenses lasted from at least approximately 2004 until at least approximately 2016. The defendant had access to cocaine laboratories in Honduras and Colombia, at which some of the cocaine was stamped with the symbol "TH," *i.e.*, the initials of the defendant's nickname, "Tony Hernandez":



The defendant also coordinated and, at times, participated in providing heavily armed security for cocaine shipments transported within Honduras, including by members of the Honduran National Police and drug traffickers armed with, among other weapons, machineguns. The defendant and his co-conspirators bribed law enforcement officials for sensitive information to protect these drug shipments and solicited large bribes from major drug traffickers for the defendant and on behalf of high-ranking Honduran politicians.

In or about February 2014, the defendant met in Honduras with Devis Leonel Rivera Maradiaga, the former leader of a violent Honduran drug-trafficking organization known as the *Cachiros* who is now a cooperating witness. One of the men who helped set up the meeting between the defendant and Rivera Maradiaga was ███████████████, a former member of the Honduran National Police who pleaded guilty to a drug-trafficking offense in this District.[2] Rivera Maradiaga audio and video recorded the meeting, capturing the defendant on tape:

---

[2] ███████████████████████████████████████████████████████████████. The defendant's attorney represented a co-defendant in the case before Judge Schofield named Fabio Lobo, who is the son of the former Honduran President who preceded the defendant's brother.

The Honorable P. Kevin Castel
January 2, 2019

 

       During the meeting, the defendant agreed to help Rivera Maradiaga by causing Honduran government entities to pay money owed to one or more *Cachiros* money-laundering front companies in exchange for kickback payments from Rivera Maradiaga. Rivera Maradiaga paid the defendant approximately $50,000 during the meeting.

### III. The October 2016 Proffer Session

       In October 2016, following public reports that speculated about the defendant's status in the investigation, the defendant traveled to the United States to participate in a meeting with the Government and agents from the DEA. The defendant was represented by his current counsel, and the meeting was conducted pursuant to the standard proffer agreement used by this Office.[3] During the meeting, the defendant asserted, among other things, that he had never met Rivera Maradiaga (even after being shown the screenshots appearing above of the meeting recorded by Rivera Maradiaga), never provided any sort of assistance to drug traffickers, and never accepted any money from drug traffickers.

### IV. The Pending Charges

       On November 21, 2018, a grand jury in this District returned the Indictment, which charges the defendant in four counts. Count One of the Indictment charges the defendant with participating in a conspiracy to import cocaine into the United States, between approximately 2004 and approximately 2016, in violation of Title 21, United States Code, Section 963. Count Two charges the defendant with using, carrying, and possessing machineguns and destructive devices in connection with Count One, and aiding and abetting the same, between approximately 2004 and approximately 2016, in violation of Title 18, United States Code, Section 924(c). Count Three charges the defendant with conspiring to use, carry, and possess machineguns and destructive devices in connection with Count One, between approximately 2004 and approximately 2016, in violation of Title 18, United States Code, Section 924(o). Count Four charges the defendant with

---

[3] The proffer agreement provided, *inter alia*, that the Government may use evidence of the defendant's statements during the meeting "in a prosecution for false statements, obstruction of justice or perjury with respect to any acts committed or statements made during or after the meeting . . . ."

The Honorable P. Kevin Castel                                                                                                       Page 5
January 2, 2019

making false statements to federal authorities during the October 2016 proffer session, in violation of Title 18, United States Code, Section 1001.

V.     **The November 23, 2018 Arrest of the Defendant**

On or about November 19, 2018, the defendant entered the United States at Miami International Airport and took a connecting flight to Houston, Texas. The defendant traveled with a Honduran national named ████████████████████████.  On November 23, 2018, the defendant was arrested at the Miami airport as he sought to return to Honduras with ████████.

████████████ told law enforcement at the Miami airport, *inter alia*, that (i) he had heard "rumors" that the defendant was a drug trafficker, (ii) he and the defendant had traveled to Houston to meet with ████████████████, and (iii) ████████ had traveled to Nebraska to inspect a vehicle for potential purchase. ████████████ also consented to a search of his cellular telephone, and law enforcement identified contacts saved in the phone associated with locations in Honduras, Mexico, and Colombia. One of those contacts, which was saved in the phone as "████ Mexico," was subsequently identified by law enforcement as ████████████████. When asked about ████████████, ████████████ stated, in part, that (i) ████████ owned a Mexican company that was owed money by the Honduran government in connection with a contract relating to road construction, and (ii) ████████ and the defendant had met with ████████████ on or about November 22, 2018.

When the defendant was arrested, he possessed, *inter alia*, the private Honduran passport that he used to travel to the United States and a Honduran diplomatic passport also issued in his name, at least six bank cards associated with foreign financial institutions that were issued in his name, and eight Honduran firearms licenses, some of which were issued in his name and some of which were issued in the names of ████████████████████████████ and ████████████████.

Following the arrest, the defendant waived his *Miranda* rights in writing and participated voluntarily in an interview conducted by law enforcement. During the interview, although the defendant claimed at times that he had traveled to the United States to go shopping, he admitted, in part, that (i) he had traveled to Houston to meet ████████████ after one or more previous meetings in Mexico, (ii) ████████████ was involved in "deals" in Mexico and Honduras, (iii) ████████████ had a company named "Tradeco" that he wanted to use to "invest" in Honduras, and (iv) the defendant had discussed introducing ████████████ or an associate to a minister in Honduras who could facilitate a deal.

The defendant possessed two phones at the time of his arrest, which the DEA seized and are now being searched pursuant to a warrant. To date, the searches have revealed documents relating to business dealings involving, among others, a company named Sociedad Mercantil Tradeco de México (which is also referred to in the documents as "TRADECO"), and what appear to be photographs of several firearms:

The Honorable P. Kevin Castel  
January 2, 2019

Page 6









The Honorable P. Kevin Castel
January 2, 2019

## APPLICABLE LAW

"[P]retrial detention was the means chosen by Congress in the Bail Reform Act to protect the community from dangerous defendants." *United States v. Dono*, 275 F. App'x 35, 38 (2d Cir. 2008). "The purpose of such detention must be to regulate the defendant's conduct, *i.e.* to prevent danger to the community and ensure the defendant's presence at trial . . . ." *United States v. Lewis*, 5 F. Supp. 3d 515, 526 (S.D.N.Y. 2014). Thus, section 3142 "requires that an accused be detained pending trial where, following a hearing in accordance with § 3142(f), 'the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community.'" *United States v. English*, 629 F.3d 311, 318 (2d Cir. 2011) (quoting 18 U.S.C. § 3142(e)(1)). In assessing a defendant's risk of flight and the danger to the community that would be presented by his release, courts must consider four factors set forth in the statute: (1) "the nature and circumstances of the offense charged, including whether the offense is a crime of violence"; (2) "the weight of the evidence against the person"; (3) the "history and characteristics of the person"; and (4) the "nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g).

The Government bears the burden of establishing that the defendant poses a flight risk by a preponderance of the evidence, and that he poses a danger to the community by clear and convincing evidence *See* 18 U.S.C. § 3142(f); *see also United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007). However, "[s]ubsection (e) of § 3142 provides that there is a rebuttable presumption that 'no condition or combination of conditions will reasonably assure' against flight or danger where probable cause supports a finding that the person seeking bail committed certain types of offenses." *English*, 629 F.3d at 319 (quoting 18 U.S.C. § 3142(e)(3)). When the presumption established by Section 3142(e)(3) applies, the defendant "bears a limited burden of production" to "rebut that presumption by coming forward with evidence that he does not pose a danger to the community or a risk of flight." *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001).

"Although the government retains the burden of persuasion, a defendant must introduce some evidence contrary to the presumed fact in order to rebut the presumption." *United States v. Rodriguez*, 950 F.2d 85, 88 (2d Cir. 1991) (citing *United States v. Martir*, 782 F.2d 1141, 1144 (2d Cir. 1986)). "Once a defendant introduces rebuttal evidence, the presumption, rather than disappearing altogether, continues to be weighed along with other factors to be considered when deciding whether to release a defendant." *Id.*

## DISCUSSION

**I.     Counts One and Two Establish a Presumption of Pretrial Detention**

Counts One and Two of the Indictment give rise to a presumption under Section 3142(e) that the defendant should be detained pending trial on the bases of risk of flight and danger to the community.  "'[A]n indictment returned by a duly constituted grand jury conclusively establishes the existence of probable cause for the purpose of triggering the rebuttable presumptions set forth in § 3142(e).'"  *United States v. Hoey*, No. 11 Cr. 337 (PKC), 2014 WL 572525, at *1 (S.D.N.Y. Feb. 13, 2014) (quoting *United States v. English*, 629 F.3d 311, 319 (2d Cir. 2011)).  Count One charges a violation of the Controlled Substances Act with a maximum penalty of life imprisonment, which triggers the presumption.  *See* 18 U.S.C. § 3142(e)(3)(A).  So too does Count Two, which alleges a particularly serious violation of Section 924(c) that involved machineguns and destructive devices.  *See* 18 U.S.C. § 3142(e)(3)(B).  Therefore, there is a presumption in favor of pretrial detention.

**II.    Section 3142(g) Counsels In Favor of Pretrial Detention**

Even in the absence of the statutory presumption, the relevant factors identified in Section 3142(g) all support continued pretrial detention.  The defendant is charged with serious crimes and is alleged to have engaged in a long-term and egregious course of conduct.  The penalties at issue are appropriately severe.  The evidence against the defendant is strong.  He lacks ties to the United States and maintains strong connections abroad.  Accordingly, based on all of these considerations, the defendant should be detained pending trial.

**A.     The Nature and Circumstances of the Offenses**

The nature and circumstances of the charged offenses demonstrate that the defendant poses a danger to the community and a significant risk of flight.  Counts One, Two, and Three charge the defendant with engaging in large-scale, long-term, and heavily armed drug trafficking.  The Indictment contains findings by the grand jury that the defendant's drug-trafficking activities were as varied as they were prolific.  He had access to cocaine laboratories in Honduras and Colombia, and at least one of those facilities produced cocaine bearing a stamp with his initials.  (Ind. ¶ 4).  He conspired with other traffickers, including members of the Honduran National Police, to distribute thousands of kilograms of cocaine using planes, boats, and even a submarine.  (*Id.*).  He protected himself and his co-conspirators by bribing one or more high-ranking Honduran politicians and members of Honduran law enforcement.  (*Id.* ¶ 5).  He abused his power in Honduras to enrich himself while seeking to facilitate government-assisted money laundering by the *Cachiros*, one of the largest drug-trafficking organizations in Honduras at the time.  (*Id.* ¶ 6).  And the defendant was so confident that his power permitted him to operate with impunity that he traveled voluntarily to the United States in October 2016 to lie about his activities to the Government and the DEA.

In light of the gravity of the defendant's conduct, the serious charges in the Indictment carry appropriately heavy penalties.  Count One carries a mandatory minimum term of 10 years' imprisonment and a maximum term of life.  *See* 21 U.S.C. § 960(b)(1)(B).  Count Two

The Honorable P. Kevin Castel  Page 9
January 2, 2019

carries a mandatory consecutive term of 30 years' imprisonment and a maximum term of life. *See* 18 U.S.C. § 924(c)(1)(B)(ii). Count Three carries a maximum term of life imprisonment. *See id.* § 924(o). Count Four carries a maximum term of five years' imprisonment. *See id.* § 1001(a). Therefore, as a result of these charges, the defendant faces a mandatory minimum term of 40 years' imprisonment and a maximum term of life.

It is an understatement to observe under these circumstances, as the Second Circuit has written previously, that "[t]he lengthy jail sentence that could be imposed for the charged crimes provides an incentive to flee." *United States v. Liebowitz*, 669 F. App'x 603, 605 (2d Cir. 2016). Thus, the nature and circumstances of the charged offenses weigh in favor of pretrial detention on the bases of danger to the community and flight risk.

### B. The Strength of the Case

The strength of the evidence against the defendant also counsels in favor of pretrial detention. If the case proceeds to trial, the Government expects to call at least six cooperating witnesses who participated in drug-trafficking and money-laundering activities with the defendant dating back to at least approximately 2004. The testimony of these witnesses will be corroborated by, among other things, the photograph of the "TH"-stamped kilogram of cocaine, photographs of firearms and firearms licenses seized from the defendant (which are particularly strong evidence of the defendant's possession and conspiracy to possess firearms as charged in Counts Two and Three), the video recording of the defendant's 2014 meeting with Rivera Maradiaga, and the defendant's statements to law enforcement after his arrest on November 23, 2018.

For example, in his post-arrest statement, the defendant admitted that (i) he discussed drug trafficking with multiple individuals who the defendant knew to be drug traffickers, including at least one who is now a cooperating witness ("CW-1") (though the defendant denied participating in drug shipments), (ii) he knew CW-1 transported cocaine through Honduras by hiding it on cattle cars so that drug-sniffing dogs could not detect the cocaine, (iii) he accepted gifts from CW-1 and other drug traffickers, including an expensive watch and two firearms, (iv) the photograph of the "TH"-stamped package was in fact a kilogram of cocaine bearing his initials (though he denied playing any role in the creation or use of the stamp), (v) he understood that drugs transiting Honduras were destined for the United States, and (vi) he met with a Honduran government official to discuss a *Cachiros* front company after the recorded meeting with Rivera Maradiaga in 2014. The strength of the Government's case further demonstrates that the defendant is as dangerous as the charges against him suggest, and provides a strong incentive for him to flee to avoid the consequences of his actions.

### C. The History and Characteristics of the Defendant

The history and characteristics of the defendant, including his extensive foreign connections, increase the risk of flight created by the charges, the seriousness of the criminal conduct alleged, and the strength of the Government's case.

The defendant is a Honduran citizen with extensive personal and political connections in Honduras—including his brother, the Honduran President—and virtually no

connections to the United States. *See United States v. Sabhnani*, 493 F.3d 63, 76-77 (2d Cir. 2007) (finding Government's "argument for detention" to be "particularly compelling" because "flight would impose no insurmountable personal or professional hardship" on the defendant and he had, "not surprisingly, maintained strong family ties" abroad); *United States v. Reza Zarrab*, 15 Cr. 867 (RMB), Dkt. No. 41 (S.D.N.Y. 2016) (denying bail to defendant charged with export violations based on, among other things, defendant's lack of ties to the United States, significant wealth and resources, and extensive international travel). Although the Pretrial Services report may shed more light on the defendant's financial situation,[4] he possessed at least six bank cards at the time of his arrest. The defendant also appears to have maintained at least two residences in Honduras as well as other assets. Photographs seized from his phones appear to depict the construction of a ranch in rural Honduras. Moreover, according to a press release issued by the Honduran *Ministerio Publico* on December 17, 2018, Honduran authorities recently seized from the defendant a residence in Tegucigalpa, Honduras, four vehicles, and five bank accounts. (*See* Ex. A). The release indicates that in June 2018 Honduran law enforcement seized $193,220 from a hidden compartment in a vehicle in Cortés, Honduras, arrested five people in connection with the incident, and discovered evidence linking the arrestees to the defendant. (*See id.*).

The defendant also appears to have ties to other foreign countries. When he was arrested on November 23, 2018, he possessed both private and diplomatic Honduran passports. Consistent with the charges and allegations in the Indictment, the defendant's travel documents reflect extensive international travel, including to Colombia, Mexico, Panama, El Salvador, Ecuador, Uruguay, Brazil, and Taiwan. *See Hoey*, 2014 WL 572525, at *2 ("On the present record, this Court concludes that there is a serious risk of flight because of defendant's substantial international contacts, his strong financial resources and a substantial motive to flee to avoid substantial prison time in the event of conviction.").[5] The defendant's travel history, lack of ties to this District and the United States, and extensive connections abroad all support an order of pretrial detention.

### D. The Danger Posed by the Defendant

The danger posed by the defendant also weighs in favor of pretrial detention. "[I]t is clear that the harm to society caused by narcotics trafficking is encompassed within Congress' definition of 'danger'" under the Bail Reform Act. *United States v. Leon*, 766 F.2d 77, 81 (2d Cir. 1985); *see also United States v. Ambrosio*, No. 94 Cr. 674 (DC), 1995 WL 138605, at *2 (S.D.N.Y. Mar. 30, 1995) ("[The defendant] is charged with masterminding an international drug ring involving the importation and distribution of large amounts of narcotics, which raises a strong presumption of dangerousness."). The defendant's drug-trafficking activities were particularly

---

[4] The Pretrial Services Office is scheduled to interview the defendant and prepare a report in aid of the bail hearing on the morning of January 4, 2019.

[5] The private passport contained a visa that the defendant used to enter the United States during his November 2018 trip. It is the Government's understanding based on communications with the DEA that the defendant's visa was revoked by the Department of Homeland Security following his arrest, that he otherwise lacks status in the United States, and that is subject to removal at the conclusion of these proceedings.

dangerous because of the types of weapons involved. If bailed, the defendant would pose a greater danger not only in the United States but also in Honduras. *See United States v. Choudhry*, 941 F. Supp. 2d 347, 358 (E.D.N.Y. 2013) ("Although 18 U.S.C. § 3142 does not define the term community, courts considering the scope of this term have concluded that it may encompass communities outside the United States at risk of danger from a particular defendant." (citations omitted)). The defendant's dangerousness is also exacerbated by the fact that his co-conspirators include several other powerful men capable of violence and witness intimidation, such as current and former members of the Honduran National Police. *See United States v. Bellomo*, 944 F. Supp. 1160, 1167 (S.D.N.Y. Oct. 30, 1996) (reasoning that defendant "is a danger at least as much for what he might direct or assist others in doing as for what he might do himself"). For all of these reasons, the danger posed by the defendant is yet another consideration that supports the denial of his application for bail.

### III. There Are No Bail Conditions That Would Adequately Protect the Public and Ensure the Defendant's Appearance

In light of the foregoing, there are no bail conditions that could sufficiently mitigate the danger and flight risk posed by the defendant.

As to danger, pretrial release in this case is entirely at odds with the need to protect the public. *See, e.g.*, *Sabhnani*, 493 F.3d at 77 (describing "serious reservations about the adequacy of home confinement as a substitute for detention in cases involving violent crime"); *United States v. Mercedes*, 254 F.3d 433, 436-37 (2d Cir. 2001) ("We have expressly held in several cases that a bail package that might 'reasonably assure the appearance of [the defendant] at trial, will not reasonably assure the safety of the community.'" (quoting *United States v. Rodriguez*, 950 F.2d 85, 88 (2d Cir. 1991))); *United States v. Ferranti*, 66 F.3d 540, 543 (2d Cir. 1995) ("The $1,000,000 bond would have deterred flight, not danger."); *Hoey*, 2014 WL 572525, at *3 ("Strict pretrial supervision and electronic monitoring of [defendant] would provide little protection against future obstructive conduct."). The defendant is alleged to have worked with others to use and possess military-grade weapons in furtherance of drug-trafficking activities, and many of his co-conspirators remain at large. If released, the defendant could more easily access this network to engage in additional dangerous criminal conduct, including efforts to intimidate witnesses and their relatives and associates abroad. Thus, because there are no conditions that could adequately ensure the safety of the community, pretrial detention is appropriate.

The defendant also presents an unacceptable risk of flight that cannot be addressed through bail conditions, due to the serious nature of the charged conduct, the weight of the evidence against him, and his personal characteristics, including his wealth, foreign ties, travel history, lack of any meaningful connection to the United States, and duplicity during the October 2016 interview with the Government. "A defendant facing a significant term of incarceration might well prefer to lose his financial assets rather than his freedom." *Sabhnani*, 493 F.3d at 77. "Further, defendants might easily persuade some friend or family member to lend them the money necessary to finance flight from the United States." *Id.*

The ease with which a sophisticated traveler such as the defendant could exit the United States undetected is illustrated by the behavior of his associate, ▆▆▆▆▆▆▆. According

to travel records, ▮▮▮▮▮ was scheduled to leave the United States on a commercial flight from Miami International Airport in or about the week of November 26, 2018. Following the defendant's public arrest on November 23, 2018, however, ▮▮▮▮▮ did not board the flight, and he appears to have left the United States in a way that permitted him to avoid contact with customs and law enforcement personnel. Put simply, the Government has been unable to locate any record of ▮▮▮▮▮'s border crossing and departure from the United States. Nevertheless, he appears to have traveled on commercial flights through Costa Rica, Honduras, and Panama in December 2018. The defendant would be a much greater flight risk than ▮▮▮▮▮ if released on bail, and even if the Court were to impose restrictive measures such as GPS monitoring or home detention. "[E]lectronic surveillance systems can be circumvented by the 'wonders of science and of sophisticated electronic technology,' and "the monitoring equipment can be rendered inoperative." *United States v. Orena*, 986 F.2d 628, 632 (2d Cir. 1993) (quoting *United States v. Gotti*, 776 F. Supp. 666, 672-73 (E.D.N.Y. 1991)); *see also United States v. Brennerman*, 705 F. App'x 13, 16 (2d Cir. 2017) ("Nor is any different conclusion compelled by [defendant's] willingness to submit to electronic monitoring and home detention or by the fact that certain relatives are willing to act as sureties.").

In sum, there is a presumption in favor of detention, and there are no conditions that could adequately protect the public and guarantee the defendant's appearance at trial. Therefore, pretrial detention is appropriate.

\* \* \*

The Honorable P. Kevin Castel                                                                 Page 13
January 2, 2019

       Because certain information included in this submission discloses the extent of the ongoing investigation and the identities of additional investigative targets, the Government respectfully requests that the Court accept the redacted version of this letter that is being filed simultaneously on ECF and maintain the separately filed unredacted version of the letter under seal.

                Respectfully submitted,

                GEOFFREY S. BERMAN
                United States Attorney

        By:   /s/
                Emil J. Bove III
                Matthew J. Laroche
                Assistant United States Attorneys
                (212) 637-2420

Enclosure

Cc:    Defense Counsel
        (Via Email)