UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE APPLICATION OF THE UNITED
STATES OF AMERICA FOR ORDER TO
DISCLOSE NON-CONTENT INFORMATION
PURSUANT TO 18 U.S.C. § 2703(d)

15 MAG 2302

<u>SEALED APPLICATION</u>

EMIL J. BOVE III affirms as follows:

1. I am an Assistant United States Attorney in the Southern District of New York and, as such, I am familiar with this matter.

2. The Government is seeking an Order pursuant to Title 18, United States Code, Section 2703(d) to require Apple, Inc., Google, Inc., Yahoo!, Inc. Microsoft Corporation, and AOL., Inc. (the "Providers"), to provide the to/from headers and other non-content information for e-mails stored in the following Subject Accounts:





3. The records requested from the Providers are set forth below and in the accompanying proposed Orders.

4. 18 U.S.C. § 2703(c) provides authority for a court to order an electronic communications service provider to disclose records or information not including the contents of communications without notice to the subscriber or customer, if the records are relevant and material to an ongoing criminal investigation.

5. Specifically, 18 U.S.C. § 2703(c)(1) provides in pertinent part:

A government entity may require a provider of electronic communication service or remote computing service to disclose a record or other information pertaining to a subscriber to or a customer of such service (not including the contents of communications) . . . when the governmental entity–

. . . .

obtains a court order for such disclosure under subsection (d) of this section;

. . . .

6. 18 U.S.C. § 2703(d), in turn, provides (in pertinent part):

A court order for disclosure under subsection . . . (c) may be issued by any court that is a court of competent jurisdiction and shall issue only if the governmental entity offers specific and articulable facts showing that there are reasonable grounds to believe that the . . . records or other information sought, are relevant and material to an ongoing criminal investigation.

7. Finally, 18 U.S.C. § 2703(c)(3) provides:

A governmental entity receiving records or information under [18 U.S.C. § 2703(c)] is not required to provide notice to a subscriber or customer.

8. As set forth below, there are specific and articulable facts showing that there are reasonable grounds to believe that the records sought herein are relevant and material to an ongoing investigation of: (i) drug-trafficking crimes, in violation of Title 21, United States Code, Sections 812, 841, 846, 952, 959, 963; (ii) money laundering crimes, in violation of Title 18, United States Code, Sections 1956 and 1957; (iii) criminal violations of the Foreign Narcotics Kingpin Designation Act, Title 18, United States Code, Sections 1901–1908; and (iv) criminal violations of the Foreign Corrupt Practices Act, Title 15, United States Code, Sections 78dd-1, *et seq*. (the "Subject Offenses").

## Background

9. Since at least in or about 2013, the DEA has been investigating individuals based in Honduras and elsewhere who have participated in large-scale drug-trafficking and money

laundering activities relating to the importation of cocaine into the United States. The targets of the investigation include: Jaime Rosenthal, Yankel Rosenthal, Yani Rosenthal, Edwin Rosenthal, Edwin Mayer Rosenthal, Juan Orlando Hernandez, Hilda Hernandez, Ebal Diaz, and Julian Pacheco.

10. Part of the investigation has focused on suspected money laundering activities of Honduran drug traffickers and a family in Honduras with the last name Rosenthal, which controls, among other entities, Grupo Continental, Banco Continental, and Empacadora Continental.

11. The Subjects Accounts are believed to be associated with the following targets of this investigation:

   a. Yani Rosenthal is believed to be the user of █████████

   b. Yankel Rosenthal is believed to be the user of █████████ and

   c. Edwin Rosenthal is believed to be the user of █████████

   d. Edwin Mayer Rosenthal is believed to be the user of █████████

   e. Juan Orlando Hernandez is believed to be the user of █████████ and █████████

   f. Ebal Diaz is believed to be the user of █████████ and █████████

   g. Hilda Hernandez is believed to be the user of █████████ and █████████.

4

h. Julian Pacheco is believed to be the user of ████████████████.

12. Based on conversations with a cooperating witness in this investigation ("CW-1"),[1] as well as my review of reports and summaries of interviews of CW-1, I know, among other things, the following:

a. Beginning in or about 2000, CW-1 was involved in the purchase, sale, and transportation of cocaine in Honduras and elsewhere.

b. In or about 2005, CW-1 and several drug-trafficking associates established a ranching entity in Honduras ("Firm-1"). CW-1 used narcotics proceeds to purchase property, equipment, and cattle in Honduras for Firm-1.

c. On behalf of Firm-1, CW-1 caused cattle to be sold to Empacadora Continental. CW-1 understood that Empacadora was controlled by Jaime Rosenthal, and that Jaime Rosenthal also controlled a bank in Honduras known as Banco Continental.

d. In approximately 2009, Jaime Rosenthal agreed to transfer a parcel of land in Honduras ("Parcel-1") from Empacadora to Banco Continental so that Banco Continental could hold Parcel-1 for use by CW-1 and Firm-1. In exchange for this service, CW-1 agreed to sell cattle to Empacadora on an ongoing basis at a below-market rate. Empacadora sometimes issued checks to CW-1 and Firm-1, which CW-1 understood constituted a portion of the proceeds from Empacadora's sale of cattle or meat processed from the cattle.

e. After CW-1 and Firm-1 gained access to Parcel-1, CW-1 caused a species of African palm trees to be planted on Parcel-1 with the intention of extracting and selling the oil

---

[1] CW-1 is providing information and assistance to the DEA in an effort to obtain a cooperation agreement and, ultimately, leniency at sentencing. Information provided by CW-1 has been partially corroborated by, among other things, information from other witnesses and consensual recordings.

from the trees after it was harvested. In connection with CW-1's plans for the African palm trees, CW-1 and others formed a new entity ("Firm-2").

f. In connection with the transaction involving Firm-2, the Malaysian firm, and Corporacion Pilatus, CW-1 caused approximately $2 or 3 million in cash—which constituted narcotics proceeds—to be delivered to Jaime Rosenthal with the intention that those funds would be used as a partial payment to the Malaysian firm for the equipment.

g. Approximately 10 days after the delivery of the narcotics proceeds, Andres Acosta—an individual whom CW-1 understood to be acting on behalf of Jaime Rosenthal—informed CW-1 that Jaime Rosenthal had decided not to use the cash in the transaction and would instead cause Banco Continental to transfer funds to the Malaysian firm.

h. In a subsequent conversation with CW-1, Jaime Rosenthal agreed to return the cash and to cause the necessary funds be transferred to the Malaysian firm in exchange for additional payments from CW-1 via transfers of cattle from Firm-1 to Empacadora.

13. Based on conversations with a cooperating witness in this investigation ("CW-2"),[2] as well as my review of reports and summaries of interviews of CW-2, I know, among other things, the following:

a. Since in or about 2000, CW-2 was involved in purchasing and selling cocaine in Honduras.

b. CW-2 met Yankel Rosenthal in or about 2008. CW-2 subsequently disclosed to Yankel Rosenthal that he was engaged in drug-trafficking activities. Yankel

---

[2] CW-2 is providing information and assistance to the DEA in an effort to obtain a cooperation agreement and, ultimately, leniency at sentencing. Information provided by CW-2 has been corroborated by, among other things, information from other witnesses and consensual recordings.

Rosenthal assisted CW-2 in financial activities, including the laundering of drug proceeds. For example:

        i.      In approximately 2010 or 2011, CW-2 gave Yankel Rosenthal $400,000 in narcotics proceeds as an investment in a soccer team in which Yankel Rosenthal had a financial interest.

        ii.     In approximately 2011, CW-2 purchased a piece of property by giving $1.6 million in cash to the owner. CW-2 caused the property to be held in the name of one of Yankel Rosenthal's associates in an effort to avoid having the property seized by law enforcement.

        iii.    In approximately 2011 or 2012, CW-2 caused $800,000 in narcotics proceeds to be delivered to an attorney who represented Yankel Rosenthal so that Yankel Rosenthal could use the funds to invest in property.

14. Based on conversations with a cooperating witness in this investigation ("CW-3"),[3] as well as my review of reports and summaries of interviews of CW-3, I know, among other things, the following:

        a.     Since in or about 2000, CW-3 was involved in purchasing and selling cocaine in Honduras.

        b.     In or about 2012, CW-1 and CW-3 met with Yani Rosenthal and Yankel Rosenthal. During the meeting, Yani Rosenthal requested, in substance and in part, that (i) CW-1 and CW-3 contribute to Yani Rosenthal's planned campaign for the presidency of Honduras;

---

[3] CW-3 is providing information and assistance to the DEA in an effort to obtain a cooperation agreement and, ultimately, leniency at sentencing. Information provided by CW-3 has been partially corroborated by, among other things, information from other witnesses and consensual recordings.

and (ii) CW-1 and CW-3 work together to collect contributions from other drug traffickers in Honduras so that Yani Rosenthal would not have to have direct contact with them.

15. Based on my review of open-source reporting, I know, among other things, the following:

    a. In approximately May 2013, the President of the United States designated as appropriate for financial sanctions the drug-trafficking organization to which CW-1 and CW-3 belonged pursuant to Section 804(a) of the Foreign Narcotics Kingpin Designation Act, *see* 21 U.S.C. § 1903(b)(1) (the "Kingpin Act").

    b. In approximately September 2013, the United States Department of the Treasury, Office of Foreign Assets Control, designated CW-1 and CW-3, as well as several business entities related to those individuals, for sanctions pursuant to the Kingpin Act.

16. In or about June 2015, the Honorable Lorna G. Schofield, District Judge, issued a warrant authorizing a search of an email account believed to be used by Yankel Rosenthal. Based on my review of materials produced in response to the search warrant, I know, among other things, that:

    a. In or about June 2014, an individual sent a Spanish-language email with Jaime Rosenthal's name at the bottom to, among others, Yani Rosenthal, Yankel Rosenthal, Edwin Rosenthal, and Edwin Mayer Rosenthal.

    b. Based on a draft-summary translation of the message, I know that the email was addressed to "Edwin," and that it stated, in substance and in part, that Jaime Rosenthal was investing a financial interest from a Grupo Continental-associated entity into another offshore entity that is believed to be controlled by, among others, Edwin Rosenthal.

17.     In or about March 2015, a grand jury in this District returned an Indictment charging Fabio Porfirio Lobo ("Lobo")—the son of Porfirio Lobo Sosa, a/k/a "Pepe Lobo," who was the president of Honduras between approximately 2010 and approximately 2014—with participating in a conspiracy, between approximately 2009 and approximately July 2014, to import five kilograms or more of cocaine into the United States, in violation of Title 21, United States Code, Section 963.

18.     Based on my review of a video recording of a Spanish-language meeting that took place in Honduras in or about 2014, as well as a draft summary translation of the meeting, I know, among other things, that:

   a.     Lobo introduced a confidential source working at the direction of the DEA ("CS-1") to Julian Pacheco.

   b.     At the time of the meeting, Julian Pacheco was a General in the Honduran armed forces and the head of Honduras' Bureau of Investigation and State Intelligence in the administration of Honduran President Juan Orlando Hernandez.

   c.     In previous meetings with Lobo, and during the meeting with Lobo and Pacheco, CS-1 purported to be a drug-trafficker seeking to transport narcotics through Honduras with assistance or consent from Honduran government officials.

19.     Based on my review of open-source reporting, I know, among other things, the following:

   a.     Juan Orlando Hernandez was elected president of Honduras in late 2013.

9

b.  Hilda Hernandez is the sister of Juan Orlando Hernandez and also helped to manage the finances of his political party—the National Party in Honduras—and his presidential campaign.

c.  Ebal Diaz is an associate of and advisor to Juan Orlando Hernandez.

d.  In or about 2014, media outlets in Honduras reported that officials at the Honduran Institute of Social Security ("IHSS") had participated in a fraud in which IHSS officials paid inflated prices for, among other things, medicine, supplies, and the maintenance of pensions, and that the private-sector recipients of the inflated payments had paid bribes to public officials in Honduras.

e.  In or about September 2014, Mario Zelaya, previously the head of the IHSS, was arrested near the Honduras-Nicaragua border based on charges under Honduran law relating to, among other things, fraud, bribery, and money laundering.

f.  In or about May 2015, Juan Charles Bogran Velasquez, who was said to be a witness in the case related to the fraud at IHSS, was murdered in San Pedro Sula, Honduras.

g.  In or about May 2015, one of the Honduran prosecutors handling the investigation of the fraud at IHSS fled Honduras after receiving death threats.

h.  In or about May 2015, Ebal Diaz made Spanish-language statements reported in the press. Based on a draft summary translation of Diaz's statements, he stated, in substance and in part: "[T]ell me what political institution is pure and neat? What is is to fight and that there is no impunity, but the cleanliness and holiness does not exist anywhere and we will try here to justify actions."

i. In or about June 2015, Juan Orlando Hernandez acknowledged publicly that the National Party in Honduras and his presidential campaign had received at least 10 checks, totaling $150,000, that were derivative of the fraud at IHSS.

### Request

20. Based on the foregoing, the Government requests that the Court enter the proposed Orders submitted herewith.

21. The Government further requests, pursuant to 18 U.S.C. § 2705(b), that this Application and the proposed Orders be sealed by the Court until such time as the Court directs otherwise, and that the Provider be ordered not to notify any person (including the subscriber associated with the Target Accounts) of the existence of the Orders for a period of 180 days from the date of the Orders, subject to extension if necessary. Disclosure of the Orders at this time to the users of the accounts or to the public at large would seriously jeopardize the Government's ongoing investigation, by leading the user of the account or co-conspirators to take steps to evade law enforcement or to destroy evidence.

22. No prior request for the relief sought herein has been made.

23. I declare under penalty of perjury that the foregoing factual assertions are true and correct to the best of my knowledge and belief.

Dated: New York, New York
      July 2, 2015

_____
Emil J. Bove III
Assistant United States Attorney
212-637-2444