J6RAHERAps

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                                  (S2) 15-cr-379 (PKC)

JUAN ANTONIO HERNANDEZ ALVARADO,

           Defendant.                  Oral Argument

------------------------------x

                               New York, N.Y.
                               June 27, 2019
                               2:15 p.m.

Before:

                    HON. P. KEVIN CASTEL

                               District Judge

                      APPEARANCES

GEOFFREY S. BERMAN
     United States Attorney for the
     Southern District of New York
BY:  EMIL J. BOVE III, ESQ.
     MATTHEW J. LAROCHE, ESQ.
     JASON RICHMAN, ESQ.
     Assistant United States Attorneys

THE MALONE LAW FIRM, P.A.
     Attorneys for Defendant
BY:  OMAR MALONE, ESQ.
     -and-
LEWIS TEIN, P.L.
     Attorneys for Defendant
BY:  MICHAEL R. TEIN, ESQ.

Also Present:  Erika de los Rios
              Francisco Olivera
              Humberto Garcia
              Spanish Interpreters

J6RAHERAps

1             (Case called)

2             THE CLERK:  For the government?

3             MR. BOVE:  Good afternoon, your Honor.  Emil Bove,

4    Matt Laroche, and Jason Richman for the government.

5             THE COURT:  Good afternoon to you all.

6             And for the defendant.

7             MR. MALONE:  Good afternoon, Judge.  Omar Malone and

8    Michael Tein on behalf of Juan Antonio Hernandez Alvarado.

9             THE COURT:  All right.  Good to see you, Mr. Tein,

10   Mr. Malone, and Mr. Hernandez.

11            So why don't we get right into things and begin with

12   the declaration of Mr. Bove and the defendant's request to have

13   access to that declaration.

14            MR. MALONE:  Yes, Judge.  As the Court is aware, we

15   had filed a motion for a bill of particulars, and we requested,

16   very modestly, quite honestly, thanks to my co-counsel, because

17   I usually ask for a whole lot more.  And the particulars were

18   very focused because of the wide scope of the conspiracy

19   alleged in the indictment, as well as some of the vagueness,

20   quite honestly, as relates to who Mr. Hernandez was alleged to

21   have conspired with.

22            And so we filed our motion.  The government, we

23   learned, filed an ex parte sealed submission to the Court.

24   There was no leave of court.  And so we had no opportunity to

25   at least address that issue before its submission and review by

J6RAHERAps

the Court.

And so we wanted to flag that issue for the Court.
Obviously if the Court is comfortable the way that was handled,
we would accede to the wishes of the Court.  But as a practical
matter, leave of court is usually sought, thereby giving the
opponent an opportunity to at least be heard on the subject
matter.

THE COURT:  Well, I have your papers, and you're
welcome to say anything else you want to say.  So the fact that
it was submitted ex parte and sealed can be undone, obviously.

MR. MALONE:  Sure.

THE COURT:  And I certainly haven't ruled yet on the
bill of particulars matter.  So therefore, if there is anything
you want to tell me, recognizing that you haven't seen the
content of the affidavit, why, that's perfectly fine.

I know.  It's tough.

MR. MALONE:  It's very difficult, Judge, to tell you
what I don't know.  I can tell you what I do know, and that is
that we haven't had an opportunity to be heard on that subject
matter.

THE COURT:  Well, you do now.

MR. MALONE:  I can't tell you any more than what we've
put in our papers because of our position of, sort of a lack of
direct knowledge as to the content.

If the Court wants to go through the bill of

J6RAHERAps

1  particulars, I'm happy to do that.

2          THE COURT:  Let me first go through the situation with

3  the affidavit.  I'm not a big fan of ex parte applications

4  under seal in criminal cases, or in any case for that matter.

5  But I've carefully reviewed the Emil Bove declaration of May

6  28, 2019.  And it explains, I'll tell you right now, that it is

7  nine pages in length, it has 29 numbered paragraphs to it, and

8  it is detailed in explaining the specific concerns that it has

9  with specific disclosures of one or more individuals, the

10  identity of one or more individuals, and the factual basis for

11  the government's concern as to premature disclosure.  Is that a

12  fair summary, Mr. Bove?

13          MR. BOVE:  Yes, your Honor.

14          THE COURT:  All right.  And based on that and the

15  provisions of Rule 16(d), I conclude that there is a basis for

16  deferring disclosure of certain information because it poses a

17  substantial risk to the safety of others and the integrity of

18  the forthcoming trial.

19          So the declaration will remain under seal.

20          Now you can turn to the bill of particulars issue.

21  And, again, I've been through your papers, but go right ahead.

22  What is it that you feel you do not have?  You mentioned, for

23  example, that you want the name of co-conspirators, the direct

24  co-conspirators, the dates, locations, participations in any

25  meetings or conversations the government will contend furthered

J6RAHERAps

1    the conspiracy, description of how Mr. Hernandez used or

2    carried machine guns as charged in Count Two and Three,

3    including the type of gun, the dates, the locations, and the

4    relationship to the drug trafficking crime, the substance of

5    the allegedly false statements referred to in Count Four, other

6    than that he, quote, never accepted money from drug traffickers

7    and he never provided assistance to drug traffickers in any

8    way, and particulars of the, I guess, the certain metadata that

9    you're seeking as well.

10          Let me begin the discussion by flipping this onto the

11   government's shoulders --

12          MR. MALONE:  OK.

13          THE COURT:  I saw you jump right down when I said

14   that.

15          -- with regard to Count Four.  Is not the defendant

16   entitled to know what false statements formed the basis of

17   Count Four?  Why shouldn't I order you to disclose that?

18          MR. BOVE:  They are entitled to that, Judge, and we

19   agreed to that disclosure.  On May 23, 2019, we sent the

20   defense a letter confirming that the two statements, which are

21   also identified in to-wit clauses in Count Four, are the

22   statements that are the basis for the charges.  I just said two

23   statements.  It's statements that your Honor just summarized.

24          THE COURT:  And those two statements are the entirety

25   of the basis for the charge.

J6RAHERAps

1           MR. BOVE:  Yes, your Honor.  We do expect to offer

2    evidence of additional statements made during that proffer in

3    support of that Count.  But those are the two bases for the

4    charge, and we've confirmed that for defense counsel.

5           THE COURT:  OK.  So do we agree that that's taken care

6    of?

7           MR. MALONE:  I agree, or I agreed until I heard that

8    last statement by Mr. Bove when he said, we do plan to offer

9    additional statements in support of.  And I don't know what

10   those are.

11          THE COURT:  But those statements cannot be the basis

12   of a conviction of your client on Count Four.

13          Do you agree, Mr. Bove?

14          MR. BOVE:  Yes, Judge.  I think that the other

15   statement that we're talking about may raise questions of

16   admissibility.  As to bill of particulars and fair notice,

17   we've identified the two.  We've also made clear that we're

18   going to offer evidence of other statements that were made by

19   the defendant during the proffer.  Those statements have also

20   been identified in notes that have been disclosed to the

21   defense.

22          THE COURT:  But the point is, I would say at trial,

23   these statements are coming in, in support of Count Four, but I

24   must tell you, ladies and gentlemen, that you may not find the

25   defendant guilty of the crime charged in Count Four if you

J6RAHERAps

1    should happen to find that these other statements were false,

2    that he is not charged with those being false statements.

3    Would you object to that, Mr. Bove?

4              MR. BOVE:  No, your Honor.

5              THE COURT:  OK.  So I think we do have that.

6              MR. MALONE:  I agree, Judge.

7              THE COURT:  OK.

8              MR. MALONE:  Judge, I think you went to the easy one

9    first probably?

10             THE COURT:  Of course I did.

11             MR. MALONE:  Judge, our whole goal is not to have the

12   government disclose its mental impressions and theories of

13   prosecution or anything like that.  Our goal is to make sure

14   our client is in a position where we have sufficient

15   information that will allow us at trial and any post trial

16   motions if necessary to be able to plead jeopardy, in other

17   words, so we know, generally, you know, this is where

18   Mr. Hernandez Alvarado is alleged to have possessed a

19   submachine gun, this is with whom he's alleged to have

20   possessed it, as opposed to just all this coming out in a

21   vacuum and it's not described in the indictment.  And it's not

22   provided for in the discovery in any particular fashion.  So

23   any information that allows you us to protect the

24   constitutional rights of Mr. Hernandez Alvarado, we would like

25   those disclosures to the extent that the Court is comfortable,

J6RAHERAps

1    disclosures that allow us to do that.

2            THE COURT:  Right.  And I've outlined what it is that

3    you're asking.  So you're not really asking -- this is not a

4    criticism, it's an observation -- not really asking for any

5    information; you're asking for the specific information that's

6    included in your motion.

7            MR. MALONE:  That's exactly right, Judge.  And I'll

8    sit down with that.

9            THE COURT:  Yes, OK.

10           Anything the government wants to add to their written

11   submissions on the bill of particulars issue?

12           MR. BOVE:  I think I'd just like to draw a little bit

13   of our theory of the case on the weapons counts for the benefit

14   of counsel, sort of to supplement the record.

15           THE COURT:  Well, it's also for my benefit.  So go

16   ahead.

17           MR. BOVE:  Sorry, your Honor.  I meant for the benefit

18   of counsel in terms of notice.

19           THE COURT:  I didn't mean that in any negative way,

20   but I will stand to learn also.  Go ahead.

21           MR. BOVE:  The government's theory on the weapons

22   charges, Counts Two and Three, is that the defendant

23   repeatedly, throughout the course of the conspiracy, caused

24   lower-level drug traffickers, some that were directly

25   associated with him and some more directly associated with his

J6RAHERAps

conspirators, who were also major drug traffickers, to provide
armed security for drug shipments that transited Honduras.
That happened on many, many occasions.  I think the
government's theory will essentially be that it happened every
time hundreds of kilos of cocaine were shipped through the
country that were worth millions of dollars, that that was the
security that was provided and that the defendant caused, that
is, aided and abetted, drug traffickers who were armed to
protect those shipments.

Defendant also proposed weapons himself.  Those are
referred to in the motion papers or photographs, some of them,
on their phone.  I take counsel's point about the fact that the
defendant had licenses for some of those, and I think your
Honor had testimony about a little of that at the bail hearing.
The fact that the weapons were licensed is from our perspective
irrelevant.  Our position would be that the defendant himself
possessed pistols and machine guns and destructive devices to
protect himself and the people around him, who were also
involved in the drug trafficking.  As to the rest, Judge, I
think we've laid out the authority in our papers that this is a
motion that's routinely denied in this district.  And the
reason, part of the reason that it's denied is that what
they're really asking for is almost entirely, is entirely,
derived from witnesses.  And so to provide this information
would be to prematurely disclose the government's witnesses.

J6RAHERAps

1          THE COURT:  Yes.  The number of cases in this district

2     are many on denying bills of particulars.  I've looked at the

3     indictment and specifically with regard to Count Two, and it

4     charges from at least in or about 2004 up to and including in

5     or about 2016, the defendant, during and in relation to the

6     drug trafficking crime for which he may be prosecuted,

7     specifically Count One, he knowingly used and carried firearms

8     in furtherance of such crime, knowingly possessed firearms, and

9     aided and abetted the use, carrying, and possession of

10    firearms, specifically machine guns.  And then Count Three is a

11    conspiracy count, running from 2004 to 2016.  And in *Calavante*,

12    which was a Judge Pauley case, the court denied particulars of

13    the dates, times, and locations that each defendant possessed

14    firearms.  The court denied particulars of the dates and places

15    of possession and types of firearms.  And I'm not going to

16    order it here because the defendant is on notice and, for

17    double jeopardy purposes, knows that the government has charged

18    the possession of firearms in connection with the drug

19    trafficking conspiracy in Count One, knows the "on or about"

20    dates, and that is all that's necessary.

21          With regard to co-conspirators, it's pretty well

22    established -- Judge Buchwald has held and others have held,

23    I've held -- that an indictment need not identify all alleged

24    co-conspirators, nor specify the nature, time, and place of

25    every overt act the defendant or others allegedly took in

J6RAHERAps

furtherance of the conspiracy.  And that's true here.  What the

defendant is now aware of is that the government has named

Victor Hugo Diaz Morales and Mario Jose Calix Hernandez as

defendants, and the government has already confirmed the

identity of one cooperating witnesses.  And the government is

not required to do more than that at this time, particularly

where disclosure could undermine the integrity of the

proceeding and put cooperating witnesses in jeopardy and raise

a risk of witness tampering.

So having reviewed the entirety of the application for

a bill of particulars, in light of not only the case law but

the specificity of the indictment and also the disclosures that

were made in response to the bail application by the government

in laying out its case, I'm going to deny that motion.

Now let me hear about the circumstance with regard to

Mr. Laroche.  And I gather what the defendants are asking is,

assuming Mr. Laroche is not going to be a witness, that any

documents regarding debriefing redact his name so it's not

before the jury that the advocate who stands before them is the

person who participated in the debriefing.  What is the

government's position on this?  I know you've said it's

premature, but what's the position on the merits here?

MR. BOVE:  Judge, the position on the merits, I think,

is in line with the defense.  It's just a little bit premature;

it's hard to predict right now frankly who's going to be on the

J6RAHERAps

1   trial team.

2           THE COURT:  Right.

3           MR. BOVE:  But either way, I think our intention would

4   be to propose that Mr. Laroche's name be redacted from the

5   proffer agreement and that Mr. Laroche not be referred to

6   during testimony on that meeting, and I think a fair substitute

7   would be a prosecutor from -- I'm not even sure that the

8   prosecutor would need to be identified as being from our

9   office.  But we have an intention and a desire to keep

10  Mr. Laroche's name out of it for the reasons that the defense

11  has identified.

12          THE COURT:  Let's see if you can get together with

13  Mr. Malone on that and come to an acceptable agreement, and if

14  you're not able to, I'll jump in.

15          MR. MALONE:  I think we should be able to, Judge.

16          THE COURT:  Good.  All right.

17          Now, we have the motion to suppress.  And as I

18  understand the motion, there are basically three grounds under

19  which the statements are sought to be suppressed.  One is that,

20  under the Sixth Amendment, once Mr. Hernandez was charged, his

21  right to counsel attached and he was entitled to have a lawyer

22  unless he knowingly and intelligently waived that right.  Then

23  there is the *Miranda* argument, the Fifth Amendment argument,

24  that he invoked that right and therefore questioning should

25  have stopped.  And thirdly, there is the argument under the

J6RAHERAps

1     Second Circuit's case in, I think it's *Hammad*, that under the

2     disciplinary rules there's a no-contact rule that the statement

3     should be suppressed because the agents should not have

4     permitted questioning in the absence of Mr. Retureta.  And I

5     think those are the three grounds.  Am I right, Mr. Malone, or

6     Mr. Tein?

7                 MR. TEIN:  Tein.  Thanks, your Honor.  Those are three

8     grounds, but really we're proceeding on the third ground.

9                 THE COURT:  Which is the no contact?

10                MR. TEIN:  Correct.

11                THE COURT:  OK.  I don't know what that means.  So, in

12    other words, it's only necessary for me to reach the no-contact

13    and not the Fifth and Sixth Amendment ground.

14                MR. TEIN:  It's a Fifth and Sixth Amendment analysis,

15    but it's all subsumed under no-contact.  It's a different

16    analysis under your third point than under the first and second

17    point.  You're correct, in a normal *Miranda* situation where the

18    defendant does not have counsel prior to the arrest known to

19    the government -- that's the usual *Miranda* situation -- the

20    defendant has to -- he can invoke -- and there's a question of

21    waiver and it has to be knowing and intelligent, and we know

22    there are cases where a defendant asks for a lawyer and then

23    subsequently decides he wants to talk to the police, and that's

24    a knowing and intelligent decision.  We don't have to worry

25    about that.  Actually this situation is far simpler than

J6RAHERAps

1    analyzing voluntariness or analyzing whether a defendant who

2    originally asked for counsel, then change his mind, without

3    some type of unconstitutional interference.  Ours is much

4    simpler.  Your third point.

5        THE COURT:  But just before we get to that, I don't

6    know that it's simpler at all, because you're -- I'm not asking

7    you to withdraw your Fifth or Sixth Amendment claim.  And

8    therefore they're on the table and they're live issues.  So I

9    don't understand why you say it's simpler.  I guess what you

10   mean by that is, grant me relief on any one of the three

11   grounds and then you don't have to reach the other two.

12       MR. TEIN:  No.  I'm actually being, I think, far

13   more -- far simpler and perhaps forthright.

14       THE COURT:  Go ahead.

15       MR. TEIN:  We're not throwing all the three strands of

16   the spaghetti against the refrigerator and see what sticks.

17   We're only throwing the third strand, that third point -- you

18   didn't make this point, but the way you framed the issue, that

19   the government -- I'm framing it -- the government knew the

20   defendant had counsel prior to arrest and they were prohibited

21   from -- the DOJ and the applicable state bar rules -- from

22   interviewing him absent a waiver from the lawyer.  That issue

23   in and of itself is the only issue we're presenting as to

24   suppression.  And it is both a Fifth and Sixth Amendment issue.

25   And I can explain why.  But we are not saying, oh, he invoked

J6RAHERAps

*Miranda*, he waived *Miranda*, nothing like that.  We're saying
that *Miranda* is not the issue that Court needs to look at.  The
only issue -- this is why I think it's actually simpler than if
we were having a hearing on voluntariness -- is that if the
defendant indeed had counsel prior to the arrest and if the
government, the AUSAs or the agents, knew that he had counsel,
then the no-contact rules that we've cited prohibit him from
being substantively interviewed -- you know, beyond
fingerprinting and biographical -- prohibited him from being
substantively interviewed absent a waiver from only one person,
and it's not him, his lawyer.  And that's what the no-contact
rule says.  So that's the issue, the only issue, we think, that
the Court needs to decide.

THE COURT:  And in deciding that issue, I have the
memoranda which describe the words said by the agents and the
words by Mr. Hernandez.  What else do I need?

MR. TEIN:  So the only thing that's missing is
whether -- is the -- so the government disputes whether
Mr. Retureta actually represented the defendant at the time of
the arrest.  We don't think that's a plausible issue.  The
issue is if the prosecutors instructed the agents not to
interview him and they went ahead and did it anyway, that would
be a violation of the disciplinary rule and the DOJ rule.

THE COURT:  Well, it would be a violation perhaps of
the DOJ rule, but if we're talking about nonlawyer

J6RAHERAps

investigators, the no-contact rule doesn't apply to them, it applies to lawyers, and if lawyers say don't do it and they do it, it doesn't apply to the agents, I mean, listen, in terms of the application of the disciplinary rule.  That's the way it is.

MR. TEIN:  You're correct, in a way.  Our object here is not to get someone in trouble.  I want to make that very clear.  We're not interested in pointing our fingers at these AUSAs or at the agents.  We have zero interest in that.  In fact, our papers have assumed that the AUSAs who were involved, who are very seasoned and experienced, instructed the agents, hey, you can't talk to this defendant who's just been arrested without Mr. Retureta's approval.  And it appears that that theory, that indeed the AUSAs fully discharged their ethical duties -- and I want to make this clear because I want to make sure that the government, the prosecutors, know this, because I'm not sure --

THE COURT:  I'm more concerned that I know.  You can write them a letter afterwards and tell them your deep affection and love later on.

MR. TEIN:  I will.

The point is, I'm just assuming, and from the timing of the phone calls, it appears that they did just that, that they knew, as virtually everybody in the DOJ knows, when you arrest a defendant who you've already dealt with his lawyer, no

J6RAHERAps

1    talking to him, no interviewing him, no interrogation, unless

2    you call in his lawyer first and his lawyer says OK.  That's

3    why they made these three calls, the agents did, to Retureta.

4    Despite that -- this is the part we can't understand -- they

5    went ahead and interviewed him, and nothing else change during

6    that time except the agents turned to him again and asked him

7    after the third call, are you represented by counsel now, which

8    turned out to be the identical question they asked him 20

9    minutes earlier that triggered the calls, although the agents

10   didn't have to ask that because they knew he was represented by

11   Ms. Retureta, as did the AUSAs.  And so that may be the point

12   that's missing.  If indeed the AUSAs, as we think did happen --

13   I'm guessing but I'm fully giving them the benefit of the

14   doubt -- if indeed the AUSAs gave this instruction to the

15   agents and the agents didn't follow it, the statement has to be

16   suppressed, because, under the disciplinary rule and the DOJ

17   rules, very clear that the agents are arms of the AUSAs.

18            THE COURT:  All right.  We're going to talk more about

19   this.  I'm not at this moment ready to rule.  But I first want

20   to get down what my record is here.  And so I have the text of

21   the exchanges or the description of the exchanges that are set

22   forth either in the video or in the memoranda prepared by the

23   agents, Papadopoulos and Gonzalez, of their conversations.  So

24   I have that.  And then you would ask me to assume for the

25   purposes of this motion that the assistants had told them not

J6RAHERAps

1   to speak to Hernandez if he was represented by counsel.  Is

2   that correct?

3         MR. TEIN:  I'm not asking you to assume that,

4   because -- I really would -- it would be much easier if we

5   could just know the truth.  Either they did instruct them or

6   they didn't.  If they didn't, it's very easy, it's over.  If

7   they did instruct them and the agents disobeyed the

8   instruction, there must be a reason.

9         THE COURT:  All right.  Well, let me in the first

10  instance -- not in the first instance, we're well beyond the

11  first instance -- in the second instance, let me hear from the

12  government on this point.  At this stage of the game, I'm

13  trying to figure out what my record is and what record I need

14  in order to fairly decide this issue.  So that's the purpose of

15  my inquiry at this stage of the game.

16        MR. BOVE:  Your Honor, the government's position is

17  that the motion can be resolved and should be denied based on

18  the record that is in front of you, and that record right now

19  consists of, as you said, the defendant's translation of the

20  recorded version of the post-arrest statement, that's attached

21  to their opening motion; Exhibit A to my publicly filed

22  declaration, which is the report that sets forth Special Agent

23  Gonzalez's handling of the prerecorded part of the meeting;

24  Exhibit B to my publicly filed declaration, which is the phone

25  records; and then there are e-mails also attached to that

J6RAHERAps

1    declaration from Mr. Retureta, one to Special Agent Gonzalez on

2    the day after the interview praising his professionalism and

3    one later in the day that we think speaks for itself and

4    indicates that Mr. Retureta was concerned about the fact that

5    he wasn't retained and that new lawyers were going to come in

6    to try to get this representation.

7              There is one other aspect of the record that I want to

8    speak to that is before the Court but I just want to make this

9    clear.  In the defendant's reply, there was a reference to the

10   fact that Mr. Retureta, when he appeared in the Southern

11   District of Florida for the Rule 5 presentment on the Monday

12   after the arrest, entered a temporary notice of appearance.  We

13   think that's very significant and probative of the fact that

14   there was not a representational relationship.  The 5(c)(3)

15   documents are part of the record.

16             THE COURT:  This is something that happened after the

17   fact.

18             MR. BOVE:  It is, Judge, but we think --

19             THE COURT:  I'm just trying to get the facts down.

20             So, in other words, how many days later was it?

21             MR. BOVE:  It was the Monday after, which I believe

22   was the 20th.

23             THE COURT:  Let me get back to something here.  I

24   understand maybe the arguments; if the assumption is that the

25   assistants -- well, I don't know what the assistants said.  I

J6RAHERAps

1    guess what -- Mr. "TEEN," is it?  How do you --

2              MR. TEIN:  Yes, your Honor.

3              THE COURT:  What Mr. Tein says is really twofold, that

4    the assistant United States attorneys had actual knowledge and

5    are of the position that Mr. Retureta did in fact at that

6    moment in time represent Mr. Hernandez -- that's one -- and,

7    number two, because they had actual knowledge of this, told the

8    agents not to speak to him.  Is that what you're asking me to

9    assume, Mr. Tein?

10             MR. TEIN:  Yes, your Honor.

11             THE COURT:  That of course has implications for the

12   Sixth Amendment claim as well, I suppose.  So can you represent

13   that the lawyers for the government had actual knowledge that,

14   at the time of this interview, Mr. Hernandez was in fact

15   represented by Retureta?

16             MR. BOVE:  No, your Honor.  Mr. Laroche and I, the

17   lawyers in questions -- we're officers of this Court -- I think

18   we've been clear in motion papers and I'll be clear now on the

19   record, that we did not have actual knowledge.  And I can go

20   further in terms of the strategy and approach to this interview

21   if the Court would like.

22             THE COURT:  Sure.

23             MR. BOVE:  Going into this we're sensitive to the

24   issues that are raised by counsel, the no-contacts rule, the

25   rule of the Sixth Amendment here, and *Miranda* as well.  So

J6RAHERAps

1   there were discussions prior to the arrest operation about how

2   to handle that.  Those discussions were based on the fact that

3   we had not heard from Mr. Retureta for 18 months.  The last

4   time we had heard from him was this call that's referenced in

5   the motion papers that was May 2017.  There's a subsequent

6   interaction that Mr. Retureta points to with Special Agent

7   Fragga in October 2017.  For purposes of our knowledge, the

8   first time we heard about that was in the defendant's motion

9   papers.  We had no information about that.  We had not heard

10  from Mr. Retureta for 18 months.  That was our state of mind

11  going into the arrest.  And I think there is some other

12  evidence that corroborates that we were right about this.  But

13  our state of mind before the arrest was --

14          THE COURT:  You knew that there was a point in time,

15  18 months ago, where Mr. Hernandez was in fact represented by

16  Retureta.

17          MR. BOVE:  I wouldn't go that far, your Honor.  We

18  knew that Mr. Retureta had called the U.S. Attorney's Office to

19  ask about the status of the investigation.  Attorneys do that

20  frequently, in order --

21          THE COURT:  Yes, but you don't take the call.  You

22  hang up the phone unless you believe that the person is

23  authorized to communicate --

24          MR. BOVE:  Well, I don't think we did much more than

25  that, your Honor.  We don't have a perfect recollection of this

J6RAHERAps

1   call.

2          THE COURT:  Right.

3          MR. BOVE:  But no information was provided to

4   Mr. Retureta.  And the recording bears out that Mr. Retureta

5   made that call -- this is from the defendant's mouth on tape.

6   He never called the defendant to tell him what was said.  So

7   our state of mind with respect to this call was: an attorney,

8   who had represented the defendant at proffer 25 months before

9   the arrest --

10          THE COURT:  So let's take that.  I'm just trying to

11   figure out what my factual record is.  And then after I know

12   what my factual record is, then I want to hear from everybody

13   about what my factual record means.  So I'm not trying to

14   mousetrap anybody here.  I'm trying to get the facts down.

15          So 25 months ago, lawyers for the government knew, 25

16   months before this interview, knew, had actual knowledge, that

17   Retureta represented Hernandez, as of that moment in time.

18          MR. BOVE:  Right.

19          THE COURT:  And then 17 to 18 months before the

20   interview, there was a call from Retureta inquiring about

21   what's going on.  The call related to Mr. Hernandez.  He wasn't

22   calling about one of his other clients.  He was calling about

23   Mr. Hernandez.

24          MR. BOVE:  Yes.

25          THE COURT:  And then there was no instruction to the

J6RAHERAps

1  agents by the assistant United States attorneys, do not talk to

2  Hernandez because he is represented by Retureta.  You did not

3  so instruct them because you believed that no such instruction

4  was necessary.

5        MR. BOVE:  That's correct.  And we went a little bit

6  further than that, because we were sensitive to this.  We said,

7  we don't think he's represented by, now, by Mr. Retureta, but

8  we understood that this day could come to pass.  So what we

9  directed Special Agent Gonzalez to do was to put the question

10  to defendant: are you represented.  And that's borne out in the

11  report.  And that's your record on that.

12        THE COURT:  I'm not -- I've said this, I'll say it

13  again -- I'm not up to deciding this issue, but, Mr. Tein, is

14  that the record that I should go on and you should base your

15  arguments on as to why this should be suppressed?

16        MR. TEIN:  I don't know.  I have to think for a minute

17  of the consequences of that.

18        THE COURT:  Yes.

19        MR. TEIN:  I'd like to know exactly what was said, and

20  I'd like to know why, after Mr. Hernandez said, I want to speak

21  to Retureta and they called Retureta three times, they didn't

22  leave a voicemail, didn't e-mail him, didn't call his office,

23  you know, his office in D.C., even though they had those

24  numbers, and then, from what we can tell from the DEA-6 and the

25  phone records, less than 40 minutes later, the agents started

J6RAHERAps

1    interviewing him substantively.  There was a phone call at

2    12:18 p.m. on the day of arrest that was three minutes.  We

3    don't know, now that I hear this, which is different from what

4    we had thought might have happened -- we assumed they had

5    instructed them, Don't -- but now that we hear this, there's a

6    question as to at what point did the AUSAs, or did they ever,

7    give the green light to the agents to go ahead and do the

8    interview, knowing that, really, Mr. Retureta, the lawyer,

9    didn't have that much time, certainly didn't have a reasonable

10   time, certainly 40 minutes after the call goes to voicemail

11   three times, immediately to voicemail, meaning his phone is

12   off.  Why didn't they do all these other things?  Why didn't

13   they give him a little bit more time?  And then we find out

14   that --

15            THE COURT:  We're getting now, no, seriously, we're

16   getting now into the arguments on the merits.  You're going to

17   have a chance to argue the merits, as is the government.  But

18   right now I want to know whether I have a record on which I can

19   rule.  I think you've raised a point that I think I'd like to

20   hear from the government on, which is, did the assistant United

21   States attorneys evaluate what was said by Mr. Hernandez and

22   what was said by the agents and make a call on whether or not

23   the agents should proceed after learning of three phone calls

24   to Mr. Retureta?

25            MR. BOVE:  Yes, your Honor, we did.  And what happened

J6RAHERAps

1    was, continuing to be sensitive to this, we had told Special

2    Agent Gonzalez to get a sense of what the defendant had said.

3    And this is borne out in the report that's Exhibit A.  And what

4    was relayed to us, in substance, was that the defendant had

5    been ambiguous about whether or not he was represented.  And so

6    you can see this in paragraph 6 of the report.  Special Agent

7    Gonzalez gets off the phone with us, and he says to the

8    defendant, that's it, we're done here, you haven't answered the

9    question.

10         Let me come back, because I don't want to put the

11   words in his mouth.

12         He gets off the phone with us, and he says to the

13   defendant, you're going to be lodged, we're not going forward

14   with an interview.  And then the defendant reinitiates.

15         THE COURT:  Now we're getting a little bit into the

16   argument.  But I've got the point.  So if I have it, what

17   you're telling me, or I think you're telling me but you'll have

18   to say more explicitly, that you, in words or substance,

19   advised the agents not to proceed at that moment in time based

20   on what you learned from them about the three calls.

21         MR. BOVE:  At that specific moment, yes, Judge.

22         THE COURT:  That's what I'm trying to get.  I'm not

23   trying to mousetrap anybody.

24         MR. BOVE:  No.

25         THE COURT:  But that is important for me to know in

J6RAHERAps

1    terms of what the record is.  And then you've been very clear.

2    And then something happened immediately after that.

3           MR. BOVE:  Which led -- I just want to be clear that

4    at no point to the DEA do anything contrary to what we advised.

5           THE COURT:  I understand.

6           Now, Mr. Laroche, you've heard a number of statements

7    made this afternoon by Mr. Bove.  Can you either supplement,

8    correct, or confirm those statements?

9           MR. LAROCHE:  I can confirm them, your Honor.

10          THE COURT:  All right.  Thank you.

11          And if there is any further representation made which

12   is not in conformity with your recollection, I call upon you to

13   rise and tell me so.

14          MR. LAROCHE:  Understood, your Honor.

15          Just to be clear from me, I did not know that he was

16   represented by Mr. Retureta, and we would not have proceeded

17   the way we did if we thought that was the case, understanding,

18   as Mr. Bove said, this specific no-contact issue.

19          THE COURT:  All right.  What's more important at this

20   stage is the representations as to what the facts are and the

21   moments in which there were either red lights or yellow lights

22   given to the agents or green lights given to the agents.  And

23   what I am hearing is that whatever it was, 23 months before the

24   interview, there was knowledge on the part of the government

25   that Mr. Hernandez was actually represented by Mr. Retureta,

J6RAHERAps

```
1    and then 18 months before there was a phone call from

2    Mr. Retureta relative to Mr. Hernandez, not calling about other

3    matters or other clients but about Mr. Hernandez implicitly.

4    And there was a conversation with the agents in which the

5    agents were told that they may not interview Mr. Hernandez if

6    he is represented by Mr. Retureta and that there was a

7    conversation thereafter in which the agents recounted what had

8    transpired with regard to the three phone calls to the phone

9    number of Mr. Retureta, and at that point the assistant United

10   States attorneys said, do not proceed at this juncture.  Have I

11   accurately summarized the facts?  I'm not talking about the

12   consequences or what anybody thinks should happen on those

13   facts, but are those the facts?

14             MR. BOVE:  With a slight change, your Honor.  The

15   point we're up to is a consultation after, it was actually

16   before, the first two calls from Mr. Retureta, where, as a

17   courtesy, we said that's fine, if we want to try and place

18   those calls, but we think it makes sense to stop here.  And

19   then we would rely on paragraph 6 of Exhibit A for the rest of

20   these facts.  But what happened is, that statement was made.

21             THE COURT:  All right.  Are those the facts, Mr. Tein,

22   that you want to base your argument on and I can proceed to

23   hear this?

24             MR. TEIN:  Yes, but I just have one question.

25             THE COURT:  Sure.
```

J6RAHERAps

1          MR. TEIN:  We did a little chart on the front page of

2     our reply brief, based on the information that the government

3     had provided, very forthrightly, in their response to our

4     motion.  And the thing that I'm not -- I just want to make sure

5     we're all on the same page, because it is a little confusing --

6     is that my understanding is that, after the third phone call by

7     the agent to Mr. Retureta's cell immediately going to

8     voicemail, that the agent had then asked him again, asked

9     Mr. Hernandez again, the same question that he had asked at the

10    beginning, about 40 minutes earlier: do you have a lawyer?  And

11    he said, I don't know.  At that point, there was a phone call

12    of three minutes, 12:18.  And I just want to understand from

13    the AUSAs, if your Honor will ask them, is that the phone call

14    in which the AUSAs told the agent, no, do not interview him,

15    the final time?  And I just want to understand, was there any

16    time -- I'm trying to understand the main -- I believe one of

17    the AUSAs said that the DEA agents at all times followed their

18    instructions.  And so if that's the case, at what point did the

19    AUSAs' instructions change?  That's the only part I'm confused

20    about.

21          THE COURT:  Yes.  I understand your question.  I think

22    I understand your question.  So the narrative I've heard so far

23    was, to use the colloquial, a red light, and then there was the

24    statement made by Gonzalez to Hernandez that, quote, he was

25    going to be processed and taken to jail without an interview,

J6RAHERAps

close quote.  And Hernandez stated, quote, that he wanted to

speak with agents at this moment and start cooperating.  And

that's the point at which Gonzalez called Retureta a third time

with no answer.

         And what I think Mr. Tein is asking is, was there a

conversation in which the assistant United States attorney

turned the red light to a green light, or did the agents

operate based on their own judgment call as to what

Mr. Hernandez's statement to them meant.  Is that the question?

         MR. TEIN:  Yes, your Honor.

         THE COURT:  OK.

         MR. BOVE:  To use those terms, Judge, we change the

red light to a green light based on the defendant having said,

I want to speak to you and do not know whether I have a lawyer.

Special Agent Gonzalez contacted us.  Those statements were

relayed to us.  And we said, proceed to the interview.

         THE COURT:  All right.  That's what Mr. Tein wanted to

know.  That's what I wanted to know.

         MR. TEIN:  There is still just one question about

timing, though.  According to the DEA-6 and the phone calls,

I'm unclear as to when that green light happened, because --

and it's important.  After the third call to Retureta at 11:54,

according to the DEA-6, the agent again asked him, do you have

a lawyer, and he said, according to the DEA-6, that he did not

know, quote/unquote.

J6RAHERAps

1          THE COURT:  And as I read that, that was after the

2     call to Retureta a third time with no answer.

3          MR. TEIN:  Right.

4          THE COURT:  And your question is, at what point in

5     this chronology was the red light turned to a green light?  Is

6     that the question?

7          MR. TEIN:  Right.  Because according to the DEA-6 and

8     the phone records, it appears that the very next thing that

9     happened was a phone call of three minutes, beginning at 12:18,

10    when the agents called the AUSAs.  We don't know what was said

11    on that call.  It doesn't mention anything in the government's

12    response or in the DEA-6.  Presumably they said, OK, Retureta

13    has not answered, the defendant said he did not know.  But

14    there's nothing in the DEA-6, prior to that phone call,

15    indicating that it was at that point that the defendant said, I

16    want to speak to you.  In fact, it appears the opposite is

17    true, that it was sometime around 12:20, 12:21, when the agents

18    began fingerprinting him, sometime between the phone call and

19    that last thing, where the defendant, according to the agents,

20    said, I want to speak to you.  So I just want to know whether,

21    is that 12:18 call, which would have been the third call

22    between the agents and the AUSAs that morning to early

23    afternoon, was that the call in which the agents told the

24    AUSAs, oh, now he said he wants to speak to us and the AUSAs

25    said go ahead?  And secondly, if that happened, what if any

J6RAHERAps

precautions did the AUSAs instruct the agents to take about not

eliciting privilege?

          MR. BOVE:  I'm still trying to confine myself to these

questions of what is the record, Judge.

          THE COURT:  Yes.  That's really what I'm going for.

And then I'm going to give both sides an opportunity to argue

what the record is, once I'm satisfied that we have a record

here.

          Go ahead.

          MR. BOVE:  So the record, I think, on these issues

right now, is Exhibits A and B to my declaration.  Exhibit A

reflects that the defendant twice indicated in substance that

he wanted to proceed with an interview.  The first time is in

paragraph 6.  And then the second time is in paragraph 7.

          With respect to the question of when the so-called

green light was given, I don't have a specific recollection of

whether that was -- and frankly I don't have a recollection of

which of these -- I don't have a recollection of which of these

calls it was, whether it was -- you can see on Exhibit B

there's an 11:50 call to Mr. Laroche's number that lasts two

minutes.  Then there's the third Mr. Retureta call, 11:54.

Then's a 12:18 call with Mr. Laroche.

          The only point I want to make about the record on this

is, the next thing, the next relevant time stamp is paragraph 8

of the DEA report, which says that at approximately 12:20, the

J6RAHERAps

```
1    agents transferred the defendant from the CBP space at the

2    airport to the DEA space to actually do the substantive

3    interview.  So in terms of the record, prior to that happening,

4    I'm comfortable saying and confident that we had authorized the

5    DEA to put a Miranda waiver to the defendant.

6              THE COURT:  And what time was that?

7              MR. BOVE:  Before 12:20.

8              THE COURT:  Before 12:18 or --

9              MR. BOVE:  I'm saying before the agents left the CBP

10   space to go --

11             THE COURT:  C --

12             MR. BOVE:  Sorry, Customs and Border Protection.  They

13   basically took the defendant from another agency's office to

14   their office to do this interview.  Prior to that happening, we

15   authorized them to take that step.  I can't, I just don't

16   remember, whether it was -- which of these calls it was.

17             THE COURT:  And that was before the video interview.

18             MR. BOVE:  Yes, Judge.

19             There was another question about, did we give the

20   agents any instructions.

21             THE COURT:  Right, about privilege.

22             MR. BOVE:  We gave the agents no instructions

23   regarding privilege and no instructions about how to focus or

24   handle the interview.  We left that to them.

25             MR. TEIN:  There is just one question.  And I hear
```

J6RAHERAps

from AUSA Bove that he may not remember correctly and it might
refresh his recollection.  If the DEA-6 is correct, it has a
slightly different chronology.  According to paragraph 6 of --
and I'm not casting any doubt on the AUSA's credibility.  I
understand this is confusing and everything happened quickly
and there were three phone calls.  I get that.  But according
to the agent who did this report, it says that, on paragraph 6,
at this time -- is your Honor at DEA-6?

            THE COURT:  I'm at paragraph 6.

            MR. TEIN:  "At this time, Agent Gonzalez'" -- "A/GS"
means "group sup.," I think -- "group supervisor Gonzalez
contacted the AUSAs, who gave permission for Gonzalez to place
a phone call to Retureta."  That was the first phone call, I
think, which was at 11:25.  That was the first time that they
were speaking.  And that was 11:25 with the AUSAs.  11:36 was
the first call to Retureta.  And he says, the agent does, "We
called two times with no answer."  That would be the 11:36 and
the 11:38 call.

            Then, at 11:40, the agents called the AUSAs, but it
appears to be a two-minute call, so probably it's a call that
went to voicemail.  And then at 11, we know that at 11:50, the
AUSAs called the agents back.  And I think that's a two- or
three-minute call.  But regardless, it was at that point, after
the two times no answer, it says, "After additional
consultation with Bove and Laroche," so that would have been

J6RAHERAps

the 11:50 call, "Gonzalez informed Hernandez that he was going
to be processed and taken to jail without an interview.
Hernandez stated that he wanted to speak with the agents at
this moment and start cooperating."  So Gonzalez called
Mr. Retureta again, with no answer.  That's the 11:54 call.
Gonzalez then asks him, do you presently have legal
representation?  And he says, I don't know.  At that point he
provides him with his consular rights and says that if he had
an attorney -- then it goes into paragraph 7.

          So it appears that all of that occurred prior to the
12:18 call with the AUSAs.  I just, I don't know if that was
the same chronology, but it appeared to be different to me.

          THE COURT:  So your question, if I get it, is, having
reviewed paragraphs 6 and 7 of the report of investigation,
does that refresh your recollection that the chronology is
different from that which you represented and is in line with
Mr. Tein's recitation?

          MR. BOVE:  No, Judge.  I think the documents speak for
themselves.  I think at this point the record is closed.  We
don't have anything to supplement it with.  I've described my
recollection.  You've given Mr. Laroche an instruction to
correct me where his recollection differs.  And to my mind,
what I've just heard was consistent with what I said.  And what
I understand to be going on is some urging by Mr. Tein for me
to say that it was the 12:18 call that was the green light.

J6RAHERAps

1    And I'm being honest with the Court that I don't recall

2    specifically what was said at 12:18.  My recollection is that

3    we authorized this before they transferred him to the office.

4    And that's why I was careful about saying that the so-called

5    green light was given before 12:20.

6                THE COURT:  All right.  Mr. Tein, I think we have a

7    record here.  Yes?

8                MR. TEIN:  Yes, your Honor.  We agree.

9                THE COURT:  And Mr. Laroche, do you agree we have a

10   record here?  Or not Mr. Laroche, Mr. Bove?

11               MR. LAROCHE:  Yes, Judge.

12               THE COURT:  Mr. Bove, you agree?

13               MR. BOVE:  Yes, your Honor.

14               THE COURT:  All right.  So let me hear Mr. Tein's

15   argument based on what I now believe to be the facts.  I

16   consider the record closed and will now be delighted to hear

17   your argument.  Yes.

18               MR. TEIN:  May it please the Court, as I said in the

19   beginning, and I think this is important, and it's important

20   for everyone to know, we're not here casting aspersions on

21   anyone.  If there was a violation of the no-contact rule, it

22   may well have been done in good faith.  It appears from what

23   these AUSAs have both said that everything they did was in good

24   faith.  But that's really of no moment one way or the other.

25   We're not here to pass judgment on their intention.  If in fact

J6RAHERAps

there was a violation of the no-contact rule, then the

statement should be suppressed.

        And here are the questions that I have that I think,

by way of argument, that I think are relevant.  What was the

rush?  And why didn't they make what appears to be a more --

why didn't they make a more concerted effort?  If they really

didn't believe that Retureta represented Mr. Hernandez, first

of all, why call him at all?  But I hear, in an abundance of

caution, they called.

        And then we know they called twice.  The phone

immediately went to voicemail.  At that point, if the purpose

of the call is to check, is to actually get Mr. Retureta on the

phone, they had his office line in Washington, D.C.  There was

a secretary there.  He has a law partner at that office.  They

have voicemail there.  No voicemail was left.

        They have his e-mail.  When a cellphone goes

immediately to voicemail, it generally means it's off for some

reason.  The gentleman might have been in court.  If their

intention was to call Retureta and see, indeed, hey,

Mr. Retureta, do you still represent him?  Because there could

be no other purpose for the call, other than to check that and

ask whether he would give permission for the interview.  Given

that they call and it went right to voicemail, and they called

again and it went right to voicemail, the record is clear that,

within 40 minutes of their third phone call going to Retureta's

J6RAHERAps

1    voicemail immediately, they began the interview.

2            So there is an inconsistency with the position that he

3    was not represented by counsel and making these phone calls.

4    I'm not saying that they should be -- that the statement should

5    be suppressed because the AUSAs were being extra careful.  I'm

6    saying that the fact is that Mr. Retureta did represent him,

7    that they then have a face-to-face meeting in Miami, an

8    extraordinary meeting where Mr. Hernandez, the defendant,

9    traveled from outside of the country to the United States and

10   sat down with one of the prosecutors and two of the agents,

11   including the special agent in charge, who was at this

12   interview, and that this defense lawyer, Mr. Manuel Retureta,

13   is well known to the office.  They knew how to get him.  And

14   there is no doubt, it's on the record, that Mr. Retureta called

15   one of the AUSAs about a year and a half before to check on

16   this.

17           What's also clear is that the day after this all

18   happened, there were e-mails back and forth between the U.S.

19   Attorney's Office, one of these prosecutors, and Mr. Retureta

20   in which the AUSA sent, by e-mail, to Mr. Retureta, the

21   indictment, which was then under seal and could not have been

22   sent to that person if the AUSA didn't have a good-faith belief

23   that this man, Retureta, represented this man, Mr. Hernandez.

24   They clearly -- these AUSAs are seasoned.  They know Rule 6,

25   Federal Rule of Criminal Procedure 6.  They would not have done

J6RAHERAps

1    that unless he did.

2          So their argument was, well, there was a hiatus.

3    Retureta didn't believe there was a hiatus, because as soon as

4    he found out that they had called, which turns out to be not

5    from his voice mails because they didn't leave any, but because

6    a relative of Mr. Hernandez found out through the other person,

7    I guess, who was arrested, that he had been arrested, Retureta

8    immediately e-mails, texts to the agents and to the AUSA.  And

9    that starts within 50 minutes of the end of the interview, less

10   than an hour.  The interview ended at 1:53.  The agents, three

11   minutes later, called the AUSAs for 22 minutes, likely briefing

12   them on the interview.  Mr. Retureta begins e-mailing the agent

13   and the AUSAs at 2:41.  So clearly less than an hour.  And

14   that's why it wasn't reasonable.  If you really want to get

15   in -- it's the same thing that we do every day when -- we have

16   a rule in this court and in our Southern District of Florida.

17   It's the same in federal court all over the country.  You have

18   to confer before filing a motion.  And conferring doesn't mean

19   calling and not getting it and then hanging up, calling,

20   hanging up.  It doesn't even mean leave a voicemail, in 40

21   minutes file the motion.  It means a good-faith effort at a

22   conference.  Most respectfully, despite what the intentions

23   were, that was not done here.

24          There was no urgency -- meaning there was no urgency;

25   the general was in custody, and there was no evanescent-

J6RAHERAps

evidence issue.  There was no danger to the community that was

imminent or danger to the defendant or any other person.  They

could have waited two hours.  They could have waited three

hours.  They could have waited a day.  They had a whole weekend

to interview him before his initial appearance in Miami.

          This entering of the temporary appearance is of no

moment.  I'm sure it's the same in this district.  At the

defendant's initial appearance, almost every single time, the

lawyer says, I'm entering a temporary appearance.  It's done

all the time.  The important thing is not whether he said his

appearance was temporary from there forward, but the point was,

up until that point, he was his lawyer.  Whether he's going to

be his lawyer for the purpose of the next year and a half of

trial, that's different.  But it was very clear, Hernandez was

represented by a lawyer for all the pretrial period.

          The government says this was, quote, part of a naked

attempt to restart a lapsed representation, unquote, part of a

naked attempt to restart a lapsed representation.  I think it's

very clear that that is not the case.  I think that the, most

respectfully I submit to your Honor, that the only conclusion

that one can draw from these facts is that the no-contact

rule -- without any question of the AUSAs' good faith, but a

mistake -- was violated.  They knew as an objective matter that

the man was represented.  They had a subjective concern that he

was represented.  They acted both before the interview and

J6RAHERAps

1   after the interview as if he were represented.  But the agents

2   and the AUSAs really wanted to interview him, because his

3   brother is the president of Honduras, who is a target of their

4   investigation.  And everyone couldn't really help themselves.

5   And if it turned out that they were able to flip him at that

6   moment, right after the arrest, when it is so raw and the

7   emotions run so high, and that period, the bell curve of when

8   you're likely to get a confession is right then, they were

9   hoping that would happen.  And the agents were certainly hoping

10  that would happen.

11          Thank you.

12          THE COURT:  Thank you.

13          Mr. Bove, I'll allow you to continue.  Just give me a

14  moment, if you want to take a moment.  I want to look at a

15  couple of things here.

16          (Pause)

17          THE COURT:  All right.  Mr. Bove.

18          MR. BOVE:  Thank you, your Honor.

19          I think today it has been helpful so far to narrow the

20  issues presented by this motion.  And it seems that the defense

21  has put aside and abandoned the Fifth and Sixth Amendment

22  arguments and is focused on this no-contacts rule.  I want to

23  address and respond to some of the factual arguments that were

24  made.  But before I do that, I think there are two very

25  straightforward bases at this point to deny this motion.

J6RAHERAps

         The first is, the defense argument is that the
government violated the no-contact rule, which prohibits the
U.S. Attorney's Office from directing agents to interview
represented parties.  In order to prevail on that motion, they
have to establish that the defendant was in fact represented,
and that we knew that.  The state of the record on that
question right now is, two assistant United States attorneys
saying that they lacked that knowledge and statements reflected
in Special Agent Gonzalez's report by the defendant indicating
he does not know if he has representation, and then recorded
statements, in a document submitted by the defense, where the
defendant confirms what he had said to Special Agent Gonzalez
before the interview started, which is that he was not
represented at the time.  And I think there's a glaring
omission in this record, and it's, I think, dispositive, that
even after we call out this issue in our opposition, there is
still no declaration from the defendant saying, yes, I was
represented at the time.  And so on that basis, the defense has
not established that the no-contacts rule applied.

         But for a second, let's assume that it did.  There is
an independent basis for denying this motion.  That is because,
since *Hammad* was decided in 1988 and there was a suppression
remedy discussed in that opinion, it's rarely if ever been
applied.  And we cite an EDNY case from this year sort of
recounting the history of that.  And certainly, in order to be

J6RAHERAps

1   entitled to a suppression, I believe what would be necessary --

2   and it's their burden -- is to establish bad faith by us.  Not

3   by Special Agent Gonzalez.  By us.  And there is none of that

4   in the record.  And to the contrary, defense counsel started by

5   saying, essentially, that they weren't arguing that there had

6   been bad faith.  And because of that, even assuming that the

7   rule applied, this motion should be denied.

8           Now if I could, I'd like to get into some of the

9   factual assertions that counsel just made.  One of the

10  questions presented was, what was the rush.  First and

11  foremost, that is an irrelevant question, because from our

12  perspective, the interview was lawful and appropriate because

13  the defendant had said that he was not represented.  But there

14  were valid law enforcement interests to interview this man at

15  the time, and the agents were entitled and we were entitled to

16  pursue that option, as long as we complied with our ethical

17  duties in the Constitution.  And they included the fact that

18  the defendant was in a position to cooperate proactively before

19  his arrest could become public.  He said that he wanted to do

20  that.  And there's nothing untoward about the DEA taking

21  defendant up on that, when he's the one asserting -- and this

22  is, again, in the fixed record, in his report, in Special Agent

23  Gonzalez's report -- that that's how he wanted to proceed.

24          There was a series of questions at the beginning of

25  defense counsel's presentation.  The next one was, essentially,

J6RAHERAps

1    why wasn't there more effort to get in touch with Mr. Retureta.

2    We instructed Special Agent Gonzalez to try and get in touch

3    with Mr. Retureta to honor the request that the defendant made,

4    which is reflected in paragraph 5 of the report, to try and

5    give him a call.  That was a courtesy.  It wasn't required.  We

6    weren't required to get in touch with him.  Some arguments have

7    been made about the phone number that Special Agent Gonzalez

8    used.  That phone number, Judge, is the number that the

9    defendant had in his phone for Mr. Retureta.  Nothing, nothing

10    was required.  What was done was a courtesy, and to the extent

11    that's relevant at all, the calls to Mr. Retureta established

12    that there was no bad faith here and therefore no suppression

13    would be appropriate.

14          Another argument that's been made deals with

15    transmission of the indictment by the U.S. Attorney's Office to

16    Mr. Retureta on Saturday the 24th following the arrest.  The

17    indictment was not sealed at that time, Judge.  We are familiar

18    with Rule 6(e).  There was an order entered by Judge Pitman

19    dated November 21st, 2018, so two days before the arrest, that

20    unsealed the indictment effective upon the defendant's arrest.

21    For whatever reason, Judge, and we're not sure what it is, that

22    order was not docketed, so if I could, I would hand a copy to

23    counsel and to the defendant.

24          THE COURT:  If you would.

25          MR. BOVE:  The e-mail to Mr. Retureta transmitting the

J6RAHERAps

indictment was a government employee sending a public document

to a lawyer who expressed interest on behalf of a defendant.

It certainly wasn't a concession on our part that Mr. Retureta

represented the defendant on a Saturday after the arrest.  And

it was entirely consistent with our view that Mr. Retureta was

simply trying to develop business.  He wanted to be retained

and he wanted to be involved in that case.

        If Mr. Retureta had submitted a declaration in

connection with the defense reply, it really doesn't do much

more than authenticate the documents that the defense submitted

in connection with the opening motion papers.  We've set out

those facts, they're in the record, about the contacts that we

had.  And what Mr. Retureta failed to do is explain why it is

that on a Saturday after the arrest he e-mailed Special Agent

Gonzalez and thanked him for his professionalism.  We've made

this point in our papers.  It bears repeating.  If the types of

ethical misconduct that have been alleged in these motion

papers had occurred, there is no way that that would have been

Mr. Retureta's reaction.

        We think the fact that he wasn't retained as of -- he

wasn't representing the defendant as of November 23rd is

further supported by the fact that he e-mailed us later that

afternoon, around 4 p.m. -- and this is, I think, in Exhibit F.

The praise of Special Agent Gonzalez's professionalism is in

Exhibit E.  The e-mail that I am now going to describe is

J6RAHERAps

Exhibit F to my declaration, where Mr. Retureta said, I'm going to instruct the Bureau of Prisons not to allow any other defense attorneys to attempt to visit the defendant.

When we received that e-mail -- maybe it went to Mr. Laroche first and it was sent to me -- that was a pretty extraordinary position, from our perspective, to have a defense lawyer seeking to block other attorneys from meeting with the defendant. And we think it's probative of the fact that he knew there would be other attorneys interested in this representation, he didn't represent the defendant, and he wanted to take that up after he learned of the arrest.

Now, defense counsel just made some references to the fact that this temporary notice of appearance that was filed the Monday following the arrest in the Southern District of Florida in connection with Rule 5(c)(3) proceedings there, and I think defense counsel's representation was that that happens all the time because that's how this is done.

THE COURT: So what do you do with the November 23, 2:53 p.m. e-mail from Mr. Retureta to Mr. Laroche, "Hello, Matt, I understand Tony Hernandez has been arrested in Miami, please note that I continue to represent him. Please make any necessary inquiries through me, as he does not wish to speak without defense counsel present. Is he detained in Miami, or is he being transported to New York? Thank you. Manny."

MR. BOVE: What we made of that, Judge, was that

J6RAHERAps

1    Mr. Retureta was trying to insert himself as representing the

2    defendant.  And keep in mind, what the defendant said on tape

3    was that, I haven't spoken to this man in over a year, the last

4    time I spoke to him --

5            THE COURT:  What questioning of the defendant took

6    place after that e-mail on November 23rd?

7            MR. BOVE:  None.  The interview was complete.  But

8    even -- so I think that's dispositive.  But this was not to us

9    demonstrative that he had represented him at any point, and I

10   don't think it should be taken as evidence of that now.

11   Defense lawyers routinely contact us, after someone has been

12   arrested, to try and stop lawful post-arrest interviews, and

13   before counsel has been appointed or appeared on behalf of a

14   defendant and been able to establish that they do in fact have

15   that relationship, this does not, would not have set up a bar

16   to us proceeding with the interview.

17           Getting back to this temporary notice of appearance,

18   Mr. Retureta sent an e-mail to Mr. Laroche at about 4 o'clock

19   on Saturday, the afternoon of the arrest, where, again, he

20   says, "I'm going to take steps to bar other the attorneys."

21   And here's the quote, that he's trying to prevent, "Publicity

22   will bring out attorneys hoping to secure representation of

23   Tony."  "Secure," present tense, as in, as of Saturday,

24   November 24th, at 4:38 p.m., Mr. Retureta still is not

25   comfortable that he represents the defendant.

J6RAHERAps

1           What happens on Monday is, he goes to court and he

2    appears on behalf of the defendant.  He enters a temporary

3    notice of appearance.  It's on our docket sheet, I think, at

4    docket entry 17.  And so this is an appearance just for

5    purposes of the Rule 5(c)(3).  That's probative of the fact

6    that defendant still had not retained Mr. Retureta for all

7    purposes.

8           And it is not the case that that always happens in the

9    Southern District of Florida.  I participated in a Rule 5(c)(3)

10   presentment in October of last year in the Southern District of

11   Florida.  It was docketed down there 18-mj-03581.  The case is

12   now before Judge Rakoff at docket 18-cr-820.  And in that case,

13   defense counsel, retained defense counsel, entered a notice of

14   appearance, for all purposes on behalf of that defendant.

15          So it's just not true that as a matter of course

16   attorneys enter these limited notices of appearance.  And I

17   think the inference that the government is entitled to is that,

18   in that situation, Mr. Retureta entered that notice of

19   appearance consistent with the e-mail on Saturday afternoon

20   knowing that he hadn't been retained as of that time.

21          And why does this matter?  All getting back to the

22   point of, at 10 a.m., on November 23rd, 2018, we do not believe

23   Mr. Retureta represented defendant; the defendant on tape said

24   he did not believe that Mr. Retureta represented him; and then

25   everything that happened after that supports the conclusion

J6RAHERAps

1    that we were right in our instincts.

2           That both goes to the no-contacts rule not applying at

3    all, but also the lack of a suppression remedy for the facts

4    here, because the entire record shows that we were reasonable

5    about this and acted in good faith the entire time.

6           I'm happy to address any other questions from the

7    Court, but I don't have anything else to add.

8           THE COURT:  Thank you.  One moment, please.

9           I'll give you a brief reply if you'd like.

10          MR. TEIN:  Just two quick issues.  Thank you, your

11   Honor.

12          I think it's very clear we didn't abandon our Fifth

13   and Sixth Amendment arguments.  Those are embodied in the

14   no-contact rule.  We briefed that very clearly in our brief.

15          The only other issue that needs to be addressed that

16   was not addressed in our brief is this newly produced order,

17   which is also of no moment, because if there really were an

18   issue in their mind of whether Mr. Hernandez was represented by

19   Retureta, your Honor just heard, they don't even want to

20   hear -- they do not even want us to have access to certain

21   evidence before trial because they have convinced -- because

22   they've taken the position, which has been accepted, that there

23   is all this danger in the case.  And so the fact that

24   Mr. Laroche did transmit the indictment the very next day upon

25   request of Mr. Retureta is a significant fact, we believe.

J6RAHERAps

1          THE COURT:  Thank you.

2          Mr. Hernandez has moved to suppress the November 23,

3     2018 post-arrest statements that were made.  There is no

4     question that, in October 2016, Assistant United States

5     Attorney Matthew Laroche and DEA Agents Papadopoulos and Fragga

6     coordinated and conducted a proffer session with Mr. Hernandez

7     through his lawyer, Manuel Retureta.

8          In May of 2017, Retureta and Laroche communicated

9     about Hernandez, and in October 2017, Retureta communicated

10    with DEA Agent Fragga, but there is no basis to conclude that

11    either of the assistant United States attorneys were aware of

12    the October 2017 communication.

13         On November 20, 2018, Hernandez was indicted by a

14    grand jury, and on November 23 was arrested at Miami

15    International airport.  After the arrest, Agents Papadopoulos

16    and Gonzalez brought him to an office in the airport, and there

17    was a question about, apparently, Hernandez stated that he

18    wanted to cooperate and that, quote, he told his lawyer over a

19    year ago that he wanted to cooperate, and he, the lawyer, told

20    Hernandez that he would speak with the prosecutors but never

21    notified Hernandez.  Gonzalez asked if Hernandez presently had

22    a lawyer, to which Hernandez responded, he, quote, had not

23    spoken to Manny in over a year but would like to call him

24    first.

25         There were communications between the agents and the

J6RAHERAps

assistant United States attorneys in New York, and they
initially gave a red light, a stop, to any communications.  At
some point in this chronology, Gonzalez called Retureta's
cellphone twice with no answer.  And after the assistants
indicated to the agents that they should not proceed, Gonzalez
told Hernandez that he was going to be processed and taken to
jail without an interview and without being asked a question,
Hernandez stated, quote, that he wanted to speak with agents at
this moment and start cooperating.  And Gonzalez asked
Hernandez, again, the Court assumes, with input from the
assistant United States attorneys, whether he presently had
legal representation, and Hernandez stated that he did not
know.  Gonzalez informed Hernandez that if he had an attorney
and wanted to consult with this attorney prior to cooperating,
that he was entitled to that, and if he wanted to speak to
agents and begin cooperating, that he would be advised of his
rights and would need to agree to this voluntary participation
in a recorded interview.

It was then that Hernandez was taken from what sounds
like the Customs and Border Patrol area to a different office
in the airport, and a video interview took place.  One of the
agents said, "I want to repeat here what you told me earlier,
that you wish to proceed and make a statement and talk with us.
You do not have legal representation today, now, huh?  You will
be talking to a lawyer in the future, but you wish to start

J6RAHERAps

this process now." Hernandez responded, "That's right. I want
to start." And the agent said, "We called Mr. Retureta several
times but he did not answer, but do you still wish to go
ahead?" He said, "I do." Hernandez was then read his *Miranda*
rights and signed a written waiver of those rights. He
verbally, orally confirmed that he had not been pressured or
threatened and that the conversation was totally voluntary.

        The agent, referring back to October 2016, said, "I
know you said earlier that you came to talk to us over a year
ago." Hernandez responded, "Yes, a year and a half or two ago,
I don't know, something like that." The agent said, "I believe
that you said something about your wishing to start this
cooperation process since some time ago." Hernandez said,
"Yes. What I was discussing with attorney Retureta was that I
was prepared to come over here in case you all wanted to
continue having some clarification or for me to continue
answering questions from all of you. And at that time, while
the lawyer told me, quote, let's wait, they will let us know,
and then time went by, I lost touch with the lawyer, and what
happened today happened." The agent inquired, "When was the
last time that you spoke with the lawyer?" Hernandez said, "I
think it was one year ago." The agent inquired, "One year
ago?" Hernandez said, "Yes," and something else that was
unintelligible. The agent then asked, "Then he is not your
lawyer today until you talk to him again?" And Hernandez

J6RAHERAps

responded, "Until I talk to him again.  He is the one who was

handling the matter first."  The agent said, "Aha."  Hernandez

said, "But I have lost touch with him.  Let's hope that he will

join the process."  And the agent said, "As I told you, you can

add a lawyer to the process at any time."  Hernandez said,

"Yes."

          And at the end of the interview, the agent said, "You

confirmed that you didn't have a lawyer.  You were thinking of

calling a lawyer to consult, to look for a lawyer, but at this

time you do not have a lawyer," to which Hernandez responded,

"I do not."

          Now, the defendant asserts that the post-arrest

interviews should be suppressed because they were taken in

violation of Rule of professional conduct 4.2(a), the

no-contact rule, and the Fifth and Sixth Amendment.  They argue

that an attorney, Manuel Retureta, during the post-arrest

interview, and -- that Hernandez had an attorney during the

interview and that the DEA agents knew that he had a lawyer

based on the earlier proffer session that was October 2016 or

so.  And defendants assert that the statements should be

suppressed.

          Let me begin by addressing *United States v. Hammad*, a

1988 decision written by Circuit Judge Irving Kaufman.  It was

a decision that applied the Model Code of Professional

Responsibility.  And the court said that a court could suppress

J6RAHERAps

1    a statement for a violation of this provision of the model

2    code, but went on to say, We have confidence that district

3    courts will exercise their discretion cautiously and with clear

4    cognizance that suppression imposes a barrier between the

5    finder of fact and the discovery of truth.  That's from *Hammad*.

6    Exclusion is not required in every case.  And it's also been

7    said that suppression of evidence is an extreme remedy that may

8    impede legitimate investigatory activities.

9         Well, much has happened since 1988.  The ABA no longer

10   follows the model code.  They have adopted the Model Rules of

11   Professional Responsibility.  The Model Rules of Professional

12   Responsibility are in place and in force in the following

13   number of jurisdictions, in their entirety:  Zero.  There's no

14   state that has wholesale adopted them.  New York adopted the

15   model rules in 2009.  And this court adopted them as a basis

16   for professional discipline in Local Civil Rule 1.5(b)(5),

17   quote, absent significant federal interests.

18        But there is an important point to be made under the

19   rule as it is in existence in New York today.  Rule 4.2(a)

20   provides, "In representing a client, a lawyer shall not

21   communicate or cause another to communicate about the subject

22   of the representation with a party the lawyer knows to be

23   represented by another lawyer in the matter unless the lawyer

24   has the prior consent of the other lawyer or is authorized to

25   do so by law."  Well, one might read that and say, well, that

J6RAHERAps

means something like "knew" or "should have known" or "had a
reasonable cause to believe," that's what "know" means.  But
that question is resolved in Rule 1.0(k) of the Rules of
Professional Conduct, which I will read.  "'Knowingly,'
'known,' 'know,' or 'knows' denotes actual knowledge of the
fact in question.  A person's knowledge may be inferred from
circumstances."  So it's quite intentional that it uses the
word "know."  In fact, in the definitions, under definition
1.0(r), there is a provision for "reasonable belief," or
"reasonably believes," and, when used in reference to a lawyer,
denotes that the lawyer believes the matter in question and
that the circumstances are such that the belief is reasonable.
It also provides in 1.S that "'reasonably should know,' when
used in reference to a lawyer, denotes that a lawyer of
reasonable prudence and competence would ascertain the matter
in question."  But 4.2(a) does not speak of "reasonable belief"
or "reasonably should know."  It speaks of "knowing."  And that
denotes actual knowledge of the fact in question.

          Now, this is not gamesmanship here on the part of the
assistant United States attorneys.  I accept as the record here
that they knew, in the sense of 1.0(k), 23 months before, that
Retureta represented Hernandez.  It was somewhat more
ambiguous, but I accept for these purposes that they knew a
year and a half before, although that is disputed by the
government in terms of their actual knowledge; it could be a

J6RAHERAps

1   lawyer fishing around.  But the government acted with caution,

2   based on the representations made by the government here in

3   open court, and therefore I conclude there was no violation of

4   4.2(a) on the record.

5            Now, in *Edwards v. Arizona*, the Supreme Court said,

6   "When an accused has invoked his right to have counsel present

7   during a custodial interrogation, a valid waiver of that right

8   cannot be established by showing only that he responded to

9   further police-initiated custodial interrogation, even if he

10  has been advised of his rights.  An accused having expressed

11  his desire to deal with the police only through counsel is not

12  subject to further interrogation by the authorities until

13  counsel has been made available to him unless the accused

14  himself initiates further communication, exchanges, or

15  conversations with the police."  That's *Edwards* at 451 U.S.

16  484-485.  And, here, I do not see an express unambiguous

17  invocation of the right to counsel.  Here there was a knowing,

18  voluntary, and intelligent waiver of *Miranda*.  There was no

19  unambiguous invocation in a *Miranda* sense.  And even at that,

20  the defendant indicated that he wanted to speak with the

21  agents.  You will recall that, based on the red light from the

22  assistant United States attorneys, he was told that he was

23  going to be processed and taken to jail without an interview,

24  and, without being asked a question, he stated, quote, that he

25  wanted to speak with agents at this moment and start

J6RAHERAps

1      cooperating.

2              So I find there is no basis to suppress under the

3      no-contact rule.  I find there is no basis to suppress under

4      *Miranda*.  And with regard to the Sixth Amendment, the Sixth

5      Amendment right to counsel, which does attach at critical

6      stages of the criminal proceeding, which includes post-

7      indictment interrogations, may be waived.  The Sixth Amendment

8      right to counsel may be waived by a defendant, so long as the

9      relinquishment of the right is voluntary, knowing, and

10     intelligent.  And the defendant may waive the right whether or

11     not he is already represented by counsel.  The decision to

12     waive need not be itself counseled.  And that's the *Montejo*

13     case, *Montejo v. Louisiana*, 566 U.S. 778 (2009).

14             *Montejo* also says that when a defendant is read its

15     *Miranda* rights, which include the right to have counsel present

16     during interrogation, and agrees to waive those rights, that

17     typically -- and those are rights that have their source in the

18     Fifth Amendment, as a general matter -- an accused who is

19     admonished with these warnings under *Miranda* has been

20     sufficiently apprised of the nature of his Sixth Amendment

21     rights and of the consequence of abandoning those rights, that

22     his waiver on that basis will be considered a knowing and

23     intelligent one.

24             So the Court concludes on this record that there is no

25     basis to suppress the statements of November 23, 2018 under

J6RAHERAps

1   Rule 4.2(a), which for the purpose of this discussion I assume

2   applies here, the Fifth Amendment to the Constitution, or the

3   Sixth Amendment to the Constitution.

4           Let me inquire of the government, have I set a

5   schedule on 3500 material, on 404(b) evidence, on further

6   proceedings in this case?

7           MR. BOVE:  Yes, your Honor.

8           THE COURT:  All right.  Is there anything further from

9   the government?

10          MR. BOVE:  No, your Honor.  Thank you.

11          THE COURT:  Anything further from the defendant?

12          MR. MALONE:  Judge, I just want to flag one issue, and

13  it may be in accordance with the schedule previously set by the

14  Court.  The government, two days ago maybe, before we came up

15  to New York, provided defense counsel with some expert

16  disclosures, as well as some additional evidence of ledgers or

17  related material, not addressing the ledgers part -- I can deal

18  with that -- the expert part, which, the government purports to

19  introduce an expert regarding drug trafficking routes, which we

20  would have an objection to.  They want to introduce testimony

21  of an expert as relates to what's referred to as, quote,

22  Honduras and Honduras policies.  I'm not trying to argue that

23  motion or that issue today.  I haven't seen any of the relative

24  background on that.  I wanted to flag the issue so that we

25  address it at the appropriate time before trial and it doesn't

J6RAHERAps

1    interfere with our schedule.

2              THE COURT:  Thank you.  There is a schedule for

3    defendant's motions in limine.  So you're welcome to make the

4    motion at that time.

5              MR. MALONE:  OK.  Thank you, Judge.

6              THE COURT:  All right.

7              MR. MALONE:  Nothing else from the defense, your

8    Honor.

9              THE COURT:  OK.  I want to commend all the

10   participants in today's hearing for the very thoughtful and

11   clear presentations in the written briefing and also in the

12   presentations today.  It's a pleasure to have good attorneys

13   making the arguments and presenting the issues.  So thank you

14   all.

15             MR. MALONE:  Thank you, Judge.

16             MR. TEIN:  Thank you.

17             (Adjourned)

18

19

20

21

22

23

24

25