UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br> - v. - <br><br>JUAN ANTONIO HERNÁNDEZ ALVARADO,<br>      a/k/a "Tony Hernández,"<br><br>                    Defendant. | S2 15 Cr. 379 (PKC) |

## THE GOVERNMENT'S MOTIONS *IN LIMINE*

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
One Saint Andrew's Plaza
New York, New York 10007

Emil J. Bove III
Amanda L. Houle
Matthew J. Laroche
Jason A. Richman
Assistant United States Attorneys
      *Of Counsel*

## TABLE OF CONTENTS

BACKGROUND .......................................................................................................... 2

  I. The Defendant Starts Providing Drug Traffickers with Law Enforcement Information ........ 3

  II. The Defendant Engages in Drug Trafficking Under the Protection of
  National Party Leaders......................................................................................... 4

  III. The Defendant Expresses Confidence That He Would Not Be Extradited and
  Prepares to Fill His Brother's Congressional Seat.................................................. 7

  IV. The Defendant Works with a Honduran Official to Transport Cocaine and the
  Official Uses $1.5 Million in Drug Proceeds to Support CC-4's Presidential Campaign.......... 8

  V. The Defendant is Elevated in the Honduran Congress and Meets with the Leader of a
  Violent Drug-Trafficking Organization...................................................................... 9

  VI. The Defendant Travels to the United States to Lie About His Crimes ............................ 10

  VII. The Defendant's Brother Protects and Monitors One of the Defendant's
  Co-Conspirators.................................................................................................. 11

  VIII. The Defendant Engages in Drug-Related Murders......................................................... 12

    A. The 2011 Murder of a Drug Trafficker in the Copán Department................................... 12

    B. The 2013 Murder of a Drug Trafficker in the Colón Department.................................. 13

ARGUMENT .............................................................................................................. 14

  I. Evidence of Narcotics-Related Corruption Is Admissible as
  Direct Evidence and Pursuant to Rule 404(b) ........................................................... 14

    A. Applicable Law ............................................................................................ 14

      1. Direct Evidence of the Defendant's Guilt............................................................ 14

      2. Other Acts Evidence Pursuant to Rule 404(b)......................................................... 15

    B. Discussion ............................................................................................ 15

  II. Evidence of Statements by Honduran Officials to CW-3 is Admissible
  Under the Hearsay Rules ................................................................................... 18

    A. Relevant Statements.................................................................................. 19

    B. Applicable Law ....................................................................................... 19

      1. Rule 801(d)(2)(E): Co-Conspirator Statements .......................................................... 19

      2. Rule 804(b)(3): Statements Against Interest................................................................. 20

    C. Discussion .......................................................................................... 22

      1. The Statements Are Admissible Pursuant to Rule 801(d)(2)(E) ................................... 22

      2. The Statements Are Admissible Pursuant to Rule 804(b)(3)........................................ 25

  III. Evidence of Statements by a Member of the Honduran National Police to CW-4 is
  Admissible Under the Hearsay Rules ...................................................................... 26

A. Factual Background ................................................................................................. 26

B. Relevant Statements ............................................................................................... 28

C. Discussion ............................................................................................................. 29

   1. The Statements Are Admissible Pursuant to Rule 801(d)(2)(E) ................................. 29

   2. The Statements Are Admissible Pursuant to Rule 804(b)(3)...................................... 31

IV. Evidence of the Defendant's Participation in Two Drug-Related Murders Is Admissible ........................................................................................................ 31

A. Relevant Facts ....................................................................................................... 31

B. Discussion ............................................................................................................. 32

V. Evidence of Statements by a Honduran Drug Trafficker to CW-5 is Admissible Under the Hearsay Rules .............................................................................. 34

A. Factual Background ............................................................................................... 35

B. Relevant Statements ............................................................................................... 36

C. Discussion ............................................................................................................. 36

   1. The Statements Are Admissible Pursuant to Rule 801(d)(2)(E) ................................. 36

   2. The Statements Are Admissible Pursuant to Rule 804(b)(3)...................................... 37

VI. Electronic Communications by Central American Drug Traffickers Regarding Cocaine Bearing the Defendant's Initials Are Admissible ......................................... 38

A. Relevant Facts ....................................................................................................... 38

B. Discussion ............................................................................................................. 39

   1. The Messages Are Admissible Pursuant to Rule 801(d)(2)(E) ................................... 39

   2. The Messages Are Admissible Pursuant to Rule 804(b)(3)....................................... 42

CONCLUSION.......................................................................................................... 44

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| - v. - | S2 15 Cr. 379 (PKC) |
| JUAN ANTONIO HERNÁNDEZ ALVARADO, a/k/a "Tony Hernández," | |
| Defendant. | |

The Government respectfully submits this memorandum in support of motions *in limine*

seeking the following rulings with respect to the upcoming trial of the defendant:[1]

1. Evidence of narcotics-related corruption, including the use of drug proceeds to fund political campaigns and bribes to politicians and law enforcement, is admissible as direct evidence and pursuant to Rule 404(b);

2. Testimony regarding statements by Honduran politicians who were co-conspirators of the defendant is admissible under Rules 801(d)(2)(E) and 804(b)(3);

3. Testimony regarding statements by a high-ranking member of the Honduran National Police who was a co-conspirator of the defendant is admissible under Rules 801(d)(2)(E) and 804(b)(3);

4. Evidence of the defendant's participation in two drug-related murders is admissible as direct evidence and pursuant to Rule 404(b);

5. Testimony regarding statements by a former drug trafficker who was a co-conspirator of the defendant is admissible under Rules 801(d)(2)(E) and 804(b)(3); and

6. Electronic communications by Central American drug traffickers regarding cocaine bearing a stamp with the defendant's initials is admissible pursuant to Rules 801(d)(2)(E) and 804(b)(3).

---

[1] Similar to the Government's consolidated opposition to the defendant's three pretrial motions, the Government is submitting a single consolidated memorandum in support of its six motions *in limine*.

# BACKGROUND[2]

The defendant worked with other violent, large-scale drug traffickers to distribute and import into the United States thousands of kilograms of cocaine.  In order to do so, the defendant and his co-conspirators relied on protection from high-ranking Honduran officials, obtained sensitive information from military and law enforcement sources that they used to plan drug shipments, and employed heavily armed security teams that included members of the Honduran National Police to protect and escort their cocaine.  The defendant and his co-conspirators engaged in this conduct in order to enrich themselves; to fund campaigns by candidates from the *Partido Nacional de Honduras* (the "National Party"), including but not limited to presidential elections in 2009 and 2013; and to maintain and enhance their power and political positions in Honduras. As a result, by 2014, the defendant was not only a violent, multi-ton drug trafficker, but also a Honduran congressman.

Based on the wealth and power that the defendant's prolonged criminal conduct afforded him in Honduras, he believed that he could operate with total impunity.  And he was right to some extent, at least in his own country.  Multiple witnesses will testify about the defendant's personal cocaine stamp.  He once described a particular brand of pistol as a "cop killer" and bragged about owning a belt-fed machinegun that could penetrate armored vehicles.  In approximately 2010, a

---

[2] The Government respectfully submits that all of the testimony and other evidence described in this brief, including with respect to acts of violence, is admissible as direct evidence of the crimes charged.  The Government hereby provides notice that it also intends to offer this evidence, in the alternative, pursuant to Rule 404(b).  The Government plans to continue to meet with potential witnesses between now and the trial, and will supplement this notice as necessary should the Government learn of additional acts of violence involving the defendant or other Rule 404(b) evidence.

Honduran President described below helped deploy military personnel to the Honduras-Guatemala border in order to deter efforts by a Guatemalan trafficker to encroach on drug-trafficking territory in western Honduras used by the defendant and his co-conspirators.  On at least two occasions between approximately 2011 and 2013, the defendant helped arrange murders of drug-trafficking rivals.  In one of those incidents, the defendant relied on a member of the Honduran National Police, who later became the chief of the entire police force, to execute the killing.  Finally, notwithstanding an egregious course of conduct that lasted over a decade, the defendant traveled to the United States in October 2016 and lied—brazenly and categorically—about his drug-trafficking connections.

The Government will establish these facts at trial through testimony from at least five of the defendant's former co-conspirators, law enforcement testimony regarding the October 2016 proffer and the defendant's November 2018 arrest, the defendant's post-arrest statement, evidence seized in connection with his arrest (including data from his phones), and expert testimony regarding drug-trafficking patterns, the relevant history and structure of the Honduran political system, and features of the weapons used by the defendant and his co-conspirators.

## I.  The Defendant Starts Providing Drug Traffickers with Law Enforcement Information

By approximately 2004, the defendant forged relationships with drug traffickers operating in western Honduras and elsewhere, including Hector Emilio Fernandez Rosa[3] and former traffickers who will testify at trial ("CW-1" and "CW-2").  In exchange for payments, the

---

[3] On August 2, 2019, Judge Sullivan sentenced Fernandez Rosa to life imprisonment following his guilty plea to participating in a conspiracy to distribute and possess with intent to distribute controlled substances, which involved 135 tons of cocaine and 20 tons of ephedrine.

defendant leveraged his family's power in the area by providing information about law enforcement activities and operations so that the traffickers could transport cocaine through Honduras without incident.

In approximately 2006, the defendant started to establish connections to Colombian drug traffickers with access to cocaine-production facilities, including ██████████████████ ██████████████████ ("CC-1"), and additional traffickers in Honduras such as ████████████ ████████████████████ ("CC-2").[4]  The defendant worked with CC-1, CC-2 and others to receive large cocaine shipments in Honduras via air and maritime routes, which other co-conspirators transported to the United States.  During the course of these activities, the defendant continued to access law-enforcement information to ensure safe passage of the shipments, and he relied on his political access to facilitate these activities.  For example, in approximately 2007, CW-1 asked the defendant to prevent the transfers of co-conspirators in the Honduran National Police to other parts of Honduras because CW-1 wanted to continue using them in drug shipments with the defendant.  The defendant successfully intervened and kept the officers assigned to locations that benefitted their drug-trafficking operations.

## II.  The Defendant Engages in Drug Trafficking Under the Protection of National Party Leaders

In approximately 2008, the defendant also started to work on shipments with, among others, CC-1, CW-2, and members of the Honduran *Los Valles* cartel,[5] which had a base of

---

[4] Attached as Exhibit A is a chart identifying the names of the co-conspirators referred to in this memorandum using the convention "CC-[number]."  The Government respectfully requests that Exhibit A be maintained under seal until after the trial.

[5] Cooperating witnesses will confirm at trial that the *Los Valles* group was "one of the most prolific Central American narcotics trafficking organizations," which earned that reputation through a

operations in the Copán Department in western Honduras.  In approximately the same year, the defendant started to talk to a Honduran official ("CW-3")—who was also a large-scale drug trafficker operating in western Honduras—about working together in drug trafficking if the National Party was successful in elections scheduled to take place in late 2009.  The defendant and CW-3 were both members of the National Party.  At the time of the defendant's preliminary conversations with CW-3, ███████████ ("CC-3"), then a National Party congressman representing the Olancho Department, was starting a campaign for the Honduran presidency.  The defendant's brother, ████████████████ ("CC-4"), was beginning to pursue reelection as a National Party congressman representing the Lempira Department.  The defendant told CW-3 that they could form a particularly successful partnership based on protection from CC-3 and CC-4 if they won in the 2009 elections, and that he believed CC-4 would succeed CC-3 as the President of Honduras and continue to protect them.

In approximately 2009, while the defendant continued to participate in large drug shipments with Fernandez Rosa, CC-1, CW-1, CW-2, and others, CW-3 met in private with CC-3 during CC-3's presidential campaign.  During the meeting, CC-3 asked CW-3 for financial and logistical support for the National Party campaigns of CC-3 and CC-4.  CW-3 promised to give CC-3 $2 million and other support in exchange for, among other benefits:  (i) protection from prosecutors and law enforcement who might investigate CW-3's drug-trafficking activities, and (ii) a political appointment for one of CW-3's relatives.  After the meeting, CW-3 sent $1 million

---

"combination of brutal violence and public corruption," including activities involving the defendant.  OFAC, *Treasury Targets Honduran Drug Trafficking Organization and Its Network* (Aug. 20, 2014), https://www.treasury.gov/press-center/press-releases/Pages/jl2611.aspx.

in drug proceeds to CC-3's residence in Tegucigalpa, Honduras.  Following the first payment, CW-3 met with CC-3 and CC-4, the defendant's brother.  CC-3 confirmed receipt of the first payment and that he would appoint CW-3's relative if the National Party campaigns were successful.  Based on these assurances, in the presence of CC-4, CW-3 sent another $1 million in drug proceeds to CC-3's residence.

During the summer of 2009, the sitting Honduran President was removed from office following a coup d'état.  After the coup, the defendant met with CW-3 to discuss the situation.  The defendant indicated that the coup had improved the chances that CC-3 and CC-4 would win in the elections later that year, and reiterated his interest in a drug-trafficking partnership.  The defendant confirmed that he had connections to one or more Colombian drug traffickers, *i.e.*, CC-1, and asked questions about CW-3's methods for securing and transporting cocaine.

CC-3 won the post-coup presidential election in late 2009.  Following the election, CC-4 told CW-3 that CC-4 was seeking to become the President of the Honduran Congress, and asked for assistance obtaining votes from other Honduran congressmen.  CW-3 agreed to help and bribed the congressmen.  CC-4 later thanked CW-3 for the assistance and told CW-3 that, as promised, CW-3 would be protected from prosecution and law enforcement targeting.

In approximately 2010, CC-4 was named President of the Congress, and the defendant finalized his drug-trafficking partnership with CW-3.  The defendant explained that members of the *Los Valles* cartel had introduced him to Colombian cocaine suppliers, and that he wanted to receive some cocaine shipments in Honduras without assistance from *Los Valles*.  The defendant and CW-3 agreed to receive the shipments in eastern Honduras, in the Mosquitia region or the Colón Department on the Atlantic coast, and then transport the drugs toward the Honduras-

Guatemala border using helicopters and/or trucks.  The defendant assured CW-3 that the cocaine-laden vehicles would not be interdicted because of his access to the police and radar information.

Following the meeting, between approximately 2010 and approximately 2012—in addition to other drug shipments with other co-conspirators—the defendant and CW-3 worked together once or twice a month on cocaine shipments that typically consisted of several hundred kilograms. During the course of those drug shipments, the defendant confirmed that some of the cocaine produced in Colombia bore a stamp with his initials, "TH."  The defendant also explained that he operated a separate facility in the Lempira Department where there were additional presses to mark kilograms.

In approximately 2011, CW-3 suggested to the defendant that they kill a member of the Honduran National Police because CW-3 thought the officer was collecting information about their drug movements in contemplation of robbing them.  The defendant responded that the murder was not necessary because the defendant could use his connections within the police force to have the officer transferred—similar to the assistance the defendant provided previously to police working in drug trafficking for the defendant and CW-1.  CW-3 agreed that they should pursue that course of action, and the officer was later transferred away from the area where the drug shipments were being transported.

## III.   The Defendant Expresses Confidence That He Would Not Be Extradited and Prepares to Fill His Brother's Congressional Seat

In January 2012, the Honduran Congress—still led by CC-4—passed legislation authorizing the extradition of Honduran nationals to face drug-trafficking charges in the United States.  The defendant told CW-3 that the legislation was enacted in response to diplomatic pressure that the United States applied to CC-3 and CC-4.  The defendant also indicated that he

was confident that he would not be extradited.  When CW-3 asked about his own prospects, the defendant expressed less confidence but promised that CW-3 would at least be protected within Honduras.

Following the conversation regarding extradition, by approximately October 2012, the defendant commenced a National Party campaign for a *diputado suplente* position representing the Lempira Department, which is akin to being a backup or deputy to a sitting congressman.  In Lempira, the defendant campaigned with an official ("Official-1") who was seeking a congressional seat while acting as the Vice President of Honduras under CC-3.  The defendant and Official-1 actively and publicly supported the presidential campaign of CC-4.  During the period of the defendant's overt National Party campaign, between at least approximately 2012 and 2014, the defendant also "rented" helicopters to CW-3 to use to transport cocaine and drug proceeds in exchange for payments of between approximately $20,000 and $50,000 per use.

## IV.  The Defendant Works with a Honduran Official to Transport Cocaine and the Official Uses $1.5 Million in Drug Proceeds to Support CC-4's Presidential Campaign

In approximately 2013, CC-4, the defendant's brother, instructed CW-3 not to seek reelection because of media reports regarding CW-3's drug-trafficking activities.  CC-4 warned that he could not continue to protect CW-3 if he remained in office, particularly in light of extradition-related pressures.  CC-4 also asked CW-3 to support his campaign for the Honduran presidency by bribing local politicians so that they would muster support for CC-4 from their constituencies.  CW-3 agreed to pay the bribes in exchange for, among other things, continued protection and the completion of a public works project in his region.  CW-3 subsequently spent approximately $1.5 million in drug proceeds to support CC-4's presidential campaign, including by paying cash bribes to other officials and providing gifts and favors to local politicians.

CC-4 was elected President of Honduras in late 2013.  The defendant and Official-1 also prevailed in their congressional campaigns in the Lempira Department.  In 2014, members of the *Los Valles* cartel were provisionally arrested in Honduras in response to a request from the United States.  Around the time of the arrests, a high-ranking member of the Honduran National Police accused CC-4 of protecting CW-3.  The defendant told CW-3 that the officer was going to be removed due to lack of loyalty to CC-4, and the officer was subsequently removed from his position.

## V.   The Defendant is Elevated in the Honduran Congress and Meets with the Leader of a Violent Drug-Trafficking Organization

In early 2014, after CC-4 was elected President of Honduras, he appointed Official-1 to act as the Honduran Minister of Defense.  As a result, the defendant was elevated from the *diputado suplente* position to assume Official-1's vacated seat in the National Congress.

Around the same time, members of the Honduran National Police who were involved in drug trafficking set up a meeting between the defendant and a cooperating witness named Devis Leonel Maradiaga Rivera.  Maradiaga Rivera and his brother had led the *Cachiros*, a violent Colón-based drug-trafficking organization, which the U.S. Department of the Treasury sanctioned twice in 2013, as part of widely publicized actions.  Maradiaga Rivera started to cooperate with the DEA in approximately late 2013, and his meeting with the defendant was conducted at the direction of law enforcement.

The purported purpose of Maradiaga Rivera's meeting with the defendant was to discuss using the defendant's political power—including his new congressional position and connections to CC-4, the President of Honduras—to help Maradiaga Rivera recover funds that the Honduran government owed one of the *Cachiros* money-laundering front companies.  The funds were owed,

at least on paper, because Maradiaga Rivera, like CW-3, had bribed CC-3 in approximately 2009 in exchange for protection from law enforcement interference and affirmative government support that helped *Cachiros* affiliates operate under a veneer of legitimacy.   In exchange for additional kickbacks, CC-3 and his son, Fabio Lobo,[6] helped cause Honduran government entities to enter into contracts with *Cachiros* fronts relating to public works projects.  By the time CC-3 left office, however, the Honduran government still owed the *Cachiros* money.   During the defendant's meeting with Maradiaga Rivera, he reviewed some of the relevant contracts, accepted a bribe, and agreed to help Maradiaga Rivera.  Because the front company in question was subject to sanctions in the United States and investigation in Honduras, Maradiaga Rivera's associates set up a new company.   The defendant admitted in his post-arrest statement that he spoke to at least one Honduran official regarding Maradiaga Rivera's request, and the Honduran government issued payments to that company after the defendant's meeting with Maradiaga Rivera.

## VI.   The Defendant Travels to the United States to Lie About His Crimes

In October 2016, the defendant traveled to the United States and participated in a proffer in Miami that was conducted by a prosecutor from the Southern District of New York and DEA personnel.

After being warned of the consequences of lying in the presence of counsel, and upon being confronted with portions of the video of the February 2014 meeting with Maradiaga Rivera, the defendant claimed that he had never met Maradiaga Rivera.  He described some aspects of his

---

[6] In May 2016, Fabio Lobo pleaded guilty to participating in a cocaine-importation conspiracy. *See United States v. Lobo*, No. 15 Cr. 174 (LGS).  In September 2017, Judge Schofield sentenced Lobo principally to 288 months' imprisonment, a $50,000 fine, and $266,667 in forfeiture.

relationships with Fernandez Rosa, co-defendant Mario José Cálix Hernandez, a member of the *Valles* cartel named Héctor Velásquez Torres, a/k/a "Toño Frontera," and others. The defendant admitted to knowing that these men were involved in drug trafficking, but denied participating in those activities. The defendant also discussed his knowledge of drug-trafficking routes between South America and the United States, and that Honduras is a major transshipment point for U.S.-bound cocaine. At the end of the meeting, the defendant lied, categorically, that (i) he had never accepted money from drug traffickers for any purpose, and (ii) he had never provided assistance to drug traffickers in any way.[7]

The defendant returned to Honduras on the day of the proffer and issued a statement to the press. He declared "his personal commitment to the firm belief that no one is above the law in Honduras," referred to a similar public comment by CC-4, and notified the public that—"as a citizen who wishes to do the right thing"—he had a "voluntary meeting" with prosecutors in the United States and remained willing to "explain whatever is required."[8]

## VII.   The Defendant's Brother Protects and Monitors One of the Defendant's Co-Conspirators

In approximately 2016, CC-4 requested a meeting with CW-3. When CW-3 arrived, one of CC-4's ministers, ███████████████████████ ("CC-5") told CW-3 that CC-4 was going to remove CW-3's relative from his government position because of increasing scrutiny

---

[7] Although those two categorical lies are the basis for the false statements charge in Count Four of the Indictment, the Government intends to offer testimony relating to his other statements during the October 2016 meeting as evidence of his intent.

[8] The direct quotations of statements by the defendant set forth herein are based on draft translations from Spanish to English, which the Government will finalize and produce to the defense prior to trial.

related to drug trafficking.  CC-5 also told CW-3 that CC-4 wanted CW-3's support in connection with the upcoming presidential election.  In response, CW-3 asked if CC-4 would continue to protect CW-3.  CC-5 responded that CC-4 would do so if CW-3 supported CC-4's campaign.  CW-3 subsequently spent one million Lempira in drug proceeds to support CC-4's successful reelection campaign.

In approximately 2018, ███████████████████ ("CC-6"), a relative of the defendant who was a member of the Honduran National Police, called CW-3 regarding media reports that CW-3 was planning to surrender in the United States.  During the call, CC-6 indicated that CC-4 wanted to know if it was true that CW-3 had surrendered.  CW-3 confirmed to CC-6 that he was still in Honduras.

### VIII.  The Defendant Engages in Drug-Related Murders

#### A.  The 2011 Murder of a Drug Trafficker in the Copán Department

In approximately 2011, a drug-trafficking associate of CW-3—███████████████ ("Victim-1")—tried to block access to one of the routes to the Guatemalan border that CW-3 was using to transport cocaine shipments involving the defendant.  CW-3 told the defendant about the problem during a meeting relating to one of their shipments, expressed interest in having Victim-1 killed, and indicated that Victim-1 had also threatened a high-ranking member of the Honduran National Police named ███████████████ ("CC-7").  The defendant offered to speak to CC-7 about murdering Victim-1.  Approximately two weeks later, during a meeting relating to payments for the same drug shipment, the defendant told CW-3 that he spoke to CC-7 about the situation with Victim-1, and that CC-7 was preparing to have Victim-1 murdered by monitoring his movements in order to identify a vulnerable location for an attack.

Victim-1 was murdered in Honduras in approximately July 2011, about a month after the defendant's meeting with CW-3, in connection with an attack that killed at least three additional men and wounded a fourth.  According to media reports, CC-7 purported to investigate the incident, going so far as to call the attack "well-planned."  Approximately one week after the murder of Victim-1, the defendant met with CW-3.  During the meeting, the defendant asked CW-3 if he had read news reports about the murder, confirmed that CC-7 had coordinated the attack, and told CW-3 that CC-7's participation had been critical because Victim-1 was protected by extensive security.

### B.  The 2013 Murder of a Drug Trafficker in the Colón Department

In approximately 2013, a worker for the defendant and CW-3 named ████████████ ████████ ("Victim-2") was arrested in connection with drug-trafficking activities in the Colón Department.  CW-3 told the defendant about the arrest of Victim-2, and described Victim-2's role in their ongoing crimes.  The defendant responded that Victim-2 had access to too much information, and that they could not risk that he would cooperate with authorities.  CW-3 agreed to talk to a co-conspirator, Wilter Neptalí Blanco Ruíz,[9] about having Victim-2 murdered, which they did.  After the murder, the defendant told CW-3 on the phone that he had seen the news and they should meet in person.  During a subsequent meeting, the defendant expressed relief that Victim-2 was dead because Victim-2 knew too much about their drug-trafficking operations.

---

[9] In May 2017, Blanco Ruíz pleaded guilty in the Southern District of Florida, pursuant to a plea agreement, to participating in a cocaine-importation conspiracy.  *See United States v. Blanco*, No. 16 Cr. 20602.  In August 2017, Blanco was sentenced principally to a term of 240 months' imprisonment.

## ARGUMENT

**I.  Evidence of Narcotics-Related Corruption Is Admissible as Direct Evidence and Pursuant to Rule 404(b)**

The defendant and other Honduran officials, such as CC-3 and CC-4, relied on drug proceeds to fund National Party campaigns and other political operations, to control large swaths of the Honduran government, to bribe officials who helped ensure safe passage for their cocaine, and in an effort to protect themselves from law enforcement scrutiny in Honduras and elsewhere. Thus, evidence of narcotics-related corruption is admissible at trial, as direct evidence and pursuant to Rule 404(b), in order to establish the nature of the conspiracy and the defendant's role in it, the relationships between co-conspirators, and the defendant's motive and intent.

**A.  Applicable Law**

**1.  Direct Evidence of the Defendant's Guilt**

Relevant evidence "need only tend to prove the government's case," such as "evidence that adds context and dimension to the government's proof of the charges." *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997). Thus, background evidence is relevant and admissible, pursuant to Rule 401, where it tends "to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed." *Id.* (internal quotation marks omitted). Evidence is also admissible if it relates to conduct that: (i) "'arose out of the same transaction or series of transactions as the charged offense'"; (ii) "'is inextricably intertwined with the evidence regarding the charged offense'"; or (iii) "'is necessary to complete the story of the crime on trial.'" *United States v. Gohari*, 227 F. Supp. 3d 313, 317 (S.D.N.Y. 2017) (quoting *United States v. Robinson*, 702 F.3d 22, 36-37 (2d Cir. 2012)). "Evidence fitting within one of these three categories is considered direct evidence and Rule 404

is not applicable." *United States v. Fiumano*, No. 14 Cr. 518, 2016 WL 1629356, at *3 (S.D.N.Y. Apr. 25, 2016).

### 2.   Other Acts Evidence Pursuant to Rule 404(b)

Under Rule 404(b), courts "may allow evidence of other acts by the defendant if the evidence is relevant to an issue at trial other than the defendant's character and if the risk of unfair prejudice does not substantially outweigh the probative value of the evidence." *United States v. Ulbricht*, 79 F. Supp. 3d 466, 479 (S.D.N.Y. 2015).   "This Circuit follows the inclusionary approach, which admits all other act evidence that does not serve the sole purpose of showing the defendant's bad character and that is neither overly prejudicial under Rule 403 nor irrelevant under Rule 402." *United States v. Curley*, 639 F.3d 50, 56 (2d Cir. 2011) (internal quotation marks omitted).  In general, evidence is admissible under Rule 404(b) "if (1) it is introduced for a proper purpose, (2) it is relevant to the charged offense, (3) its prejudicial effect does not substantially outweigh its probative value and (4) is admitted with a limiting instruction if requested." *United States v. Rutkoske*, 506 F.3d 170, 176-77 (2d Cir. 2007).

### B.   Discussion

As is clear from the face of the Indictment, one of the defining characteristics of the charged drug-trafficking conspiracy and related weapons offenses is the use of drug proceeds to fund political operations for the National Party in exchange for protection of participating traffickers, including but not limited to the defendant.  The Government will establish this deeply corrupt *quid pro quo* through, *inter alia*, testimony from cooperating witnesses—including testimony regarding co-conspirator statements whose admissibility under the hearsay rules is addressed below—and campaign materials reflecting the connections between some of the members of the conspiracy.

Beginning in at least 2004, the defendant provided sensitive law enforcement information to drug traffickers, in exchange for payments, to help them with drug shipments transiting western Honduras toward Guatemala.  By that time, the defendant's brother, CC-4, had been a congressman representing the Lempira Department in western Honduras for years.  As early as 2008, the defendant—who was already participating in multi-hundred-kilogram cocaine shipments with CC-1, a Colombian drug trafficker, and the *Los Valles* cartel—expressed excitement to CW-3 about the prospects of engaging in additional large-scale drug trafficking under the protection of CC-3 and CC-4 once they ascended to leadership roles following the 2009 elections.

CW-3's payment in 2009 of $2 million in drug proceeds to CC-3—who was elected President of Honduras later that year—was based on conversations with and promises from CC-3 and CC-4, and is inextricably intertwined with the defendant's conduct because he motivated CW-3 to support the campaigns so that they could participate in drug shipments together.  Other cooperating witnesses, including Rivera Maradiaga and CW-1, will testify that they also used drug money to support CC-3's campaign in approximately 2009.  In early 2012, the defendant expressly confirmed to CW-3 that he, too, was relying on political protection from CC-3 and CC-4 during a discussion of extradition-related developments.  With his brother acting as the President of the Honduran Congress, the defendant expressed confidence to CW-3 that he would not be sent to the United States for prosecution and that CW-3 would be protected within Honduras.

CC-4 confirmed the ongoing relationship between the National Party and drug trafficking in 2013, when he asked CW-3 not to seek reelection because of media scrutiny on his ongoing criminal activity, but promised to continue to protect CW-3 once he left the public realm.  In order to secure that protection, CW-3 spent another $1.5 million in drug proceeds on efforts to muster

support for CC-4's presidential campaign in western Honduras. CC-4, like CC-3 before him, was elected President based at least in part on the proceeds of drug trafficking. In 2014, the defendant talked to CW-3 about CC-4's efforts on CW-3's behalf, explaining that a high-ranking police official was going to be removed based on his public criticism of CC-4 and CW-3. Around the same time as this conversation, the defendant—as a Honduran congressman—was providing helicopters to CW-3 to transport cocaine and drug money in exchange for between approximately $20,000 and $50,000 per use.

Thus, evidence of high-level political corruption involving the defendant, CC-3, CC-4, and other traffickers is admissible as direct proof because it is inextricably intertwined with the charged crimes and necessary to complete the story of the crime on trial. *See Gohari*, 227 F. Supp. 3d at 317. The evidence tends to explain, for example, why the co-conspirators came together, how they operated, and why there able to continue crimes of this magnitude unabated for over a decade. *See United States v. Delligatti*, No. 15 Cr. 491, 2018 WL 1033242, at *6 (S.D.N.Y. Feb. 23, 2018) ("[W]here potential evidence explains the development of the illegal relationship . . . and explains the mutual trust that existed between the coconspirators, it will be plainly admissible." (internal quotation marks omitted)); *cf. United States v. Robles*, 193 F.3d 519, 1999 WL 707902, at *7 (5th Cir. 1999) (finding evidence sufficient in drug-trafficking case where jury could infer that defendant "intend[ed] to pay bribes or otherwise provide protection to the [drug-trafficking organization] by finding out whether members of the organization were targets of police investigations"). Corruption evidence is also necessary to help the jury understand the criminal purpose underlying the defendant's February 2014 recorded meeting with Rivera Maradiaga.

In the alternative, and for similar reasons, the corruption evidence is admissible pursuant

to Rule 404(b) because it illustrates the broader criminal plan of the defendant, CC-3, CC-4, and others, to use drug trafficking to help assert power and control in Honduras, and is probative of the defendant's motive and intent in joining the conspiracy, *i.e.*, to enrich himself and his family while enhancing his power. *See United States v. Pipola*, 83 F.3d 556, 566 (2d Cir. 1996) (noting that evidence is admissible under Rule 404(b) "to explain how a criminal relationship developed" and "help the jury understand the basis for the co-conspirators' relationship of mutual trust"). Thus, evidence of narcotics-related corruption involving the defendant and his co-conspirators is relevant and has substantial probative value.

Finally, this evidence is not unduly prejudicial relative to other proof the Government expects to offer. The defendant's drug shipments traversed Honduran waters and airspace based on information from the Honduran military and police. Honduran police escorted his cocaine so that it would not be seized. The defendant, the police, and other security personnel participated in these activities while heavily armed, including at times with military-grade weapons. And these activities involved extensive violence. Accordingly, evidence of the full breadth of the corruption involved in the defendant's crimes is not barred by Rule 403.

## II. Evidence of Statements by Honduran Officials to CW-3 is Admissible Under the Hearsay Rules

Several Honduran officials talked to CW-3 regarding the membership, status, and functioning of the drug-trafficking conspiracy and their joint efforts with the defendant to increase their power in Honduras. Evidence of these statements is either not hearsay, exempted under the hearsay rules, or both, and has significant probative value for the reasons set forth above in Section I.

## A. Relevant Statements

The Government respectfully submits that the following statements, referred to below as

"Statement [number]," are admissible through testimony of CW-3:

1. In approximately 2009, CC-3 asked CW-3 for financial and logistical support for the National Party campaigns of CC-3, who was campaigning for the Honduran presidency, and CC-4, who was at that time running for reelection in the Honduran National Congress.

2. In approximately 2009, CC-3 and CC-4 confirmed to CW-3 receipt of the first $1 million and that CW-3's relative would be appointed to a political position if the National Party campaigns were successful.

3. In approximately late 2009, CC-4 asked CW-3 to help gather support for his efforts to become President of the Honduran Congress, which CW-3 did by paying bribes, and CC-4 later reiterated that CW-3 would be protected while thanking him for his efforts.

4. In approximately 2013, CC-4 instructed CW-3 not to seek reelection because of media reports regarding CW-3's drug-trafficking activities, warned that he could not continue to protect CW-3 if CW-3 remained in office, and asked CW-3 to support his campaign for the Honduran presidency by bribing local politicians.

5. In approximately 2016, CC-5, a cabinet-level minister for CC-4, told CW-3 that CC-4 was going to remove CW-3's relative from his government position because of increasing scrutiny related to drug trafficking, but indicated that CC-4 would protect CW-3 from law enforcement if CW-3 supported CC-4's reelection campaign.

6. In approximately 2018, CC-6, a member of the Honduran National Police and cousin of the defendant, called CW-3 and indicated that CC-4 wanted to know if it was true that CW-3 had surrendered.

## B. Applicable Law

### 1. Rule 801(d)(2)(E): Co-Conspirator Statements

Rule 801(d)(2)(E) of the Federal Rules of Evidence provides in relevant part that "[a]

statement is not hearsay if . . . the statement is offered against an opposing party and was made by

the party's co-conspirator during and in furtherance of the conspiracy." To admit a statement

pursuant to this Rule, the Court must find two facts by a preponderance of the evidence: *first*, that

a conspiracy that included the declarant and the defendant existed; and *second*, that the statement was made during the course and in furtherance of that conspiracy.  *Bourjaily v. United States*, 483 U.S. 171, 175 (1987).

Once a conspiracy is shown to exist, the "evidence sufficient to link another defendant to it need not be overwhelming," and "the 'in furtherance' requirement of Rule 801(d)(2)(E) is satisfied" when, for example, "a co-conspirator is apprised of the progress of the conspiracy, or when the statements are designed to induce his assistance."  *United States v. Paone*, 782 F.2d 386, 390 (2d Cir. 1986) (internal quotation marks omitted).  Statements between co-conspirators that "provide reassurance, serve to maintain trust and cohesiveness among them, or inform each other of the current status of the conspiracy," further the conspiracy, *United States v. Simmons,* 923 F.2d 934, 945 (2d Cir. 1988), as do statements "that apprise a co-conspirator of the progress of the conspiracy," *United States v. Rahme*, 813 F.2d 31, 36 (2d Cir. 1987).

### 2. Rule 804(b)(3): Statements Against Interest

Under Rule 804, if a declarant is "unavailable," there is an exception to the hearsay rule where:

> (A) a reasonable person in the declarant's position would have made [the statement] only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability; and

> (B) is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.

Fed. R. Evid. 804(b)(3).  This rule "is founded on the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements

unless they believe them to be true." *Williamson v. United States*, 512 U.S. 594, 599 (1994).

To satisfy Rule 804(b)(3), the proponent of the statement must show by a preponderance of the evidence: "(1) that the declarant is unavailable as a witness, (2) that the statement is sufficiently reliable to warrant an inference that a reasonable man in [the declarant's] position would not have made the statement unless he believed it to be true, and (3) that corroborating circumstances clearly indicate the trustworthiness of the statement." *United States v. Wexler*, 522 F.3d 194, 202 (2d Cir. 2008) (internal quotation marks omitted).  A declarant is unavailable for purposes of Rule 804 if, as relevant here, the declarant is "exempted from testifying about the subject matter of the declarant's statement because the court rules that a privilege applies," Fed. R. Evid. 804(a)(1), or "is absent from the trial or hearing and the statement's proponent has not been able, by process or other reasonable means, to procure the declarant's attendance or testimony," *id.* 804(a)(5)(B).

"A statement will satisfy Rule 804(b)(3)'s requirement that it 'tended' to subject the declarant to criminal liability if it would be probative in a trial against the declarant." *United States v. Persico*, 645 F.3d 85, 102 (2d Cir. 2011) (internal quotation marks omitted).  Moreover, a declarant need not "be aware that the incriminating statement subjects him to immediate criminal prosecution," but instead, that the "incriminating statement sufficiently tended to subject the declarant to criminal liability so that a reasonable man in his position would not have made the statement unless he believed it to be true." *United States v. Lang*, 589 F.2d 92, 97 (2d Cir. 1978) (internal quotation marks and citation omitted).

Finally, the Second Circuit requires corroboration of both the declarant's and the statement's trustworthiness.  *United States v. Doyle*, 130 F.3d 523, 543-44 (2d Cir. 1997).

Statements made to co-conspirators, not in response to questioning, and not made in coercive atmospheres are sufficiently reliable for purposes of this Rule. *See, e.g.*, *United States v. Matthews*, 20 F.3d 538, 546 (2d Cir. 1994).

## C.  Discussion

The Statements by Honduran officials to CW-3 are relevant and admissible under the hearsay rules.  First, insofar as the Statements reflect requests to CW-3 by CC-3 and CC-4, or a question by CC-6 in Statement 6, they are not hearsay and are therefore admissible.  *See, e.g.*, *United States v. Kuthuru*, 665 F. App'x 34, 38 (2d Cir. 2016) ("Questions and commands are ordinarily not hearsay . . . .").  Second, as discussed in more detail below, the Statements are admissible in their entirety pursuant to Rule 801(d)(2)(E) and Rule 804(b)(3).

### 1.  The Statements Are Admissible Pursuant to Rule 801(d)(2)(E)

Under Rule 801(d)(2)(E), the Government will establish by a preponderance of the evidence that the defendant, CC-3, CC-4, CC-5, and CC-6 were members of the charged drug-trafficking conspiracy, as well as a related conspiracy to leverage drug trafficking to maintain and enhance their political power and the control of the National Party in Honduras.  *See United States v. Russo*, 302 F.3d 37, 45 (2d Cir. 2002) ("[T]he objective of the joint venture that justifies deeming the speaker as the agent of the defendant need not be criminal at all.").  The defendant told CW-3, as early as 2008, that he hoped to increase his drug-trafficking activities with protection from CC-3 and CC-4 following the 2009 presidential election.  CW-1, CW-3, and Rivera Maradiaga—each of whom also engaged in drug-related activities with the defendant—will explain that they used drug proceeds to support CC-3's 2009 presidential campaign in order to obtain protection from CC-3 and his associates.  The Government will establish at trial that CC-3 delivered on that

promise.  For example, CW-3 will testify that in approximately 2010, after CW-3 discussed the

issue with the defendant and then CC-3, CC-3 helped deploy Honduran military forces to the

Guatemalan border to deter incursions against the territory that CW-3 and the defendant were using

for drug shipments by a Guatemalan drug trafficker named Jairo Orellana Morales.

The Government will also establish that the defendant and CC-4 were co-conspirators.  For

example, the defendant told CW-3 in 2008 and 2009 that he expected CC-4 would be in a position

to protect them in the Honduran Congress and later as President.  In 2014, the defendant told CW-

3 that a high-ranking police official would be moved in response to his public statements that CC-

4 was protecting CW-3.  CW-1, CW-3, and at least one additional cooperating witness—a former

member of the Honduran National Police described below in Section III as CW-4—will describe

CC-6's membership in the conspiracy.  Finally, CC-5's 2018 statement to CW-3 establishes his

membership in the conspiracies with the defendant because CC-4 summoned CW-3 to the meeting

and CC-5 spoke on behalf of CC-4 as a minister appointed previously by CC-4.

The statements at issue were also in furtherance of the conspiracy.  Statements 1, 2, and 3

by CC-3 and CC-4 involved requests for funds and political support combined with promises of

protection and other favors that were designed to induce CW-3 to act on their behalf in connection

with the 2009 elections, which were also central to CW-3's ongoing dialogue with the defendant

regarding post-election drug trafficking.  *See United States v. Gigante*, 166 F.3d 75, 82 (2d Cir.

1999) (finding "in furtherance" requirement met where statements "induce a coconspirator's

assistance"); *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1199 (2d Cir. 1989)

(finding "in furtherance" requirement met where statements "prompt the listener to respond in a

way that facilitates the carrying out of criminal activity" (internal quotation marks omitted));

*United States v. Persico*, 832 F.2d 705, 716 (2d Cir. 1987) (finding "in furtherance" requirement met where statements "solicited [listener's] assistance").

Like Statements 1, 2, and 3, Statement 4 by CC-4 in 2013 conveyed a request to CW-3 for assistance in CC-4's campaign for the Honduran presidency that year.  This time, however, CC-4 made his promise of protection contingent on CW-3 leaving office in response to increased scrutiny on his drug trafficking.  Thus, in Statement 4, CC-4 sought to induce action by CW-3 and adjust the operations of the conspiracy to protect the group.  *See United States v. Eisen*, 974 F.2d 246, 269 n.8 (2d Cir. 1992) ("[A]cts or statements designed to conceal an ongoing conspiracy are in furtherance of that conspiracy.").  In 2016, in connection with Statement 5, CC-5 informed CW-3 that due to additional public criticism, CC-4 was going to remove CW-3's relative from a government position that the relative obtained based on CW-3's previous drug-derived bribes to CC-3 and CC-4.  CC-5 also promised CW-3 that CC-4 would protect him in exchange for support of CC-4's 2017 presidential reelection campaign.  As a result, Statement 5 furthered the conspiracy because CC-5 conveyed information about the status of the conspiracy, challenges faced by other co-conspirators, and CC-4's strategy for avoiding detection.  *See Persico*, 832 F.2d at 716 (finding "in furtherance" requirement met where statements "informed [listener] of the identity and activities of his coconspirators"); *Delligatti*, 2018 WL 1033242, at *6 ("[S]tatements that convey information about others in the same organized crime syndicate are considered to be during and in furtherance of a conspiracy"); *United States v. Esparra*, No. 12 Cr. 844, 2014 WL 1569607, at *6 (S.D.N.Y. Apr. 17, 2014) (finding "in furtherance" requirement met where "the statements included a discussion as to the extent the [drug-trafficking conspiracy] had been compromised and which members could still be trusted").  Finally, in Statement 6, CC-6 asked CW-3 on behalf of

24

CC-4 whether CW-3 had surrendered in the United States, and CW-3 confirmed that he was still in Honduras.  *See United States v. Delva*, No. 12 Cr. 802, 2014 WL 4460360, at *10 (S.D.N.Y. Sept. 10, 2014) ("Statements made to hide the existence or activities of a conspiracy are made in furtherance of it.").  CC-6's inquiry furthered the conspiracy by obtaining information for himself, CC-4, and others regarding CW-3's status and whether CW-3 had compromised the conspiracy by cooperating with law enforcement.

### 2.   The Statements Are Admissible Pursuant to Rule 804(b)(3)

Statements 1 through 6 are also admissible under Rule 804(b)(3) because the declarants are unavailable and their remarks would be probative of their guilt were they to stand trial on drug trafficking or money laundering charges.

CC-3, CC-4, CC-5, and CC-6 are located abroad, outside the Government's subpoena power, and would invoke the Fifth Amendment if they were questioned under oath regarding these activities.  *See United States v. Savoca*, 335 F. Supp. 2d 385, 390 (S.D.N.Y. 2004) ("[T]he 'unavailability' component is established by the fact that [the declarant] is expected to invoke his Fifth Amendment privilege."); *see also United States v. Ortiz*, 962 F. Supp. 2d 565, 573 (S.D.N.Y. 2013) (finding witness unavailable where located outside United States at time of trial). Statements 1 through 6 were against the penal interest of the declarants because the Statements "implicated [the declarants] in drug activity," and each declarant "would not have made the statement unless he believed it to be true."  *United States v. Dupree*, 870 F.3d 62, 80 (2d Cir. 2017); *see also Ortiz*, 962 F. Supp. 2d at 573.  The statements are also sufficiently reliable because they were made in confidence to CW-3, "a person whom the declarant[s] believe[d] [was] an ally, not a law enforcement official."  *United States v. Sasso*, 59 F.3d 341, 349 (2d Cir. 1995).

Moreover, the Statements do not reflect "effort to shift blame" away from the declarants, and there is no possibility that they would have uttered these remarks "solely to curry favor with the authorities." *Id.*; *see also Dupree*, 870 F.3d at 80 (finding sufficient trustworthiness where declarant spoke to perceived ally and did not attempt to shift blame). Finally, because CC-3, CC-4, CC-5, and CC-6 all occupied higher positions in the Honduran government than CW-3, these declarants had "no need to attempt to impress [their] subordinate[]," CW-3, by making "self-incriminating statements without a foundation of truth." *United States v. Gupta*, 747 F.3d 111, 129 (2d Cir. 2014). Therefore, Statements 1 through 6 are also admissible under Rule 804(b)(3).

## III.   Evidence of Statements by a Member of the Honduran National Police to CW-4 is Admissible Under the Hearsay Rules

CC-6 was a high-ranking officer in the Honduran National Police, and he is a cousin of the defendant and CC-4. During the course of CC-6's participation in the conspiracy with the defendant and others, CC-6 spoke to a co-conspirator in the Honduran National Police ("CW-4") about the roles in the conspiracy played by the defendant, CC-4, CW-1, and CW-3. Testimony from CW-4 regarding these statements by CC-6 is admissible under Rules 801(d)(2)(E) and 804(b)(3).

### A.   Factual Background

CW-4 met CC-6 in the early 1990s when they both attended the Honduran police academy, and they stayed in close contact after that. CW-4 started to participate in drug trafficking in Honduras in approximately 2004, principally by helping to provide security for drug shipments. Prior to 2007, CC-6 told CW-4 that the defendant and CC-4 were his cousins, and he talked to CW-4 periodically about the political power the defendant and CC-4 were amassing in the National Party as well as in the Departments of Copán and Lempira, among other places. During the same

timeframe, CC-6 and CW-4 discussed significant drug traffickers in western Honduras, including at least two who will testify as cooperating witnesses at trial.

In approximately 2008, CC-6 and CW-4 attended a police training together.  During the training, CC-6 told CW-4 that he was about to work on a drug shipment.  Although they did not discuss the shipment further at that time, CW-4 also helped provide security for the same cocaine load at the direction of CW-1.  Afterwards, CC-6 told CW-4 that he had seen CW-4 during the shipment, and the two men began to discuss their criminal activities in more detail.  CC-6 told CW-4 that the defendant was protecting CW-1 in exchange for payments.

In approximately 2010, CW-4 was assigned to work at the headquarters of the Honduran National Police in Tegucigalpa.  After CW-4 reported to the new position, CC-6 asked him to provide information regarding investigations and operations that would be used to protect drug shipments for the defendant and CW-3.  CC-6 said that CW-3 was still using drug proceeds to pay the defendant, who in turn was using some of the money to help finance campaigns for CC-4.  CC-6 also told CW-4 that the defendant and CC-4 would be able to protect CW-4, pay him, and help him with promotions.  CW-4 agreed to do what CC-6 asked, and he provided sensitive law enforcement information to CC-6 more than 10 times in exchange for payments of between $300 and $600 as well as "gifts" such as clothing and watches.

In approximately 2012, CW-4 grew concerned after the Honduran Congress passed legislation that removed a preexisting constitutional barrier to the extradition of Honduran nationals to the United States to face drug-trafficking charges.  CW-4 asked CC-6 about the situation.  CC-6 told CW-4 that (i) the new extradition law in Honduras was enacted in response to pressure from the United States and intended to appease the U.S. government, and (ii) the

defendant told CC-6 that while extradition may be available in theory, they would not be extradited.

In approximately 2013 or 2014, CW-4 asked CC-6 for assistance in obtaining a promotion. CW-4 believed the promotion would require congressional approval, which he thought would be difficult to obtain. CW-4 asked CC-6 to talk to CC-4 about the situation. CC-6 said that he would talk to the defendant first, and ask the defendant to speak to CC-4 on behalf of CW-4. CW-4 subsequently received the promotion, and expressed gratitude to CC-6. Also in approximately 2014, after CC-4 became President, CC-6 told CW-4 that CC-4 was considering eliminating extradition because CC-4 was concerned that the United States would submit an extradition request for the defendant.

In approximately 2016, CW-4 elected to surrender voluntarily based on pending charges in the United States. When CC-6 learned of CW-4's plan, he tracked CC-6 down by approaching his wife at church. CW-4 subsequently met with CC-6, and CC-6 explained that while CC-4 was working to avoid extradition of the defendant, they could not protect CW-4 because of CC-4's interest in pursuing reelection. CC-6 also stated that CW-4 could not talk about the defendant, CC-4, or CC-6 in the United States because the situation was being handled at the Honduran presidential level and was therefore too sensitive. CC-6 ended the discussion by apologizing, and he paid CW-4 approximately $500.

## B. Relevant Statements

The Government respectfully submits that the following statements, referred to below as "Statement [number]," are admissible through testimony of CW-4:

1. In approximately 2008, CC-6 told CW-4 that the defendant was protecting CW-1 in exchange for payments of drug proceeds.

28

2.  In approximately 2010, CC-6 told CW-4 that (i) CC-6 wanted access to sensitive law enforcement information to help protect drug shipments involving the defendant and CW-3, (ii) CW-3 was using drug proceeds to pay the defendant, who was using some of the money to help finance CC-4's presidential campaign, and (iii) the defendant and CC-4 would protect CW-4, pay him, and help him with promotions in exchange for information.

3.  In approximately 2012, CC-6 told CW-4 that (i) the new Honduran extradition law was enacted in response to pressure from the United States and intended to appease the U.S. government, and (ii) the defendant told CC-6 that while extradition may be available in theory, they would not be extradited.

4.  In approximately 2013 or 2014, CC-6 told CW-4 that he would speak to the defendant about getting CC-4 to help CW-4 obtain a promotion.

5.  In approximately 2014, CC-6 told CW-4 that CC-4 was considering eliminating extradition because CC-4 was concerned that the United States would submit an extradition request for the defendant.

6.  In approximately 2016, CC-6 told CW-4 that (i) CC-4 was working to prevent the defendant from being extradited, but could not protect CW-4 because of CC-4's interest in pursuing reelection, and (ii) CW-4 could not talk about the defendant, CC-4, or CC-6 in the United States.

## C.  Discussion

### 1.  The Statements Are Admissible Pursuant to Rule 801(d)(2)(E)

As discussed above, the Government will establish that the defendant and CC-6 were co-conspirators through testimony from CW-1, CW-3, and CW-4.  CC-6's statements to CW-4 furthered both the drug-trafficking conspiracy and the conspiracy between the defendant, CC-4, CC-6 (a cousin of the defendant and CC-4), and others to leverage drug trafficking for the purpose of maintaining and enhancing their political power and the power of the National Party in Honduras.

Through Statement 1, CC-6 told CW-4 in approximately 2008—around the same time that the defendant was talking about setting up a drug-trafficking partnership with CW-3—that the

defendant was protecting CW-1, that CW-1 was using drug proceeds to pay the defendant, and that the defendant was using some of those tainted funds to support the National Party.  Thus, Statement 1 furthered the conspiracy by informing CW-4, who was working with CW-1 at the time, of the identities and roles played by co-conspirators.  In Statement 2, CC-6 provided CW-4 with an update about the status of the conspiracy, including additional information about CW-3's activities.  He also furthered the conspiracy by conveying a request to CW-4 for law enforcement information to be used in support of drug trafficking, which was intended to induce CW-4 to assist CC-6 and other members of the conspiracy.

In approximately 2014, in Statement 4, CC-6 agreed to speak to the defendant about obtaining assistance from CC-4 related to a promotion for CW-4, which CW-4 was later granted. Statement 4 furthered the conspiracy because it confirmed that the conspiracy was intact and had access to CC-4, who was the new President of Honduras, assured CW-4 that his co-conspirators were willing to help him based on his continued efforts to provide law enforcement information to facilitate drug shipments, and advanced the objectives of other co-conspirators by appeasing CW-4 so that he would continue to assist them.

Statements 3, 5, and 6 involved CC-6 conveying information to CW-4 at various times between 2012 and 2016 about the status of Honduran extradition policy, which threatened to compromise the conspiracy, and CC-4's efforts to protect them.  CC-6 also used Statement 6 in 2016 to further the conspiracy by instructing CW-4 not to cooperate against other co-conspirators, including himself, the defendant, and CC-4.  Therefore, the Statements are admissible pursuant to Rule 801(d)(2)(E).

## 2.   The Statements Are Admissible Pursuant to Rule 804(b)(3)

As explained above, CC-6 is unavailable for purposes of Rule 804(b)(3) because he is located abroad and would invoke the Fifth Amendment in response to questioning.  His statements to CW-4 were against penal interest because he implicated himself, the defendant, and others in drug-trafficking activities and related corruption.  CC-6's statements bear sufficient indicia of reliability because he spoke in private and did not appear to shift blame, *e.g.*, *Dupree*, 870 F.3d at 80, and he made the statements to a colleague he had known since the early 1990s, *see United States v. Saget*, 377 F.3d 223 (2d Cir. 2004) (reasoning that "speaking with a friend" in a "private setting" was another consideration suggesting reliability).   The Statements will also be corroborated in part by testimony from CW-1 and CW-3.  Therefore, CC-6's statements to CW-4 are admissible pursuant to Rule 804(b)(3).

## IV.   Evidence of the Defendant's Participation in Two Drug-Related Murders Is Admissible

The defendant conspired with CW-3 and others to have two drug-trafficking rivals murdered.  Testimony from CW-3 regarding these incidents is admissible as direct evidence related to Counts One, Two, and Three, and, in the alternative, pursuant to Rule 404(b).  Under either theory, the evidence has significant probative value with respect to the cocaine-importation conspiracy charged in Count One and the weapons offenses charged in Counts Two and Three, and is not unduly prejudicial under Rule 403.

### A.   Relevant Facts

As explained in Part VIII.A of the Background Section, in approximately 2011, CW-3 talked to the defendant about an emerging rivalry with Victim-1 in the Copán Department.  In response, the defendant offered to ask CC-7, a high-ranking member of the Honduran National

31

Police, to murder Victim-1.  In a subsequent meeting, the defendant told CW-3 that CC-7 had agreed to carry out the murder and was working with other police to plan it.  After the murder, the defendant confirmed that CC-7 had orchestrated the killing.

Approximately two years later, in 2013, CW-3 and the defendant agreed that Victim-2 needed to be murdered to prevent him from cooperating with law enforcement with respect to their activities in the Colón Department on the Atlantic coast in eastern Honduras, where they were receiving drug shipments and transporting the cocaine to the Copán Department near the border with Guatemala.  Following that conversation, CW-3 worked with Blanco Ruíz to have Victim-2 murdered while Victim-2 was detained in prison.

## B.  Discussion

Evidence of the defendant's role in these two murders is probative of his participation in the drug-trafficking conspiracy charged in Count One, including the connections to the Honduran National Police that the defendant relied upon in connection with the conspiracy and the great lengths to which the defendant was willing to go in order to protect himself and his co-conspirators—as corroborated by CC-2's warning to CW-5 in approximately 2009 that the defendant was willing to kill and had the means to do it, *see infra* Part V.B.  *See Ulbricht*, 79 F. Supp. 3d at 485 (reasoning that "murder-for-hire evidence is directly relevant to proving the elements of the narcotics offense" because "the context of each of the alleged solicitations involves narcotics dealers"); *see also United States v. Gadsden*, 300 F. App'x 108, 110 (2d Cir. 2008) (affirming admission of "past violent acts" because "such evidence helps to explain the mutual trust that existed between coconspirators" (internal quotation marks omitted)); *United States v. Arrington*, 867 F.2d 122, 130 (2d Cir. 1989) (reasoning that a "plot to silence witnesses further[ed]

the goals" of a narcotics conspiracy); *United States v. Barret*, No. 10 Cr. 809, 2011 WL 6704862, at *5 (E.D.N.Y. Dec. 21, 2011) ("Acts of violence are frequently deemed to have been performed as overt acts in furtherance of, and thus are direct evidence of, an alleged drug distribution conspiracy."). The defendant's participation in these murders with drug-trafficking co-conspirators therefore has significant probative value with respect to Count One.

Evidence related to these murders is also probative of the defendant's ability to cause, aid, and abet others in the use of firearms in furtherance of the drug-trafficking conspiracy, as charged in Count Two, and his conspiracy with others to use firearms in furtherance of the drug-trafficking conspiracy, as charged in Count Three. *See United States v. Abdalla*, No. 14 Cr. 716, 2018 WL 5819799, at *4 (S.D.N.Y. Oct. 23, 2018) (reasoning that murder in furtherance of uncharged drug-trafficking conduct was "probative of the Defendants' opportunity to conspire to use and carry firearms in furtherance of drug crimes"); *see also United States v. Barnes*, 560 F. App'x 36, 41 (2d Cir. 2014) (reasoning that defendant's admission "about killing a rival drug dealer" was admissible "as direct proof of the charged crack conspiracy and of [defendant's] firearms possession related to that conspiracy"). Thus, the evidence is plainly relevant and has even more probative value than the murder in *Abdalla* because the murders in question here were in furtherance of Count One rather than uncharged drug-trafficking in another controlled substance.

Finally, evidence related to these murders is admissible under Rule 403. "Since 'drug trafficking is often attended by violence,' courts in this Circuit repeatedly have declined to preclude evidence of violence in narcotics cases." *Ulbricht*, 79 F. Supp. 3d at 487 (quoting *United States v. Sureff*, 15 F.3d 225, 228-29 (2d Cir. 1994) and collecting cases); *see also Abdalla*, 2018 WL 5819799, at *4; *United States v. Baptiste*, 264 F.3d 578, 590 (5th Cir. 2001) ("Although the

evidence of the murders and attempted murders was prejudicial, it was necessary for the jury to understand the brutal nature of the conspiracy."); *United States v. Chin*, 83 F.3d 83, 88 (4th Cir. 1996) (finding no Rule 403 violation where "the murder demonstrated the extent to which [defendant] was willing to go, or at least threaten, in order to ensure that the heroin deal and any future deals went smoothly").  The Rule 403 balancing with respect to these two murders must also take into account the fact that the evidence in this case relates to extremely violent drug trafficking carried out by heavily armed criminals.  For example, during the defendant's post-arrest statement, he admitted to accepting two firearms from a former co-conspirator and that former co-conspirators had "participated several times in many, uh, cleanings," which he confirmed was a reference to "killing people."  Rivera Maradiaga has admitted to causing 78 murders in connection with his cooperation agreement.  Two other anticipated cooperating witnesses have admitted to causing more than 10 murders each.  Particularly in that context, evidence related to the defendant's participation in two murders is not unduly prejudicial under Rule 403.

## V.   Evidence of Statements by a Honduran Drug Trafficker to CW-5 is Admissible Under the Hearsay Rules

In 2009 and 2010, CC-2—one of the defendant's Honduran drug-trafficking co-conspirators—helped introduce a cooperating witness ("CW-5") to the defendant during an in-person meeting where they discussed large drug shipments and weapons.  Following the meeting, CC-2 provided additional detail to CW-5 regarding the roles played by the defendant and CC-1, a Colombian drug-trafficking associate of the defendant.  CC-2's statements to CW-5 are admissible under Rule 801(d)(2)(E) and Rule 804(b)(3).

34

### A.   Factual Background

In approximately 2009, CW-5 participated in drug shipments with some of the defendant's co-conspirators, including CC-1 and CC-2.  During the course of those activities, CC-2 helped set up a meeting in Honduras between the defendant and CW-5, among others.  The defendant was escorted to the meeting by a security detail wearing what appeared to be military uniforms and carrying assault rifles.  In the meeting, the defendant told CW-5 that he had approximately two tons of cocaine in Honduras at the time, and that he also had access to a cocaine laboratory in Colombia where he could mark kilograms with unique stamps to identify his drugs, including but not limited to a "TH" stamp.  The defendant said that he had strong relationships with Honduran politicians as well as the military and police, particularly in the Copán Department.  The defendant also offered CW-5 weapons, including grenade launchers, machineguns, and an FN Herstal .57 pistol that he referred to in Spanish as a "cop killer."

At the conclusion of the meeting, CC-2 and CW-5 agreed to travel to the Copán Department to inspect the defendant's cocaine, and they ultimately purchased approximately 700 kilograms.  In connection with those activities, CC-2 told CW-5, in substance, that (i) CW-5 could trust the defendant but should not let him down, and (ii) if CW-5 did not pay the defendant, the defendant would kill him and he had the means to do it.  Following the 700-kilogram transaction, the defendant supplied CC-2 and CW-5 with additional multi-hundred-kilogram loads of cocaine that were imported into the United States.  CC-2 confirmed to CW-5 that the defendant and CC-1 had supplied the drugs for those shipments.

### B.  Relevant Statements

The Government respectfully submits that the following statements, referred to below as "Statement [number]," are admissible through testimony of CW-5:

1.  In approximately 2009, CC-2 told CW-5 that (i) CW-5 could trust the defendant but should not let him down, and (ii) if CW-5 did not pay the defendant, the defendant would kill him and he had the means to do it.

2.  On several occasions between approximately 2009 and 2010, CC-2 told CW-5 that the cocaine they were working to distribute and import was supplied by the defendant and CC-1.

### C.  Discussion

#### 1.  The Statements Are Admissible Pursuant to Rule 801(d)(2)(E)

The Government will establish that the defendant and CC-2 were drug-trafficking co-conspirators through testimony from CW-5 because CW-5 attended a meeting regarding drug trafficking with both men in approximately 2009 (around the time of Statement 1), and then traveled with CC-2 to inspect some of the defendant's cocaine.  Strengthening the evidence of the existence of this conspiracy, CW-1 will describe working on drug shipments with CC-2 and his associates, including during the period when the defendant was helping to protect CW-1's shipments.

CC-2 used Statement 1 to CW-5 to further the conspiracy by assuring CW-5 that he could trust the defendant in connection with their criminal activity.  *See United States v. Roldan-Zapata*, 916 F.2d 795, 803 (2d Cir. 1990) (finding "in furtherance" requirement met where statement "inform[ed]" the listener "of the identity and role of" the defendant and "reassure[d] him to proceed with the transaction in the presence of someone with whom he was not familiar").  CC-2's warning in Statement 1 that the defendant would resort to violence furthered the conspiracy by

36

making CW-5 aware that there would be severe consequences for any failure to deliver on his promises and agreements. *See United States v. Simmons*, 923 F.2d 934, 945 (2d Cir. 1991) (finding "in furtherance" requirement met where "the story of [former co-conspirator's] murder warned members of the Crew that a similar fate awaited those who failed to follow [leader's] orders"); *see also United States v. Khan*, 591 F. Supp. 2d 202, 205 (E.D.N.Y. 2008) ("Intimidation, violence, and the payment of debts is generally understood to be intertwined with the management and operation of narcotics conspiracies and these uncharged acts demonstrate defendant's alleged leadership role."). Moreover, for the same reasons discussed above with respect to evidence of the defendant's participation in two drug-related murders, CC-2's warning regarding the defendant is not unduly prejudicial under Rule 403.

Statement 2 furthered the conspiracy because CC-2's subsequent confirmations to CW-5 that the defendant and CC-1 were participating in the conspiracy by supplying cocaine provided CW-5 with information about the status of the conspiracy and the roles played by other members, and assured CW-5 that they were still operating with a politically powerful ally capable of protecting them and the cocaine.

### 2.   The Statements Are Admissible Pursuant to Rule 804(b)(3)

Based on information from a cooperating witness, the Government believes that CC-2 is unavailable under Rule 804 because he is deceased. *See* Fed. R. Evid. 804(a)(4). CC-2's Statements to CW-5 related to drug shipments in which they were participating with the defendant and CC-1, and, in light of the evidence described above, CC-2 did not appear to exaggerate the defendant's role or shift blame from himself when he spoke to CW-5. In Statement 1, CC-2 also relayed mutually inculpatory information about his prior experience in drug trafficking with the

defendant.  *See United States v. Stratton*, 779 F.2d 820, 828-29 (2d Cir. 1985) (finding that declarant's statements regarding "history of the conspiracy" were "overwhelmingly contrary to his penal interests").  CC-2 said these things in private to a co-conspirator at the time, CW-5, without any indication that the statements would be disclosed to authorities.  *See id.* at 829 (finding statements sufficiently reliable where declarant "believed he was talking to co-conspirators rather than the authorities" and "therefore had no reason to lie or attempt to curry favor").  Accordingly, CC-2's statements to CW-5 are also admissible under Rule 804(b)(3).

## VI.   Electronic Communications by Central American Drug Traffickers Regarding Cocaine Bearing the Defendant's Initials Are Admissible

In June 2016, two drug traffickers in Central America ("CC-8" and "CC-9") exchanged electronic communications via BlackBerry messenger, which included discussion of purchasing hundreds of kilograms of cocaine in San Pedro Sula, Honduras, that were marked with a stamp bearing the defendant's initials.  During the exchange, CC-8 sent CC-9 a photograph of one of the "TH"-stamped kilograms.  The messages are therefore probative of the defendant's participation in the conspiracy, and they are admissible pursuant to Rules 801(d)(2)(E) and 804(b)(3).

### A.   Relevant Facts

On June 23, 2016, CC-8 and CC-9 exchanged communications for approximately five hours via BlackBerry Messenger, which were lawfully intercepted pursuant to a Title III wiretap in another District.  (*See* Ex. B (draft translations of the intercepts)).  During the exchange, CC-8 used a device that was connected to a Honduran telecommunications service provider, and CC-9's device was connected to a Guatemalan provider.

In sum, the interceptions revealed that CC-9 was late paying CC-8 in connection with a prior drug deal because CC-9's "client" had not paid him yet.  (*Id.* at 1:3, 5).  CC-8 was seeking

to collect on the debt so that he could buy more cocaine. (*Id.* at 1:1, 4). He sent CC-9 a photograph of one of the kilograms, which bore the defendant's "TH" stamp:



(*Id.* at 1:2). CC-8 indicated that the "TH"-stamped kilograms were in San Pedro Sula, Honduras ("SPS"). (*Id.* at 1:4). He also expressed concern that he and CC-9 had "never made them," *i.e.*, the group supplying the cocaine, "wait like this." (*Id.* at 1:18). CC-8 and CC-9 agreed that they had to handle communications with the supplier carefully, and CC-8 indicated that "[h]e is the only one who gives me" cocaine. (*Id.* at 2:3-4, 11). Throughout the day, CC-8 continued to pressure CC-9 for payment so that he could "pick up 200 things," *i.e.*, kilograms of cocaine, from "the picture that I sent." (*Id.* at 2:16-17). CC-9 urged caution because he had no money to pay for the drugs at that time. (*E.g.*, *id.* at 2:22).

**B.  Discussion**

### 1.  The Messages Are Admissible Pursuant to Rule 801(d)(2)(E)

The content of the messages demonstrates that CC-8 and CC-9 planned to be downstream purchasers of the defendant's cocaine, through a connection to an intermediary they had worked with previously, and were therefore part of the same conspiracy as the defendant. *See United*

*States v. Hernandez*, 521 F. App'x 14, 17 (2d Cir. 2013) ("Preliminary questions of this nature are to be resolved by the court by a preponderance of the evidence, which may include reference to the hearsay statements themselves so long as other independent evidence corroborates the fact of the defendant's participation in the conspiracy."); *see also United States v. Parker*, 554 F.3d 230, 238 (2d Cir. 2009) (describing a "chain conspiracy" in which "[o]ne who establishes a continuing business of selling drugs in large, wholesale quantities knows that the success of his selling business depends on the ability of his customers to resell to others, who in turn will resell to still others, until the product ultimately is sold to retail consumers").  CC-8 and CC-9 used the Spanish slang "Cuas" to address each other, which reflected friendship and familiarity, and the communications demonstrated that CC-8 and CC-9 had worked together previously in drug trafficking.  (*See* Ex. B at 1:6 ("[Y]ou are always very punctual to pay me.")).  The communications also indicated that CC-8 and CC-9 had worked previously with the person offering them the defendant's "TH"-stamped cocaine, and that CC-8 and CC-9 considered the relationship to be sensitive.  (*Id.* at 2:111 ("He is the only one who gives me . . . .")); *id.* at 1:18 ("[W]e have never made them wait like this."); *id.* at 2:3-4 ("I answer him as soon as he sends a message because then he thinks bad, or he can think that I lose something.  It is my responsibility to keep him posted." // "Yes, Cuas, same here.")).

Other evidence demonstrates by a preponderance that the defendant was a participant in the conspiracy with CC-8 and CC-9.  They were all operating in the same area.  CC-8 used a device connected to a Honduran service provider to inform CC-9, who was using a Guatemalan provider, that the "TH"-stamped cocaine was in San Pedro Sula.  (*Id.* at 1:4).  Moreover, during the defendant's post-arrest interview, when DEA agents asked him about the photograph of the "TH"

stamp that CC-8 sent to CC-9, the defendant confirmed that the photograph depicted "a T and an H," that "[s]upposedly its Tony Hernandez," and that "it's a . . . a kilo of a kilo or . . . or a package of . . . of . . . of drugs, supposedly drugs."[10]  The defendant's admissions are highly incriminating with respect to the photograph because he immediately confirmed that the stamp depicted "TH," "supposedly" referred to himself, and was imprinted on "drugs."  In addition to the communications themselves and the defendant's admissions, at least two witnesses will testify that the defendant's cocaine stamp was a "TH," which further connects the defendant to the picture exchanged between CC-8 and CC-9—and therefore the drug-trafficking conspiracy.

Finally, the communications between CC-8 and CC-9 were in furtherance of the conspiracy because they related to prior criminal dealings, a pending drug debt owed by CC-9 and his "client," and ongoing drug negotiations between CC-8, CC-9, and downstream suppliers of the defendant's cocaine related to the purchase of hundreds of the "TH"-stamped kilograms that were stored in Honduras at the time of the communications.  *E.g.*, *Maldonado-Rivera*, 922 F.2d at 959 (finding "in furtherance" requirement met where statements "seek to induce a coconspirator's assistance, or serve to foster trust and cohesiveness, or inform each other as to the progress or status of the conspiracy").  Therefore, the messages set forth in Exhibit B are admissible pursuant to Rule 801(d)(2)(E).

---

[10] Because the Government will offer the defendant's post-arrest statements regarding the photograph, the exchange of communications between CC-8 and CC-9 is also admissible in order to provide context for how the DEA obtained the picture and the circumstances under which it was originally transmitted.

## 2. The Messages Are Admissible Pursuant to Rule 804(b)(3)

The electronic messages between CC-8 and CC-9 are also admissible pursuant to Rule 804(b)(3). Both men are unavailable because they are located outside the United States and would invoke the Fifth Amendment with respect to these communications if given the opportunity.[11] The entire exchange is against the penal interests of CC-8 and CC-9 because they discussed past, present, and future drug dealings using fairly explicit language whose import was even clearer by the transmission of the photograph of a kilogram of cocaine.

There are also sufficient indicia of reliability related to the BlackBerry messages. The defendant discussed the cocaine stamp with the DEA following his arrest, and cooperating witnesses will testify about the defendant's use of a cocaine stamp bearing his initials. The co-conspirators exchanged messages in private using BlackBerry accounts subscribed in aliases rather than their names. Their use of Central American service providers corroborates references in the communications to San Pedro Sula and other evidence of the defendant's drug trafficking in Honduras. CC-8 and CC-9 also had no reason to lie. To the contrary, CC-9 stated explicitly, "we tell the truth between both of us." (Ex. B at 1:17). CC-9 explained that he was owed money, which caused his delinquency in payment to CC-8, and CC-8 informed CC-9 that his supplier of the "TH"-stamped cocaine was pressuring him to consummate a deal. CC-8 and CC-9 did not appear to seek to shift blame for their criminal conduct, and they had no reason to suspect that the

---

11

communications were being intercepted such that it might be in their interests to puff regarding their connections or the "TH"-stamped cocaine they sought to distribute.  Thus, the BlackBerry communications are also admissible pursuant to Rule 804(b)(3).

## **CONCLUSION**

For the foregoing reasons, the Government respectfully submits that the Court should grant

the relief requested herein.

Dated:  New York, New York
        August 2, 2019

Respectfully Submitted,

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York

By:   _____/s/_____

Emil J. Bove III
Amanda L. Houle
Matthew J. Laroche
Jason A. Richman
Assistant United States Attorneys
212-637-2444

Cc:     Defense Counsel
        (Via ECF & Email (unredacted))