

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

August 26, 2019

Via Email
T. Omar Malone
Michael Tein
Email: omar@malonelawfirm.com
Email: mtein@lewistein.com

    Re:  United States v. Juan Antonio Hernandez Alvarado,
       S2 15 Cr. 379 (PKC)

Counsel:

  Set forth below are additional disclosures regarding expert testimony and evidence the Government intends to offer in its case-in-chief at trial.

  **I.**  **Supplemental Expert Notice**

  Pursuant to Rule 16(a)(1)(G) of the Federal Rules of Criminal Procedure, and in response to your August 16, 2019 filing (Dkt. No. 79), the Government hereby provides the following additional information regarding anticipated expert witness testimony at trial and seeks reciprocal disclosures. The Government reserves the right to supplement this notice with notice of additional expert witnesses and/or additional information concerning the witnesses disclosed herein.

  **A.**  **Drug Trafficking**

  The Government intends to call Drug Enforcement Administration ("DEA") Group Supervisor and Special Agent Gregg Mervis as an expert on drug-trafficking routes. Summaries of some of the facts and opinions that we intend to elicit from Special Agent Mervis are set forth in the testimony of Special Agent Mervis in *United States v. Fagot Maximo*, 15 Cr. 290 (E.D.V.A.), which was provided to you previously, and footnote 2 of our August 15, 2019 letter. With respect to Special Agent Mervis's anticipated testimony regarding the manufacturing process typically used to produce cocaine, he will explain that (i) most cocaine in the Americas region is produced in clandestine laboratories in mountainous and jungle areas of Colombia where the coca plant grows best, (ii) coca leaves are processed in the laboratories, typically using gasoline, acids, and ammonium, to extract cocaine base, (iii) the cocaine base is dried, dissolved using solvents such as acetone and ether, and then boiled to facilitate the crystallization of cocaine hydrochloride,

(iv) laboratory workers seek to remove solvents from the cocaine hydrochloride by pressing the substance, including with tools such as hydraulic presses and microwaves, and (v) presses used in an effort to remove solvents from the cocaine can also be used to press the cocaine into kilogram bricks and imprint the kilograms with marks and symbols.

To provide additional context for Special Agent Mervis's expected testimony—particularly with respect to the evolution of drug-trafficking routes and the prices of cocaine—we have also attached the expert testimony of Special Agent Daniel Mahoney in *United States v. Lorenzana Cordon*, 03 Cr. 331 (D.D.C.) (attached as Exhibit A), and the expert testimony of Special Agent Mahoney in *United States v. Flores*, 15 Cr. 765 (S.D.N.Y.) (attached as Exhibit B). We expect Special Agent Mervis to testify regarding the same topics at the defendant's trial.

### B. Honduras and Honduran Politics

The Government intends to call New York University Professor Patricio Navia to testify as an expert regarding Honduras and Honduran politics. In addition to the facts and opinions identified in our June 24, 2019 disclosures, we plan to elicit testimony regarding: (i) the approximate populations and sizes of Honduran cities, including Tegucigalpa, San Pedro Sula, and Gracias, and Departments, including Colón, Copán, Lempira, and Gracias a Dios; (ii) the 1982 adoption of the Honduran constitution and the three-branch system established by the constitution; (iii) the unicameral structure and proportional representation in the Honduran National Congress; (iv) basic platforms of the Partido Nacional, Liberal Party, and LIBRE Party; (v) the voting process for mayoral, congressional and presidential elections, and the results of national elections in 2005, 2009, 2013, and 2017; (vi) the functions of the *Fondo Vial*, *Secretaría de Obras Públicas, Transporte y Vivienda* (SOPTRAVI), *Dirección Nacional de Lucha Contra el Narcotráfico* (DCLN), the *Oficina Administradora de Bienes Incautados* (OABI), and the *Policía Nacional de Honduras*, *i.e.*, the Honduras National Police; (vii) in addition to the politicians identified in our June 24, 2019 disclosures, political positions held by Samuel Armando Reyes Rendón, Roberto Antonio Ordóñez Wolfovich, Hugo Alfredo Ardón Soriano, Miguel Rodrigo Pastor Mejía, and Juan Carlos Bonilla; and (viii) 2012 legislation that amended the Honduran constitution to permit extradition of Honduran nationals to face prosecution in the United States, and the formal procedures for the Honduran government to consider extradition requests.

### C. Machineguns and Destructive Devices

The Government's expert witness from the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") is Firearms Enforcement Officer ("FEO") Cody J. Toy. FEO Toy's resume is attached as Exhibit C.

In addition to the weapons identified in our previous disclosures, FEO Toy will testify regarding FN Five-seven pistols, Beretta pistols, Kel-Tec firearms, FAL rifles, M60 machineguns, 40 millimeter grenade launchers, and firearms depicted in the defendant's phones (attached as Exhibit D). We plan to elicit testimony regarding which of these weapons qualifies as a machinegun or destructive device under 18 U.S.C. § 924 for purposes of Counts Two and Three,

and basic information regarding the features, ranges, capacities, rates of fire of these weapons, and common legitimate uses of these weapons.

We offered similar testimony regarding some of these weapons in *United States v. Kourani*, 17 Cr. 417 (S.D.N.Y.). A transcript of the testimony is attached as Exhibit E.

### D. Spanish Translations

The Government's Spanish-language expert witness will be Maria Elena Alvarado. Ms. Alvarado's resume is attached as Exhibit F.

### E. Electronic Devices

The Government intends to elicit testimony from Enrique Santos regarding searches of the electronic devices seized from the defendant. Mr. Santos's resume is attached as Exhibit G.

### F. Request for Reciprocal Discovery

The Government reiterates its prior requests for reciprocal discovery under Rule 16(b) of the Federal Rules of Criminal Procedure and for notice under Rules 12.1, 12.2, and 12.3. Specifically, the Government requests that the defendant:

- Allow inspection and copying of: (1) any books, or copies or portions thereof, which are in either defendant's possession, custody or control, and which either defendant intends to introduce as evidence or otherwise rely on at trial; and (2) any results or reports of physical or mental examinations and of scientific tests or experiments made in connection with this case, or copies thereof, which are in either defendant's possession or control, and which either defendant intends to introduce as evidence or otherwise rely on at trial or which were prepared by a witness whom either defendant intends to call at trial.

- Disclose prior statements of witnesses either defendant will call to testify at trial. *See* Fed. R. Crim. P. 26.2; *United States* v. *Nobles*, 422 U.S. 225 (1975). We request that such material be provided on the same basis upon which we agree to supply the defendant with 3500 material relating to Government witnesses.

- Pursuant to Rule 16(b)(1)(C) provide notice regarding any expert witness that either defendant intends to rely upon, including a written summary of any testimony that either defendant intends to elicit under Rules 702, 703, or 705 of the Federal Rules of Evidence. Any such summary should include the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications.

- Pursuant to Rules 12.1, 12.2, and 12.3, provide notice of any alibi defense, insanity defense, or public-authority defense that either defendant intends to rely upon in this case.

## II. Supplemental Rule 404(b) Notice

We also write, in an abundance of caution, to disclose additional evidence that we plan to offer at trial relating to acts of violence by the defendant. (*See* Dkt. No. 78 at 2 n.2). Specifically, we plan to offer testimony from the individuals described as "CW-2" and "CW-5" in our August 2, 2019 motions *in limine* that, in approximately late 2009, following a robbery in Guatemala of cocaine being distributed by the defendant and others, the defendant and others paid to have the perpetrators of the robbery murdered. Approximately eight victims were killed, including a Guatemalan police officer. The defendant coordinated the murders with his co-conspirators in the drug-trafficking conspiracy charged in Count One of the above-referenced Indictment. These activities, which are discussed in more detail below, are direct evidence on Count One as well as the weapons charges in Counts Two and Three. Evidence of these activities is also admissible, in the alternative, pursuant to Rule 404(b).

We expect CW-2 to testify, in substance and in part, that in approximately September 2009, the defendant and members of the Honduran *Los Valles* cartel sold approximately 500 kilograms of cocaine to Mexican drug traffickers responsible for importing the cocaine into the United States. The cocaine was manufactured at a laboratory in Colombia, which the defendant controlled in partnership with the drug trafficker referred to in our August 2, 2019 motions *in limine* as "CC-1," and others. Each of the 500 kilograms was branded with a stamp of either "TH" or "La Tia." The defendant, CC-1, the *Los Valles* cartel, and others hired CW-2 to transport the cocaine from Honduras to the Guatemalan border with Mexico, where the Mexican drug traffickers were to take possession of the cocaine and import it to the United States. En route to the Guatemalan border with Mexico, however, 425 kilograms were stolen.

Approximately one week after the robbery, CW-2 attended a meeting with the defendant, CC-1, and a representative from *Los Valles* ("the *Los Valles* Representative"). The defendant was accompanied to the meeting by armed security. The defendant told CW-2 that he would give CW-2 one month to pay the debt arising from the lost cocaine, as long as the *Los Valles* Representative vouched for CW-2 that the debt would be repaid, and that the payment needed to be made in the denomination of $100 bills. The defendant further stated, in substance and in part, that he would investigate the robbery so that it could be "handled" and similar problems would not arise in the future. Following this meeting, the *Los Valles* Representative informed CW-2 that the robbery had been orchestrated by a drug trafficker known as "Oscar Guerra."[1] The *Los Valles* Representative told CW-2 that the defendant said the defendant would pay for an assassin to kill

---

[1] For the reasons set forth in our motions *in limine*, the statements of the defendant's co-conspirators identified herein regarding the defendant's role in this cocaine transaction and subsequent murders are admissible pursuant to Rule 801(d)(2)(E) and/or Rule 804(b)(3).

Guerra and anyone else who had assisted in the robbery. CW-2 offset the debt he owed to the defendant by delivering $300,000 to an assassin known as "Sergio Urreta," a/k/a "Tonino." Using firearms, Tonino and his hitmen killed Guerra and approximately seven other individuals believed to have been involved in the robbery, including at least one police officer in the Santa Rosa Department in Guatemala who they believed had facilitated the robbery. Following these murders, the *Los Valles* Representative told CW-2 that the *Los Valles* Representative reported back to the defendant, in substance and in part, that the payment to Tonino had been made and that the murders were complete.

Additionally, we expect CW-5 to testify, in substance and in part, that, close in time to the robbery described above, CW-5 discussed the robbery and retaliatory murders with several members of the conspiracy. First, CW-2 told CW-5 about the robbery, that the stolen cocaine belonged to the defendant and *Los Valles*, and that CW-2 had been instructed to pay Tonino approximately $300,000 to assassinate the perpetrators of the robbery. Second, one of the hitmen who worked for Tonino told CW-5 about the murders and the money that had been paid to him. Third, the drug trafficker identified in our August 2, 2019 motions *in limine* as "CC-2" spoke to CW-5 about the robbery and told CW-5, in substance and in part, that the stolen cocaine belonged to CC-2's friend "T," which, based on his prior discussions with CC-2, CW-5 understood to be a reference to the defendant

Sincerely,

GEOFFREY S. BERMAN
United States Attorney

By: _____/s/_____
Emil J. Bove III
Amanda L. Houle
Jason A. Richman
Assistant United States Attorneys
(212) 637-2444 / 2420

Enclosures