JAG9HER1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                              15 CR 379 (PKC)

5    JUAN ANTONIO HERNANDEZ
     ALVARADO,
6
                   Defendant.
7
     ------------------------------x
8
                                              New York, N.Y.
9                                             October 16, 2019
                                              10:08 a.m.
10

11   Before:

12                     HON. P. KEVIN CASTEL,

13                                      District Judge

14                          APPEARANCES

15

16   GEOFFREY S. BERMAN,
          United States Attorney for the
17        Southern District of New York
     EMIL J. BOVE, III
18   AMANDA HOULE
     JASON RICHMAN
19        Assistant United States Attorneys

20   OMAR MALONE
     MICHAEL R. TEIN
21        Attorneys for Defendant

22

     ALSO PRESENT:  HUMBERTO GARCIA, Interpreter (Spanish)
23                   NATHAN RHODES, Interpreter (Spanish)
                     BRIAN FAIRBANKS, DEA
24                   MORGAN HURST, Paralegal, USAO

25

JAG9HER1

1              (Jury not present)

2              THE COURT:  Please remain standing.  Good morning.

3    There are a few things I want to mark for the record.  One is

4    an e-mail I received last night from the government with

5    proposed changes to the verdict sheet which had been previously

6    transmitted.  The verdict sheet that was previously transmitted

7    is also being marked -- I guess the e-mail is marked as 5.  The

8    one that was previously transmitted is marked as 6.  The

9    government's letter request for a jointly proposed charge

10   regarding statements of defendant will be marked as Court

11   Exhibit 7.  The final verdict sheet will be marked as Court

12   Exhibit 8.  And the final jury instructions will be marked as

13   Court Exhibit 9.  And the so-called trial indictment or

14   redacted indictment will be marked as Court Exhibit 10.  And

15   the parties have the redacted indictment.  Do you have that?

16   Yes.

17             Do you have the verdict sheet, the final verdict sheet

18   and the final charge?

19             MR. MALONE:  Yes, Judge.

20             THE COURT:  Thank you.  All right.

21             Please bring our jurors in.

22             (Continued on next page)

23

24

25

JAG9HER1

 1          (Jury present)

 2          THE COURT:  Good morning, ladies and gentlemen.

 3          JURY:  Good morning.

 4          THE COURT:  We're going to begin with our closing

 5     arguments.  If any lawyer states a fact in the closing argument

 6     which does not -- is not consistent with your recollection of

 7     the facts as they came out at trial, it's your recollection

 8     that controls.

 9          And during jury deliberations if you need any of the

10     testimony read back, we can arrange to have that for you.

11          If any lawyer in their closing argument states a

12     principle of law which is inconsistent with any principle that

13     I deliver to you in my closing instructions, it's my closing

14     instructions that you must follow.

15          Now, I've indicated to the lawyers how I intend to

16     instruct you.  So it's perfectly appropriate for them to say,

17     "I expect that the judge will instruct you that," all right.

18     But if there's a variance between what they say and what I say,

19     what I say controls.  If any lawyer makes a statement that

20     isn't supported by the evidence, in other words endeavors to

21     introduce a fact that is not a fact that came out at trial, you

22     should disregard that statement because, as you heard the first

23     day we met, lawyers' arguments are not evidence.  They are

24     potentially very helpful because they give you an overview of

25     what a party believes the evidence did or did not show.  All

1    right.

2              So with that, for the government, we're going to hear

3    from Mr. Bove.

4              MR. BOVE:  Yes, Judge.

5              THE COURT:  All right.  Whenever you're ready, sir.

6              MR. BOVE:  Thank you, Judge.

7              MR. BOVE:  Good morning, ladies and gentlemen.

8              JURY:  Good morning.

9              MR. BOVE:  Eight thousand.  There are eight thousand

10   individual doses of cocaine in a kilo.  And there is real

11   misery in that number.  This is not Netflix.  This isn't a

12   movie.  Every single dose could leave a parent wondering where

13   their child is.

14             MR. TEIN:  Objection, your Honor.

15             THE COURT:  Overruled.

16             MR. BOVE:  Each dose could leave a child growing up

17   without a parent.  That is why we are here.

18             This man, Tony Hernandez, helped to import almost two

19   hundred thousand kilos of cocaine into the United States.  That

20   is 1.6 billion doses of poison.

21             Each one of those kilos was worth more than $30,000

22   here.  And so every single one had the capacity to cause a

23   tragedy.  Each kilo was capable of causing horrific violence at

24   every step along the way from Colombia to the United States and

25   many of them did.

1          These numbers, ladies and gentlemen, they are

2     staggering.  They are horrific, and they arise from horrific

3     facts.  Honduras has about as many people as New York City.

4     The Country of Honduras is smaller than New York State.  It's

5     about the size of Ohio.  And for almost fifteen years the

6     defendant ravaged his country to work with other men to send a

7     tidal wave of cocaine to the United States.  He showed zero

8     regard for the people he harmed.  Zero concern for those he

9     placed at risk, including people here.

10         The defendant began these crimes in 2004 when he

11    started to provide information and logistics to drug

12    traffickers working on cocaine shipments.  He leaked sensitive

13    law enforcement information.  He told traffickers about the

14    schedule at Honduran military bases and about DEA operations.

15    The defendant used the Honduran National Police to provide

16    security for cocaine, including his cousin.  And over time the

17    defendant made huge sums of money distributing cocaine with

18    murderers.

19         The defendant stockpiled that blood money.  He enjoyed

20    it and he rose up in the drug trade.  By 2006 the defendant was

21    a supplier and a manufacturer of cocaine.  He developed

22    connections in South America including to a cocaine lab in

23    Colombia.  He was so arrogant about all of this that the man

24    put his initials on the cocaine coming out of that lab.

25         As the defendant emerged as a major drug trafficker in

JAG9HER1                    Summation - Mr. Bove

1    Central America with his own TH-branded kilos of cocaine, he

2    worked with others to rot the public institutions of Honduras,

3    to use them for drug trafficking.

4           You see, in 2005 the defendant's National Party lost

5    the presidential election and they vowed to never let that

6    happen again.  To increase his own power and the power of his

7    family, the defendant helped funnel millions of dollars in drug

8    money into National Party campaigns.  They did that for

9    elections in 2009, 2013, and 2017.

10          These weren't campaign contributions.  We're not

11   talking about donations.  These were bribes and it came with

12   strings.  The traffickers who gave that money expected

13   protection, protection from arrest, protection from

14   investigation, protection from extradition, protection so that

15   they could continue to work with the defendant to make millions

16   of dollars distributing cocaine toward the United States.

17          Ladies and gentlemen, this plan worked for a while.

18   The defendant's coconspirators, they won those elections.  They

19   infiltrated the Honduran government and they controlled it.

20   They turned the government against its people.  And they used

21   the government for state-sponsored drug trafficking.

22          What do I mean by that?  That's the difference between

23   the early phases of the defendant's drug trafficking career and

24   the most egregious one.  Early on the defendant relied on some

25   bad apples in public positions to get access to information

1    that could help with drug shipments.  But by 2010 the defendant

2    and his associates controlled the government and they used the

3    government to protect the drug traffickers that aligned with

4    the National Party.  That is state-sponsored drug trafficking.

5    And with that level of power and control the defendant was

6    virtually untouchable.

7           The results of that are astonishing.  Beginning in

8    2010 the defendant worked on massive cocaine shipments sent to

9    the United States on a monthly basis.  The president of

10   Honduras deployed the military to the border with Guatemala to

11   protect the defendant's drug turf.  The defendant used the

12   National Police to murder one of his drug rivals.  And the ring

13   leader in that murder was later promoted to become the chief of

14   the entire police force.

15          Chapo Guzmán came to Honduras in 2013.  Twice.  You

16   remember that defense counsel referred to Chapo as the most

17   wanted man in the world at the time.  He was still able to get

18   to Honduras safely for those meetings with the defendant.  And

19   during the second meeting he handed the defendant a million

20   dollars in cash, drug money, to help the defendant's brother,

21   Juan Orlando, get elected president so he could keep protecting

22   them.

23          Now, Chapo wasn't arrested when he went to Honduras.

24   And the defendant wasn't arrested either.  In fact, between

25   2004 and 2012 it wasn't even possible for the defendant to be

1  extradited to the United States to be prosecuted for these

2  crimes.  The Honduran Constitution conveniently prohibited

3  that.  And by the time the U.S. applied enough pressure to get

4  that changed, the defendant took steps to cloak himself in an

5  official title, to get elected to the Honduran Congress.  And

6  as a congressman, beginning in 2014, for four more years he

7  continued to help traffickers and he continued to work on

8  cocaine shipments.

9         Now, at the beginning of this trial Mr. Malone said

10 that trials can be sort of like CAT scans or MRIs, procedures

11 that are designed to give you a better perspective on a

12 problem.

13        Now the defense doesn't have any burden here.  They

14 don't have to do or say anything.  That's because the burden of

15 proof in this courtroom is always on the government.  But when

16 the defense makes an argument, you're entitled to scrutinize

17 it, to think about it, consider whether it makes sense.

18        So let's think about what Mr. Malone said.  Let's look

19 at this in perspective.

20        I said in the beginning that Honduras is about the

21 size of Ohio.  So let's imagine a man in Ohio who brings two

22 hundred thousand kilos of cocaine into that state.  Imagine

23 that the man brings the cocaine to Ohio using planes, planes

24 that land on dirt runways in the woods instead of at airports,

25 delivering literally a mountain of cocaine.

1           Imagine that this man in Ohio brings the cocaine to

2    Canada and then in order to get it there he uses heavily armed

3    security, the police, and machine-gun wielding thugs.  And

4    imagine that this goes on for almost fifteen years.

5           Is it conceivable that such a man would never even be

6    investigated?  Is it plausible that a man like that in Ohio

7    would not be arrested?  No.  No, it isn't.

8           But there was more than one such man in Honduras.  I'm

9    not just talking about the defendant.  The largest and most

10   violent drug traffickers who testified at this trial, they

11   weren't arrested in Honduras either because they were protected

12   by the defendant.

13          Crimes of this scale, of this magnitude, they all but

14   require official protection.  That is what the defendant

15   provided.  He smothered Honduras in corruption in order to

16   achieve it.  And that is what the evidence at this trial has

17   shown.

18          Let's talk a little bit about the cooperating

19   witnesses.  There were five of them who testified.  And the

20   defense wants you to believe that they are all on some kind of

21   deranged revenge plot, all here to try and get back at the

22   defendant.  When you do the MRI on that argument you'll find

23   that it doesn't make any sense.

24          Now, let me be clear.  We're not here to vouch for the

25   morality of those witnesses or for anything else.  Their crimes

1    are every bit, if not more, tragic and awful than the

2    defendant's.  But the defendant chose those men as

3    coconspirators, not us.  Those witnesses are the product of

4    years of the defendant's state-sponsored drug trafficking.

5    They are the only people in a position to tell you exactly what

6    he did.

7           Keep in mind, please, that the witnesses told you

8    about a lot more than just the defendant.  They came to the

9    United States and they admitted all of their crimes.  They

10   talked about the involvement of their relatives.  They admitted

11   to murders, to participating in torture.  These witnesses

12   weren't charged with murders in Honduras.  And they weren't

13   charged with murders in the United States when they got here.

14   They voluntarily disclosed those things.

15          Does it make any sense that these witnesses would come

16   to the U.S. and admit to all of this violence just for an

17   opportunity to testify at this trial against the defendant?

18   No.  No, it doesn't.  And those witnesses are being held

19   accountable in the United States for their crimes.  That

20   accountability is something that did not and never would have

21   happened in Honduras because the defendant was protecting them.

22          Now this is another argument that Mr. Malone made

23   during his opening statement.  He said the cooperating

24   witnesses were shipped to the U.S., signed, sealed and

25   delivered by Juan Orlando Hernandez.  And the MRI on that one

1    says:  Wrong.  Absolutely false.  Zero witnesses in this case

2    were extradited by Honduras.  Three of them surrendered

3    voluntarily and the other two were extradited by Guatemala.

4    Those witnesses have no axe to grind with Juan Orlando and

5    certainly not with the defendant.  And I submit to you, ladies

6    and gentlemen, that this argument about the supposed law

7    enforcement policy of Juan Orlando Hernandez is a distraction.

8    It is intended as a sideshow to get you to look away from what

9    these witnesses said about what the defendant did.  And the

10   reason for that is that the testimony from just one of these

11   witnesses is enough to convict the defendant.  And you heard

12   from five of them.

13          But that's not all you saw and heard at this trial.

14   In addition to the testimony of those five cooperating

15   witnesses, there are five types of physical evidence that you

16   have that show you that the witnesses told the truth and show

17   you that the defendant is guilty.

18          So let's talk about that physical evidence.  The first

19   piece of evidence is the recording of the defendant's meeting

20   at the Denny's.  This is that recording.  Government Exhibit

21   401.  In 2014 as a newly elected congressman the defendant sat

22   down for a meeting with one of the most violent and notorious

23   drug traffickers in Central America.  On tape he agreed to help

24   that man by getting the Honduran government to issue payments

25   to front companies, payments that were designed to get around

1    U.S. sanctions that were all over the news at the time.  This

2    recording shows you in vivid color just how comfortable the

3    defendant was meeting with and helping drug traffickers because

4    he was one of them.

5            This is the second piece of physical evidence that you

6    have, ladies and gentlemen, the wiretap that led to the

7    discovery of the defendant's TH kilo.  These are those

8    intercepts, Government Exhibit 402.  In 2016 the DEA

9    intercepted a series of communications, communications that

10   included this picture of the defendant's TH kilo and

11   communications indicating that there were several hundred of

12   these kilos in San Pedro Sula, Honduras.  So you have in

13   evidence a photograph of a kilo of cocaine with this man's

14   initials on it, just like the witnesses at this trial told you.

15   And keep in mind.  This isn't clip art.  The witnesses didn't

16   draw this.  This came from a completely independent source of

17   evidence, the wiretap, in a totally separate investigation.

18           Remember when defense counsel asked if the defendant's

19   fingerprints were ever found on a kilo of cocaine?  Maybe not.

20   But this is the next best thing.  He basically signed his own

21   drugs.

22           This is the third piece of physical evidence that you

23   have.  The drug ledger with the defendant's name in it,

24   Government Exhibit 250A.  This one on the top.  This is that

25   ledger.  In 2018 Honduran police seized this ledger referring

1    to a cocaine shipment that the defendant sent to Honduras in an

2    airplane, 650 kilos.  Honduran police seized this ledger from a

3    vehicle that also contained three pistols, two grenades and a

4    bunch of cash.  And the ledger shows you what the defendant was

5    doing in February 2018.  Still distributing cocaine.

6            Another piece of physical evidence that you have is

7    the recording of the things that the defendant said to the DEA

8    after he was arrested.  This recording is Government Exhibit

9    403.  The defendant admitted to the DEA to having relationships

10   with major Honduran traffickers, including some of the people

11   who testified at this trial.

12           Remember when defense counsel asked those witnesses

13   whether they knew of any corroborating evidence relating to the

14   meetings they described, remember that?  The witnesses didn't

15   know about this recording but you do.  And you know that when

16   the defendant was arrested he admitted to the DEA that he had

17   relationships with these men.  The defendant admitted that he

18   had meetings with these men.  He admitted that he understood

19   some of their drug routes.  He knew about some of their cocaine

20   shipments.  The defendant said he understood the drugs were

21   going to the U.S.

22           On tape he was shown a picture of his TH kilo and he

23   said:  That's TH.  Supposedly it's Tony Hernandez.  That's me.

24   This looks like a package of drugs to me.

25           Ladies and gentlemen, the things that the defendant

JAG9HER1                    Summation - Mr. Bove

1   said to the DEA after he was arrested is another piece of

2   powerful evidence that shows you that he's guilty.

3           And here is another category of physical evidence.

4   Things that the DEA seized from the defendant when he was

5   arrested, including two phones.  These are Government Exhibits

6   202 and 203.  And the DEA found on these phones pictures of

7   cash -- you see that one on the bottom left -- and machine

8   guns.

9           So when you're thinking about the other evidence of

10  the security that the defendant had to protect himself and to

11  protect his drug money and to protect his cocaine you don't

12  have to imagine what that looked like because there are

13  pictures of the weapons and the drug money on his phones.

14          So that's an overview of the evidence, ladies and

15  gentlemen.  Five cooperating witnesses.  Five types of physical

16  evidence that, taken together, show you that the defendant is

17  guilty beyond a reasonable doubt of all of the crimes that he's

18  charged with.

19          Now this closing is my opportunity to walk you through

20  that evidence, to explain how it fits together, to talk about

21  it in a linear, chronological way so that you can see just how

22  powerful it is.

23          Before I start to do that, I want to say a little bit

24  about the charges.

25          Judge Castel has already summarized these for you.

JAG9HER1                    Summation - Mr. Bove

1    There are four counts in the indictment.

2              Count One charges the defendant with participating in

3    a conspiracy to import cocaine into the United States.  A

4    conspiracy is basically an agreement.  And one of the questions

5    that you'll be asked with respect to Count One is whether the

6    offense involved more than five kilos of cocaine.

7              That's right.  The legal threshold that you'll be

8    asked to consider is five kilos.  The smallest drug shipment

9    that you heard about in this case involved 280 kilos that the

10   defendant transported on one of his helicopters.  You've heard

11   about almost 200,000 kilos of cocaine that the defendant helped

12   to import, 40,000 times the legal threshold that you'll be

13   asked to consider.

14             Every single drug shipment in this case, each one

15   alone is enough to make the defendant guilty on Count One.

16             Counts Two and Three relate to machine guns and

17   destructive devices which is basically a fancy word in this

18   case for grenades, the weapons that the defendant used to

19   protect himself, to protect his cocaine, and to protect his

20   drug money.

21             Count Four relates to the lies that the defendant told

22   to the DEA during the interview in October 2016 that you heard

23   about yesterday.  The defendant overplayed his hand that day.

24   He thought that he was so powerful that he could come to the

25   United States and lie to those agents.  Lies like that make it

JAG9HER1                     Summation - Mr. Bove

1   difficult, if not impossible, for the DEA and other federal

2   agents to protect the public from drugs and from dangerous

3   traffickers.  And so Count Four seeks to hold the defendant

4   accountable for those lies.

5          So that's a little bit about the charges and this is

6   what I'd like to do with the rest of my time this morning.

7   We're going to talk about the Central American cocaine route,

8   the evidence that you heard about the way cocaine is

9   manufactured in Colombia and transported to the United States.

10         Next we're going to talk about the evidence of the

11  defendant's drug trafficking career and the different phases

12  that I've already mentioned, logistical support to traffickers,

13  a cocaine supplier, and a manufacturer and, finally,

14  state-sponsored drug trafficking beginning in 2010.  At the end

15  I'm going to come back to the charges and talk a little bit

16  more about what I expect Judge Castel is going to say to you

17  about the law and how the evidence establishes that we've met

18  the legal requirements for those charges to prove that the

19  defendant is guilty.

20         So this is where we're going to start, thinking about

21  the evidence of how cocaine gets from Colombia up to the United

22  States.  You're going to see as I go through this that almost

23  every feature of that transportation and production, every

24  feature of that route is illustrated by the drug ledger with

25  the defendant's name, the intercepts of the TH kilo that I

JAG9HER1                    Summation - Mr. Bove

1    already talked about and things that he said on tape.

2            On the screen right now are excerpts from that ledger

3    and you can see on the right where it was seized from:  A trap,

4    a secret compartment inside a vehicle in Honduras.

5            So you heard that most of the cocaine, especially in

6    the Americas region, is produced in Colombia.

7            The reason that I referred to cocaine as poison is

8    that these are some of the chemicals that go into that process,

9    gasoline, ammonia, hydrochloric acid, acetone, all pumped

10   through the cocoa leaf to create these kilos in Colombia.

11           What happens next?  The drugs have to get transported

12   from Colombia to Central America.  The ledger illustrates that

13   for this 650 kilo shipment that happened on a plane.  You can

14   see the reference in the ledger to a Nava.  And the witness who

15   testified yesterday, Chang, explained that that is code for

16   Navajo, a piper Navajo airplane.  There's a picture of that

17   plane on the screen.  And this is how -- this is one of the

18   ways that drugs are transported from South America to Central

19   America.  And it is illustrated very, very clearly in this drug

20   ledger exactly how the defendant did it in this instance in

21   that entry in the book.

22           In order to fly a plane from Colombia to Honduras

23   that's loaded with drugs the traffickers have to be worried

24   about the radar, radar that could pick up that plane and

25   intercept it in Colombia and in Honduras.  And the drug ledger

that contains the defendant's drug shipment talks about this.

Rojo, the first cooperating witness who testified, explained that TV is code for air radar. That's the transcript segment that's on the screen right now. Chang confirmed that yesterday. So these references in the ledger to TV, that's the defendant and his coconspirators making payments to be sure that radar is not going to interfere with the Navajo plane as it travels from Colombia into Honduras.

Somebody has to be responsible for helping that plane land and you heard that usually that happens in Eastern Honduras where there are mountains and jungle. The drug ledger for the defendant's 650 kilo shipment indicates that a person named Pichete was responsible for that.

Once the drugs get to Eastern Honduras, to the jungle, the next step is to transport them across the country towards Guatemala, towards the bigger cities where the drugs become worth more money. So the ledger, again, refers to the transport costs that were paid to help this cocaine get through Honduras. And there's -- you know that this cocaine was worth so much money that the traffickers didn't just send it out there in cars. They tried to protect it, including using the Honduran National Police. And this is a picture from the defendant's phone of a police escort. This is what National Police escorting cocaine shipments looks like. You can see Policia Nacional on the hood of that truck.

1       Once the cocaine makes it close to the border with

2   Guatemala it's necessary to cross it into Guatemala.  All as

3   the traffickers work together to get the drugs into the United

4   States.  This part of the transaction, the idea of going from

5   Honduras further west into Guatemala is illustrated in the

6   wiretap that we've already talked about today.  Male 1, using a

7   phone in Honduras, reaches out to Male 2 who is in Guatemala.

8   And he says:  Look, there are three hundred of these, three

9   hundred of the TH kilos in SPS.  Do you see that at the bottom?

10   That's a reference to San Pedro Sula in Honduras.  And what

11   Male 1 is trying to do here is to get the cocaine into

12   Guatemala so that they can continue pushing it towards the

13   United States.

14       Special Agent Mervis testified that almost 90 percent

15   of the cocaine that gets transported along this route makes it

16   to the United States.  And the defendant knew that as well.

17   This is what he had to say about the process of importation

18   when he was talking to the DEA.

19       (Recording played)

20       This is what this looks like in dollars, ladies and

21   gentlemen.  And Special Agent Mervis also explained this.  The

22   cocaine starts in Colombia where the kilos are worth about

23   three thousand.  And then there's a process of investing in

24   these drugs, investing in transportation costs, investing in

25   security to get them closer to the U.S. where they're worth

JAG9HER1                    Summation - Mr. Bove

1     more money.

2                So the first jump from South America to Honduras

3     increases the value of that kilo up to between nine and ten

4     thousand dollars.  Then that east-to-west action that I talked

5     about from Honduras in the jungle to Guatemala raises the price

6     even further.  Closer to the border in Guatemala, the drugs are

7     worth eleven thousand dollars.  As you move north in Guatemala

8     towards Mexico, that price increases to 16,000.  The kilos

9     there are more valuable because there's less ground to cover on

10    the way to the U.S., less investment cost required to get those

11    drugs into the United States.  And why are these traffickers so

12    focused on getting the drugs to the United States?

13               Look at the difference in the market value in the

14    U.S., 30 to $35,000 per kilo, and where it started, down in

15    Colombia.  That's why these men are working together to do

16    this.

17               One of the ways that you know that these drugs are

18    being distributed and ultimately sold in the United States is

19    the involvement and the use of U.S. dollars in these

20    transactions.  Honduras has its own national currency, the

21    lempira.  But you know that that drug money is being poured

22    back down from the United States to Guatemala, Honduras, and

23    Colombia after those drugs are being sold.  That's where these

24    U.S. dollars come from.  And this is right in the ledger.

25               On the left side Pichete, who is responsible for

1  receiving the plane, he gets paid in lempira.  Do you see that

2  L?  The defendant, because he's a supplier is a major

3  participant in this transaction.  He's getting paid in dollars,

4  dollars that are cycled back through Central America after the

5  drugs are sold in the United States.  That's why there's a

6  dollar sign in the ledger and that's why there's a picture of

7  bulk cash in the defendant's phone.

8          Let's pause here for a minute to think about how much

9  money these men are making, how much money this man made in

10 connection with these shipments.  This is one shipment of

11 cocaine reflected in this ledger.  The defendant owned 536 of

12 those kilos.  He was paid at the price in Honduras $9,200.  So

13 that's within the price range that Special Agent Mervis

14 explained to you.  That's what kilos are worth in Honduras and

15 that's what the defendant was paid.  And that works out to 4.9

16 million U.S. dollars for one drug shipment, $4.9 million of

17 Tony's money.

18         That ledger, ladies and gentlemen, that was the focus

19 of what I talked about for the last five or so minutes,

20 Government Exhibit 250A, seized in Honduras in 2015.  That

21 ledger by itself proves that the defendant was a participant in

22 this drug trafficking conspiracy.  You really don't need much

23 more than that.  But there is a whole lot more than that and

24 that's what we're going to talk about now, the different phases

25 of the defendant's drug trafficking career.

1    Started out providing information and logistics to

2    traffickers.  And the main witness from that, you heard him

3    early in the trial.  Rojo said a lot about how that worked.

4    That begins in 2004.

5    By 2006, as I've said, the defendant had access to his

6    own cocaine lab.  You heard about that cocaine lab from three

7    witnesses, Rojo, Alex Ardon, and Chang, who testified

8    yesterday.

9    This begins in 2006 where the defendant emerges as a

10   cocaine supplier and it continues until he's arrested.

11   You know that because the ledger we just talked about

12   reflects an entry in February 2018 where he sent 650 kilos.

13   The next phase that we're going to talk about is the

14   defendant's state-sponsored drug trafficking which began in

15   2010.

16   Step one.  Helping traffickers get cocaine safely

17   through Honduras so that it can be imported into the United

18   States.  The defendant described this process in his own words

19   during his postarrest statement.  He described traffickers

20   wanting to get access to politically connected powerful people

21   in Honduras so that they would be available to help with drug

22   shipments.  The defendant is guilty of participating in this

23   conspiracy just by the fact that he made himself available to

24   these men if they had any problems.  He did a whole lot more

25   than that.  But the defendant's agreement to work with these

1    guys and help to make sure that their drugs got through safely,

2    that's enough.  So this is what the defendant said during his

3    postarrest.

4                   (Recording played)

5                   That is what he said to the DEA and that is exactly

6    what he was doing beginning in 2004.  Let's talk about how that

7    worked.

8                   Rojo described this to you.  Rojo had a drug

9    trafficking worker named Carlos Toledo.  Carlos Toledo was the

10   defendant's best friend.  So Toledo introduced these two men,

11   introduced Rojo, a major Honduran trafficker, to the defendant.

12   The defendant admitted this.

13                  (Recording played)

14                  So at this point the defendant has admitted to how

15   these relationships work, where traffickers try to get access

16   to people who can help with the shipments, people with

17   political power, people with government positions.  And now the

18   defendant has admitted to having been introduced to Rojo early

19   on in 2004.

20                  And he also referred to another major Honduran

21   trafficker during the clip that you just watched, Don H.  Rojo

22   explained that Don H was Rojo's boss until about 2010.  And so

23   the defendant isn't just connected with a midlevel worker.  He

24   also knows the guy who is in charge of sending these cocaine

25   shipments through Honduras into the United States.

1    Rojo explained at this trial that he was very explicit
2    about the cocaine routes that they were using.  "I told the
3    defendant, Tony Hernandez, that the cocaine was transported to
4    Guatemala, then to Mexico, with an ultimate destination into
5    the United States."
6    The defendant said the same thing.
7    (Recording played)
8    So one of the things that Judge Castel is going to
9    instruct you to think about is whether there was an agreement
10   to distribute cocaine knowing and intending that it was going
11   to the United States.  The defendant admitted on tape that he
12   knew that that was a part of this conspiracy that the drugs
13   were coming here.
14   He also talked about a more specific conversation with
15   Carlos Toledo relating to how the drugs were being transported
16   into Honduras.  The drug flights.  Just like the one that's
17   referenced in the ledger that we've already gone through.
18   (Recording played)
19   It might have been a joke to the defendant in 2004 but
20   it's a crime now.
21   One of the things that defense counsel has suggested
22   to you is that in this timeframe, 2004 to 2010, the defendant
23   didn't have the type of connections, the type of access to
24   actually help with traffickers.  You're going to see from the
25   defendant's phone that that is absolutely false, just wrong.

JAG9HER1                    Summation - Mr. Bove

1    The defendant said during his postarrest that he had served in

2    the Honduran military.  There are over 50 contacts saved in the

3    defendant's phone that refer to military colonels.  Some of

4    these are up on the screen right now.  On the left side you can

5    see some of the names that are saved by actual people.  But on

6    the right you can see that the defendant organized some of his

7    military contacts by the types of things that they could do for

8    him in drug trafficking.

9         So the top one on the right, Colonel Mosquitia.

10   Mosquitia is that region in Eastern Honduras with the jungle

11   and the mountains where the cocaine was coming in by boat, by

12   plane, by helicopter.  So here is one of the defendant's

13   contacts to help with the drug shipment.

14        And I just mentioned helicopters.  Look at the contact

15   right underneath that.  Not saved by a name.  Saved by the

16   colonel who is in charge of the helicopters.

17        So, first, the defendant had access to military

18   information, just like Rojo explained to you, that he could use

19   to help with drug shipments.

20        Let's stop here for a minute and be really clear.

21   These phones that I'm talking about, Government Exhibits 202

22   and 203, phones that were physically seized from the defendant

23   in November of 2018, these are absolutely this man's phones,

24   phones that he was using in that timeframe.  They are loaded

25   with selfies that he took, a picture of a note that he took

1    referring to him by the name Tony, and pictures of his

2    passport.  So there can be no serious question that when we

3    talk about contacts from these phones and pictures from these

4    phones, that these were the defendant's.

5          Let's get back to his connections.  We talked about

6    the military.  He also had connections to the police.  You

7    heard about this from Giavonnii Rodriguez, a witness at this

8    trial who was a member of the Honduran National Police and a

9    drug trafficker, a drug trafficker who worked for Rojo and

10   worked for the defendant.  And he told you about one of the

11   defendant's main police connections, Mauricio Hernandez Pineda

12   who is shown in the bottom left with the hat on.

13         Rodriguez told you that by 2006 or 2007 Hernandez

14   Pineda was talking about working for Rojo and working for the

15   defendant.  They were doing that together.  And even in 2018,

16   ladies and gentlemen, Mauricio Hernandez's contact information

17   is still in the defendant's phone.  Because the defendant is

18   still involved in drug trafficking.

19         So we've talked about military connections to help

20   with logistical support.  We've talked about police connections

21   to help with logistical support.  Now let's talk about some of

22   the other politicians who were involved in this early on.

23         Rojo told you that Tony Hernandez wasn't the only

24   powerful person coming to these meetings about drug

25   trafficking.  Juan Carlos Valenzuela was there.  At the time of

1    the meetings Rojo talked about, Valenzuela was a councilman in

2    a town in the Lempira Department where the defendant is from.

3    But later on, by the time the state-sponsored drug trafficking

4    started, he became a congressman.

5         Rojo also explained that Mario Jose Calix was at these

6    meetings.  Calix later became the mayor in the town where the

7    defendant is from, Gracias Lempira.

8         This is what the defendant had to say about Valenzuela

9    during his postarrest.  He admitted that Valenzuela is one of

10   the people who connected him to these drug traffickers to help

11   him join this conspiracy.

12        (Recording played)

13        and in that clip he's talking about Don H again.  He's

14   talking about Rojo and that one of the other connections to

15   these men was Juan Carlos Valenzuela.

16        And here, again, look at the left side of the screen.

17   Valenzuela's contact information is still saved in the

18   defendant's phone in 2018.

19        Now let's talk about Mario Jose Calix.  These are some

20   of the things that the defendant said about Calix during his

21   postarrest statement to the DEA.  He admitted that Calix was

22   involved in drug trafficking.  He said that Calix was still

23   involved in November 2018.  And on the right side of the screen

24   you can see where the defendant described going to meetings

25   with drug traffickers at a restaurant that Calix owned.

1    At some point in this interview the defendant realized

2    that he had admitted a little bit too much about Mario Jose

3    Calix.  And so during the interview, this box in red, he says:

4    I don't have much contact with Calix anymore, not in November

5    of 2018.  False.  Wrong.  Not true.

6    The middle row here is an entry from one of the

7    defendant's phones.  It shows a picture of Calix with the

8    defendant that was saved on the phone in April 2018.  Calix's

9    contact information is still in the defendant's phone at the

10    time of his arrest.  You can see that that contact was created

11    around the same time as the photograph and it was modified just

12    under two months before the defendant was arrested.

13    So when he said I don't have much contact with Mario

14    Calix anymore, that was a lie because he started to get

15    concerned that he was incriminating himself a little bit too

16    much.

17    Rojo gave you a good summary of the defendant's role

18    in this phase of the drug trafficking, the information and

19    logistics phase.  The defendant's job was to take payments,

20    usually five thousand dollars per shipment, and make sure that

21    there were zero problems.  And the defendant told Rojo as long

22    as you keep paying me there will be zero problems, zero risk of

23    seizure of the cocaine, zero risk of arrest of the persons

24    involved.

25    So let's talk a little bit more about how the

1   defendant did that, how he helped these men protect cocaine

2   beginning in 2004.

3          He provided radar information like we've talked about,

4   through his military connections, to help planes and boats that

5   were loaded with cocaine enter Honduras safely.

6          He relied on Mauricio Hernandez and Giavonnii

7   Rodriguez, in the top left of this screen, for information

8   about police checkpoints and investigations; things that

9   traffickers would want to know about so they could schedule

10  shipments to avoid them and transport cocaine safely through

11  Honduras.

12         The defendant also helped keep police who were aligned

13  with the traffickers in the Department of Copan.  You heard

14  throughout this trial that the Copan Department was so

15  important to what these guys were doing because it contained

16  one of the main roads into Guatemala, the Central American

17  Highway.  Alex Ardon was a mayor in Copan.  The Valle brothers

18  had their base of operations in Copan.  And this was a

19  strategically important area.

20         So Rojo went to the defendant and he said:  Sir,

21  Roberto Lozano is helping me escort shipments.  I can't have

22  him transferred.  I need him here to continue helping.  And

23  that happened.  The defendant used his connections in the

24  capital to keep Lozano in place.

25         The next man in the bottom left corner, Mauro Flores

JAG9HER1                    Summation – Mr. Bove

Santos.  Rojo did the same thing.  He didn't want Santos

transferred away because Santos was a good worker and the

defendant helped keep him there.

You also heard that the defendant provided information

about Honduran military operations.  The white boxes on the

screen relate to two of the key military bases that you heard

about in Honduras, Puerto Castilla, a naval base on the

Atlantic Coast.  And Rojo explained that if you were going to

transport a shipment of cocaine into Eastern Honduras you

needed to understand the operations at that base because that's

where the assets would be deployed if anyone was going to try

and seize those drugs, assets meaning Air Force planes, boats

to come out and intercept a maritime shipment.  And so the

defendant provided information about the schedule at that base

so that they could plan their drug shipments

Towards the left side of the screen there is a box

around Naco.  Naco Cortes, another military base.  This one

situated right on Rojo's main drug routes.

You remember this map as the demonstrative that Rojo

used to talk about how specifically he transported the cocaine.

And there's a military base right in the middle of it.  And so

Rojo relied on the defendant to explain when people, when

soldiers from the capital were sent to that military base in

Naco because they had bribed the people who lived in Cortes,

but they didn't control the people who were coming from the

JAG9HER1                          Summation – Mr. Bove

1    capital, and they didn't want to send drug shipments when they

2    were at the base.

3                (Continued on next page)

1           MR. BOVE:  You also heard about a meeting in 2008 when

2     the defendant said look, the DEA is teaching the air force

3     pilots how to fly at night, you need to be more careful about

4     when and how you're sending your cocaine shipments in.

5           So these are in specific detail the types of things

6     that the defendant was doing to help traffickers beginning in

7     2004.

8           These are the prices that the defendant was charging.

9     Rojo explained these.  $5,000 each time there was a cocaine

10    shipment, just to make sure that the defendant was available to

11    help if there was a problem.  $5,000 for those police

12    reassignments we talked about, Lozano and Santos.  $10,000 for

13    tips about who was working in Naco, Cortes at the military

14    base.  And $50,000 each time the defendant provided information

15    relating to the Honduran radar.

16          During the defendant's post-arrest, he talked about

17    receiving bonuses from these drug traffickers and he described

18    them basically as gifts.

19          (Video recording played)

20          MR. BOVE:  You saw Rojo testify during this trial.

21    Did the man look like a philanthropist?  Did he look like Santa

22    Claus?  Is he just giving out gifts randomly to the defendant?

23    No.  Not at all.  Rojo gave those gifts and the defendant

24    accepted them because they were part of what the defendant was

25    accepting as payment to provide assistance.  The defendant,

1    having taken those gifts and admitting to it, including guns,

2    is part of the evidence that he joined this conspiracy.

3          And in this phase, this phase alone, 2004, with

4    information and logistical support, and Rojo said this began in

5    2004 and continued until the time Rojo was arrested, the

6    defendant helped send 140,000 kilos of cocaine towards the

7    United States.

8          The next thing that we're going to talk about is the

9    emergence of the defendant as a manufacturer of cocaine, how he

10   developed access to a cocaine lab in Colombia.  Rojo described

11   this.  He was one of the people.  And what happened here is

12   that the defendant meets a Colombian named Cinco.  That's his

13   picture on the bottom of the screen, several of the witnesses

14   identified that.  And the defendant says to Rojo I'm going to

15   start marking kilos with my initials -- and so you see that

16   kilo on the left -- and it's going to look like the Tommy

17   Hilfiger brand logo.  You see that on the right.

18         The defendant also described this to Alex Ardon, who

19   you heard from at this trial.  He didn't reference Cinco, but

20   he said he was developing connections to Colombians through the

21   Valle brothers.  Who were the Valle brothers?  They're shown on

22   the left side of the screen.  They were two major Honduran

23   traffickers working in that Copan department.  The defendant

24   admitted during his post-arrest statement that he met them.

25   And those are the men that introduced the defendant to Cinco

1    said he could develop the connection to cocaine lab.

2            There's a key piece of evidence about this.  In one of

3    the passports that was seized from the defendant when he was

4    arrested, an expired passport that he carried with him when he

5    came to United States reflected a 2006 trip to the San Andres

6    Islands in Colombia.  Chang explained yesterday what the San

7    Andres Islands are.  They are a hub, a transshipment point for

8    some drugs to stop on their way from Colombia to Honduras.

9            2006 is exactly when Rojo told you he first heard

10   about the emergence of this cocaine stamp and the connections

11   to Colombian traffickers.  And this is another powerful piece

12   of corroborating evidence that shows you that Rojo told the

13   truth in that the defendant was a drug trafficker.  The San

14   Andres Islands are not a vacation spot, he went there to help

15   set up cocaine distribution operations.

16           Three witnesses at this trial told you that they saw

17   kilos of cocaine marked with TH, they saw the defendant's

18   cocaine in Honduras.  This is what the defendant said when he

19   was confronted with the picture of that kilo during the

20   interview.

21           (Video recording played)

22           MR. BOVE:  Immediately the defendant looks at this and

23   says it's a kilo.  He knows, he's confronted by this, and what

24   he tries to say is:  Well, who would do this?  Who would put

25   their initials on kilos of cocaine and send them to the United

1    States?  The answer is:  Very, very arrogant, very, very

2    protected drug traffickers.

3              And the defendant was not the only one.  You heard

4    from two other witnesses about other people whose stamped their

5    initials on kilos of cocaine.  Rojo told you about a trafficker

6    named Ruben Mejia, who used a cocaine stamp with RM, and Ardon

7    said that he used his own initials, AA.  So it might sound

8    crazy, hearing about this for the first time, that somebody

9    would do that, until you think about all of the evidence in

10   this case, think about the fact that in 2006 it wasn't even

11   possible for the defendant to be extradited to be prosecuted

12   for these crimes, and it wasn't possible for any of these men

13   to be extradited and prosecuted.  And again, this is how

14   arrogant they were.  This is what they did, TH, RM, AA.

15             Now we're going to start to talk about some of the

16   cocaine shipments that the defendant sent once he had access to

17   a cocaine lab, once he was more than just a logistics guy, he

18   was supplying the cocaine for these shipments.

19             Rojo and Chang both told you about this shipment.

20   Rojo said the defendant sent me 400 kilos of cocaine on a plane

21   that landed in Sico, you can see that on the map where the

22   arrow stops on the right, and that cocaine was transported on

23   the ground to me in Tracerros, where Rojo's picture is.

24             Chang explained that the plane he supplied was U.S.

25   registered, and Rojo explained there was heavily armed security

for these drugs while they were transported, and that they were ultimately imported into the U.S.  So that's another one single drug shipment that makes the defendant guilty of Count One.

Here's another one:  Rojo and Chang told you about this one, 500 more kilos sent on a plane in Honduras, this time to Gualaco.  Rojo told you that that plane landed at an airstrip, an airstrip controlled by Mario Calix, a man who the defendant admitted that he knew, you can tell from his phone that he was close with, and the defendant has admitted he was a drug trafficker.  So these 500 kilos, they land on a plane in Gualaco, they're transported to Rojo, and imported into the United States.  Another, one drug shipment, guilty on Count One.

Here's another one:  Rojo told you about this as well. 1,000 kilos that Rojo saw with TH stamp in Espiritu in the Copan department.  I said this already:  Espiritu was the base for the Valle brothers, the men who first introduced the defendant to Cinco, the Colombian, who introduced those guys in the first place.  So it's no surprise that there's one ton, one thousand kilos of cocaine at the Valle's ranch.  Rojo inspected those 1,000 kilos, and Chang told you yesterday he bought 700 of those kilos out of the thousand and helped import them into the United States.

What happened after that?  Five more times the defendant sent 700-kilo drug shipments to Chang.  Five more

1    times between 2008 and 2010.

2           Here's another drug quantity figure from these

3    witnesses.  So Rojo told you about 140 tons of cocaine, Chang

4    tells you about another 15,000 kilos that he helped distribute

5    with the defendant.  Remember, the legal threshold you're

6    considering here is five.

7           By 2010, as I said, is when the defendant and his

8    associates took control of the Honduran government.  This is

9    the beginning of the period of state-sponsored drug

10   trafficking.

11          Let me give you some background on that.  Rojo

12   explained that in 2005 he paid $40,000 in drug money to the

13   defendant to help the defendant's brother, Juan Orlando, in a

14   campaign to get reelected for the congress.  Juan Orlando won

15   reelection that year during the 2005 election.  He was

16   reelected as a congressman, but the National party lost the

17   presidential election, as I already said.  Mel Zelaya from the

18   Liberal party took the office in 2006.  And equally problematic

19   for these guys was that because Zelaya controlled the

20   presidency, he had a lot of influence over who would be the

21   leader of congress, so that was also someone from Liberal

22   party, Roberto Micheletti.

23          Remember the testimony about the coup that happened in

24   2009 when Zelaya was removed from office by the military?

25   Micheletti was the next guy in command, essentially like the

1   vice president in the U.S.  So what happened here, because they
2   lost these -- the National party lost these elections in 2005,
3   was that for several years the defendant and his brother had
4   more limited power.  And as I said, they vowed at that point to
5   never let that happen again, so this how they did it.
6            THE COURT:  Ladies and gentlemen, at this point we're
7   going to take a ten-minute recess.  Please do not discuss the
8   case among yourselves or with anyone.  We'll be back in action
9   in ten minutes.  Thank you.
10           (Jury not present)
11           THE COURT:  We are in recess.
12           (Recess taken)
13           (Jury present)
14           THE COURT:  Mr. Bove, you may continue.
15           MR. BOVE:  Thank you, Judge.
16           So before the break we had just started to talk about
17   the beginning of the period of state-sponsored drug trafficking
18   in Honduras.  And let's recap that a little bit.  Beginning in
19   2004 the defendant starts working with Rojo and Don H.  He's
20   receiving those $5,000 per shipment payments.  He admitted on
21   tape that he received guns from Rojo and watches.  The
22   defendant didn't have any of those men arrested, they were
23   still distributing massive amounts of cocaine and he was
24   protecting them while they did that.  And again, that is by
25   itself enough to make the defendant guilty of Count One.

1          Then in 2006 he starts sending his own TH kilos into

2    Honduras so they can be imported into the U.S.  So we looked at

3    some of those shipments, and each and every single one of those

4    shipments is enough to make the defendant guilty on Count One.

5    But around 2009 is when things changed, is when this conduct

6    got even more serious, it's when the defendant and his

7    co-conspirators took steps to take over the Honduran government

8    to use it for drug trafficking.

9          On the screen right now is some testimony from Alex

10   Ardon about the way that part of that started.  Alex Ardon was

11   a mayor in El Paraiso, Copan, that department that we have been

12   talking about right on the Guatemalan border that's a very

13   important strategic location for drug shipments.  He was a

14   mayor from the National party, and he aligned closely with the

15   defendant, with the man who became president in 2010, Pepe

16   Lobo, and with Juan Orlando Hernandez, the defendant's brother,

17   who is now the president of Honduras.

18         So Ardon described the conversation in 2009 where the

19   Liberal party president has just been removed by force from

20   office, and the defendant essentially says:  This is great for

21   us.  This coup has divided the Liberal party.  It makes it more

22   likely that the National party is going to win, and we're going

23   to be able to work together on bigger cocaine shipments.

24         This comes up right after the coup, and then they

25   start to negotiate how those shipments are going to work from

JAGTHER2                    Summation - Mr. Bove

1    2009 as they work towards the election that November.

2              Another thing that changed as the defendant set up

3    state-sponsored drug trafficking, you have this partnership

4    with Alex Ardon emerging, and the Cachiros drug trafficking

5    organization starts to emerge as well.  So Ardon is on the

6    border near Guatemala, the Cachiros are based in the Colon

7    department, which is on the Atlantic coast over near the

8    jungles in the east.  And they start to emerge as another large

9    drug trafficking organization in Honduras that develops

10   connections to a bunch of politicians, but politicians that

11   included the National party.

12             And here's an important one:  Rivera, one of the

13   leaders of the Cachiros explained that Oscar Najera, a National

14   party congressman from the base of operations for the Cachiros,

15   the Colon department, was one of the people protecting the

16   Cachiros.  Who is Oscar Najera?  Another close friend of the

17   defendants who was a part of setting all of this up so that the

18   Honduran government could be used to protects drug traffickers.

19             When the defendant was arrested he had Oscar Najera's

20   contact information in his phone.  And these on the bottom of

21   the screen are some pictures of Najera which is also on the

22   phone.  You see the picture of the defendant and Oscar Najera

23   together in a hot tub, and then on the right and left side of

24   the screen are pictures of Najera with Juan Orlando Hernandez,

25   the current president of Honduras.  So you can see the

1    political connections starting to emerge that serve as the

2    foundation for the state-sponsored drug trafficking.  You have

3    Ardon on the Guatemalan border and now you have the Cachiros

4    and Oscar Najera over in the east.

5          This is a list of the bribes that drug traffickers

6    paid to support Pepe Lobo and Juan Orlando Hernandez in the

7    November 2009 election.  Rojo told you that he paid $100,000 in

8    drug money to the defendant.  Rivera, the leader of the

9    Cachiros, described providing between half a million and

10   $600,000 to Pepe Lobo directly who was running for president at

11   the time.  And Alex Ardon described paying $2 million in drug

12   money to help Pepe Lobo get elected president and to help the

13   defendant's brother become the leader of the congress, that

14   sort of stepping stool right before he became president.

15         These are the results of the elections in 2009.  Pepe

16   Lobo becomes president as of 2010, and Juan Orlando Hernandez,

17   the defendant's brother, becomes the president of the congress.

18         And at this point, ladies and gentlemen, the National

19   party and these drug traffickers control the presidency, they

20   control the president of the congress, which is like

21   controlling the vice president here.  And this is when the

22   state-sponsored drug trafficking truly started, and the things

23   that I described as astonishing began to take place.

24         Ardon said that beginning in 2010 he worked with the

25   defendant on another 30 or 40 tons of cocaine distributed

JAGTHER2                    Summation - Mr. Bove

through Honduras on their way to the United States.  And let's

talk about some of the ways that they did that.

         Between 2010 and 2011 the defendant used helicopters

to hop from country to country, Panama, Costa Rica, Nicaragua,

Honduras.  Ardon's partner, Wilter Blanco, received those

helicopters in the jungles of Honduras, and the defendant used

his own helicopter to transport them to the Copan department

near the Guatemala border.

         Ardon told you during the trial that one of those

helicopters was blue, and there is a picture of a blue

helicopter and the defendant sitting in a helicopter on his

phone.  And you can see both of those pictures on the screen.

         For one year the defendant worked on these helicopter

shipments at a rate of 280 to 350 kilos per month.  That 280

number was basically the most cocaine that the smaller

helicopter to handle.  That's the smallest drug shipment that

you heard about in the case, 280 kilos, when you're being asked

whether this conspiracy involved five kilos.

         Beginning in 2010, the defendant and Ardon also

started to help Chapo transport cocaine through Honduras.  Now

Ardon told you that he met Chapo in 2007.  But he started to

have the defendant help with these shipments to protect them in

2010.

         And this is what this part of the deal looked like.

Chapo was bringing cocaine to San Pedro Sula, Honduras, and he

JAGTHER2                    Summation – Mr. Bove

1    mansion wanted to make sure that it got safely into the

2    Guatemalan border and into Guatemala.  So you can see the arrow

3    from San Pedro Sula to El Paraiso, which was Ardon's territory

4    where he was mayor, and then up over the mountains to Los

5    Amates, which is in Guatemala.  Ardon explained to you that

6    between 2010 and 2012 he and the defendant transported cocaine

7    for Chapo at a rate of about a ton a month, one thousand kilos

8    over this route so they could be imported into the United

9    States.

10          Chapo was the leader of the Sinaloa cartel, his drugs

11    could not be placed at risk, absolute protection was a must,

12    and so these were some of the most heavily guarded shipments

13    that you heard about.  Machine guns, national police, you heard

14    about Mauricio Hernandez Pineda being involved in protecting

15    these shipments.

16          This is another way that the defendant worked with

17    Chapo to distribute cocaine.  Ardon told you about these

18    Televisa trucks, basically a TV network, and Chapo set up these

19    fake Televisa trucks that looked like they were working for the

20    network but were actually transporting cocaine.  These trucks

21    were capable of transporting six tons of cocaine from Guatemala

22    up to Mexico.  And Chapo came to Ardon and he said:  Can you

23    help me fill these trucks up with drugs?

24          And who did Ardon seek for help with that?  The

25    defendant.  And so twice in 2011 the defendant supplied his TH

JAGTHER2                    Summation - Mr. Bove

1    kilos to be used in connection with these Televisa shipments.

2    The first time the defendant had the 1,300 kilos delivered in

3    Francia, Colon, you can see that dot on the screen as the first

4    stop, by a maritime shipment on a boat.  And then they provided

5    security for the cocaine to be transported over land to El

6    Paraiso and into Guatemala to be loaded onto Chapo's trucks.

7    And then they did it again with 1,600 kilos, also the

8    defendant's cocaine stamp, all for Chapo to import those drugs

9    into the United States.

10            The defendant had so much power in Honduras at this

11   time that other people who dared to challenge their authority,

12   whether it was Ardon's or the defendant's, those people were

13   murdered.  And here's an example of that.  Ardon described a

14   trafficker named Frank Arita who was based in Copan Ruines.

15   You can see that on the map.  The reference to CA-1, that

16   little white sign, that's the Central American highway.  So

17   Copan Ruines is on one of the main routes to get cocaine out of

18   Honduras, over of the border, into Guatemala.

19            And Franklin Arita dares to say to Ardon:  I'm not

20   going to let you do this anymore.  I'm going to stop this

21   unless you start paying me.  Ardon goes to the defendant, and

22   the defendant doesn't say let's talk to him, maybe let's make

23   him a partner, maybe we can pay him, too.  He says let's have

24   him killed.  And the defendant was the one who knew how to do

25   that, who wanted to do it.

1          These men, you heard about this, they had access to

2     assassins.  These men were all responsible for many murders.

3     But in this case, for someone who dared to try and block the

4     defendant's access to the Guatemalan border, he said:  We'll

5     have the national police do it.  I'm going to get in touch with

6     my friend Tigre Bonilla, who at this time in 2011 was a

7     regional police chief in western Honduras.  And you know what

8     happened to Franklin Arita.  The defendant had Bonilla murder

9     him.

10          And while that was going on he continued to work on

11    drug shipments.  He changed up his helicopter route with Ardon

12    a little bit.  And that's because the helicopters couldn't

13    transport enough cocaine into Honduras.  So the defendant said

14    to Ardon:  Can you receive some boats?  They can carry more

15    drugs.  I can send them into Mosquitia.  Ardon coordinated that

16    with Wilter Blanco, and so between 2011 and 2012, instead of

17    sending helicopters into Honduras, the defendant started to

18    send boatloads of cocaine, each shipment between 700 and

19    1,600 kilos once a month between 2011 and 2012.  And once those

20    drugs got into Honduras safely, they continued to use the

21    defendant's helicopter to transport the drugs from the jungle

22    over the Guatemala border so the drugs could be pushed towards

23    the United States.

24          Rojo was still distributing cocaine in this timeframe,

25    and what he told you about what he was doing was receiving

1    maritime drug shipments, boats of cocaine, in Choluteca.  We

2    talked a lot today about the Atlantic coast in northern

3    Honduras.  Choluteca is on the south on the Pacific side.  And

4    Rojo was working with Mario Jose Calix, who we talked about

5    today, and defendant to receive more cocaine down on the south

6    side.

7        When the defendant was interviewed by the DEA, he

8    described this drug route.  Just like he slipped up when he

9    said a little bit too much about Mario Calix, he accidently let

10   it slip that he knew about this drug route through Choluteca as

11   well.  Those drugs, and we'll look at the map in a minute, were

12   arriving on boats and then being transported in cattle cars

13   towards the Guatemalan border and up to United States.

14       Here's what the defendant said about the Choluteca

15   shipments.

16       (Video recording played)

17       MR. BOVE:  The only reason he knew about that was

18   because he was involved in it.  It's not like these drug

19   shipments are reported in the newspapers.  And that was

20   something that the defendant admitted during his interview by

21   accident that is additional proof that shows you that he's

22   guilty.

23       And you see that reference to Mr. Pinto at this end

24   there?  Who is Mr. Pinto?  It's Melvin Pinto.  Melvin Pinto was

25   Ardon's right-hand man.  So the defendant is, whether by

JAGTHER2                    Summation - Mr. Bove

1   mistake or slip, describing ongoing drug shipments that he had

2   been involved in dating back to 2012.

3          2012 is also the point at which the Honduran

4   constitution was amended and changed to allow Honduran

5   nationals to be extradited to the United States.  So as I said,

6   up until this point, all the drug shipments that we have talked

7   about, in addition to the fact that the defendant and his

8   brother and Pepe Lobo controlled the Honduran government, it

9   wasn't even a possibility that they could be prosecuted here

10  for those crimes.

11         That changed a little bit when the constitution was

12  amended in 2012.  And Professor Euraque explained to you what

13  happened.  Pepe Lobo and the defendant's brother went to Miami

14  and they had a meeting where the U.S. government applied

15  pressure in order to get the country to change this.  And so

16  they went back, and there was a constitutional amendment, and

17  at this point in 2012 some of traffickers start to wonder:

18         I see as a legal matter that this has changed.

19  Suddenly I'm a little more exposed than I was previously.

20  Mr. Hernandez, the defendant, you have said you will protect

21  me.  You have said I will not be extradited.  These were part

22  of the deals.  These were the strings connected to those drug

23  money payments in 2009.

24         And so these guys go to the defendant and they want to

25  know what's going on.  And the defendant says what anybody

JAGTHER2                    Summation - Mr. Bove

1    would say when they are part of a group that controls the

2    entire government, he basically says that was just for show,

3    Alex Ardon, you will not be extradited as long as the National

4    party remains in power.  That's the top quote on the screen.

5            And Giovani Rodriguez, the guy from the national

6    police, is wondering the same thing.  And so he asks the

7    defendant's cousin, Mauricio Hernandez Pineda:  Hey, I see this

8    amendment happened, are we going to be prosecuted now, or is

9    the deal still good?  And Hernandez Pineda says:  We're fine.

10   We are fine.

11           And that, that is really the crux of the state

12   sponsored drug trafficking that we're talking about.  Even when

13   it became a possibility that these men could be extradited, the

14   defendant's main co-conspirators were not sent here.  And the

15   defendant continued to distribute cocaine.

16           Now he toned it down in 2012 a little bit.  He receded

17   into the shadows just a bit.  He stopped supplying Ardon with

18   cocaine.  What did he do instead?  He said:  Alex Ardon, Wilter

19   Blanco, come up with your own drugs, but once they get to

20   Honduras, I'll help you transport them.

21           How did he help?  Ardon explained it.  The defendant

22   let them use his helicopter, including his blue helicopter

23   shown on the defendant's phone, the defendant provided drug

24   pilots to help transport that cocaine once it was in Honduras

25   over the Guatemalan border, and he also provided more law

1    enforcement information, because of course the defendant

2    doesn't want his own helicopter loaded with drugs to get seized

3    in Honduras.  So for another year, 2012 to 2013, this is what

4    the drug trafficking partnership between the defendant and

5    Ardon looked like:  280 to 350 kilos per month transported in

6    the defendant's helicopters, the maximum amount of drugs that

7    these helicopters to hold.

8            We have talked about a lot of drug shipments.  The

9    drug ledger that I showed you in the beginning this morning

10   reflected a payment of over $4 million to the defendant.  So

11   you can imagine by 2013 the cash is starting to pile up.  And

12   it's piling up so much that Giovani Rodriguez sees literally a

13   three-foot tall stack of U.S. dollars packed into a closet at

14   one of the defendant's houses because he doesn't even know what

15   to do with all the money that he is making at this point.

16           These are the bribes that were paid into the 2013

17   election.  This is the election where the defendant's brother

18   is running for president of Honduras and the defendant was

19   running for congressman, as I said, running for congressman to

20   try to cloak himself in an official title so that he could be

21   even more protected.  Because by 2013 it's at least plausible,

22   especially if the National party loses the elections, that the

23   defendant could be extradited again.  So he wants to make

24   himself look more formal and he runs for congress.

25           How were these campaigns funded?  Ardon told you that

JAGTHER2                          Summation - Mr. Bove

1    he spent $1.6 million in order to help the defendant and Juan

2    Orlando, the defendant's brother, get elected.  And Ardon

3    explained there was an explicit agreement, an agreement between

4    the defendant, Chapo, Ardon, and the Valle brothers, that if

5    they paid this money there would be no extraditions.

6            And these are the two meetings in Honduras with Chapo

7    that I already talked, one in Espiritu, the Valles' base, and

8    the second in El Paraiso, Ardon's base.  And it was in El

9    Paraiso that Chapo handed the defendant the million dollars

10   that is reflected on the screen here to help the defendant's

11   brother get elected president and to keep on protecting him.

12           Here are the results of this election.  This is the

13   November 2013 election.  Juan Orlando Hernandez, elected

14   president of Honduras, still holds that position today.  The

15   defendant's brother, initially elected into this suplente

16   position, sort of like a deputy congressman.  How did the

17   defendant's brother fix that?  The person who was elected as

18   the main congressman, Samuel Reyes, suddenly gets appointed to

19   be the minister of defense by Juan Orlando Hernandez, so that

20   the defendant is able to slot into the main congressman

21   category beginning into 2014.

22           There was another important change in the way that the

23   defendant was drug trafficking that arose out of these meetings

24   with Chapo.  As I said, he receded a little bit from his

25   partnership with Ardon.  He started to work on those helicopter

1    rentals instead of supplying cocaine.  But an important thing

2    happened at this meeting with Chapo:  They exchanged contact

3    information, the defendant and Chapo.  They basically cut Ardon

4    out in 2013 so that that they could work together directly to

5    continue distributing cocaine and importing it into the United

6    States.

7            This is from the same meeting where Chapo paid the

8    defendant a million dollars.

9            This picture from the defendant's phone is an

10   embodiment of what state-sponsored drug trafficking looks like.

11   This is a machine gun that you heard about yesterday with the

12   defendant's brother's name engraved into it.  Ardon explained

13   that he saw this picture in 2013 right around the time that

14   Juan Orlando was running for and was elected to become

15   president.

16           And that second red box on the right, do you see that?

17   Do you remember the questions yesterday about whether this was

18   some kind of gift or a trinket or a fake gun?  This picture was

19   taken in a room full of these machine guns.  On the right in

20   the red box you can see the ridges on the weapon.  There's not

21   just one of these, there are several.  They were arming

22   themselves for protection, to protect their drug money, and to

23   continue to protect their cocaine.  And they were so brazen

24   about it that they are literally inscribing the name of the

25   president on some of the weapons that they used to do that.

1          In 2013 one of the drug workers that helped Wilter

2    Blanco and Ardon was arrested, arrested in the Colon department

3    on the Atlantic coast in connection with a maritime drug

4    shipment.  What happens to Chino?  Tony Hernandez decides that

5    the man has to die because he knows too much about their drug

6    trafficking operations, and he's concerned that Chino has

7    already started to cooperate and provide information about what

8    the defendant has been doing.

9          Ardon explained that Chino was involved in these drug

10   shipments dating back to 2010, 2009, and that Ardon told the

11   defendant who Chino was and what he was doing.  And so when the

12   time came that the defendant found out that Chino was

13   incarcerated, what did he do?  He didn't try to get him out of

14   jail.  The man is a lawyer.  He didn't try to represent him in

15   that case.  He had him murdered in prison, and two witnesses

16   told you about that.  Ardon told you about how this murder

17   happened from his perspective, learning that Chino got

18   arrested, talking with the defendant, the defendant ordering

19   the murder.

20         And then Ardon goes and talks to Wilter Blanco, whose

21   picture is on the screen.  Rivera told you about this murder

22   from his perspective.  The leader of the Cachiros said Wilter

23   Blanco came to me and he says that this guy Chino needs to be

24   murdered in prison.  And so Rivera is the one who arranged

25   that.  But two witnesses describe this murder and described how

JAGTHER2                    Summation - Mr. Bove

1    it happened.  Here's how the defendant reacted after it was

2    carried out.  This is what he said to Alex Ardon.  He was

3    happy, because Chino had all the information.

4            Now I would like to talk a little bit about the

5    recording that I already mentioned today, this Denny's meeting.

6    These are the participants in this meeting:  Rivera, the leader

7    of the Cachiros.  Juan Manuel Avila Meza, that is a man who is

8    he member of Honduran national police and also a member of the

9    Cachiros drug trafficking organization.  He had helped Rivera

10   with a murder in 2004.  He helped with drug shipments.  And he

11   was the main person who introduced Rivera to the next person on

12   the list, Oscar Ramirez a/k/a Alero.

13           You remember during the testimony of Special Agent

14   Papadopoulos that the defendant admitted that it was Oscar

15   Alero is the way he referred to them in the interview in Miami,

16   that Alero came to the defendant and pitched this meeting.

17   This guy Alero, Ramirez, this is the defendant's contact, it's

18   not Rivera's contact.  And this is his contact information

19   saved in the defendant's phone in April of 2018.  So when you

20   think about the testimony about how this meeting got set up,

21   the defendant's contacts were every bit a part of this as much

22   as Avila Meza.

23           And think about the context of what is happening on

24   this tape.  Rivera explained that in September 2013 the

25   Department of the Treasury, OFAC, in the United States, issued

1    an announcement sanctioning the Cachiros.  This is a little

2    excerpt on the left side of the screen from that announcement.

3    Rivera described it like a bomb in the meeting.  That's

4    September 2013.  In November 2013 the defendant gets elected

5    and becomes a congressman, takes office in January, and in

6    February 2014 he is sitting down with this man everyone in

7    Honduras knows is a violent, notorious drug trafficker.  He

8    didn't sit down with him in connection with a sting, the police

9    didn't storm Denny's to arrest Rivera, he sat down with him to

10   talk about how to help the Cachiros launder money.

11            When Rivera testified, there was some

12   cross-examination trying to suggest that this meeting related

13   to legitimate business.  There was even a question about why

14   the men had worn business casual clothing.  You really need to

15   look at the transcript of this meeting to see that this was a

16   meeting about money laundering and front companies, not

17   legitimate business.  This is the defendant on line 2 saying:

18   We're going to have to move them over.  And what he is talking

19   about are contracts that the government of Honduras issued to a

20   Cachiros front company.

21            So literally the Honduran government agreed to pay

22   money to a front company of a man responsible for 78 murders.

23   And the defendant shows up in February 2014 and he says, in

24   essence, the substance of this statement is:  Look, you have

25   got a problem.  Your first company is sanctioned by the United

1    States.  We have got to get you a second company to get the

2    government to be able to make these payments so you can have

3    the money.  That's what "we're going to have to move them over"

4    means.  See how on line 6 he says "so the payments can be

5    issued in the name of the other one," he's talking about the

6    new front company that isn't listed on this OFAC notice.

7                    (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     MR. BOVE:  (Continuing)  That picture on the right

2     side of the screen shows you that there is no question that the

3     defendant knew which front companies were being discussed at

4     this meeting.  That is a picture of him holding the contracts

5     for the Cachiros front company Inrimar was the acronym.  You

6     can see that acronym in the box on the left, listed on the OFAC

7     announcement.  The defendant knew exactly what was going on

8     here.  This wasn't legitimate business.  He was trying to help

9     the Cachiros launder money as a newly elected congressman.

10         Another telling comment that the defendant makes

11    during this recorded meeting.  He says:  I'm going to go to

12    Hugo's people to get help with this, to get the Honduran

13    government to issue these money laundering payments.

14         Who is Hugo?  It's Hugo Ardon, Alex Ardon's brother.

15    And you'll remember that Alex Ardon explained that this was

16    part of the deal for the $2 million that he paid in 2009 and

17    the $1.6 million that he paid in 2013 into these elections.

18    The deal was if I give you this drug money to help your brother

19    get elected you need to put my brother in a government

20    position.  They agreed to make him the head of the Fondo Vial

21    which is basically like a public works department in the

22    Honduran government.  And the defendant knew exactly who Hugo

23    Ardon was on this tape.  And when he is asked to help a massive

24    violent drug-trafficking organization launder money, he knows

25    that one of the first stops is going to be Hugo Ardon who has

1    been one of the coconspirators in this all along.

2           This is Alex Ardon explaining during his testimony

3    that agreement.  The agreement was to install Hugo in the Fondo

4    Vial.  That's what happened.  The defendant knew that.  And the

5    defendant tried to leverage that himself.

6           The transcript from this recording and everybody --

7    and the parties agree that the transcript is accurate --

8    reflects the defendant saying we can start working on that as

9    soon as possible.

10          He tried to say the DEA when he was arrested:  I

11   didn't really mean it.  I was surprised to find out that the

12   Cachiros were involved.  Somebody told me that this would be a

13   problem and we couldn't do it.

14          This is what the defendant said in the meeting:  We

15   can start working on this money laundering as soon as possible.

16          And Rivera explained what happened with the bribe.  He

17   said that before they got to the Denny's he handed $50,000 in

18   cash to Oscar Ramirez, the guy whose contact information was

19   still saved in the defendant's phone in 2018.

20          And at the end of this meeting Rivera says to Avila,

21   the member of the Honduran National Police, who is in the room:

22   Let's just give him the money.  Let's just pay Tony.

23          And Avila says they're going to take it, meaning

24   Ramirez and the defendant are going to keep that money.  And

25   that's what happened during this Denny's meeting.  The

JAG9HER3                    Summation - Mr. Bove

1    defendant and Ramirez took $50,000 and they agreed to help the

2    Cachiros launder money using the Honduran government itself as

3    another part of the state-sponsored drug trafficking.

4          These are those wiretap intercepts that we've already

5    talked about. And I think here it's important to note this is

6    a point at which there are ten years of evidence of the

7    defendant's TH kilos in Honduras. You heard about those

8    conversations in 2006 where Rojo says -- Rojo explained to you:

9    The defendant says I have a connection to Colombian

10   traffickers. It came through the Valles. That's 2006. In

11   2016 these kilos are still being distributed through Honduras.

12         The very next month Giavonnii Rodriguez decided to

13   surrender in the United States and, as you can imagine, that

14   posed a real problem to the defendant. This wasn't a situation

15   where Juan Orlando had arrested this man and was going to

16   extradite him. Rodriguez agreed to come here on his own.

17         So what the defendant tried to do was intimidate

18   Rodriguez, prevent him from telling the truth when he got here.

19   And he did that through Mauricio Hernandez Pineda, the National

20   Police contact, the guy wearing the hat in this picture, whose

21   contact information was in the defendant's phone in 2018.

22         And Hernandez Pineda calls Rodriguez and he says

23   cryptically: You should be very careful in mentioning him,

24   Tony Hernandez, or Juan Orlando Hernandez about them being

25   involved in drug trafficking.

JAG9HER3                        Summation - Mr. Bove

1             And you know why the defendant and Mauricio Hernandez
2    wanted to prevent that.  Because he came here and told you the
3    truth about what he did and what he saw.  And what Giavonnii
4    Rodriguez told you was that he had a high-ranking position in
5    the Honduran National Police where he had access into
6    Tegucigalpa, the capital, to all of the operational information
7    for all of the police planning in the entire country.  And that
8    for years he took that information, he passed it to Hernandez
9    Pineda so that Hernandez Pineda could use it to coordinate the
10   defendant's drug shipments.  And so that's why they were
11   concerned that Rodriguez was surrendering and that's why they
12   warned him before he left.  But that warning failed.  The man
13   ignored it because he came here to this trial and he testified
14   to explain what happened.
15             2018.  In June.  This is the seizure of the drug
16   ledger that we've already talked about today.  This ledger was
17   seized from a trap, a secret compartment that was welded shut.
18   You can see on the right side of the screen some of the things
19   that were in that trap, the cash, the two grenades.  There were
20   pistols and other parts of the car.
21             And as I said in the beginning, this ledger by itself
22   shows a 650 kilo drug shipment that the defendant sent in a
23   Nava, the piper Navajo plane he sent to Honduras.  And you
24   know, because the defendant admitted, that drugs that made it
25   to Honduras were going to the United States.  This ledger by

JAG9HER3                    Summation - Mr. Bove

1    itself is enough to convict the defendant on Count One, the

2    conspiracy to import cocaine and on the weapons charges because

3    you can see the guns that were involved in transporting this.

4              And let's talk about who was in those cars.  One of

5    the men that was arrested that day used the name Nery Orlando

6    Lopez Sanabria, alias Wilson Lopez.

7              If you had any doubt that this ledger reflected a

8    cocaine shipment by a Honduran drug trafficker just based on

9    what was seized from the car, this slide should resolve that

10   doubt because Rivera had worked with this man before, Nery, and

11   he had helped receive cocaine shipments by plane with Nery.

12   This is one of the guys who is arrested in connection with the

13   seizure of the drug ledger.

14             Rojo knew this same man by a different name, Wilson

15   that alias he used.  And he had also participated in drug

16   trafficking with this guy who is arrested with the vehicles

17   that have the drug ledger with the defendant's name in it.

18             November 2018.  The DEA arrests the defendant in

19   Miami.  We've talked about the things that he admitted.  He

20   admitted to relationships with all of the traffickers that are

21   on the screen right now.  Don H, Rojo, he referred to Ardon by

22   his alias, Chande.  He talked about Mario Calix, Carlos Toledo.

23   He said he had met the Valle brothers.

24             And we've talked about what was on the defendant's

25   phone.  Pictures of -- that is a picture of drug money on the

1    man's phone in November of 2018.  Those are machine guns that

2    were being used to protect cocaine found on his phone when he

3    was arrested in the United States.

4         The same month that the defendant was arrested they

5    give another warning, this one to Ardon.  And Ardon explained

6    what happened.  November 2018, same month the defendant is

7    arrested, Mauricio Hernandez Pineda calls him.  You can see

8    that he's one of the enforcers in this group, one of the people

9    that the defendant used to try and intimidate coconspirators.

10        And so Hernandez Pineda, who Ardon knew as Primo,

11   calls him and he says:  The president of the country wants to

12   know where you are.  Juan Orlando is not asking where Ardon is

13   because he wants to arrest him.  He's not looking for Ardon

14   because he's investigating him.  Juan Orlando Hernandez is

15   concerned that the defendant had been arrested because Ardon

16   had already come to the United States.  But Ardon hadn't yet.

17   He was still in El Paraiso.

18        And he told you what happened.  He said I told Primo

19   that I was still there and Primo didn't believe me so he made

20   me put somebody else on the phone to confirm it.  And that's

21   November 2018, more efforts by members of this conspiracy to

22   try and check on where witnesses are, to keep track of the

23   people who were valuable members and who were in a position to

24   come to this trial and tell you the truth about what happened.

25        Ardon hadn't surrendered in November 2018 but he

JAG9HER3                       Summation - Mr. Bove

surrendered early in 2019 and he came to this trial and he told
you the truth about what he had done with the defendant.

        So now I'm going to come back to talk more about the
charges, the things that I expect Judge Castel is going to say
to you about the law and the way that it applies to these
charges and how, when you consider the elements of these
charges, there's not going to be any doubt in your mind that
the defendant is guilty of all of these crimes.

        So let's start with Count One.  Count One is the drug
trafficking conspiracy, the conspiracy to import cocaine into
the United States.  I expect that Judge Castel is going to
instruct you that there are three objects or goals of this
conspiracy and that evidence of only one of them is required on
this element.

        So the questions for you will be:  Was there an
agreement to import cocaine into the United States?  Was there
an agreement to distribute cocaine knowing that it was going to
end up in the United States?  And that's one to really focus
on.  Men in Honduras and in Guatemala trafficking in these
massive quantities of cocaine, they know exactly where it's
going, for all of the reasons that we talked about when I
described the Central American cocaine route, because
geographically United States is the closest, most lucrative
market and they know that the cocaine is going to the United
States because they are being paid in dollars after the drugs

JAG9HER3                        Summation - Mr. Bove

1    are sold there.

2              The next question for you will be whether the

3    defendant knowingly and intentionally joined that conspiracy,

4    whether he became a part of it.  Ladies and gentlemen, you

5    certainly can join a conspiracy, and the defendant did, by

6    supplying cocaine for massive shipments.  But that's not

7    required.  The defendant joined the conspiracy in a host of

8    different ways, beginning in 2004, simply by just agreeing to

9    provide information to the traffickers and accepting gifts and

10   guns in exchange for that.

11             And then finally on Count One you'll be asked to think

12   about the special interrogatory, basically another question to

13   consider during your deliberations.  And I expect that one of

14   the special interrogatories that Judge Castel will ask you is

15   whether this offense involved five kilos.  And we've already

16   talked about that.  Every single shipment in this case meets

17   that threshold.

18             So who are the members of this conspiracy?  I'm not

19   going to name them all.  These are some of their pictures.

20   They fit into groups:  The politicians who supported

21   state-sponsored drug trafficking, who protected these men so

22   that they could do these things and not be arrested.  The

23   police, like Tigre Bonilla and Mauricio Hernandez Pineda, who

24   provided security for the cocaine and information to help the

25   traffickers get it through Honduras.

1    And then the distributors and the suppliers, the

2    straight drug traffickers, men like Chapo, the Valles, Walter

3    Blanco.

4    The people who are highlighted in red, who are

5    outlined in red on the screen right now, testified at this

6    trial and explained to you in detail exactly how this

7    conspiracy worked.

8    There should be no serious question that the defendant

9    joined it.  He admitted to the DEA he had relationships with

10   these men.  He admitted to taking gifts from them.  He took

11   those gifts so that he would be available to help them.  He

12   agreed to accept those things because he was saying he would

13   protect the shipments.

14   And you know things got much, much worse after that.

15   Supplying cocaine, helping Chapo, furthering the conspiracy by

16   funneling drug money into these National Party campaigns to

17   help other politicians get elected, to keep control of

18   Honduras.  These are some of the ways that the defendant showed

19   in the evidence that he was a member of this conspiracy, that

20   he joined it.

21   Just the evidence from the wiretap and the ledger

22   shows you that the defendant was a part of the conspiracy.  His

23   kilos are in Honduras in 2016.  These coconspirators, Male 1

24   and Male 2, I expect that Judge Castel is not going to instruct

25   you that you need to know every coconspirator's name, and Male

JAG9HER3                    Summation - Mr. Bove

1 and Male 2 count.  You can find that because they have his

cocaine in Honduras, in San Pedro Sula, and they're looking to

move it into Guatemala to import it into the U.S.

        Same thing with the ledger.  Nery Orlando Lopez

Sanabria is a coconspirator in this case.  You saw the

testimony from other witnesses that he was a drug trafficker.

And this is the ledger reflecting a 650 kilo cocaine shipment

that the defendant sent to this man.

        You will be thinking, as you consider this charge

about whether the defendant knew or intended to import drugs

into the United States, this is yet another time during the

postarrest where he admitted that he did.

        And finally, one are one of the objects of the

conspiracy that you're going to be asked to consider, one of

the goals, was to use U.S.-registered aircraft to distribute

cocaine.  This is an important one because it's a particularly

easy one.  Alex Ardon explained to you that the defendant's

blue helicopter, which there's a picture of that on the

defendant's phone, had an N in the registration number.  And

you know from Special Agent Mervis and from Chang, who

testified yesterday, that the N signifies that the helicopter

was registered at the time in the United States.

        Chang also described providing planes to Rojo to

transport the defendant's cocaine, including in those two

shipments that we talked about in 2008, the one to Sico

JAG9HER3                        Summation – Mr. Bove

1    Honduras and the one to Gualaco.  The cocaine that the

2    defendant supplied in those shipments, those TH kilos were

3    transported on U.S.-registered aircraft.  And I expect that

4    Judge Castel is going to instruct you that the defendant didn't

5    even have to know where the planes were registered.  It's

6    enough that they were.  He obviously knew where his own

7    helicopter was registered.  But with respect to the planes from

8    Chang, it doesn't even matter.  All that matters is that this

9    happened.  This was one of the objects of the conspiracy and

10   this is another way that you can find the defendant guilty on

11   Count One.

12          Count Two is the weapons charge that we talked about.

13   And this is what I expect Judge Castel will say about the

14   elements for Count Two.  First, you need to find that there was

15   a drug trafficking crime.  That's the conspiracy charged in

16   Count One.

17          And the next question is whether the defendant himself

18   possessed or caused someone else to possess a firearm in

19   furtherance of that drug trafficking crime.

20          What does that mean?  Judge Castel is going to give

21   you detailed instructions but you can think about it this way:

22   The evidence in this case is that Honduras was dangerous

23   because of the defendant.  Honduras was dangerous because of

24   the massive drug traffickers, violent men that the defendant

25   helped to protect.

1          You heard testimony that the defendant brought a Glock

2    pistol to nearly all of his meetings with drug traffickers.

3    That was because they were dangerous men.  And bringing a Glock

4    pistol to a drug trafficking meeting furthers that because it

5    protects the defendant and it makes him feel more comfortable

6    to carry out those negotiations.  Using a firearm to protect

7    cocaine, to protect drug money, those are other ways that guns

8    can be used in furtherance of a drug trafficking crime.

9          With respect to Count Two and also Count Three I

10   expect that Judge Castel is going to ask you another one of

11   these special interrogatories, questions.  If you find that the

12   offense was committed, did it involve a machine gun or a

13   destructive device?

14         So a machine gun, you will hear that that basically

15   means that the gun was capable of being fired in automatic

16   mode.  Destructive device here means a grenade.  And we're

17   referring specifically to that bazooka, the rocket-propelled

18   grenade launcher that you saw in the courtroom yesterday.

19         So let's talk about some of the evidence about

20   firearms possession.

21         First, you know the defendant possessed firearms

22   because there are pictures of them all over his phones.  The

23   ones outlined in red, ladies and gentlemen, are machine guns

24   for purposes of that special question.  And these are all the

25   guns depicted just on the phones that were taken from the

JAG9HER3                    Summation - Mr. Bove

1    defendant in November of 2018.

2           How else do you know that the defendant himself

3    possessed firearms?  Because he had a bunch of gun licenses

4    with him when he was arrested.  And I expect that Judge Castel

5    is going to explain to you that having a license for a gun is

6    not a defense to the charges in Counts Two and Three.  That's

7    because Honduras did not issue gun permits to the defendant so

8    that he could use weapons to protect drug trafficking.

9           One of these gun licenses, the one that's a little bit

10   bigger on the screen with the red box, is a machine gun.

11   Defense counsel asked Special Agent Gonzalez whether it was an

12   automatic weapon and he confirmed that.  So this is a gun

13   license showing that the defendant possessed a machine gun.

14          You don't need a machine gun to drive around Honduras.

15   You need a machine gun to protect millions of dollars.  You

16   need a machine gun to feel safe around the type of men who were

17   involved in this crime.

18          The defendant also had begun licenses for other people

19   when he was arrested, to give you a sense of the possession of

20   weapons by his security teams.  You can see those licenses on

21   the left.  And on the right of the screen, two pistols with

22   licenses issued in the name of a man named Orellana and on the

23   right another license for a pistol possessed by a man named

24   Pineda.

25          This is more evidence that the defendant possessed and

JAG9HER3                    Summation - Mr. Bove

1    had access to firearms.  These licenses are not a defense to

2    Counts Two and Three.  They are more powerful evidence that the

3    defendant committed these crimes.

4           This is a list of the machine guns that the defendant

5    possessed that you have in evidence.  The CZ Scorpion is that

6    gun with the president's name inscribed in it.  In the picture

7    where they're sitting in the room and you can see that there

8    are boxes of those guns all over the place.

9           The SK is the weapon and the license that we just

10   looked at.

11          And then you heard testimony about the defendant's

12   AR-15.  Alex Ardon said:  I went to meet with the defendant.  I

13   got in his car.  He had the AR-15 there.  The barrel was sawed

14   off and I could see the selector switch and see that it was an

15   automatic weapon.

16          You also heard testimony from Rojo about the

17   defendant's use of what he called an assault rifle and then he

18   looked at the government exhibit and identified the one that is

19   a machine gun.

20          And, finally, you heard from Ardon that the defendant

21   admitted to having an M60 belt-fed machine gun.  A tool of

22   just -- it's a military weapon.  It's a tool for war.  It's the

23   kind of thing that you could only have if you were intending to

24   provide the highest levels of security for millions of dollars

25   of cocaine and millions of dollars of drug money.  And this is

JAG9HER3                    Summation - Mr. Bove

what the defendant said about his M60, "I have it to shoot

through armored vehicles."  This is one of the weapons that the

defendant himself possessed in furtherance of the drug

trafficking crime charged in Count Two.

        I expect that Judge Castel is also going to talk to

you about a concept called aiding and abetting.  This is

another way that the defendant can be guilty on Count Two.  It

basically relates to a concept like causation.  The defendant

caused other men to be armed with machine guns and grenade

launchers to protect him and to protect his drugs.  And so

these are some of the things that I expect that Judge Castel is

going to say to you about aiding and abetting, this other way

that the defendant can be guilty on Count Two.

        One way is that the defendant intentionally caused

another person to commit Count Two.  Intentionally caused, for

example, Mauricio Hernandez Pineda to accompany him while

Hernandez Pineda was armed with a machine gun.  When the

defendant brought his security to these meetings those were

people who worked for him.  When they -- when the defendant

brought security guards to drug trafficking meetings he caused

them to be there.  He knew they had machine guns and that act,

the act of the defendant having these security teams and

causing them to be there makes him guilty of Count Two as well.

        Another type of aiding and abetting liability arises,

and I expect this is what Judge Castel is going to say, if the

defendant actively participated in a drug trafficking crime
with advanced knowledge that somebody else was going to have a
machine gun.

So how did that work?  You saw it time after time.
The defendant supplies cocaine from Colombia.  He sends it to
Honduras.  And he has talked to these men.  He talked to Rojo,
Ardon.  He understood that the cocaine was going to be
protected with military-grade weapons once it got there.  It
would be unacceptable if it wasn't.  There was no tolerance for
risk of loss of this cocaine.

So the defendant had full knowledge of the type of
security that was going to be provided for these drugs once
they arrived in Honduras and he still sent the drug shipments
here.

So let's take a look at some of the evidence of the
security teams.

These are some of the pictures from the defendant's
phone that give you a sense of what these security teams look
like.  On the left you see a picture of the types of armed
guards that the defendant traveled with.

On the right you see pictures taken through glass that
look like car and truck windows of the police who were
escorting them.

This is a list of the different machine guns possessed
by security teams that the defendant had and also the

JAG9HER3                    Summation - Mr. Bove

coconspirators.  Because, remember, when you're thinking about
aiding and abetting on Count Two, one of the questions is:  Did
the defendant send drugs to Rojo, understanding that Rojo's
team would have machine guns and grenade launchers?

         And so this is a list, by machine gun and destructive
device, of who was using what.

         The Galil machine gun, you heard about the defendant
having a personal security team outside the Denny's meeting,
armed with those weapons.  And you also heard that Rojo's team
used a Galil.

         AK-47s, another type of machine gun used by Alex Ardon
and the Valle brothers.

         M16.  Machine gun no. 3.  Defendant's security team
used them.  Ardon's security team.  And so did the Valles.

         AR-15.  The defendant and Ardon.

         And, finally, the RPG, the bazooka, was something the
Ardon's security team used near the border of Guatemala to
protect the cocaine.

         The defendant was aware that all of these people were
using these types of weapons.  He sent cocaine to them
precisely because they had this level of security.  And that
makes him guilty of Count Two as well.

         This is one illustration.  This is what Ardon said
about his security teams.  He said:  Near the border in the
Copan Department I have around seven guys when the helicopter

1    lands.  They have AR-15s, M16s, AK-47s and bazookas.

2                Later on he explained:  I provided that security for

3    the defendant's helicopter for each of the times that it landed

4    in El Paraiso Copan; each of the times that the defendant sent

5    cocaine to that area or rented the helicopter to Ardon to

6    deliver cocaine there.

7                Did you tell the defendant how the men would be armed?

8    Yes.  That testimony right there is another way that the

9    defendant is guilty on Count Two.

10                Count Three is similar.  It's another weapons charge.

11    And this one is a conspiracy.  So I expect that Judge Castel

12    will explain that it's basically an agreement between two or

13    more people to use these types of weapons in furtherance of

14    drug trafficking.  So, for example, an agreement between the

15    defendant, Ardon, and their security to use machine guns and

16    destructive devices.

17                And for all of the reasons that I already explained

18    with respect to Count Two, for the machine guns the defendant

19    had, for the machine guns his own security guards had, and for

20    the machine guns and destructive devices that the other

21    traffickers' guards had, the defendant is guilty of Count Three

22    as well.

23                Count Four is the false statements charge, the count

24    that relates to the defendant's lies during the interview in

25    October 2016 in Miami.  And I expect that Judge Castel is going

1    to instruct you that these are the two main lies.  These are

2    the whoopers.  "I have never received any money from drug

3    traffickers," that's one.  And two, "I did not provide any

4    assistance in any way to drug traffickers."

5         You can see some of the clips from the defendant's

6    postarrest statement and I think in -- you've seen all of those

7    clips during the trial and you can see that he basically

8    confessed to having lied about receiving money from these

9    traffickers.

10         With respect to the Valles the defendant says:  No,

11   no, no.  The only one they would send to me was Tono Frontera,

12   the intermediary, with money.

13         So this is not a close question, ladies and gentlemen.

14   We've talked about the evidence of the defendant's drug

15   trafficking, of him getting paid and what he did to help these

16   traffickers.  And all of that evidence proves to you that he

17   lied that day.  He thought that he was untouchable when he came

18   to the United States and this is a charge to show that he was

19   not.

20         So, that is the evidence in this case.  Five

21   cooperating witnesses testified at this trial explaining the

22   defendant's drug trafficking.  Five additional pieces of

23   evidence shows you that those men told you the truth about what

24   the defendant did.  The Denny's meeting, that recording; the

25   wiretap with the TH kilo; the ledger with the defendant's name;

JAG9HER3

1    the things he admitted on tape to the DEA; and the things on

2    his phone, the picture of drug money on his phone, the machine

3    guns.  Those five witnesses and those five pieces of evidence

4    prove to you beyond a reasonable doubt that this man is guilty

5    of all the charges.

6            And we ask, ladies and gentlemen, that you think about

7    the evidence carefully and that you listen to Judge Castel's

8    instructions on the law.

9            And then we ask that you do justice, justice long

10   avoided in Honduras, justice for a man who is virtually

11   untouchable and totally protected by the Honduran government.

12   We ask that you do justice in this courtroom and return the

13   only verdict that is supported by the evidence, that he is

14   guilty on all of the charges.  Thank you.

15           THE COURT:  Thank you, Mr. Bove.

16           We are just going to doublecheck right now that your

17   lunch has arrived and if it has then we'll break for lunch.

18   I'll know in just a sec.  And my thought is I don't want anyone

19   on my jury to get indigestion but since you will not have to go

20   out for lunch, if it would be convenient for us to do lunch

21   half an hour or 40 minutes, something like that, it would

22   enable us to continue with the summations so that we can get

23   the case to you as quickly as possible.  Would that be

24   convenient?

25           JURY:  Yes.

JAG9HER3

1                 THE COURT:  OK.

2                 THE DEPUTY CLERK:  They're not here yet but they were

3    told to be.  I can go down.

4                 THE COURT:  Ladies and gentlemen, I'm going to have

5    you go to the jury room and we'll sort out the situation for

6    lunch and we'll give you at least a half an hour after the

7    lunch arrives.  All right.  So, remember, do not discuss the

8    case among yourselves or with anyone.  There's more to come.

9    Keep an open mind.

10                (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JAG9HER3

1          (Jury not present)

2          THE COURT:  Please be seated.  If you'll just bear

3     with me until I get a report from my deputy so we'll know

4     approximately how long our lunch break will be.

5          I requested the lunch for 12:15.

6          I'm advised that it's on the cart and it's coming up

7     now.  So we will resume at 5 minutes after one.

8          Thank you.

9          (Luncheon recess)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JAG9HER3                    Summation - Mr. Tein

1                          AFTERNOON SESSION

2                               1:14 p.m.

3              THE COURT:  Please remain standing for our jurors.

4              (Jury present)

5              THE COURT:  Good afternoon, ladies and gentlemen.  I

6    hope no one has indigestion.  I hope the food was reasonably

7    good.

8              JURY:  Yes.

9              THE COURT:  All right.  We're back in action.

10             And, Mr. Tein, whenever you're ready you may proceed.

11             MR. TEIN:  Thank you, your Honor.

12             May it please this honorable Court, Members of the

13   Jury, counsel.  I'm going to speak for about two hours, maybe a

14   little less.  I'm not going to be able to talk about every

15   single piece of evidence, and they're going to get an

16   opportunity to talk after I'm done, probably for about half an

17   hour.  So -- and I don't know everything they're going to say

18   but I'm going to give you in my discussion now some of the ways

19   that the evidence has come in to you and so you can understand

20   how it's done, how it was done in this case by the government

21   and so when you are back in the jury room you'll be able to

22   talk about issues that I may not be able to address in my

23   argument because they may raise them afterwards.

24             So, let's talk about how it was done.  What did you

25   hear?

JAG9HER3                        Summation - Mr. Tein

1              You heard shock and awe.  You heard at the beginning

2    of this case -- and I put a little excerpt from the beginning

3    of their opening statement -- you heard them say:  Tons of

4    cocaine, millions of dollars in drug money and the vicious

5    cycle of corruption fueled by them both.  This man, Tony

6    Hernandez, distributed massive quantities of cocaine, etc.,

7    etc.

8              You heard when counsel for the government got up this

9    morning him start out with "8,000 doses" and "it's poison into

10   our community."  You shouldn't be distracted by that.  This

11   case is not about whether cocaine is poisonous.  It's not

12   whether you approve or disapprove of drug violence.  Of course

13   you disapprove of it.  Of course you disapprove of the

14   importation of cocaine and drugs.

15             The question is whether the evidence that came from

16   that witness stand is something that you can believe enough to

17   base your verdict on, about Antonio Hernandez beyond a

18   reasonable doubt.  Because you have to follow the judge's

19   instructions in this case.  And at the end he's going to give

20   you instructions and he's going to say, I expect, that you have

21   to find this case, if you're going to find guilt, you have to

22   find beyond a reasonable doubt.  And if there is a reasonable

23   doubt, if you're not certain, you cannot convict.  And we're

24   going to talk about that.  And we're going to talk about

25   reasonable doubt and what it is and what it isn't.

JAG9HER3                    Summation - Mr. Tein

1          But you can't be distracted from the evidence.  You

2    can only decide based on the evidence.  And the evidence came

3    from one place, the witness stand, and also stipulations.  If

4    we agreed to a certain fact, like we agreed to venue, that it

5    is here in New York City, this trial is right to be happening

6    in New York City.

7          But the evidence that came in was only in the form of

8    testimony and hard evidence, documents, pieces of paper, things

9    like that.  Nothing else.

10         This isn't a referendum on the drug war.  It's not a

11   referendum on:  Well, do you agree that these are the routes or

12   not?

13         You're going to see, as we dissect this over the next

14   hopefully a little less than two hours, that there is nothing

15   linking Antonio Hernandez to these routes.  The reality is that

16   this case, the way it was presented to you, was a lot more like

17   a history lesson.  And what we heard, really, from counsel for

18   the government just now, just before lunch, was a lot more like

19   a history lesson.  But the problem was it was a history lesson

20   that was written based on testimony given by five of the worst

21   people who you could ever imagine being asked to rely on.  And

22   we're going to talk about that.  People who, I respectfully say

23   to you, you probably -- anyone would probably never, ever, ever

24   believe anything that they say about anyone in any circumstance

25   much less the circumstance that, as his Honor has reminded us

1  over and over again, is so important.  You cannot rely on those

2  people.

3        You can only believe the version of the evidence that

4  you heard if you believe those five multi, multi murderers and

5  liars.  You can't believe them.  You can't believe them to

6  convict someone beyond a reasonable doubt of crimes like these

7  that are charged.  And it's obvious what's at stake here

8  because we heard about the sentences that they are trying to

9  trade.

10        But don't get distracted, please, I urge you, by shock

11  and awe.  Don't get distracted by them saying drugs coming into

12  our community.  Of course they do.  No one wants that.  But the

13  question is:  Is he guilty beyond a reasonable doubt of the

14  four crimes charged in the indictment?

15        When they brought all those machine guns in here, that

16  was scary.  It's scary especially for people who aren't used to

17  handling machine guns or guns at all.  But what were they

18  doing?

19        Look, understand this.  In my comments I'm not blaming

20  them for anything.  They are not on trial.  Antonio Hernandez

21  is on trial.  If I sound like I'm criticizing them, I'm just

22  trying to explain Antonio's view of the evidence.

23        They have a job to do.  We have a job to do.  You have

24  a job to do.

25        We're not casting aspersions.  We're not casting

1   stones.  He just deserves to be found not guilty.  That's all

2   we're here to argue about.

3            But when you bring those guns in here, they have an

4   emotional effect because everyone is grown-ups here.  We know

5   what those things are.  It was designed to scare the living

6   daylights out of you.  And it might have.  But I asked the ATF

7   agent a question:  Were any of those guns seized from Antonio

8   Hernandez?  No.

9            What about most of the pictures that you were matching

10  up to the guns?  They were from the ATF's own library, taken

11  against a carpet that he took the pictures or someone at the

12  ATF took the pictures.

13           You can't get confused -- and I know you aren't.  It

14  doesn't matter what I think but I just mean there is no way

15  that a jury like this -- and the judge has said what a great

16  jury you are, and it's so obvious -- is going to get confused

17  that:  Oh, Antonio Hernandez used one of those guns.  And

18  that's why I pushed them all the way over there.  Because they

19  have nothing to do with Antonio.  Those are the guns that those

20  liars, losers, and murderers said that Tony had.  And I submit

21  to you that you should throw out absolutely everything that

22  they said.

23           Let me go through the rest of these five ways that it

24  was done.  Look, because we said so.  The judge is going to

25  give you an instruction.  This just needs to be said and then

JAG9HER3                    Summation - Mr. Tein

1    move on.  He's going to give you an instruction, I anticipate,

2    that says the fact that this prosecution is brought in the name

3    of the United States of America entitles the government to no

4    greater and no lesser consideration than that accorded to any

5    other party in the litigation -- to a litigation.  And then I

6    think he's going to say:  All parties, whether the government

7    or an individual, stand as equals under the law.

8            That flag belongs to you as much as it belongs to

9    anybody in this courtroom.

10           So the fact that the government lawyers -- I'm not

11   sure what happened there -- the fact that the government

12   lawyers got -- appear to be standing behind the version of the

13   facts that you heard at the witness stand does not mean you

14   should give it any greater weight than anything.  What the

15   lawyers say is not evidence.

16           Let me see if I can get this working again.  It should

17   come up in a minute.

18           OK.

19           THE COURT:  Is that up on everybody's screen?

20           JURY:  Yes.

21           MR. TEIN:  Thank you, your Honor.

22           So the prosecutors don't get any advantage in here

23   over any other party.  We're all equals under the law in this

24   courtroom.

25           Mixup/matchup.  That's important and I'm going to go

JAG9HER3                       Summation - Mr. Tein

1    through a bunch of examples of that.

2          When they flash you -- when they flash up on the

3    screen, for example, what you see here at the bottom right,

4    this photo from his phone of cash and then they put it right up

5    against the cash that was seized in June of 2018.  That's

6    mixing two things up.  And you can't match them up.  There is

7    no -- no one can think that just because he has a photo of cash

8    in his phone that he's responsible for that June 2018 criminal

9    activity.  You can't think about that.  You can't think of

10   that.  You can't jump to that conclusion.  It's not enough.

11         I also put down, and we're going to get to this:

12   Nava.  They circled Nava.  This was at the bottom of the screen

13   I have, on the bottom right.  They circled Nava on a document

14   showing you the seized journal -- the seized ledger from that

15   June 2018 seizure at those cars and they say that Nava means

16   this plane.  And they show you a picture of a plane.

17         This journal is dated -- and we're going to go over it

18   later -- February of 2018, which is after the conspiracy and

19   when that man Chang Monroy was already in jail.

20         The reason I say these things -- and we're going to go

21   through this -- is it's really, really important to Antonio

22   that you be precise with everything that you analyze in this

23   case.  If you're going to use a piece of evidence and look at

24   it and say, well, that makes him look guilty, please, read the

25   whole thing.  Look at it closely.  When there's a transcript,

1  read every word.  If you're going to think, you know what, he

2  looks like he might be guilty from that transcript, read the

3  words.  Read the whole thing.  Because -- and we're going to go

4  over it.  And I won't do too much reading because it gets

5  boring.  But I will show you how it works.  Because if a

6  transcript can be read in two different ways, one way that

7  looks guilty if you pick certain parts out of it but another

8  way if you look at it as a whole and you actually read the rest

9  of it, it looks like, you know what, he's innocent, then you

10  have a reasonable doubt about this transcript.  And that's how

11  reasonable doubt works.

12          So if one piece of evidence or all the evidence can be

13  interpreted in two different ways, one way consistent with

14  innocence and one way consistent with guilt, then you must have

15  a reasonable doubt about it because it's reasonable, if you've

16  read it, to say that looks like he's simply saying he knows the

17  people, because he lives in a tiny little town, because he's a

18  politician, and because if you walk around in a tiny little

19  rural town in Honduras with your nose up in the air and a halo

20  over your head and you snub these guys who are bad guys, and

21  they are obviously bad guys, then you're going to end up as

22  number 79 on El Rojo's list of 78 murders.

23          And we're going to talk about that, this idea of guilt

24  by association.

25          Rip out the page.  That's what I'm talking about,

JAG9HER3                         Summation – Mr. Tein

1    about transcripts, about anything.  You can't look at any piece

2    of evidence in isolation.  You can't look at a part of a piece

3    of evidence in isolation.  You have to look at it as a whole.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JAGTHER4                    Summation - Mr. Tein

1          MR. TEIN:  You have to, or it's not fair.  And so this
2     other way of focusing you on one piece of something without
3     looking at the rest is very dangerous, because there's a risk
4     of making the wrong verdict when you do that.  You must look at
5     all the evidence together carefully.
6          A big deal is no big deal.  That's the last of the
7     give ways that it was done.  Let's be clear about this, and
8     we're going to talk about this, those murders, their criminal
9     pasts, their incentives to get out of jail, that's a big deal.
10    And dismissing it with a line, how many murders do you have, I
11    have this amount, and a man answers, then he answers I had a
12    meeting in the hotel in the same voice, that's a big deal.  And
13    we're going to talk about how big a deal it is and why it's
14    such a big deal.
15         But it's not to be dismissed.  In fact, really, it's
16    the biggest deal.  Because this whole case is based on the
17    testimony of these five multi-murderers, and then they have
18    hung on a bunch of little other things, look, he has pictures
19    of guns on his phone and that sort of thing.  I'm not
20    belittling it, but it's not what a case like this can be based
21    on.  It's not enough to convict.
22         You should look at the evidence by X-ing out all of
23    those five murderers' testimony completely and decide this case
24    based only on the hard evidence that you got.  Because when you
25    come into this courtroom, and it is a beautiful courtroom and a

JAGTHER4                     Summation - Mr. Tein

1   gorgeous courthouse, while it's all formal and we have all

2   these rules that we follow, you don't leave your common sense

3   outside that door.  That's the thing about the jury system,

4   that's why it's so great, is that you're here because of your

5   experience, your life experiences, your judgment, your wisdom,

6   your reasoning, your logic, your ability to sift out stuff that

7   makes sense from stuff that is a lie.

8          And I don't think they will do this, but if they -- if

9   anybody suggests that reasonable doubt is not that big of a

10  deal, it is a big deal.  It's the rule here.  We'll talk about

11  that some more.

12         One more thing I wanted to go over about this:

13  Sympathy, fear or bias.  There's an instruction that I believe

14  his Honor is going to read to you, and he's going to say under

15  your oath as jurors, you are not to be swayed by sympathy.

16  Once you let fear, prejudice, bias, or sympathy interfere with

17  your thinking, there is a risk that you will not arrive at a

18  true and just verdict.

19         That's why I raised the issue with you of the guns, of

20  talking about oh, the scourge of drugs in our community.

21  Things like that might, in some of you, instill an unconscious

22  reaction of fear or bias against the defendant or sympathy for

23  the prosecutors.  That's not what this case is about.  We don't

24  want your sympathy, but we don't want your fear either.  You're

25  going to have to bracket that stuff out and look just at the

JAGTHER4                    Summation - Mr. Tein

1    evidence.

2          Here's one other thing before I move past this slide.

3    The prosecution said in their summation that the defendant said

4    it goes through vehicles, referring to something about drugs.

5    The defendant didn't say that, one of the criminal cooperators

6    said that the defendant said that.  And that's important that

7    you have that distinction.  When they put a transcript up on

8    the screen and it's a transcript of Ardon or El Rojo,

9    understand that's Ardon or El Rojo saying that Antonio

10   Hernandez said something, and they have nothing to back it up

11   except their word, and we're going to talk about that.

12         Let's briefly run through what's not a crime.  Guilt

13   by association is not a crime.  It is not a crime if your best

14   friend who you grew up with took the wrong turn.  You're not

15   his keeper, but at the same time, you're not responsible for

16   what he did as long as you don't join in and participate.  If

17   you rent your home to him and he turns you out to be a drug

18   dealer, if you knew that he was a drug dealer and he paid rent

19   or it looked like he was because he, as Antonio said, brought

20   back whiskey and all those things all the sudden, and in a

21   small town you know everything, that doesn't mean you joined in

22   this giant multi 200,000-kilo conspiracy, it just doesn't mean

23   that.

24         Rejecting offers.  Please, when you read these

25   transcripts again in the jury room, look at them carefully how

1    many times Antonio says yes, I knew them, yes, I met them, but

2    I rejected their offers to get involved.  He is clear on that.

3    And if he rejected their offers to get involved, then he didn't

4    join in their criminal agreement, which is what a conspiracy

5    is, a criminal agreement.

6          Having pictures of guns on your phone is not enough to

7    find that those guns were yours or that you used them in

8    furtherance of a drug trafficking crime.  And we're going to

9    get to that.  We're going to drill down on the evidence of

10   these guns in the phones and whether those pictures were sent

11   from someone else to Antonio or whether Antonio sent them, or

12   whether they even know, the government, of what that is a

13   picture of.  You have to convict only beyond a reasonable doubt

14   or you must find Antonio not guilty.

15          I mean pictures that someone has on their phone,

16   that's what you convict someone of?  Who someone's friends are

17   and turn out to be, that's what you get convicted of?  Having

18   cash on you, that's what you get convicted of?  If that's the

19   case, then where do you draw the line?  You can't find someone

20   guilty beyond a reasonable doubt because they have $8,000 of

21   cash on them.  That doesn't make them a drug dealer.  Now you

22   may not like them, and you may, whoever the person is, and you

23   may not like the way they dress or the way they act or who

24   their friends are, but that $8,000 doesn't tip the balance and

25   say oh, and by the way, that's evidence that this is a

JAGTHER4                    Summation - Mr. Tein

multi-international drug dealer.

         Same with these other issues.  This idea of Honduran
law, Honduran politics, we'll get to that.  If something is a
crime in Honduras, that doesn't make it a crime here.  And it's
important to see.  And the reason that we pointed out the fact
that he has these permits, including one for an automatic
weapon, is because you could get permits for stuff in Honduras,
and it's legal there.  That isn't legal if you were here in the
United States.  That's a really dangerous country.  We heard
all that testimony, the DEA agents said that.  We know that
from common sense.

         And yes, contrary to what they said, they said you
don't need -- when you drive around Honduras, you don't need an
automatic weapon.  There's no evidence about that.  You didn't
hear evidence about that.  Actually, the evidence was the
opposite.  You can't trust the police, it's an extremely rural
country, and it's filled with dangerous drug dealers.  So if
the government there allows you to have an automatic weapon and
it's licensed and registered, then you shouldn't be convicted
here for doing what is legal.

         Some responses, direct responses to some things that
they raised that you might have found powerful in their
summation, and let's go through those.  They said there were
zero witnesses extradited by Honduras.  Look, technically
that's true, but like with everything, you have to say, when

1    that is said to you:  What would Omar and Mike say about that

2    if they could respond?

3              And so we do have the opportunity to respond now, and

4    we will, but we're not going to have the opportunity to respond

5    after they get the opportunity to rebut what our argument is

6    afterwards.  And we're not going to be in the jury room with

7    you, but you will be able to say:  Wait a second, Malone and

8    Tein, what they would say about zero witnesses being extradited

9    by Honduras is yeah, some of these guys knew they were going to

10   get extradited and so they surrendered so they wouldn't have to

11   spend a year or whatever it is biding their time in a Honduran

12   prison, that they could take a plane, like one of them did,

13   directly to the United States on a commercial airline and get

14   arrested here rather than down there.

15             So the fact that they self extradited, there's no

16   dispute, there is no dispute that starting -- the law changed

17   in 2012 down in Honduras, and starting in 2014, when his

18   brother became president, he started extraditing drug dealers

19   to here.  Now they are saying to you:  But this president

20   himself is a drug dealer.  Look, that president, his brother,

21   is not on trial here.  If there's going to be a trial about

22   whether that guy is a drug trafficker, that's not what we're

23   here to decide.  And we're not going to take on that burden no

24   matter what they say.  We're not going to take on any burden.

25             Look, the thing about the burden of proof that they

JAGTHER4                    Summation - Mr. Tein

have the presumption of innocence, which is kind of its twin
sister or twin brother, is that Antonio is presumed innocent.
I mean Mr. Malone and I, we could have done absolutely nothing
in this trial, and if you found that they didn't present proof
beyond a reasonable doubt, you would have to find Antonio not
guilty.  But we did say things, because there's a lot of stuff
flying around and we have a right to say those things, and we
have a right to cross-examine witnesses, and we have a right to
talk to you now just as much as they do.

          But this case isn't about extradition, revenge.  These
guys had an opportunity they saw.  They didn't like the fact
that his brother, the president, was enforcing the law and
being hard on crime and extraditing these major traffickers who
had, up until 2014, enjoyed a life of immunity down there.  And
they saw an opportunity to help themselves and hurt him and his
brother at the same time.  But forget about that for a second.
Let's not argue about who was extradited, who self-surrendered,
just look at their incentives to lie and dump on him and invent
stories.  And we're going to talk about that in the next slide.

          They indicated that Antonio said, or that we said in
opening that he didn't have connections.  That's not the
argument.  Of course he had connections.  He had connections
enough that he was able to run for congress and be elected.
From 2013 to 2017 into the very beginning of 2018 he had been
elected congressman, and his brother was the president.  But

1    the point is before then, when all of these guys are saying

2    that Antonio had all this power, it's not true.  Because as

3    Mr. Malone told you in opening statement, politics down there

4    is vicious, and when you're out, you're out.  And there's no

5    disputes, their party didn't get in back in until 2014.  So all

6    this idea that they have put in their heads that Tony is

7    walking around and he's some kind of well, I'm the sheriff and

8    I can get everything done for these bad guys.  He didn't have

9    that kind of access, and he talks about that in his post-arrest

10   statement.  In that tape with the DEA, he explains that to

11   them.

12          Mario Jose Calix, the next thing, Mario Jose Calix.

13   He told them look, I'm out of contact with him.  The picture

14   that they showed you just now was of Antonio standing next to

15   Calix.  Look at it closely.  They're not looking like they're

16   buddies, they're standing next to each other.  It's obviously

17   some kind of political event under some tent, and the date on

18   the picture, when you look, look at the exhibit itself, drill

19   down on this stuff, it's April of 2018, six months before he is

20   arrested.  So what he said is true, he's not friends with this

21   person anymore.

22          Then they said:  What was the defendant doing in San

23   Andres, Colombia?  San Andres, these islands in the middle of

24   the Caribbean, kind of off the coast of Nicaragua, which

25   belongs to the country of Colombia, they said -- and the stamp

on Antonio's passport was from April of 2006, and they said

look, that matches up perfectly.  This is where your common

sense, your experience and judgment comes in.

        Number one, there was no evidence in this case that

San Andres is not a vacation spot.  And you can use your own

experience, because we can't talk about what is not in

evidence, and there's no evidence about that.  But you can use

your own common sense and experience knowing that in fact what

they said about San Andres is simply 100 percent inaccurate.

100 percent inaccurate.

        So you're supposed to base your verdict on some kind

of speculation or guess or imagining something and it turns out

it's not true?

        Here's another one of the instructions that the judge,

I believe, is going to give you on page 8.  I think the judge

is going to say reasonable doubt is a doubt that appeals to

your reason, your judgment, your experience, your common sense.

It is not caprice, whim, or speculation.  It is not an excuse

to avoid the performance of an unpleasant duty, and it is not

sympathy for the defendant.  But he, I believe, will instruct

you -- and this is so important -- when you decide this case,

you cannot base it on speculation.  When they say imagine what

this case would be if it were in Ohio, that's not okay.  Now I

know that's just a manner of speaking, and again, I don't blame

them, but when you hear stuff like imagine dot, dot, dot out of

JAGTHER4                    Summation - Mr. Tein

a lawyer's mouth in this courtroom, you know they're not

talking about what the evidence is.  Why?  This isn't in Ohio.

What else?  So they showed you a contact taken out of

his phone from saying that he knew a colonel and this

colonel -- helicopter ride.  Let's drill down on that.  When

you actually take the contact out of the phone, next to it is a

time stamp that says created and modified.  Created.  Look,

they didn't have an expert testify on this, but you can use

your common sense.  Created April 9, 2018.  Then look at the

dates around the picture of the helicopter ride.  April 14,

2018.  And you can use your common sense to connect that.

Now there was no evidence about that helicopter ride,

and there certainly was no evidence that that helicopter ride

had anything to do with drugs.  And you can look at the

pictures and see whether smiling Antonio taking a picture of

himself in the helicopter and this woman are involved in a drug

shipment or whether it was for an innocent purpose.  Like I

said, if a piece of evidence admits of:  Well, they say it's

guilty, but look, there's a logical explanation from it, that's

a reasonable doubt, a doubt that appeals to your reason, your

judgment, your experience, your common sense.

Folks, when there's another side to the story, that

can create a reasonable doubt, and in this case, that other

side to the story does create a reasonable doubt.

Like Omar talked about in opening statement, we

1    weren't there for the grand jury.  The grand jury only heard

2    one side of the story.  We were here for this trial, for sure,

3    and you did hear the other side of the story through

4    cross-examination and through my talking to you now.

5          Cross-examination has been called the best lie

6    detector test ever invested, and it is.  Because on

7    cross-examination we got to actually test these people and show

8    how motivated they were to lie, what liars they are, what

9    murderers they are, how we would never trust them, they're not

10   trustworthy at all.  Cross showed it, and I'm going to talk a

11   little later about that one very dramatic thing that happened

12   Friday afternoon when the liar just kept lying and lying and

13   lying, and he just got totally caught.  And had you believed

14   him, had we not been able to cross-examine that, well, he would

15   have fooled everybody.  And that's not right.  That isn't

16   justice.  No way.

17         They showed you Colonel Mosquitia, in that same list

18   of contacts it says Colonel Fuentes Mosquitia.  Colonel Fuentes

19   in Mosquitia.  Mosquitia is an area of their country.  Again,

20   this isn't about speculation, innuendo.  Oh, look, prejudice,

21   Mosquitia, it must mean that's a drug area in this country

22   where he's a congressman and he knows a colonel from Mosquitia,

23   that makes him a drug dealer?  I don't have to tell you what to

24   do with that.

25         Oscar Najera, the picture in the Jacuzzi of Oscar

1    Najera.  Look at the date on the picture.  It's not during some
2    drug deal.  Oscar Najera was -- the testimony was he was the
3    head of the congress, really prominent congressman.  Again,
4    what is Antonio supposed to do?  He lives in this country.  And
5    just living there, just guilt by association, that's not what
6    we have in this country.  That's not this justice system.
7    That's the picture, 9/12/2018, like two months before he got
8    arrested he's in a Jacuzzi with these people.  Well, okay, then
9    he's in a Jacuzzi with a congressman, therefore he's a drug
10   dealer?  No.  You have a reasonable doubt about that, most
11   respectfully.
12            Next slide.  This slide is a chart of the five
13   murdering criminal cooperators who were the entire foundation
14   that the government's case was built on.  Let's look at this.
15   This is unreal.
16            MR. BOVE:  Judge, I have an objection to this chart.
17            THE COURT:  Basis?
18            MR. BOVE:  Only one of these witnesses has been
19   sentenced to a prison term, and the remainder have not been
20   sentenced yet, and they were very clear about that.
21            MR. TEIN:  I will clarify that.
22            THE COURT:  Thank you, if you will.
23            MR. TEIN:  By prison term there, I mean prison term
24   facing.  That's absolutely correct.  Prison term that they're
25   facing are these amounts.

 1          Look, if I got one wrong, one should be life plus 30

 2     and it's really life plus 25, the point is there.  If you're

 3     facing a life in prison and you are a 78-time murderer, what's

 4     an afternoon of lies to you?  I mean let's take a step back,

 5     really, because this was absurd what happened here, and but for

 6     this trial, this would just be a nightmare to wake up from.

 7          I mean murderer, serial killer after serial killer

 8     gets up on the stand and tells you what happened with this

 9     uncanny memory of what happened 15 years ago, ten years ago.

10     They have this -- they can't remember when they were

11     interviewed by the DEA after they surrendered, they can't

12     remember what they said, but they can remember that 15 years

13     ago Antonio had a meeting and it was at this particular hotel

14     and he happened to be brandishing a particular weapon.  And

15     that just stands out in all those murderers' minds like Antonio

16     is walking around with bandoleras and AR-15s.  It was absurd on

17     its own face.  It was such a lie.  If you didn't know that El

18     Rojo had killed 78 people in cold blood, you still wouldn't

19     have --

20          MR. BOVE:  Judge, I object.  It's not what the chart

21     says, and again, the chart is totally inaccurate with respect

22     to the sentencing exposure of these witnesses.  Totally

23     inaccurate.

24          THE COURT:  All right.  I think Mr. Tein misspoke.

25          MR. TEIN:  Yeah.  Look, where I was -- I don't think

there's a dispute that El Rojo admitted to being involved in 78
murders.

THE COURT:  I think you're misspeaking.

MR. TEIN:  You're correct, sorry, the Cachiro
Maradiaga.  Sorry, there's a lot of cooperators here.

I will say this:  After a while, they kind of become
interchangeable.  I mean one evil guy after another.  And
that's the problem with that thing about a big deal, it's no
big deal.  Like after a while when you continue to be exposed
to that level of depravity, of being -- of psychopathy, after a
while it's like okay, well, that next guy, he only when has 15
murders, he's not as bad as the guy with 78 murders.  So I'm
sorry, but they all don't deserve to be believed about
anything, anything.

And then like some of them admitted to torture.  And
my point about this is, again, I don't want your sympathy or
prejudice, I want your common sense.  If a person is involved
directly or even indirectly because they hired a hit person in
killing 78, 56, 18, 15 and one murder, if they're involved in
that, if they have no regard for the value of a human being's
life, none, if they killed these people because it would be
advantageous to their business, not because oh, it was
self-defense I had to kill him to get out of a concentration
camp.  No.  They killed them for their own advantage.  That's
the type of psychologically depraved people these are, and they

have no regard, no respect for the value of a human being's
life or that person's family and how it would affect them.
They don't care about anybody but themselves.  And so if
they're willing to do that, do you think that a little lie is
going to bother them?

          And that's what this case is based on.  And from what
we -- our count was they all admitted to lying and/or
committing one, committing three murders while they were
cooperating with the DEA.  Now what does that mean?  Why is
that so significant?  I mean a liar is a liar.  What's so bad
about that?  It's because, look, they all said I know I was a
bad guy in the past, but that's past, now I'm a good guy.  Now
I've decided I'm going to start telling the truth because these
prosecutors are asking me to tell the truth and I raised my
hand and took an oath look, as if words mean anything to them.

          But even when they were looking the DEA agents in the
face here, on U.S. soil even, saying I'm here to cooperate
because I want to get out in less than these crazy sentences
for the rest of my life in jail, they still lied to the DEA and
they still got called as witnesses in the case.  Now that's
outrageous.  I'm sorry, sorry for raising my voice.  That is
outrageous that this man is on trial for what is at stake here.
They only lied once to the DEA.  Chang, that was really
something, and I'm not sure if it was so evident when it came
out, so let me go over it for a second.

1           Mr. Malone asks these questions of Chang Monroy:  When

2     you were debriefed, you know, when interviewed -- that's their

3     law enforcement word for interview -- when you were debriefed

4     by the DEA in 2015, in 2016, in 2017, in 2018, number one, you

5     didn't say anything about Tony Hernandez, and when you were

6     asked about him, you specifically said I don't know him.  But

7     you admitted to knowing and being a drug dealer with all these

8     other really, really, really dangerous guys.  That's what

9     Mr. Malone asked him.

10          But all of the sudden, after spending roughly four

11    years in jail, Chang Monroy says oh, Tony Hernandez, the guy

12    who was just arrested, the president's brother, that Tony

13    Hernandez, that guy happened to be a big drug dealer with me,

14    and let me spin it all out to you.  Come on.  I mean that's why

15    we have juries, because common sense is like:  Of course that

16    guy is lying.  Why?  Why would he lie?  Well, he is facing 30

17    years in jail.  And if I got that wrong, if it's 25 years, it

18    was 30, he was asked are you facing 30 years sentence and he

19    said yes.

20          MR. BOVE:  Objection.  He was not asked that and he

21    did not testify to that.

22          THE COURT:  Ladies and gentlemen, if any lawyer states

23    as a fact something that is not in accordance with your own

24    recollection, your own recollection should control.  And if

25    there's any doubt on the subject, you can always send a note

JAGTHER4                    Summation – Mr. Tein

1    out asking for a portion of the testimony to be read.

2              Please continue, Mr. Tein.

3              MR. TEIN:  Thank you.

4              Chang Monroy knew he was facing a gigantic sentence.

5    Let's be clear, does anybody think –– would anyone reasonably

6    think that if Chang Monroy was facing 20 as opposed to 30 years

7    that it would be any more truthful?  We know he wasn't

8    truthful.  We know after sitting in jail for four years he all

9    the sudden remembers all this stuff about Tony Hernandez that

10   he specifically lied about before.  As if you would forget the

11   fact that the brother of the president was your drug dealing

12   buddy.  They're liars.

13             And I'm sorry to use that word, and I know it's direct

14   talk, but we don't have time for anything else.  This is the

15   time for direct, and they're liars and they're multi-murderers,

16   and you would just as soon –– like if the Son of Sam Berkowitz

17   gets on the stand and starts telling you stories, you're not

18   going to believe him.  If any other serial murderer, Jeffrey

19   Dahmer or somebody gets on the stand and tells you some stories

20   about oh, well, this guy, he was in it with me, and these

21   people have, you know, four, five, six, seven, eight, nine, ten

22   times the number of murders as the people I just mentioned,

23   like this is crazy.  It's not okay.  It's not normal.  You

24   cannot believe those people, not anything that they say.

25             And then not only are they incentivized to lie,

JAGTHER4                    Summation - Mr. Tein

because they will get a reduction in their sentences if the

government files this letter saying please take the mandatory

minimums away, we want you to get a percentage off your

sentence, these guys get a percentage off your sentence because

of cooperation.

Mr. Malone told you in opening statement:  Follow the

money.  Follow the money.  The amount of money that these guys

made is mind boggling, mind boggling.  Tens and tens of

millions of dollars.  One of them admitted, the mayor, Ardon,

the AA guy, called himself AA, admitted that he made over $200

million.  Just think about that for a second how much money

that is.  And then they don't have a single penny left?

Please.  They're lying.  They have all that.  They have a lot

of that money left.

Then they say -- this is where they get cute, and

again you know they're lying.  Where did all that money go,

they're asked.  Well, it went to bribing the defendant.  I

paid -- well, let's see, I paid him 50,000.  So 100 million

minus 50,000, all right.  I paid a million dollars for the

president for his bribe.  So now we're at, instead of 200

million, we're at 199 million.  I bought some houses and some

ranches and some -- I mean nothing is left?  No.

Even Maradiaga admitted, you saw this on cross, right,

I asked him where did the money go?  He said I gave some to my

family, I helped my family out.  And I showed him the chart,

JAGTHER4                    Summation - Mr. Tein

1    the OFAC chart, the Treasury chart of all the bad guys whose

2    accounts were frozen, and it was him and his brother and the

3    family members, mom, dad, the sister.  And I said you mean

4    these are the people you gave the money to?  And then he backed

5    up, because he realized that the DEA ought to be going after

6    those people.  Like what a benefit.  It's getting absurd.  It's

7    absurd.

8            You want to put one guy on the stand, and they have a

9    murderer and they say I'm sorry and it was out of self-defense

10   or something like that, but you put people on with 78 murders,

11   people who were lying during cooperation periods, and then you

12   don't even make them give up their ill-gotten gains, what --

13           MR. BOVE:  I object.

14           THE COURT:  You may continue.

15           MR. TEIN:  You don't even make them give up their

16   ill-gotten gains?  It's nuts.  It's not okay.  It's not how our

17   justice system should work.  You cannot dangle hundreds,

18   millions dollar carrots in front of these people and get out of

19   jail free cards or get out of jail early cards.  They're not

20   going to tell the truth.

21           And then if you call them, you, as jurors, most

22   respectfully, should listen to the way they spoke about dates,

23   times, places.  Right?  It's fair for you to ask well, you said

24   you had a meeting at a hotel with Antonio.  When did that

25   happen?  And they say, oh, it happened in 2006 or 2007.  So

1  then can't get any better with that.  They don't remember

2  anything closer than two-year time span, but they can tell you

3  the exact kind of gun that Tony was supposedly brandishing

4  during the meeting?  Because you know how when drug dealers

5  have a meeting with each other they all show each other how

6  they will kill each other if the meeting goes wrong.  It's

7  absurd on its face, but when it comes out of the mouths of

8  these liars, it's a hundred times more absurd, and you should

9  reject it.  And again, I'm not blaming these lawyers.  It's not

10 about them.  They're not on trial.  He's on trial.  And you're

11 here to determine whether those people, those disgusting

12 murderers, are telling the truth.

13         And you would expect, okay, well, can you give us a

14 slightly better date?  I mean you can remember the make, model,

15 and type of the weapon that Tony and all the other people in

16 the room were carrying 15 years ago, but can you tell us

17 whether this was 15 years ago or 13 years ago so we can check

18 it and see whether Tony was in fact there, using a credit card

19 receipt or a phone record or go to that hotel and see if

20 someone from the hotel remembers it?  Of course 15 years ago no

21 one except these guys is going to remember stuff.

22         It's asking us to prove a negative.  But we don't have

23 the burden of proof, they do.  So it's not about whether we

24 prove that the meeting didn't happen, because we don't have to

25 prove that.  That's the rule.  They have to prove.  They have

1    to prove the meeting happened.  And if you want to put people

2    like that on the stand -- and I'm being charitable in calling

3    them that -- I'm sorry, if you want to put witnesses like that

4    on, shouldn't you try to match up their testimony with

5    something other than saying oh, look, there's this a stamp in a

6    passport to San Andres and everybody knows that's not a tourist

7    destination.  Really?  That's it?

8           I mean look, I'm going to -- I want to go over this

9    slide, because they -- you will hear the judge, he will say

10   particular investigative techniques are not required.  And you

11   have to follow his instructions.  He's the judge of the law,

12   you're the judges of the facts.  I want to make clear,

13   Mr. Malone and I, on behalf of Antonio, are not putting the

14   government on trial.  We are not saying they should have used a

15   particular investigative technique or could have and didn't.

16   We're saying something very different.  They did.  They did use

17   every investigative technique known to U.S. law enforcement,

18   the most powerful law enforcement group of agencies on the

19   globe.

20          They used it all.  They used wiretaps, they used

21   confidential sources going in to videotape people with watch

22   phones.  They used cooperating witnesses, they used phone

23   records.  They looked at everything.  But this is what they

24   brought you.  What they brought you is all they got.  And I

25   mean these phone extraction reports that are in evidence, the

1  testimony -- that's not all that was in the phone, just these

2  hundred different lines of chat or contacts, this is just what

3  they extracted, selected for trial.  They had the guy's phone.

4  He had a Samsung phone and an Apple phone, and there's a report

5  for each.  Please look at it when you're back in the jury room

6  if you are going to use that at all to convict him.

7          Another one of you should say oh, but let's actually

8  read it.  Let's actually see what it is.  Let's see how much

9  information they had that they could get about Antonio and what

10  they came up with.  They come up with a picture of cash, they

11  come up with pictures of guns on his phone, they come up with

12  picture of him on a helicopter ride and him in a Jacuzzi.  Of

13  the thousands and thousands of pieces of data, hundreds of

14  thousands of pieces of data on the phone, this is what they

15  bring to you because that's all they have, because he's

16  innocent.  That's all they have.  So I'm not saying -- we are

17  not saying oh, they should have used a different law

18  enforcement technique.  You saw they said we did do a wiretap.

19  That's how we got Male-1 and Male-2.  We're going to talk about

20  that.

21          Let's talk about reasonable doubt.  This is really

22  important.  Do not let anyone minimize your burden.  And you

23  are only deciding these charges, and we submit to you that the

24  way they presented the case, he's either guilty on all four or

25  not guilty on all four.  There's no way you can logically find

JAGTHER4                    Summation - Mr. Tein

1    that he possessed machine guns in the course in furtherance of

2    a drug trafficking crime but he didn't commit a drug

3    trafficking crime.  And the false statements that he's alleged

4    to have -- that they say are false, it's not a question of

5    whether he was interviewed or not.  He was.  They say the false

6    statements were he denied being a drug dealer.

7            So he's he were guilty on all four or not guilty on

8    all four.  He's not guilty on all four.  He's not guilty on

9    anything that they have charged, and that's the only thing in

10   front of you.

11           Burden of proof.  Think about this, please, when

12   you're in the jury room.  The judge is going to give you an

13   instruction on the burden of proof.  You will have it in

14   writing.  It will be back there.  It's, I guess, about a page

15   and a half or so, two pages.  Please read it.  It's the law.

16   And we have to follow the law as Judge Castel gives it.

17           If you think he might be guilty, that's not enough to

18   convict.  If you think he's probably guilty of something,

19   that's not enough to convict.  If you think, you know, he just

20   seems guilty, why would someone have all those pictures of guns

21   in the phone?  That's not enough.  If you think oh, he had a

22   picture of money in his phone, people just probably are guilty

23   of something if they have that.  Look, I don't have to tell

24   you, you can see the words on the screen, you get it.

25           It's a really high standard.  It's not like in a civil

1  case where you just have to kind of prove 49, 51 percent and if

2  one side is a little stronger than the other, then the guy is

3  guilty.  No.  This is the highest standard in the United

4  States.  And don't let anybody say to you well, it's the same

5  standard that's been going on for over 200 years since the

6  birth of the Republic.  That's true.  That's we have that flag.

7  That's what makes us different from every other country in the

8  world, and that's why this is the greatest country in the

9  world, and that's why this is the greatest justice system in

10  the world, because it's decided by jurors like yourselves and

11  they must go beyond a reasonable doubt and they don't have to

12  listen to anybody but themselves and follow the law that the

13  judge gives them.  You are the last word of justice in the

14  United States.  We have the greatest system because of that.

15       It doesn't matter what the lawyers say.  It doesn't

16  matter what the government thinks.  It doesn't even matter what

17  the President of the United States thinks.  You're the judges

18  of the facts.  If they ask you to decide this case because

19  there are pictures of guns in the man's phone, please evaluate

20  that against what you know the evidence to be.  You know that

21  you can have licenses to own guns in Honduras.  Okay?  So

22  people have guns in Honduras.  People have machine guns in

23  Honduras, and we saw a license of something that looks like a

24  machine gun, and we asked the ATF agent:  That was a machine

25  gun.  So you can legally own machine guns there, but they're

prosecuting him for having these machine guns.  Why?  Because
they say, based on the over 168 murders collectively by those
five criminals, they say he was part of a drug trafficking
scheme.  So even if he legally had a machine gun in Honduras,
it was in the course and furtherance of drug trafficking, so
you should convict him.

         But it's ridiculous.  Look at these things.  Drill
down.  I'm not going to be able to have time to go through
every single one of the lines of the evidence on the disk
that's in evidence, but I will show you how to do it so if you
want to look at this in the jury room and one of you says look,
there's a gun, guns, he's charged with guns, another one of you
could say no, let's drill down on how -- what the metadata says
about the picture.

         And you are going to see on some of them, some of
these pictures, not all, it indicates whether it was on a text
that was incoming or outgoing.  And on some of these that
they're showing you, it's incoming.  Now we don't -- we didn't
hear expert testimony because they didn't call an expert on
that, but use your common sense.  Direction, incoming, status,
read.  Direction, incoming, status, read.

         This helicopter ride.  If they're using a picture and
they want you to convict based on a picture in the man's phone,
look at the date, look at whether you can tell whether he sent
it or received it.  And better yet, look to see whether it

JAGTHER4                    Summation – Mr. Tein

shows him in the picture with a gun.  Otherwise, you're left to
guess and speculate about what that really -- what that picture
was part of.  And the judge is going to instruct you:  You are
not to guess and speculate, you have to decide based on the
evidence, or you must acquit.

When they say "imagine," no, do not imagine.
Evidence.  That's it.  More metadata.  Look, again, my point is
not oh, they could have used other investigative techniques but
they didn't, shame on them.  Look, we want more evidence.  No,
my point is they had all the evidence possible in the world
that they could possibly get to establish that Antonio
Hernandez was guilty of these crimes and this is all they got.

And look, in some of these pictures you can tell
whether -- some of these pictures it appears you can tell
whether it was taken by a camera, like a selfie, like this one.
And I don't know why they picked, out of all the photos, why
did they pick one of him in biking clothes and him with his
shirt off in another one?  I don't know what that is evidence
of, maybe we'll learn in their rebuttal argument, but they can
tell exactly where he was at that time, and they can even tell
on some of these pictures latitude and longitude to plug in to
give you an exact point.

That's not some big law enforcement technique.  You
can't do any outside work, but anybody could plug that into
Google and find:  I will tell you exactly where he is.  Let's

JAGTHER4                    Summation - Mr. Tein

1    see if he was at the San Pedro Sula drug dealer hotel having a

2    drug dealer meting.

3           You know, you were promised that El Chapo was involved

4    in this case.  That's more of the shock and awe.  I mean you

5    were entitled to expect some actual evidence about El Chapo and

6    this gentleman having a meeting, other than just the absolutely

7    uncorroborated, unbacked up naked word of an admitted

8    multi-murderer, that's the evidence of El Chapo?  I mean

9    because when you heard "El Chapo" in the opening statement, you

10   were entitled to think:  Well, they're going to wrap this up

11   somehow.

12          Same way you heard when he's got a TH stamp, you

13   expected they were going to somehow tie it to him, show he was

14   in a picture with the TH or that they found it at his house or

15   in his car or in his girlfriend's house or car, but they

16   didn't.  And you might have been waiting for that.  And you all

17   were taking notes.  You might have been waiting:  They're going

18   to tie this up somehow, we're just waiting for the witness.

19   The judge told us keep an open he mind, don't decide anything

20   all the evidence has to come in, each witness tells another

21   little piece of the puzzle, then you put the puzzle together

22   and see if it is actually a puzzle or if it should go in the

23   garbage.

24          And they never connected that.  And the way they

25   connected it -- I will show it in a few minutes, the way they

1    the connected it is they didn't connect it.  The way they

2    connected it is mix up, match up, mix up, match up.  If we make

3    it seem like a TH stamp appears somewhere near Tony or near

4    some testimony about Tony, well, then it must be his stamp.

5    It's his initials.  Turns out it's not his initials.

6        So I put these pictures on because here's an automatic

7    weapon, here's an automatic weapon that we don't know, at least

8    we can't tell, there's been no evidence whether this was an

9    incoming or outgoing photo, but they spent a lot of time on

10   this photo.  We know when it was sent, but there's no evidence

11   that this was Tony's weapon, that it's in his house, that he

12   ever touched it.  We don't know anything about that.  They're

13   like:  Look, convict.

14       Let's talk about the Denny's meeting.  Now the Denny's

15   meeting was interesting.  Even the last agent who testified,

16   not the -- the last -- sorry, the last DEA agent who testified,

17   Agent Papadopoulos, even he got confused.  He was like well,

18   that video is not a video of the Denny's meeting.  This is what

19   you're convicting him on, according to them, the Denny's

20   meeting video.  And you know what?  It is a perfectly normal

21   looking lawyer business meeting video and transcript.  Please,

22   read the whole thing.

23       I'm going to go over it.  There's contracts.  He says

24   numerous times:  I don't understand what you're asking me to

25   do.  They're saying it has to do with a front company and

JAGTHER4                    Summation - Mr. Tein

switching names.  They haven't supplied you with that

information.  That's guessing and speculating.  Half the tape

says unintelligible all over the place.  And we know it was in

possession of this liar who lied about how long he kept it, and

so we don't know what he did to alter when it started, when it

ended, whether he deleted other recordings that he took earlier

that day or later that day with the defendant, this in a

meeting that he said was supposedly in a car right before then.

We don't know how much he tampered with it, make it staticky

where things were said that weren't going to help him get out

of jail.  But we do know that he was one of the biggest drug

traffickers in the hemisphere and he had access to everything

and he was buying up spy stuff and he had unlimited money, and

so God knows what he did with that thing.

          And something sounded wrong.  Even when we started to

ask when the Denny's meeting first came up with the witnesses

and we asked the DEA agent, that meeting, did your source tell

you he was going to video the meeting?  Because Agent Gonzalez

said:  I met with the confidential source before the Denny's

meeting.  That confidential source turned out to be Maradiaga.

And we heard from Maradiaga.  Did he tell you he was going to

video the meeting?  No, he didn't.  Did he tell you he was

going to audio the meeting?  No, he didn't.  Did you watch the

meeting happen?  No.

          Why do I ask those questions?  Why is Tein wasting our

JAGTHER4                    Summation – Mr. Tein

1    time with that?  Because if he decided he was going to

2    videotape the meeting and he didn't tell the DEA, he is a liar.

3    Everything he does and says we have to double-check.  Why

4    wouldn't he be telling the DEA:  I'm about to go to this

5    meeting, I have this video watch, I'm going to videotape it.

6              The reason is we all know, because if the video didn't

7    come out exactly the way he wanted it, he wasn't going to tell

8    them about it.  Or if he told them about it, they were going to

9    say he needs to come up right away and give us the video right

10    after the meeting to make sure it doesn't get altered, because

11    we heard about chain of custody.  That's the way law

12    enforcement works when it works the right way.

13              (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. TEIN:  (Continuing)  You make sure that the bad

2     guy can't monkey around and delete stuff.  You make sure of

3     that.

4          But he didn't.  Because he wanted an out.  Because

5     he's a criminal and you can't believe anything he says.

6          So I asked him:  When -- referring to the videotape

7     that we saw that you made at Denny's, when did you give that to

8     the DEA?

9          The same day that I recorded it, sir.

10          Well now when you gave the watch -- I asked him like

11     five different times so that he can't say oh, I was confused by

12     your question.

13          Now when you gave the watch video to the DEA you

14     didn't say anything to them about this fifty thousand bribe

15     that you just paid?  Right?

16          I only handed them -- I only handed the video over to

17     them, sir.

18          And on the day -- that day, that day, did you hand

19     anything else over to them?

20          Only the video, sir.

21          So now it's like three, four times that he says I

22     handed the video over that day.

23          Why did I ask him about the $50,000?  Because it's not

24     on the tape.  Because it's completely made up.  That's why.

25          Did you ever give any other videos to the DEA?

1    I only gave one video over to them, sir.

2    Why did I ask that question?  Because he was going

3    to -- this guy would vent anything, right.  So he'll say, Oh, I

4    thought you were talking about a different video.  I gave that

5    on a different day.  I thought that was -- I was confused.  No.

6    He says one video.  That's it.  That day.  Directly.

7    What did you physically give to the DEA?

8    So now we're really getting specific and he gets even

9    more specific in his lie because he's a liar.

10    What did you physically give to the DEA after the

11    Denny's meeting so they would have a video of the Denny's

12    meeting?

13    Answer:  What I turned over to the DEA, sir, was a

14    card that was inside the watch.

15    Here's the question again:  And that was the same day

16    as the Denny's meeting, right?  As if I had to ask that

17    question a sixth time.

18    Yes, sir.

19    And then we got even more specific.  To make sure that

20    this -- so you could see the lie.  So it would be so clear.

21    Did you go directly from the Denny's to the DEA in order to

22    give them the video or did you make any stops along the way?

23    Answer:  I went directly to the hotel, sir.

24    Meaning where the DEA was.

25    On that day?

1          Yes, sir.

2          Of the Denny's meeting?

3          Yes, sir.

4          You didn't wait a month?

5          No, sir.

6          And you made no stops, you went directly to the hotel

7   where you met the DEA and gave them that little card from the

8   watch?

9          Answer:  I gave the card to the DEA agent that same

10  day, sir.

11         Directly that day.  Do not pass go.  Do not collect

12  two hundred dollars.  And then he told this -- then I asked

13  even more, right.

14         But why did you want to go -- why were you so intent

15  on going that day?

16         I had to go because I thought the police were going to

17  arrest me and they'd find this little teeny SIM card thing, a

18  little memory card from the video of the -- I had to go.

19         What do you mean?  Common sense.  You have a little

20  teeny thing.  You could like put that somewhere under the

21  carpet.  They're not going to find it just because you get

22  stopped for a traffic stop for having a broken taillight.

23         Oh, no.  I had the president's brother on the phone,

24  on this recording.  I was scared for my life.  I had to go

25  directly.

1    Well as it turns out, as it turns out that was a
2    complete lie.  It was totally made up.  And why is that
3    important?  It's not just important for that witness,
4    Maradiaga, to completely throw out absolutely everything he
5    says.  He cannot be trusted.  We know that.

6    Now we knew that just when he showed up with the 78
7    convictions.  We knew that just when he showed up and he had
8    lied and committed three murders during cooperation on the
9    side.  But now we know that he told a boldfaced lie, a total
10   lie to you, to your face, sitting 20 feet from you, under oath,
11   looking you in the eyes.

12   And you all might have believed him had we not cleared
13   that up on the questioning afterwards.  And it's like that old
14   adage.  Fool me once, you're the fool.  Fool me twice, I'm the
15   fool.

16   I mean these people, they're liars for a living.  They
17   live in jail now.  Their entire human existence has been lying,
18   cheating, stealing, drug dealing, and killing.  And then they
19   look at you and they lie to you.  With a straight face,
20   convincing.  And they're lying.  And that was just a dramatic
21   illustration of what they were all doing the whole time.  That
22   was just the one time we caught him so bad.  That's not normal.
23   That was really dramatic.  They were all doing that.  All these
24   ridiculous stories that they tell.  And this guy, like them
25   all, was such a liar.  He lied to cover up the lie because

1    liars lie.

2                So, we asked him:  And the reason you answered that

3    way, making up the ridiculous story that you were telling the

4    jury was the truth about this Denny's video, which is the only

5    piece of evidence in the entire case that backs up something

6    that one of these five guys says.  He says I took a video at

7    the Denny's and here it is and we see it.  We don't know much

8    about how well it was preserved and deleting and changing and

9    how he started and stopped it when he wanted to.

10               But we know it got made because we have it.  So that's

11   what you have to rely on to convict him.  The Denny's video.

12   So we asked him about that video and he lies about it.  So how

13   can you convict him based on that video?  You can't.

14               And the reason that you answered that way was because

15   you thought in your mind that lying today would be more useful

16   to you than telling the truth; isn't that true?

17               No, sir.  I am here to tell the truth.  The thing is

18   that I got confused when I said that to you, sir.

19               That's a lie.  Because he couldn't have been confused.

20   Because I asked him about it like seven, eight, different ways.

21   And he spun out this whole story.  No one in this courtroom,

22   respectfully, thought that he was just confused.

23               My last question:  Because it would help you get a

24   sentence reduction and help convict this man Antonio Hernandez,

25   you were willing on cross-examination when I asked you

1    questions to directly and flatly lie to these jurors; isn't

2    that true?

3            And he said I just got confused in the answer that I

4    gave you, sir, but I am here to tell the truth.  I don't care

5    whether or not the defendant is convicted --

6            JUROR:  Went out.

7            MR. TEIN:  Went out again?

8            Is it still out?

9            JURY:  Yes.

10           MR. TEIN:  Something must be loose here whenever I

11   touch it.  I'm not touching it.

12           He says:  I'm just here to tell the truth.

13           So it's a lie.  If he was really this reformed angel

14   who saw the light he would have said, you know what, I just

15   fell back on my old ways for a moment into lying.  You're

16   right, Mr. Tein, I'm sorry.  It went out again.

17           The point is none of the cooperators can be trusted.

18           JUROR:  It went out again.

19           MR. TEIN:  Now it's back on?

20           JUROR:  No.

21           MR. TEIN:  The point is you can't believe any of them.

22   That's the point.

23           Let's talk about these sentence reduction letters,

24   finally, for a second the way this works.  OK.

25           These guys testified:  Oh, it's some letter and the

1  good and the bad goes in.  To be very clear, the process.  The

2  key to getting in the courtroom to have the judge, any of the

3  judges, and it's not necessarily this judge for each one of

4  these guys.  They have different cases in different courtrooms.

5  The key for any judge to be able to reduce their sentences

6  beyond the mandatory minimum, and I think we agree that at

7  least four of the five are facing life sentences.  Some life

8  plus.  The only way they can get a reduction, it's not if a

9  judge says, you know what, you tried to help the United States

10  government in their case.  I'm going to depart down.  That's

11  not the way Congress set it up.  Congress makes these rules

12  here on how sentences work.  The only way it works, Congress

13  gave, made a rule that says the only way to get underneath this

14  mandatory minimum of life is if the prosecution writes a letter

15  to the judge and the letter says they gave substantial

16  assistance in the prosecution of another person.  And here's

17  what they did.  They testified at trial.  They testified

18  truthfully.  And you should give them a sentence reduction.

19          Now, part of the sentencing process is that the judge,

20  as you would imagine, considers the defendant, the past of

21  these guys.  So that goes into his or her consideration.  But

22  the only way to get anything less than spending the rest of

23  your life in one of the worst places that you could ever

24  imagine spending every single day is if they do this.  And what

25  you saw here is the way they would say anything because they

thought it would please the prosecutors.

That's not OK. That's why Maradiaga, who is equally bad. They're all equally bad. That's why he made up that ridiculous story. But the whole thing was a ridiculous story. It's just that how could we prove the negative. If he says something happened in 2006 or '7 in some unspecified place or if one of them says El Chapo flew in on a helicopter and Antonio was there with his AR-15s. How are we going to prove that didn't happen? We don't have the burden of proof anyway. They're the ones who should be coming to show some independent person saying El Chapo came that day, I was working in the city hall, and I'm a clerk there. And yes, there was a big hullabaloo because a helicopter came in and they told us all to go home early. None of that happened. That's what you would expect to hear. You didn't hear it. You're entitled to hear that.

Look closely at the transcript of the Denny's meeting. I'm not going to go through the whole transcript with you here because I don't have enough time and I don't think I need to. I'm going to show you how to do it. If you're going to use that transcript as something that you want to consider in the jury room, make sure you read the whole thing. Make sure you read every word of it. And when you read it, read it once in the light most favorable to Antonio. Read it once as if what Antonio said in 2018 when he was arrested and what I'm saying

1  to you now is actually true.  And see if in your own judgment

2  what Tony said to the DEA on tape when he was arrested in that

3  video matches up to what he says about that meeting, what

4  happened in that meeting.  Because they, again, mixup/matchup,

5  right.  Tony is very clear when he talks to the DEA.  He says I

6  didn't realize that guy was a Cachiros then.  I did realize it

7  afterwards.  Because I went and I actually took these papers

8  and I brought it to -- they call him the ingeniero, pardon my

9  pronunciation, the guy who is the engineer of the roads and he

10  decides did this road get built correctly, should I process the

11  purchase order so that -- the work order so that it gets paid

12  by the government.  And he says here, and he goes over this,

13  and he says, it's right up here on your screen, I won't read

14  the whole thing.  But if I don't read the whole thing it's not

15  because I'm trying to avoid it.  We want you to read

16  everything.  That's why on cross-examination I went through all

17  the papers.  I'm going to talk about that in a moment too.

18          Why did I go through all those papers?  Because what's

19  in a person's wallet, what's in a person's phone tells you a

20  lot about who they really are.  And we're the ones who showed

21  that to you.  In the -- when he's arrested he's asked about the

22  Denny's meeting and he says, look, all I can do is talk to the

23  minister with the highways director and ask him why they

24  haven't paid you in reference to this subject.  We obviously

25  talked about a percentage, meaning some lawyers get paid on a

1    percentage, not by the hour, they get paid if they're able to

2    be successful, they get a percentage of the recovery.  It's

3    called a contingent fee.  It happens.  You may have heard of

4    it.  When I was given that stack of papers I went to the

5    highway office and I asked:  Ingeniero, I said, what is this?

6    Look, these people are telling me that they're owed this many

7    mills.  And Walter said whoa, take that away from here.  You'll

8    end up in trouble.  What happened, I asked him.  That's from

9    the Cachiros.  Geez, I said.  And then Walter says:  You'll get

10   in trouble with your brother, meaning the president at the

11   time.  Geez, I said.  I throw that blank away.  He said in

12   those words, throw that blank away.  So I got rid of it.  And

13   don't leave it here, it says, take it somewhere else, blah,

14   blah, blah.  And then Antonio explains that the guy was on

15   the -- he was on the OFAC list.

16          So, why -- but the DEA says but we showed him a

17   picture.  We showed him a picture of the Cachiros in 2016 when

18   he came in to present himself in Miami and answer our questions

19   and he said he didn't recognize the guy.

20          So let me find that slide.

21          I'll get to it.  I can't find it right now.  It's out

22   of order

23          You saw that the picture that they showed him was this

24   picture from this -- that OFAC chart showing all the people

25   who -- they put on the OFAC list and had their accounts frozen.

1    And the picture of the Cachiros brothers were completely

2    different from the way they look today.  You saw the mug shots.

3    And I will show you this.  I'll get to it.  It didn't look like

4    him.  It was this black-and-white picture that was a Xerox of a

5    Xerox of a Xerox.  And he had a mustache.  And he's about

6    25 pounds lighter than he was when he was here today.  Same

7    thing in his mug shot.  Same thing with his brother.  He looked

8    nothing like it.  It's not like they gave him a fair look at

9    the guy and said:  Is this the guy?  No.  I don't recognize him

10          A few quick slides on their experts.  You know they

11   show you the shock and awe of the DEA routes.  I asked the

12   expert -- really the first witness I think it was, one of the

13   first witnesses:  Did you ever mention Antonio in your whole

14   testimony?  No.  How many days have you spent in Honduras.

15   Three days

16          Again, mixup/matchup.  You see this DEA expert he's

17   obviously someone who knows a lot and studies a lot about these

18   drug routes.  Does it have anything to do with this case and

19   Antonio?  No.  It has nothing to do with Antonio.  They call

20   this independent expert on Honduran politics.  It turns out

21   he's anything but an independent expert.  He's not independent.

22   He's completely biased.

23          We asked him questions on cross-examination.  We even

24   played that podcast that he's on and it's so clear when he says

25   I have no dog in this fight, he totally has a dog in the fight.

JAG9HER5                    Summation - Mr. Tein

He totally wants to see the National Party, his brother's
party, voted out of office.  He supported the opposing
candidate who lost four years ago.  And then, he even put out a
statement in this little known political weekly paper in
Uruguay called *La Brecha*, the gap, where it's in Spanish, but
we translated it, and he says, you know, Tony has been
identified -- Tony's part of the syndicate of a bridge between
drug dealers and political campaigns.  So he had decided this
case and he comes to testify against Tony and he's biased.

         Look, he's a history professor.  Whatever.  But it's a
little -- it's another little indication of when people come up
here and they look you in the eye and they say I've got no dog
in the fight, I'm just here to tell the truth, not get a
sentence reduction.  Maya Angelou said, in a poem, said if
someone tells you who they really are, believe them.  When the
guy says I'm a 78-time murderer and I lied in cooperation,
believe him.  Believe that that's who they are.  They're liars.

         Agent Gonzalez.  Here's the guy who is the case agent,
the lead agent on the case until recently.  We cross-examined
him.  And he doesn't want to be cross-examined.  But, again,
cross-examination, we're entitled to it.  It's the best lie
detector test ever invented in the history of people.  And I
asked him -- well the guy bought a TV and here's the receipt,
right here.  He bought the receipt and he paid 88,000 lempiras.
I asked him isn't that the equivalent of $3,200.  The

conversion rate is about 24, 26, something like that.  And he

says I'm not familiar with the currency conversion rate, sir

Now if I didn't have the transcript of that you

wouldn't believe it.  It's just so absurd.  But I have the

transcript of it.  I mean this isn't -- this is a nightmare.

It is a nightmare.  I mean the case agent who's supposed to be

investigating and you follow the money and all that stuff.

Again, I'm not saying they should have used a

different investigative tool.  I'm saying they did investigate.

I'm saying he did look at all these receipts.  I'm saying he

didn't like what he saw because it didn't matchup with what his

view of the case was which is guilty.  It's not fair.  He has a

better -- he has more of a responsibility.  When I ask him,

come on.  You're not familiar with the currency rate at all?

And he says not really.

Do you know whether it's between 20 and 30 -- I ask

him lempiras.  Like I'm giving this broad range, I mean being

as fair as you could to the guy to get him to answer.  No, I do

not.

When was the last time you were down in Honduras?

Several years.

Well, then he should know the rate.  And you know

what.  He did know.  He did know.  And common sense, he was

playing a game.  Because he didn't want to answer my questions

because he knew -- he knew where I was going.  He knew where I

was going with this bag, that I was going to go into the bag
even more.  I was already in there and he knew that these
receipts show a man who lives his life like a nondrug
trafficker, who lives his life like anything but one of these
Cachiros and these Mayor Ardons and these El Rojos who make
ten, twenty, a hundred million dollars.

        Why did you save the receipt from the TV that you
bought?  Why?  When you bought it months and months ago.  Why
do you save it?  You save it because maybe the TV stops working
and you want to go back there and say I want my money back or I
want a new TV the way a normal person does.  Not a hundred
million dollar drug dealer.  They don't save that.

        And they don't pay for it with a credit card.  For two
reasons.  One, they have cash.  They want to get rid of their
cash.  Two, they don't want anybody to know where they were or
when because when you look on this receipt you know he was in a
particular place down to the minute on a particular day.  And
that, if you're a drug dealer, you don't want to know.  You
want to live in secret.  If you're doing bad stuff, you don't
use your credit card.  You use cash.

        If you do -- if you're buying the 11-inch action
figures and you're a drug dealer -- first of all, you're not
buying 11-inch action figures.  But if you're a drug dealer,
you're not paying for it with a credit card tarjeta credito and
a certificato de relegado, a gift certificate.  If you are the

person that they say you are.  If Antonio is this mastermind

who is so bold he uses TH, then using a gift certificate to buy

these toys.

          And what I have on the screen -- and you'll have it.

You'll have the stuff.  You look for yourself.  Again, don't

believe anything that I say just because I say it.  Everything

I say is backed up by evidence and transcripts.  Everything.

Every single thing.  Look yourself.  You can compare these two

ATM things that are on the screen.  They matchup with these two

savings passbooks.

          They're like old school in Honduras, the old way where

you had a savings passbook and go to the bank and they would

write it in for you and here's what they do.  And what does

this appear to be?

          You look at it.  He takes a hundred dollars in

lempiras out of his account and -- the numbers -- the account

numbers all matchup.  And he puts it in Juan Jose's account.

His son.

          Is that what a drug dealer does?  Is that how a drug

dealer does it?  He wants to give a hundred dollars to a family

member.  He whips out, peels out -- peels off one of the

hundreds.  He doesn't go and take three thousand lempiras out

of the bank and then you'll see it, two minutes later, puts it

in the other account.  It's just not how he does it

          Does a drug dealer fly basic economy?  Again, we don't

1  have to have an American Airlines witness here to know.  Does

2  he fly basic economy or does he fly around on his private jet

3  or at least first class or business class and does he book the

4  middle seat?

5          I mean that's how -- we know, this is -- this is

6  actual evidence.  This is actually true because a third party,

7  uninterested, American Airlines issued it.  Not someone who is

8  looking to get out of jail.

9          And he boards Group 9.  This isn't some frequent

10 flier.  He boards last or in one of the last groups because he

11 paid for the cheapest ticket.  That's the big drug dealer.

12         This chart shows -- think about drug dealers and

13 what -- the way they are and what you saw here.  Drug dealers

14 do all of these things on the left.  Antonio does the opposite

15         And we've talked about a lot of these things.

16         Let's look at this one, avoiding the DEA and the USA

17 because we haven't gone over that yet.

18         Antonio reads about the fact in the press, we know

19 this because we heard all this testimony about how Maradiaga

20 testified previously in early 2016 at an unrelated hearing

21 having nothing to do with this case, here in the United States

22 that he had had a meeting with Antonio.

23         MR. BOVE:  Objection.

24         THE COURT:  Basis.

25         MR. BOVE:  This testimony was stricken because it's

factually inaccurate.

THE COURT:  Ladies and gentlemen, you'll have to rely on your recollection of whether the testimony was stricken and if there's any doubt about that you can ask for a read back and we'll get that for you nailed down.

Thank you.

MR. TEIN:  Thank you.

Yes.  If I have remembered that incorrectly, check it. OK.  Check everything that I say.

Now, the point that I'm making is he came here to clear his name.  Is that what a drug dealer does?  Does a drug dealer fly across the border from Honduras, the safety apparently -- you control the whole government down there according to them -- does he fly into Miami and willingly speak to the DEA and the U.S. Attorney's Office and says:  Ask me whatever you want.  No protection.  His lawyer is there.  And within ten minutes the prosecutor who is down there in Miami says I don't believe a thing you're saying.  And he goes out to meet with his lawyer for ten minutes.  And he comes back and he says the same thing again, insisting that he's telling the truth.

And compare what Agent Papadopoulos said about what Tony's words were in 2016 in Miami with what is on the 2018 videotape, right.  2016 he goes to Miami, flies in and says: Ask me anything that you want.  He says a bunch of things.

1    They say we don't believe you.  He leaves.

2          Then 2018 he comes back for a shopping trip.  On his

3    way back he gets arrested.  They interview him.  He says the

4    same thing.

5          Here's what's interesting.  The thing that they want

6    to convict him on, on these false statements, denying a drug

7    dealer, is of the interview that Agent Papadopoulos testified

8    about in 2016 where we don't even have a transcript.  It wasn't

9    recorded.  It wasn't videotaped.

10          Like if you are going -- they're asking you to convict

11    on that type of nonevidence.  That's not fair.

12          When he's interviewed 2018, and I asked Agent

13    Gonzalez:  Did the defendant tell you that one of the purposes

14    of his trip was to go shopping?  And he also told you that it

15    involved going to buy a truck from Nebraska, right?

16          In evidence is a chat from his phone that they pulled

17    out a month later, after he was arrested, blah, blah, blah, and

18    shows it's exactly what's going on.

19          And so you'll see in the interview, this is from the

20    transcript of the November 2018 postarrest statement.  And he

21    says, he's asked by Agent Gonzalez:  What were you doing here?

22    And he says I was here to do some shopping.  It's right

23    before -- he gets there I guess right before Thanksgiving.

24    He's arrested right after Thanksgiving.

25          And he says -- and another colleague who is buying

1   trucks in Nebraska, because they said they were cheaper, was

2   the one who told us to go over there.  And he is still over

3   there, meaning in Nebraska, because the truck broke down and

4   he's not coming until tomorrow.

5        And Agent Gonzalez, OK, Investigator Gonzalez says:

6   Well that seems strange to me.

7        And Antonio says:  Why?

8        And as we know, as it turns out, of course, it's

9   totally true.  But you didn't hear that from them.

10       So here it is.  You'll see there is a chat.  It's one

11  of the exhibits in the 202 or 203 series showing the truck that

12  they were going to buy in Nebraska.  Here is apparently the

13  guy -- one of these guys are involved in the -- moving the

14  truck.  Here's the truck with the top opened, the hood opened,

15  having broken down in the day there.  And then here's texts

16  literally the day before he's arrested saying -- they call each

17  other leader, like, you know, hey boss, hey man, whatever,

18  that's what's in these texts:  Leader, I'm hoping that in two

19  hours they will tell me if I can take the truck or not.  I'll

20  let you know.  Tony says OK.

21       The point is to the extent that they want to say to

22  you:  Hey, he was here for no good because he had cash on him,

23  that's guessing and speculating and it's not fair.

24       We don't have to prove that he was here for a

25  legitimate reason but he was.  And here's what the tape --

1    here's what the chats show.

2            And so if -- and, again, I'm not casting aspersions on

3    them.  But, frankly, the DEA -- he's innocent.

4            And Agent Gonzalez wanted to play games.  This is not

5    the time for games.  When I asked him, you know -- I was asking

6    did you go through these bank records and look to see, follow

7    the money, see if you saw any money coming into his wife.  And

8    he goes well I don't recall his wife's name.  I know his

9    girlfriend's name.  Now that was him trying to be smart with

10   me.

11           Now you heard so many times the Judge says:  No, you

12   got to ask a question and the person has got to answer the

13   questions asked.  And that's for a reason.  That's because

14   that's the rule in this courtroom.  And that agent was like,

15   oh, I know his girlfriend's name.  Now -- and I said:  Well,

16   what's his girlfriend?  Sicily.  And, obviously, they had that.

17   And you can be absolutely sure that they did a financial

18   analysis and everything they could get on her.  And if they

19   found something you would have heard about it and you didn't so

20   it means they didn't.

21           And then I cleared it up.  I said, as to this thing

22   about his girlfriend.  They're separated, right?  I believe so.

23           The only thing he was trying to do with that answer

24   was be smart and try to see if he could prejudice one of you

25   against him to suggest that he was cheating -- that Tony was

1    cheating on his wife when there was no evidence of that.  And

2    that's not right.  Because the judge -- the judge will instruct

3    you, as I said, you are to decide this case based on the

4    evidence, not on bias or speculation or prejudice.

5        Here is me asking Agent Gonzalez:  Did you look at

6    everything in his phone?  Did they find WhatsApp chats?

7        Yes.  Yes.  Yes.  They looked at everything.  So if

8    they come up here and say well Tein is saying we should have

9    done a different type of investigation, understand I'm not.

10    I'm saying you did everything you could conceivably do before

11    coming to trial two weeks ago.  This was the big day.  There's

12    nothing else.  What you saw is what they have.  And if they

13    continue to come back and tell you about Ardon and Rojo and

14    Maradiaga and Chang Monroy, that's a foundation of mush.

15    Anything that they say when they go over the evidence and if

16    it's quoting from one of these bad guys, it's mush.  You

17    disregard it, most respectfully.  You're entitled to do that.

18        And the judge even gives you an instruction that says

19    these convicted cooperating witnesses, their testimony must be

20    looked at with an additional level of scrutiny.  Now it's up to

21    you ultimately, the judge will tell you, whether you believe

22    them or not.  But obviously someone like that you're going to

23    be skeptical of.  We're way past that.  You know, I believe --

24    strike that.

25        It's very clear that they're not to be believed at

all.  And just to be specific, I'm asking him does any of the

information that you found have anything to do with chats with

El Rojo or Amilcar Ardón?  No.  No.

        By the time Agent Gonzalez came up those were the two

witnesses that were called.  I asked:  With El Chapo?  No.

With the Valle Valles?  No.  But we know none of the witnesses

are corroborated.

        Now if they tell you:  Oh, the reason for that is

because when we seized the defendant's phones at the time of

his arrest he only had -- the phone information only went back

to 2016.  It appears that that's the case.  But, remember, I

asked Agent Gonzalez on the phone:  Isn't it true that the

day -- two days before that Denny's meeting that your

confidential source, which turns out to be Maradiaga who made

the video on the watch, gave you the phone number that Antonio

Hernandez -- that you used to get Antonio Hernandez?  So they

had the phone number of Hernandez back in 2014.

        So you can fairly assume that whether they did that in

2014 or last month that they ran that phone number and they

pulled anything they could conceivably have about that phone

number.  But it didn't produce any evidence that would help

them convict Antonio.  So you didn't hear it.

        And remember I asked that last question of Maradiaga.

He testified that when -- that he paid a $50,000 bribe to

Antonio but Antonio didn't do anything for him, didn't get the

money out of the government for him.  And he testified,

Maradiaga, I had no further contact with Antonio after that.

And I said so you just -- that's what you do when someone

doesn't pay you -- you pay someone $50,000, they don't do what

you bribe them to do, you just let that go?

        I mean does that guy seem like a guy who would let you

go after paying you $50,000 for something or is that a guy who

sends someone out to break your legs or kill you?  And what

does that tell you?  It tells you that the $50,000 bribe never

happened.  It never happened.  It never happened.  It never

happened.  His own testimony is inconsistent on its face.

They're all liars.

        I have I guess about --

        MR. MALONE:  23 minutes.

        MR. TEIN:  About 23 minutes left and so I will not go

over that.

        So I asked Agent Gonzalez you have these bank records.

Did you check?  And he says I didn't check.  I didn't look at

it.

        Look, do we really believe that the DEA is that

incompetent?  I mean you saw how well organized --

        MR. BOVE:  Objection.

        THE COURT:  This is lawyer argument.  It's not

evidence.  I'll let it stand.  Go ahead.

        MR. TEIN:  Do you really think the DEA didn't look

1    into Antonio's bank accounts, especially when he's walking

2    around with the bank numbers and all these credit cards?

3    Because they would see that's a way to find out whether he was

4    in a place at a certain time.  You saw they tried to do that

5    with the -- with his passports.  They had all these passports

6    that he was arrested with.  And expired ones.  And current

7    ones.  A diplomatic one.  And a tourist one.  And in the

8    arrests -- sorry, in the pages it shows where he's been.  And

9    so the best they could come up with is he was at this San

10   Andrés Island saying -- oh, and that's not a tourist

11   destination.  That's just a drug dealing jungle or something

12   that you're supposed to believe.  That's where the labs are.

13   There is no evidence of that.  That's just them saying that.

14   You can use your common sense on that.

15           But we know they do that.  So when I say:  Do we

16   really think the DEA is incompetent?  No.  We don't think

17   they're incompetent.  That's not the point.  They're not

18   incompetent.  In fact, they're super-competent.  They're all

19   competent.  They're all careful.  They all did everything they

20   could to investigate everything and there is nothing.  There's

21   nothing.  There's nothing except the testimony of the liars.

22           We went over this.  Let's talk about the TH stamp now.

23   They say he was so arrogant and so protected that he stamped

24   his cocaine with his own initials and we established they have

25   no evidence of that.  You were waiting for them to tie it up.

JAG9HER5                    Summation - Mr. Tein

1    You were waiting to show that it actually is him and it's not.

2           Look, there is no link, there is no link, none.

3    Mixup/matchup.  Put the TH stamp.  Say it's his initials.  Have

4    enough of these bad guys say it's TH stamp and maybe you'll

5    think it's his TH stamp.

6           No.  We cleared it up with Agent Gonzalez.  Do you

7    know what this is?  I asked him about the TH cocaine.

8           Yes, sir.

9           What is it?

10          It's a kilo of cocaine with a TH stamp on it.

11          Have you ever seen this kilo of cocaine in person?

12          No, sir.

13          Well, that's a surprise.  Because one might have

14   thought that you actually seized some.

15          So we go further.  Do you have an independent

16   investigation of this photograph?

17          I do not.

18          They probably did and they found nothing.

19          But do you know for sure even that this is cocaine?

20   This picture?  That you've never actually put your hands on?

21          No.  I don't know for sure.

22          So do you know even the date this picture was taken?

23          We know that it was -- they caught it on a wiretap.

24   They did everything.  Wiretapped everybody in the world, right.

25   All over.

1             Do you know the date this picture was taken?

2             No.

3             Who took it?

4             I don't know who took it.

5             And if they had come up here afterwards and say well

6    we know -- Tein was saying we don't know whether it was taken.

7    No.  No.  No.  We know that the wiretap was in 2016.  We have

8    the date on the wiretap.  Bust that doesn't mean that's when

9    the picture was taken or where it was taken or who took it or

10   what it is of.  We know what it looks like.  We're here in a

11   drug trial and it must be drugs, right.  But that's not proof

12   beyond a reasonable doubt.

13            And they say this is a quote from their closing --

14   from their opening statement taken from the transcript.  They

15   said, "You'll learn that this picture was intercepted in a 2016

16   text exchange between two of the defendant's coconspirators

17   during which they were engaged in a conversation about hundreds

18   of kilograms of cocaine, the kind of deal the defendant did on

19   a regular basis."

20            That is nonsense, OK.  And you were entitled to expect

21   that they would deliver on that promise, that promise made you

22   think that, oh, we're going to hear a wiretap, a text exchange

23   that got intercepted on a wiretap where he and his

24   coconspirators -- that didn't happen.

25            I asked the question of Agent Gonzalez.  Remember,

1    they read in Male 1 and Male 2.  They had the transcript.  It

2    was short.  Two of them.  They stood up and said I'll be Male 1

3    and I'll be Male 2 and they read it to you.  Because they don't

4    know who it is.

5            I asked -- 402 is the transcript number.  Government

6    Exhibit 402 is the transcript of that chat with TH stamp.  Do

7    you know who Male 1 is?  I asked him.  Like he's the case

8    agent.

9            No.

10           Do you know who Male 2 is?

11           No.

12           They don't even know whether Male 1 is a male.  And so

13   I asked him.

14           Do you even know where this was taken?  And he says

15   no.

16           And then on redirect they say:  Well, you do know.  It

17   was -- Male 1 was in Honduras.  Male 2 was in Guatemala.  OK.

18   Great.  You know the country.

19           There's testimony there was nine million people in

20   Honduras.  Stop it.

21           You don't know where it was.  You can try to stitch up

22   what you've -- what's beyond repair.  You can't do it.  There

23   is no link.

24           I asked finally is -- I'm not saying I asked, I'm

25   saying this is -- this is the case.  Is there a record of the

1    seizure in any of the DEA's computers, a record anywhere that

2    they have access to, anywhere in the history of the world,

3    agents of any law enforcement agency, is there a record that

4    any agency seized a kilo of cocaine with a TH stamp on it, a

5    physical kilo?

6              Answer:  Not that I'm aware of.

7              So did it come up that his fingerprints were found on

8    a kilo of cocaine?

9              No, sir.

10             On a kilogram of anything, cocaine, heroin, talcum

11   powder and coke, anything?

12             No.

13             How about do you have his fingerprints on anything?

14             No.

15             Now they said in opening statement -- I'm sorry, in

16   their summation, just now, their closing statement, they said:

17   We don't need his fingerprints on it because we have TH.  No

18   you don't have TH.  Look at this.  Look -- I even asked the

19   agent:  Who suggested TH to who?  I said did the DEA suggest TH

20   when you were talking to these bad guys and they were

21   supposedly cooperating or did they come up with TH out of the

22   blue and you went in your database and said, Oh, do we have any

23   intercepts of TH anywhere in the world?  Oh, there it is.

24   These guys were telling the truth.

25             No.  The opposite happened.  And this is the risk of

JAG9HER5                    Summation - Mr. Tein

1  using these cooperators the way they did.  Because if you

2  suggest something to them they're going to dance.

3          THE COURT:  You're now at the two-hour mark.  You have

4  fifteen minutes left.

5          MR. TEIN:  Thank you, your Honor.

6          So, is this the way it happened?  Hey, open-ended

7  question:  Did Antonio use anything to identify kilos?  Oh,

8  yeah, he used the TH.  OK.  Well let's search our databases.

9          Instead, how did it actually happen?

10         The next slide after that is the actual testimony from

11 Agent Gonzalez.  I asked Agent Gonzalez:  Who suggested to

12 whom?  And he says it came from the DEA.

13         So this is how it happened.  And I'm not saying they

14 used these exact words but you guys are grown-ups.  You have

15 common sense.  You know how this stuff can go down and just go

16 wrong fast.

17         The DEA asked them:  Did you use a stamp?  And they

18 said yeah.  You know, did you -- did he use this TH stamp?

19 They suggested it to the witnesses.  Now, that's horrible.

20         And how do I know that?  How do we know that?  Because

21 we asked Agent Gonzalez.  This idea of a TH kilo, is that

22 something that El Rojo brought to you first without your ever

23 having suggested its existence to him?

24         And right those next two lines here are just an

25 objection.  Not any issue.

1          Answer:  No, sir.

2          And then I go:  OK.  Well how about with Mayor Ardon?

3          Well I don't recall how the topic came up with Mayor

4     Ardon.

5          We all know.  You know how the topic came up with

6     everyone.  And once it was out of the bag with one of these

7     guys, it was out.  Oh, there's a TH -- oh, yeah, that Tony

8     Hernandez, TH stamp, that Tony Hernandez who I denied knowing

9     because I was scared because me, multi-murderer scared.  Come

10    on.  These guys.  Oh, that Tony Hernandez.  Yeah.  I was afraid

11    of him.  El Rojo was afraid of him, who killed his best friend

12    or his -- Maradiaga, kills his best friend, right.  And so

13    Maradiaga is afraid of him?  No, no, no.  The other way around,

14    which explains why Antonio tries to be friendly with everyone

15    so in this little town of Gracias, Lempira so he doesn't get

16    killed.

17         But the DEA is the one that suggested the TH stamp.

18    And you know.

19         THE COURT:  Could you go back to the slide before that

20    one.

21         MR. TEIN:  Yes.

22         THE COURT:  The slide before that one.

23         Are those quotes from the transcript?

24         MR. TEIN:  No.  Illustration purposes only.

25         THE COURT:  When you say illustration purposes, are

1    they from a document or any evidence in the case?

2            MR. TEIN:  It's my paraphrasing what Agent Gonzalez

3    said on this slide.

4            THE COURT:  All right, ladies and gentlemen, you

5    understand that that is not testimony in the case or any

6    evidence in the case.

7            Go ahead.

8            MR. TEIN:  Thank you.

9            That's a cartoon to illustrate my point which is --

10   you don't need a cartoon.  You got it when I asked Agent

11   Gonzalez who came up with the -- who told who about TH first,

12   the agents or the bad guys?

13           No.  The agents raised it with them first.  Oh, did

14   Tony use a TH stamp?

15           But jurors, it's not even his initials.  When he's

16   arrested, right, and they look in his baggage what does he use

17   as his initials JAH.  Juan Antonio Hernandez.

18           This whole thing about this TH stamp, which is their

19   big way of tying Antonio into these bad guys.  It's just not

20   true.  Look, it's ridiculous on its face, as Antonio was trying

21   to explain to them when he was arrested in 2018.  Why would I

22   put my initials on something that was so bad?  Obviously, I'm

23   not a drug dealer to begin with but your question is absurd.

24   And that's what they're saying.  Oh, when he goes what is this?

25   He goes supposedly TH.  I mean he's trying to -- he's trying to

1    do what he can to please these guys.  He's trying to cooperate.

2    They're intimidating.  He's under arrest.  Never seized

3    anywhere in the world.  Never seen by law enforcement ever.

4    Never photographed with Antonio.  No fingerprints.  No

5    intercepts.  No chats with Antonio.

6         The best they come up with is someone named Man 1 and

7    someone named Man 2 that they don't know who it is or where it

8    is except for they know what country it's in.  OK.  So it's in

9    the United States.  There's 250 million people here.  It's in

10   Honduras.  There's 9 million people there.

11        No evidence that it's even cocaine.  Again, I don't

12   care whether that really is a kilo or not.  The point is they

13   don't know what it is and they have the burden.  It's not his

14   initials and the DEA suggested it to the cooperators.

15        They say this thing, this is Nava and it's a Nava

16   plane.  Really?  This is in 2-27-2018.  In Latin America they

17   write the dates -- they invert the day and the month.  That man

18   Chang Monroy was already in jail in the United States then.  So

19   for them to say this was some Navajo plane that they ran

20   together.  Invented.

21        And here's my point.  Remember I asked these questions

22   on cross-examination of that first witness, the young police

23   officer who came from Honduras.  That black bag that you

24   seized, they spread everything out but not what's in the bag

25   which is supposedly -- may I?

1    These ledgers.  These ledgers are really important to

2    them.  They spent a lot of time in the case on them, a lot of

3    time in their closing argument.

4    But what happened down in Honduras with the police

5    force that they keep telling us is one of the most corrupt in

6    the world, it's -- we don't see what's in the bag when they

7    spread all the evidence out.  So we have a doubt what's in the

8    bag.

9    So I asked them how long did it take you -- how long

10   did it -- how long did it take you to put these ledgers, OK,

11   into your evidence locker?

12   13 days.

13   Anything that relates to that ledger you throw out.

14   It's not trustworthy.  What were these guys up in the wherever

15   far away they were in Honduras doing during those 13 days

16   before they came up with the ledger to put in there.  And even

17   the ledger that they come up with and says Tony Hernandez, it's

18   the only ledger in the entire case of all these ledgers that

19   have been seized, and El Rojo's ledgers, and these ledgers,

20   everyone is named Chevy and El Guapo and El Flacco and Gordo

21   and El Lexus and El Toyota except for Tony Hernandez.  Tony

22   Hernandez.  Tony Hernandez.  Come on.  The thing was tampered

23   with.  And you can fairly conclude that.  And that's not

24   speculation.  Why wait 13 days to put it in?

25   There it is.  There it is.  20-6 means the 20th day

1    of June.

2            Your Honor, how much time do I have?

3            MR. MALONE:  I said eight minutes.

4            THE COURT:  I'll answer the question, Mr. Malone if

5    you don't mind.

6            MR. MALONE:  I don't, judge.

7            THE COURT:  You have seven minutes.

8            MR. TEIN:  Thank you.

9            There is no explanation for this.  There is no good

10   reason for it.  What's the best they can say?  Sloppy police

11   work.  But you can seriously have a reasonable logical doubt

12   based on reason and common sense that something went wrong

13   there and their major, major, the only drug ledger that they

14   tie to Tony, that they talk to you about in opening statement,

15   that they put all this evidence in, 13 days.  That's why we

16   asked those questions.  Because you can have a reasonable doubt

17   of what happened between the day they seized it and why it took

18   13 days to get there.

19           OK.  Really quickly on the guns.  I explained this to

20   you.  Please, look at the pictures.  Look -- if there are

21   pictures, look to see whether they were taken by the ATF or by

22   Antonio.  And if they're in Antonio's phone, look and see

23   whether they were sent to him or whether he sent somewhere out.

24   They're not going to have that type of evidence.  They just

25   keep showing you guns, guns, guns.  But you're not entitled --

1    you can't decide this case based on fear or a reaction or them

2    wheeling this stuff in.

3            And the fact that a gun has the president's name on

4    it.  Look at the date.  April of 2018.  And he is not here to

5    answer for his brother.  Regardless of why someone would gift

6    the president with a military gun with the president's name on

7    it.

8            Maybe the arms supplier had a good reason, which

9    reminds me of something.  You're going to see a chat -- also

10   they may talk about it in their rebuttal -- that talks about --

11   that's from Santos Armería.  Armería is the Spanish word

12   armory.  It's a gun store.  You're going to see, yes, there are

13   pictures back and forth when he sells -- when he's looking at

14   guns that are being offered to him from the gun store.

15           These guns, that he has permits for, guns that are

16   lawful down there, there's not -- there is no linkage between

17   that and drug dealing other than that they keep showing you

18   these pictures.

19           I only have a few minutes so let me -- there's the

20   picture that they showed him saying oh, you don't recognize

21   this guy.  This guy looks a lot different from the guy that

22   came in and testified, I respectfully submit to you.

23           Here's how he looked when he testified before you and

24   here's his brother who didn't testify and here are the two

25   pictures that they said.  So could it be reasonable that

JAG9HER5                    Summation - Mr. Tein

1   Anthony -- Antonio, when he's asked these questions, says I

2   don't recognize that guy?  Yes.

3           Jury instructions and the verdict form and then let

4   me -- and I will wrap up.

5           The verdict form.  It asks you for each count, guilty

6   or not guilty.  And then it has these additional questions,

7   they call them interrogatories, questions.  You don't get to

8   the questions if you find that he's not guilty.  And we submit

9   to you that in Counts One, Two, Three, and Four there is only

10  one reasonable verdict if you're going to base your decision

11  based on the evidence and not fear and not mix and matchup and

12  not shock and awe.  It's a verdict of not guilty.

13          And there are questions that you should fairly expect

14  them to answer.  Why are the cooperators so vague about years?

15  Weren't there any evidence to back them up?  Why don't they

16  match a single location, date, or dollar to Tony that backs up

17  what these guys said?

18          How many murders is too many before you just

19  completely reject their testimony?  You don't have to answer

20  that question because the number of murders involved here is

21  too many.  They knowingly lied.  They shouldn't have even been

22  called into this courtroom.  And for them to say these are

23  Antonio's associates, please.  That's a cute answer.  That's

24  not -- no.  They have to prove that these are his associates

25  first.

1          And why would this global drug kingpin use credit

2     cards and gift certificates and his regular phone to arrange

3     the Denny's meeting?  And the answer is because he's not that.

4     The answer is you look at this stuff and this shows you exactly

5     who he is.  You look in the phone and you see whether it really

6     shows that this man is a drug dealer.

7          But we know who he is.  We know what he was doing on

8     this trip.  We know from this receipt two days before he was

9     arrested and he goes and he uses a credit card at Target and he

10    buys a PJ set, two PJ sets before Christmas, and this Tra Gen

11    Studio, which is this transformers game that you open up into a

12    studio, and these pajamas, these Christmas pajamas.

13              (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1    MR. TEIN:  And so we ask you, when you go into the

2    jury room and deliberate in this very important matter on

3    behalf of Antonio, Mr. Malone and I ask you to do justice.

4    There is no way that on this evidence you can find Antonio

5    Hernandez guilty.  The only verdict consistent with truth and

6    justice is a verdict on all counts, all counts of not guilty.

7    THE COURT:  Thank you, Mr. Tein.  You can take that

8    down.

9    Ladies and gentlemen, we're going to take a ten-minute

10   recess.  Please do not discuss the case among yourselves or

11   with anyone.  We'll be back in action in ten minutes.  Thank

12   you.

13   Silence.

14   (Jury not present)

15   THE COURT:  We are in recess.

16   (Recess taken)

17   (Jury present)

18   THE COURT:  Whenever you're ready.

19   MS. HOULE:  Thank you, your Honor.

20   Defense counsel just said Juan Orlando Hernandez is

21   not on trial.  That may be about the only thing that the

22   government can agree with in terms of the two and a half hours

23   of argument that you just heard.  The defendant is not on trial

24   because his brother is the president of Honduras.  The

25   defendant is on trial because he committed serious crimes.  We

1    are not all here today because of who the defendant's family

2    is.  We are here because he sent enough cocaine to this country

3    to destroy over a billion families.  The defendant is not a

4    victim of some revenge plot by the cooperating witnesses.  He's

5    not a victim at all.  He's a perpetrator.  He's a drug

6    trafficker, a murderer, a liar.  That is why we are here today.

7    You know that the defendant was a cocaine trafficker, a violent

8    one, because you have paid careful attention over the last two

9    weeks.  You have seen the photos, you have watched the videos,

10   you have listened carefully to those witnesses, you know the

11   defendant is guilty.

12        Now Mr. Bove spent two hours this morning walking you

13   through all of the evidence that shows beyond a reasonable

14   doubt that the defendant is guilty.  I'm not going to walk back

15   through all of that evidence.  You have already seen it.  You

16   know the defendant is guilty.  What I'm going to do is respond

17   to some of the arguments that you just heard.  I don't have

18   time to respond to all of them, and you don't need me to.  You

19   have seen the evidence.

20        Now remember, the government bears the burden of

21   proving the defendant's guilt beyond a reasonable doubt.  That

22   is solely with us.  That is a burden that we embrace.  The

23   defense has no obligation to make any arguments, but when they

24   do, you are entitled to scrutinize those arguments.  It is your

25   duty to look at them closely, to ask yourselves:  Does this

1    make any sense?  The answer to that question here is no.  So

2    let's talk about why.

3         Defense counsel spent a lot of time talking about the

4    cooperating witnesses.  Now I'm going to start by talking about

5    the physical evidence in this case.

6         This is Government Exhibit 250A.  It is a drug ledger

7    with the defendant's name written in black and white.  This is

8    devastating evidence of the defendant's guilt.  Now defense

9    counsel just told you that you should ignore this ledger.  It's

10   not surprising that defense counsel wants you to ignore this

11   evidence, but what is surprising is that defense counsel would

12   make that argument after the parties agreed that this ledger

13   could come into evidence and that it was seized on a particular

14   day.

15        Ms. Hurst, could you bring up Government Exhibit 1005,

16   please.

17        This is an agreement between the parties.  It is

18   signed by defense counsel.  And it's not just an agreement that

19   that ledger can come into evidence, it's an agreement that the

20   facts in the stipulation are true.

21        It says that on June 6, 2018, officers from the

22   military stopped two vehicles, that that was a lawful stop.  If

23   we could turn to the next page.

24        Detectives lawfully searched the vehicle.

25        Now look at paragraph four.  This ledger was lawfully

1   seized from a hidden compartment inside one of those vehicles.

2   This is an agreement between the parties.  I expect the judge

3   is going to tell you that you must accept these facts as true.

4   This didn't say anything about planted ledgers.  Nothing that

5   the defense counsel argues now can change the facts that are in

6   evidence.

7          Thank you, Ms. Hurst, you can take that down.

8          And take a look at that ledger, because the

9   defendant's name is in the middle of it, there's an extensive

10  drug transaction described, the handwriting is the same

11  throughout the ledger.  You know that this is evidence of the

12  defendant's guilt.

13         Defense counsel argued that it took 13 days for the

14  detective's partner to put the ledger into evidence and that's

15  why you should ignore it.  That argument goes nowhere because

16  you remember what Detective Reynoso told you.  He told you that

17  and the day he seized the ledger he took it with him back to

18  his office and he immediately reviewed it.  And he saw then

19  what you saw in court, the defendant's name.  So if it took 12

20  or 13 days or 12 or 13 years for the detective's partner to put

21  this in an evidence locker is irrelevant.  What matters is that

22  it contains the defendant's name, and Detective Reynoso told

23  you that he saw that on that day.  That's how you know that

24  that ledger is reliable.  You should rely on it.  It is

25  devastating evidence of the defendant's guilt.

1          Let's talk about the piece of physical evidence.

2     That's the recording of the Denny's meeting.

3          Ms. Hurst, could you now bring up Government

4     Exhibit 1001.

5          This is another agreement between the parties, and it

6     says that Government Exhibit 401, which is the recording of

7     that meeting, was a recording of a February 6, 2014 meeting,

8     that that recording was made by Rivera, that it was done at the

9     direction of the DEA.  It says that that recording can come

10    into evidence.  So what is the argument here now?  Not only do

11    you know when that recording was made, but you know that it's

12    the defendant in the recording.  You saw that for yourselves.

13         But you also saw the defendant admit to Special Agent

14    Gonzalez on video in his post-arrest that's him in the Denny's

15    video.  When Special Agent Gonzalez brings up the Denny's

16    recording, the defendant doesn't say that's not me, that must

17    be an altered videotape, he gives a ridiculous explanation for

18    why he was at that Denny's meeting, which defense counsel tried

19    to review for you, but he doesn't say:  That's not me.  You

20    know that that's him there.

21         So the argument now is that Mr. Rivera somehow clipped

22    that exhibit.  You can watch that exhibit.  You will be able to

23    see.  You can ask yourselves whether there's any editing in

24    there.  I submit that you're going to find that you don't think

25    that there is any editing.  Rivera maybe a lot of things, but

now suddenly he's a tech genius?  No, that's ridiculous.

And defense counsel has said that that meeting, when you look at the transcript, suggests that it was a lawyer business meeting.  You can watch that video on mute and know that it is not a lawyer business meeting because you know what those people are who were sitting there.  Oscar Ramirez, dirty lawyer, drug trafficker.  Avila Meza, dirty cop, drug trafficker.  Leonel Rivera, you heard him testify about his own crimes.  He was a drug trafficker, a murderer of 78 people. The defense is right about that.  The government is not trying to hide that.  So ask yourselves:  Why was the defendant sitting in a meeting with those men?  And look at him on that video.  He's completely comfortable.  He's shaking hands, he's smiling.  These are his people.  These were his partners.

There's no reason for the defendant to be at that meeting if he was this law and order congressman that the defense wants you to believe that he was.  What was he doing there?  You know the answer, he was having a meeting with other cocaine traffickers because he is a cocaine trafficker.

Ms. Hurst, you can it take that down.

Defense counsel talked a lot about bank accounts and bank records and bank receipts that were found on the defendant at the time of his arrest and suggested that because the defendant had bank accounts he's innocent.  This is some more common sense for you.  Sometimes massive cocaine traffickers

JAGTHER6                    Rebuttal Summation - Ms. Houle

1    have bank accounts.  Rivera told you that.  He said that he had

2    bank accounts.  Having a bank account doesn't magically

3    transform you into a law abiding person.

4            Here's some more common sense:  When drug traffickers

5    use bank accounts, what do you think those accounts look like?

6    Do you think they go to the bank and get that little deposit

7    slip and write on the memo line:  Bribe from Chapo?  No, of

8    course not.  That's ridiculous.  Do you think when they engage

9    in a wire transfer with their cocaine supplier they write in

10   the message:  Payment for poison?  No, that's ridiculous.

11           And remember where the defendant held those bank

12   accounts.  Honduras.  You heard from Special Agent Mervis and

13   Special Agent Gonzalez the DEA does not have the ability to

14   compel banks or businesses in Honduras to turn over their

15   records.  The defendant knew that he could keep a hundred bank

16   accounts in Honduras and the DEA was not going to be able to

17   compel those records.  This is a distraction.

18           Defense counsel also said if you look at those

19   receipts you will see that they show that this is not the type

20   of person who is a cocaine trafficker.  First of all, common

21   sense tells you that even cocaine traffickers who make millions

22   of dollars might want to save money.  Common sense will tell

23   you that they might clip coupons or use gift cards or keep

24   receipts.  That doesn't mean that they're not cocaine

25   traffickers.  Remember the testimony of Chang, he said that he

1  made millions of dollars in cocaine trafficking.  He also said

2  that he kept an expense book at his house with his wife to keep

3  track of household expenses.  Those two things can be true.

4        And on that point, defense counsel wanted to have it

5  both ways with this argument.  They want to say that those

6  receipts and that trip which they claim and the defendant

7  claimed, or at least one of his explanations to Special Agent

8  Gonzalez was that that was a shopping trip, that that all shows

9  that he's a normal person who's not a drug trafficker.  Use

10  your common sense on this one.  Do normal people take

11  international trips for black Friday shopping?

12        Even if that is the answer, that he was shopping for

13  black Friday, which is different from what he said when he was

14  meeting with a Mexican person who he couldn't remember his last

15  name, but even if it was a shopping trip, is that something

16  that normal people do?  That's something that someone who has a

17  lot of money does.  That's what the defendant supposedly did.

18        And defense counsel said why would the defendant sit

19  in the middle of the plane, why wasn't he flying first class,

20  why wasn't he on a private jet?  Common sense will tell you

21  that the defendant may have had a lot of reasons to not want to

22  draw attention to himself on that trip.  One of them is the

23  other reason that he gave Special Agent Gonzalez for why he was

24  coming to the United States, which was some business meeting

25  where he couldn't describe exactly what the business was or the

JAGTHER6                    Rebuttal Summation - Ms. Houle

1    last name of the person he was meeting with but it was someone

2    from Mexico.  The defendant had a lot of reasons to not draw

3    attention to himself on that trip.

4          And don't forget what the defendant was carrying with

5    him when he was arrested, $8,000.  So what is defense counsel

6    talking about here?  They're trying to distract you.  The fact

7    the defendant had some receipts for small purchases does not

8    mean he was not a massive cocaine trafficker.  You know from

9    all the other evidence that he was.

10          Defense counsel also spent some time talking about

11   that Blackberry message wire where the picture was passed of

12   the kilogram of cocaine stamped with the defendant's initials.

13   And defense counsel has tried to make you question whether or

14   not those were actually drug messages or when that photo was

15   taken or who took it.

16          You know everything you need to know about those

17   messages.  Special Agent Gonzalez told you how those

18   communications were intercepted.  It was across a drug wire, a

19   court-authorized wiretap for communications between drug

20   traffickers.  And you know that it was drug traffickers

21   exchanging messages because you can look at the content of

22   those messages.  They're talking about 300 ready in SPS, San

23   Pedro Sula.  Rojo told you what happens in San Pedro Sula.

24   That's a cocaine transshipment point.  That's what they're

25   talking about, and that's the context of the conversation where

JAGTHER6                    Rebuttal Summation – Ms. Houle

1    they pass a photograph of a kilogram of cocaine stamped with

2    the defendant's initials.

3         And what is defense counsel even suggesting with this

4    argument?  That these people on the wire are posing as drug

5    traffickers?  Of course not.  That's ridiculous.  Why?  So they

6    could frame themselves so they could be arrested?  This

7    argument makes no sense.  You know that that was a drug

8    trafficking communication.  You know that's a picture of a

9    kilogram of cocaine because you can see it, and because the

10   witnesses testified that they saw real kilograms of cocaine

11   right in front of them with their own eyes that were stamped

12   with the very same stamp, the defendant's initials.

13        Defense counsel has made several arguments about the

14   guns that the defendant used.  I'm going to try to address some

15   of those arguments now.

16        One of the arguments was Honduras is a dangerous

17   place, everybody had guns there.  First, this won't surprise

18   you, but there's no everybody-was-doing-it defense.  That's not

19   an instruction that you're not going to hear from the judge.

20   If you are a cocaine trafficker who uses guns to protect your

21   cocaine business, you are just as guilty as everyone else who

22   does it.

23        And on this point about Honduras being a dangerous

24   place and whether you need machine guns to travel safely in

25   Honduras, defense counsel said you need that because you can't

JAGTHER6                    Rebuttal Summation - Ms. Houle

1    trust the police.  Well, maybe ordinary people can't trust the

2    police.  Why?  Because the defendant has paid them all off.

3    Because he had corrupted the system.  Those police were working

4    for the defendant.  You heard multiple witnesses testify about

5    that, and you saw photos on the defendant's phone of police

6    officers protecting him.

7         The defendant didn't need to worry about corrupt

8    police, they were working for him.  But let's put that argument

9    aside, everybody was doing it, and turn to this next argument

10   about gun permits.  Having a permit to carry a gun does not

11   make it legal to use that gun to protect your cocaine

12   trafficking.  That is something that you will hear an

13   instruction from the judge on, I expect.

14        And that makes sense under any legal system, right?

15   It may be legal for someone to carry a pistol, that doesn't

16   mean that it is legal for them to take that pistol and rob and

17   shoot someone.  The defendant may have had a legal permit to

18   carry any type of gun, it doesn't mean that it was legal for

19   him to use it to protect his very illegal cocaine trafficking

20   business.

21        Defense counsel said that the machine guns were scary.

22   Yeah, that was the point.  That's why the defendant was using

23   them.  That's why when the defendant's security was carrying

24   them, they would scare away anyone who tried to mess with the

25   defendant's cocaine shipments.  It was scary.  It was also

1   scary when the defendant had murderers carrying them around so

2   they could protect him and his cocaine shipments.

3           Defense counsel said there are guns on the defendant's

4   phone but you don't know if those pictures are pictures of the

5   defendant's actual guns.  First of all, Ardon testified that at

6   least one of those photos was absolutely a gun that he had seen

7   the defendant carry.  That was 202R1.  That's a machine gun.

8           But also what is defense counsel really arguing here?

9   The defendant admitted to the DEA in that post-arrest interview

10  that he used guns.  He came through that airport with those

11  permits the defense counsel keeps talking about.  Clearly he

12  was using guns.

13          Ms. Hurst, could you bring up Government Exhibit 211,

14  please.  And if you could zoom in on the picture.

15          So while defense counsel spent so much time talking

16  about those photos on the defendant's phone, how about that

17  photo?  That's a photo of machine gun, the defendant's picture

18  on it and his name.  Of course the defendant was using machine

19  guns, there's no real dispute about this, and he was using it

20  in connection with his drug trafficking.  You know that from

21  what is on his phone, you know that from what he said to the

22  DEA, you know that from witness after witness, you know that

23  from your common sense.

24          Thank you, Ms. Hurst, you can take that down.

25          Defense counsel asked about the defendant's interviews

with law enforcement and why would the defendant sit down in

2016 with the DEA, why would the defendant sit down in 2018

with the DEA.  The answer is because the defendant was

incredibly arrogant.  He had been protected in Honduras.  He

was untouchable.  He was used to a system where your power and

your connections could protect you, and he thought that that

would work here for him.  He was wrong, and that's why he's

sitting here today.

        And remember, Special Agent Papadopoulos told you

people could have a lot of reasons to meet with law

enforcement.  You also know that the defendant was being

investigated at the time of that 2016 meeting with the DEA.  So

you can use your common sense to figure out why the defendant

might have wanted to meet with the DEA to get ahead of that.

        And let's talk about the 2018 meeting.  At that time

the defendant had been arrested.  He was trying to talk his way

out of that arrest.  And you can see him on that video, he is

acting in pure politician form.  He's giving politician speak

to those special agents.  Special Agent Gonzalez asks the

defendant when he first got involved in drug trafficking, and

the defendant quibbles with what the word "directly" means.

That happens four times on the video.  Those aren't examples of

the defendant coming in and being truthful with law

enforcement, it's the defendant trying to talk his way out of

his arrest.  It's the defendant trying to get around the fact

1    that he knew that he was a drug trafficker and he thought that

2    he could convince the other people in the room, the DEA agents,

3    that he wasn't.  He was wrong.  That's why he's here today.

4            Defense counsel also said, by the way, that if you

5    look at the 2016 and the 2018 meetings, you can see that the

6    defendant says the same thing, and therefore, he was telling

7    the truth.  First, your common sense tells you because somebody

8    says something twice certainly does not make it the truth.  But

9    second, you should think about whether or not that is even

10   true.

11           In the 2016 meeting, Special Agent Papadopoulos told

12   you, here's one example:

13   "Q.  During the interview, did the defendant describe meetings

14   with Rojo at all?

15   "A.  Yes, he said the meetings were short and that no drug

16   trafficking was discussed."

17           That's pretty different from what the defendant said

18   in 2018 when he talked about sitting down with Rojo and hearing

19   about how all the drugs were coming to the United States.  So

20   the defendant didn't tell the truth in either of those

21   meetings.  The fact that he sat down with the special agents

22   certainly doesn't show that he was telling the truth.  You

23   should reject that argument from defense counsel.

24           So let me turn now to the witnesses.  Defense counsel

25   said you cannot rely on those people, those liars, losers,

JAGTHER6                      Rebuttal Summation - Ms. Houle

1    murderers.  You know who relied on those people?  The

2    defendant.  They were his partners in drug trafficking.  That's

3    why they are the people who testified before you, because the

4    defendant choose them as his partners.  The defendant decided

5    to partner with Rojo to send more than 140,000 kilograms of

6    cocaine to the United States.  The defendant decided to partner

7    with Alex Ardon to transport Chapo's cocaine and to murder two

8    people.  Those are the people who know about the defendant's

9    crimes because they committed them together.

10          And yes, it would be easier for the government if we

11   could always call Girl Scouts and choir boys as witnesses, but

12   unless those Girl Scouts were trafficking mass quantities of

13   cocaine into the United States, they can't tell you about how

14   the defendant did that.  And unless those choir boys were

15   carrying around M-16s and RPGs and murdering people to protect

16   the defendant's drug business, they can't tell you about what

17   the defendant did.  People who commit serious crimes know about

18   the defendant's serious crimes.  That's why those witnesses

19   were here testifying before you.

20          Let's talk about defense counsel's argument about the

21   incentives that those witnesses had.  And I want to start with

22   this question around extradition.  At the beginning of this

23   trial defense counsel said that the witnesses were signed,

24   sealed, and delivered by Juan Orlando.  They have conceded now

25   that that's not true.  Not a single one of those witnesses was

1    extradited from Honduras.  Not a single one.

2            And think about that.  Think about what that shows,

3    that none of the witnesses were extradited.  None of them were

4    even investigated.  That's because they were being protected by

5    the defendant and his brother.  Think about Alex Ardon.  He

6    told you that he was never once investigated in Honduras for

7    drug trafficking, despite the fact that the defendant said in

8    his post-arrest interview that everyone knew that Ardon was a

9    drug trafficker.  He says that.  So why wasn't he investigated?

10   You know the answer.  Because the defendant was protecting him.

11   Ardon told you he committed more than 50 murders.  Not a single

12   one of those murders was investigated in Honduras?  Why?

13   Because the defendant was protecting him, the same way the

14   defendant was protecting the rest of the witnesses.

15           Defense counsel said that the witnesses surrendered

16   because they knew they were going to be extradited.  There is

17   absolutely no evidence that any of these witnesses ever

18   believed that they were going to be extradited.

19           Defense counsel has turned to talking about the

20   extradition of the Valles.  What does that have to do with the

21   witnesses who testified before you?  Think about the Valles.

22   Those are two brothers who are involved in drug trafficking.

23   They're the ones who introduced the defendant to his cocaine

24   producing partner in Colombia.  And you did hear that the

25   Valles were extradited, but you also heard about why.  The

1    Valles were only extradited after they tried to assassinate

2    Juan Orlando.  The extradition of the Valles did not send a

3    message throughout Honduras that Juan Orlando was tough on drug

4    traffickers, it sent a message that he is tough on his enemies.

5    But the witnesses weren't his enemies, they were protected by

6    Juan Orlando, they were protected by the defendant.  The

7    extradition of the Valles does not play into the decision of

8    these witnesses to surrender.  There is absolutely no evidence

9    of that.  That is entirely argument from the defense, and you

10    should reject it.

11        Defense counsel said that these witnesses are lying

12    essentially because they want to get out of prison.  The

13    witnesses told you:  Do they miss their families?  Yes.  Do

14    they like being in prison?  No.  I'm sure that none of that

15    testimony surprised.  But you should ask yourself the much more

16    important question:  What is the one hope that those witnesses

17    have of seeing those families again?  Testifying truthfully.

18    That is the only way that they will get that letter from the

19    government.  That is the only way that they can hope of getting

20    a sentence below the mandatory minimums that they face.  And if

21    they lie, that cooperation agreement that they have with the

22    government is ripped up, and the judge is required to sentence

23    them to mandatory minimums.  Think about what those mandatory

24    minimums were.  For Rojo it was 40 years, for Ardon it was life

25    plus 30 years.  That is an incredible incentive to tell the

1    truth.  If they lie just once, the cooperation agreement will

2    be ripped up.

3            And think about the risks that they took just to

4    testify here, Rojo, Ardon, Chang, they all told you they were

5    terrified to talk about the defendant and Juan Orlando.  They

6    knew the consequences that their families could face.  They

7    testified about that.  So why would they get up on that witness

8    stand?  Why would they go through all of this?  Why would they

9    put their families at risk in the way that they told you they

10   did if they were just going to lie and spend the rest of their

11   lives in prison?  It makes no sense.

12           Defense counsel said you shouldn't believe the

13   witnesses because the witnesses couldn't remember exactly what

14   day they met with certain DEA agents or exactly what was said

15   at some of those meetings.  You saw a couple of federal agents

16   testify at this trial.  You saw what the inside of some of

17   those rooms looked like, like where the defendant was

18   interviewed at a DEA office, and you can use your common sense

19   and imagine that it could be difficult to remember exactly what

20   days those meetings happened or exactly what was said at each

21   of those meetings.

22           THE COURT:  Two more minutes.

23           MS. HOULE:  Thank you, your Honor.

24           But compare that to a meeting where you are sitting

25   with the brother of the president and you're talking about

JAGTHER6                    Rebuttal Summation - Ms. Houle

1    cocaine trafficking and you're surrounded by men who are

2    carrying machine guns.  Maybe that would be easier to remember.

3    That's why those cooperating witnesses told you that they were

4    telling the truth.  You know that they were telling the truth

5    because you can evaluate their testimony.  You can understand

6    why it would be easier for them to remember those meetings with

7    the defendant.

8              Defense counsel also told you that the government is

9    not going to make those witnesses turn over their drug money.

10   That's completely false.  You heard the testimony of Rivera, he

11   told you that at sentencing the judge will decide what he needs

12   to turn over.  That's in the plea agreements, you can look at

13   that for yourself.  It's a provision called forfeiture.  It

14   happens at sentencing.  Chang told you he's the one that has

15   been sentenced.  He turned over planes, helicopters, cars,

16   Rolexes.  This argument is nonsense, and it was frankly an

17   effort to mislead you.

18             I want to make one more point about the cooperating

19   witnesses and what defense counsel is really asking you to

20   believe here.  Defense counsel is asking you to believe that

21   the ways that the cooperating witnesses' testimony overlaps and

22   the way that it's corroborated by the entirely independent

23   evidence is, I suppose, just a coincidence.

24             Let's start with some basics and think about whether

25   or not that makes any sense.  There is no dispute about when

JAGTHER6                    Rebuttal Summation – Ms. Houle

1    those witnesses were arrested.  They were arrested across four

2    different years and entirely separate places.  So defense

3    counsel is asking you to believe that these five witnesses

4    arrested across four years in different places all just

5    happened to come up with the idea to tell the government that

6    the defendant was a massive cocaine trafficker operating a

7    state-sponsored cocaine business, and then even more of a

8    coincidence, none of those men were extradited or investigated

9    or charged by Juan Orlando's administration.  That's a pretty

10   big coincidence that doesn't look very good for the defendant.

11          And then, even more of a coincidence, three of those

12   witnesses then told the government that they saw the

13   defendant's TH stamp.  They all just happened to magically come

14   up with that.  There's been to testimony in this trial that the

15   DEA suggested that stamp to any of them.  You should reject

16   that argument from defense counsel, but it's another

17   coincidence that doesn't look very good for the defendant.

18          And then coincidence of all coincidences, two drug

19   traffickers with absolutely no connection to the rest of this

20   investigation just happened to be passing drug messages, and

21   they pass a photo that looks exactly like the photo described

22   by the government's witnesses.  That's another big coincidence,

23   right, that defense counsel is asking you to believe.

24          And wait, because there's another coincidence to add

25   on top of that, which is that in 2018 when four out of those

JAGTHER6                    Charge

1    five witnesses are in prison in the United States, a drug

2    trafficker in Honduras, again entirely separate from this

3    investigation, gets stopped with a drug ledger with the

4    defendant's name in it.  Those are a remarkable series of

5    coincidences.  It's impossibly bad luck because it is

6    impossible.  These are not coincidences, this is overwhelming

7    evidence of the defendant's guilt.

8            THE COURT:  Bring it to a close, please.

9            MS. HOULE:  Ladies and gentlemen, you have seen the

10   evidence here.  You have seen the videos, the photos, the

11   witness testimony, the drug ledger, the messages, you know that

12   it all fits together to show that the defendant is guilty

13   beyond a reasonable doubt.  The defendant for years exploited

14   the political system in Honduras to protect his drug

15   trafficking business.  He used the military to protect his

16   cocaine shipments, he used the police to murder his rivals, and

17   he used the president of the country to protect his allies.

18            But all of that power and that prestige mean nothing

19   in this courtroom.  This is a place where criminals are held

20   accountable for their crimes.  It is time for the defendant to

21   be held accountable for his crimes.  It is time for you to hold

22   the defendant accountable and to return a verdict of guilty.

23            THE COURT:  Thank you, Ms. Houle.

24            Ladies and gentlemen, just stand up and stretch for a

25   minute, if you will, please.  Take a deep breath.

JAGTHER6                    Charge

1          (Pause)

2          THE COURT:  Members of the jury, you have now heard

3    all of the evidence in the case as well as the final arguments

4    of the parties.  We have reached the point where you're about

5    to undertake your final function as jurors.  You've paid

6    careful attention to evidence, and I am confident that you will

7    act together with fairness and impartiality to reach a just

8    verdict in this case.

9          It has been my duty to preside at the trial and to

10   decide what testimony and evidence was relevant under the law

11   for you to consider.  My duty at this point is to instruct you

12   as to the law.  It is your duty to accept these instructions

13   and to apply them to the facts as you determine them.

14         If any attorney has stated a legal principle different

15   from any that I state to you now in my instructions, it is my

16   instructions that you must follow.  You must not substitute

17   your own ideas of what the law is or ought to be.  You are not

18   to infer from any of my questions or rulings or anything else I

19   have said or done during this trial that I have a view as to

20   the credibility of the witnesses or how you should decide the

21   this case.

22         I will give you the text of these instructions for

23   your use in the jury room.  It's possible that there's a slight

24   variance between the words I speak and the typed text that I

25   will give you.  The words I speak control over the typed text.

JAGTHER6                    Charge

1          As members of the jury, you are the sole and exclusive

2    judges of the facts.  You pass upon the evidence.  You

3    determine the credibility of the witnesses.  You resolve such

4    conflicts as there may be in the testimony.  You draw whatever

5    inferences are reasonable for you to draw from the facts as you

6    have determined them.  You determine the weight of the

7    evidence.  You have taken the oath as jurors and it is your

8    sworn duty to determine the facts and to follow the law as I

9    give it to you.

10          It is the duty of the attorneys to object when the

11    other side offers testimony or evidence or argument that the

12    attorney believes is not properly admissible or not proper

13    argument.  Therefore, you should draw no inference from the

14    fact that an attorney objected to any evidence, nor should I

15    draw any inference from the fact that I sustained or overruled

16    an objection.

17          Your verdict must be based solely on the evidence

18    developed at trial or the lack of evidence.  The parties in

19    this case are entitled to a trial free from prejudice about a

20    party's race, religion, national origin, sex, or age.  Our

21    judicial system cannot work unless you reach your verdict

22    through a fair and impartial consideration of the evidence.

23          Similarly, under your oath as jurors, you are not to

24    be swayed by sympathy.  Once you let fear, prejudice, bias or

25    sympathy interfere with your thinking, there is a risk that you

JAGTHER6                    Charge

1    will not arrive at a just and true verdict.  Your verdict must

2    be based exclusively on the evidence or lack of evidence in the

3    case.

4              The fact that the prosecution is brought in the name

5    of the United States of America entitles the government to no

6    greater and no lesser consideration than that accorded to any

7    other party to a litigation.  All parties, whether the

8    government or an individual, stand equal under the law.

9              The defendant in this case, Juan Antonio Hernandez

10   Alvarado, has entered a plea of not guilty to the indictment.

11   As I told you before, the law presumes a defendant to be

12   innocent of all charges against him.  The defendant is to be

13   presumed by you to be innocent throughout your deliberations

14   until such time, if ever, that you as a jury are satisfied that

15   the government has proven the defendant's guilt beyond a

16   reasonable doubt.

17             (Continued on next page)

18

19

20

21

22

23

24

25

JAG9HER7                         Charge

1            THE COURT:  (Continuing)  The presumption of innocence

2       alone is sufficient to require an acquittal of a defendant

3       unless and until, after careful and impartial consideration of

4       all the evidence, you, as jurors, are convinced unanimously of

5       the defendant's guilt beyond a reasonable doubt.

6            The question that naturally comes up is:  What is a

7       reasonable doubt?  The words almost define themselves.  It is a

8       doubt founded in reason and arising out of the evidence, or the

9       lack of evidence.  It is a doubt that a reasonable person has

10      after carefully weighing all the evidence.  Proof beyond a

11      reasonable doubt must, therefore, be proof of such a convincing

12      nature that a reasonable person would not hesitate to rely and

13      act upon it in the most important of his or her own affairs.

14      Proof beyond a reasonable doubt is not proof beyond all doubt.

15           Reasonable doubt is a doubt that appeals to your

16      reason, your judgment, your experience, your common sense.  It

17      is not caprice, whim, or speculation.  It's not an excuse to

18      avoid the performance of an unpleasant duty.  It is not

19      sympathy for the defendant.

20           The government must prove each and every element of

21      the crimes charged beyond a reasonable doubt.  The burden never

22      shifts to a defendant.  The law never imposes upon a defendant

23      in a criminal trial the burden of calling any witnesses or

24      producing any evidence.  The fact that one party called more

25      witnesses and introduced more evidence does not mean that you

1    should find in favor of that party.  It is the quality of

2    evidence that matters.

3           If, after a fair, impartial, and careful consideration

4    of all the evidence, you can honestly say that you are not

5    satisfied of the guilt of a defendant -- that is, if you have

6    such a doubt as would cause you, as a prudent person, to

7    hesitate before acting in matters of importance to yourself,

8    then you have a reasonable doubt.  In that circumstance, it is

9    your duty to return a not guilty verdict for the defendant.

10          On the other hand, if after a fair, impartial, and

11   careful consideration of all the evidence, you can honestly say

12   that you are satisfied of the guilt of the defendant and that

13   you do not have a doubt that would prevent you from acting in

14   important matters in the personal affairs of your own life,

15   then you have no reasonable doubt.  Under that circumstance,

16   you should return a guilty verdict for the defendant.

17          The evidence in this case is the sworn testimony of

18   the witnesses, the exhibits received into evidence, and the

19   stipulations made by the parties.

20          By contrast, the questions of a lawyer are not

21   evidence.  It is the witnesses' answers that are evidence, not

22   the questions.

23          Testimony that has been stricken or excluded by me is

24   not evidence and may not be considered by you in rendering your

25   verdict.  If I have instructed you that evidence is received

 1    for only a limited purpose, then it may be considered only for

 2    that limited purpose.

 3             Arguments by lawyers are not evidence because the

 4    lawyers are not witnesses.  What the lawyers have said to you

 5    in their opening statements and in their summations is intended

 6    to help you understand the evidence.  If, however, your

 7    recollection of the facts differs from the lawyers' statements,

 8    it's your recollection that controls.

 9             To constitute evidence, exhibits must first be

10    admitted or received in evidence.  Exhibits marked for

11    identification but not admitted are not evidence, nor are

12    materials brought forth only to refresh a witness's

13    recollection.

14             It is for you alone to decide the weight of the

15    evidence, the weight, if any, to be given to the testimony you

16    have heard and the exhibits you have seen.

17             Ladies and gentlemen, please stand up and stretch.

18             Generally, there are two types of evidence that you

19    may consider in reaching your verdict.

20             One type is direct evidence.  Direct evidence is when

21    a witness testifies about something he or she knows by virtue

22    of his or her own senses -- something he or she has seen, felt,

23    touched, or heard.

24             Circumstantial evidence is evidence from which you may

25    infer the existence of certain facts.  Let me give you an

1    example to help you understand what is meant by circumstantial

2    evidence.

3            Now I want you to assume that this morning was bright

4    and sunny when you came into the courthouse.  And I want you to

5    assume that the windows in the courtroom when you got here were

6    completely covered.  Now we covered this particular window to

7    keep the sun out but I want you to assume it was completely

8    covered top to bottom so you couldn't see outside.  You don't

9    know whether it's day or night outside or snowing or raining or

10    the sun is shining.

11            Now I want you to assume that the back doors of the

12    courtroom open and in walked a person carrying an umbrella and

13    the umbrella may be dripping.  And a few minutes later somebody

14    else comes in wearing a raincoat and you see that they are

15    brushing droplets off their coat.

16            Now, remember, you can't look outside.  So you don't

17    know what the weather is.  But from the combination of facts

18    that I have described for you it would be reasonable for you to

19    infer that it had been raining.

20            That's all there is to circumstantial evidence.  You

21    infer on the basis of reason and experience and common sense

22    from one established fact the existence or nonexistence of some

23    other fact.

24            Circumstantial evidence is of no less value than

25    direct evidence.  The law makes no distinction between direct

JAG9HER7                    Charge

 1  evidence and circumstantial evidence.  It simply requires that

 2  your verdict must be based on all the evidence.

 3        You've had the opportunity to observe all the

 4  witnesses.  It is now your duty to decide how believable each

 5  witness was in his or her testimony.  You are the sole judges

 6  of the credibility of each witness and of the importance of his

 7  testimony.

 8        You should carefully scrutinize all of the testimony

 9  of each witness, the circumstances under which each witness

10  testified, the impression the witness made when testifying, and

11  any other matter in evidence that may help you decide the truth

12  and the importance of each witness's testimony.

13        In other words, in assessing credibility, you may size

14  up a witness in light of his or her demeanor, the explanations

15  given, and all of the other evidence in the case.  In making

16  your credibility determinations, use your common sense, your

17  good judgment, and your everyday experiences in life.

18        If you believe that a witness knowingly testified

19  falsely concerning any important matter, whether at trial or in

20  a prior proceeding, you may distrust the witness's testimony

21  concerning other matters.  You may reject all of the testimony

22  or you may accept such parts of the testimony that you believe

23  are true and give it such weight as you think it deserves.

24        The testimony of a witness may be discredited by

25  showing that the witness testified falsely concerning a

material matter, or by evidence that at some other time the

witness said or did something, or failed to say or do

something, which is inconsistent with the testimony the witness

gave at this trial.

Evidence of a prior inconsistent statement may not be

considered by you as affirmative evidence of the fact asserted

in the statement.  Evidence of a prior inconsistent statement

was placed before you for the more limited purpose of helping

you decide whether to believe the trial testimony of the

witness who contradicted himself.  If you find that the witness

made an earlier statement that conflicts with his testimony,

you may consider that fact in deciding how much of his

testimony, if any, to believe.  If you believe that a witness

has been discredited in this manner, it is exclusively your

right to give the testimony whatever weight you think it

deserves.

In making this determination, you may consider whether

the witness purposely made a false statement or whether it was

an innocent mistake; whether the inconsistency concerns an

important fact, or whether it had to do with a small detail;

whether the witness had an explanation for the inconsistency;

and whether that explanation appealed to your common sense.

In deciding whether to believe a witness, you may take

account of any evidence of hostility or affection that the

witness may have towards the defendant or the government.  You

may consider any evidence that a witness may benefit in some

way from the outcome of the case, and any loyalty, incentive,

or motive that might cause the witness to shade the truth.  You

should carefully scrutinize all of the testimony of each

witness, the circumstances under which each witness testified,

and any other matter in evidence that may help you decide the

truth and the importance of each witness's testimony.

In deciding whether or not a witness was truthful, you

may ask yourself:  How did the witness appear?  Was the witness

candid, frank, and forthright or did the witness seem evasive

or suspect in some way?  How did the way the witness testified

on direct examination compare with how the witness testified on

cross-examination?  Was the witness consistent or

contradictory?  Did the witness appear to know what he was

talking about?  Did the witness have the opportunity to observe

the facts he or she testified about?

It is your duty to consider whether the witness has

permitted any bias or interest to color his or her testimony.

In short, if you find that a witness is biased, you should view

his or her testimony with caution, weigh it with care, and

subject it to close and searching scrutiny.

Of course, the mere fact that a witness is interested

in the outcome of the case does not mean that he has not told

the truth.  It is for you to decide from your observations and

applying your common sense and experience and all the other

JAG9HER7                    Charge

1    considerations mentioned whether the possible interest of any

2    witness has intentionally or otherwise colored or distorted his

3    testimony.  You are not required to disbelieve an interested

4    witness.  You may accept as much of his testimony as you deem

5    reliable and reject as much as you deem unworthy of acceptance.

6            You have heard testimony of law enforcement officials.

7    The fact that a witness may be employed by federal, state, or

8    local government as a law enforcement officer does not mean

9    that his testimony is deserving of more or less consideration

10   or greater or lesser weight than that of an ordinary witness.

11   It is your decision, after reviewing all the evidence, whether

12   to accept the testimony of law enforcement witnesses, and to

13   give that testimony whatever weight, if any, you find it

14   deserves.

15           You have heard evidence of certain statements

16   allegedly made by the defendant to the DEA.  Ultimately, you

17   are to give the statements such weight, if any, as you feel

18   they deserve in light of all the circumstances.

19           Among the exhibits in evidence, some documents are

20   redacted.  Redacted means that part of the document was

21   covered.  You are to concern yourself only with the part of the

22   item that has been admitted into evidence.  You should not

23   consider any possible reason why the other part of it has been

24   covered.

25           One or more witnesses -- more than one witness in this

JAG9HER7                    Charge

1    trial has testified using the Spanish language.  The testimony

2    was translated for you by a court-certified interpreter.  Even

3    if you speak Spanish, you are obligated under the law to accept

4    as binding the translations of witness testimony provided to

5    you by the court-certified interpreter.

6         In this case you have heard evidence in the form of

7    stipulations of fact.  A stipulation of fact is an agreement

8    between the parties that a certain fact is true.  You must

9    regard such agreed-upon facts as true.  The weight or

10   importance of the fact is a matter for you to decide.

11        You have heard testimony from witnesses who testified

12   that they were involved in certain crimes and are cooperating

13   with the government in the hopes of receiving a lower sentence.

14   The law allows the use of such testimony.  The testimony of a

15   cooperating witness may alone be enough to establish the

16   elements of a crime, if the jury believes that the testimony

17   establishes the elements beyond a reasonable doubt.

18        A cooperator's testimony should be scrutinized with

19   greater care than the testimony of an ordinary witness and

20   viewed with particular caution when you decide how much of that

21   testimony to believe.  It does not follow, however, that simply

22   because a person has admitted to participating in one or more

23   crimes, that he is incapable of giving truthful testimony.

24        Stand up, ladies and gentlemen, please.

25        Please be seated.

1           The fact that a witness is cooperating with the

2     government may be considered by you as bearing upon his

3     credibility.  You may consider whether a cooperating witness

4     like any other witness called in this case has an interest in

5     the outcome of the case or is biased in favor or against the

6     defendant or the government and, if so, whether it has affected

7     his testimony.

8           It is no concern of yours why the government made an

9     agreement with a particular witness.  Your sole concern is

10    whether a witness has given truthful testimony.

11          In evaluating the testimony of a cooperating witness,

12    you should ask yourselves whether the witness would benefit

13    more by lying, or by telling the truth.  Was his testimony made

14    up in any way because he believed or hoped that he would

15    somehow receive favorable treatment by testifying falsely?  Or

16    did he believe that his interests would be best served by

17    testifying truthfully?  If you believe that the witness was

18    motivated by hopes of personal gain, was the motivation one

19    that would cause him to lie, or was it one that would cause him

20    to tell the truth?  Did this motivation color his testimony?

21          Like the testimony of other witnesses, cooperating

22    witnesses' testimony should be given the weight that it

23    deserves in light of the facts and circumstances before you,

24    taking into account the witness's demeanor, candor, the

25    strength and accuracy of a witness's recollection, his

JAG9HER7                          Charge

1    background, and the extent to which his testimony is or is not

2    corroborated by other evidence in the case.

3          If you find that the testimony was false, you should

4    reject it.  However, if, after a cautious and careful

5    examination of a cooperating witness's testimony and assessment

6    of his credibility, you are satisfied that the witness told the

7    truth, you should accept it as credible and act upon it

8    accordingly.  Even if you find that a witness testified falsely

9    in one part, you may still accept his testimony in other parts,

10   or you may disregard it all.  This is a determination entirely

11   for you, the jury.

12         You heard testimony from government witnesses who have

13   pleaded guilty to charges arising out of the same facts that

14   are at issue in this case.  You are instructed that you are to

15   draw no conclusions or inferences of any kind about the guilt

16   of the defendant from the fact that a prosecution witness

17   pleaded guilty to similar charges.  The decision of that

18   witness to plead guilty was a personal decision that he made

19   about his own guilt.  It may not be used by you in any way as

20   evidence against or unfavorable to the defendant on trial here.

21         You have heard testimony about evidence seized in

22   connection with certain searches conducted by law enforcement

23   officers.  Evidence obtained from these searches was properly

24   admitted in this case and may be properly considered by you.

25   Such searches were appropriate law enforcement actions.

1          Whether you approve or disapprove of how this evidence

2     was obtained should not enter into your deliberations because I

3     now instruct you that the government's use of this evidence is

4     entirely lawful.  You must, therefore, regardless of your

5     personal opinions, give this evidence full consideration along

6     with all the other evidence in the case determining whether the

7     government has proved the defendant's guilt beyond a reasonable

8     doubt.

9          Video and audio recordings of various foreign-language

10    conversations have been admitted into evidence, and the

11    transcripts of English-language translations of those

12    foreign-language recordings have been admitted into evidence.

13    I instruct you that it is the English translation of the

14    conversations reflected on those transcripts that is the

15    evidence.  The parties have stipulated that the English

16    translation of the conversations are accurate and admissible as

17    evidence.  As a result, you should not substitute your own

18    understanding of any of the foreign languages for that of any

19    translation that was admitted in evidence.  You must accept the

20    translations without regard to your own understanding of those

21    foreign languages.

22         Whether you approve or disapprove of the recordings of

23    the conversations may not enter your deliberations.  I instruct

24    you that these recordings were made in a lawful manner, that no

25    one's rights were violated, that the government's use of this

JAG9HER7                     Charge

1    evidence is lawful, and that it was properly admitted into

2    evidence.  Of course, it is for your to decide what weight, if

3    any, to give to this evidence.

4          There is no legal requirement that law enforcement

5    agents investigate crimes in a particular way or that the

6    government prove its case through any particular means.  While

7    you are to carefully consider the law enforcement evidence

8    introduced by the government, you are not to speculate as to

9    why they used the techniques they did or why they did not use

10   other techniques.  The government is not on trial.  Law

11   enforcement techniques are not your concern.

12         Your concern is to determine whether, on the evidence

13   or lack of evidence, the defendant's guilt has been proven

14   beyond a reasonable doubt.

15         You have heard evidence during the trial that

16   witnesses have discussed the facts of the case and their

17   testimony with the lawyers before the witnesses appeared in

18   court.

19         You may consider that fact when you are evaluating a

20   witness's credibility.  There is nothing either unusual or

21   improper about a witness meeting with lawyers before testifying

22   so that the witness can be aware of the subjects he will be

23   questioned about, focus on those subjects, and have the

24   opportunity to review relevant exhibits before being questioned

25   about them.  Such consultation helps conserve your time and the

1  Court's time.  In fact, it would be unusual for a lawyer to

2  call a witness without such consultation.

3       You have heard testimony from what we call expert

4  witnesses.  An expert witness is a witness who by education or

5  experience has acquired learning or experience in a specialized

6  area of knowledge.  Such witnesses are permitted to give their

7  opinions as to relevant matters in which they profess to be an

8  expert and give their reasons for their opinions.  Expert

9  testimony is presented to you on the theory that someone who is

10 experienced in a specialized field can assist you in

11 understanding the evidence or in reaching an independent

12 decision on the facts.

13      Your role in judging credibility applies to experts as

14 well as to other witnesses.  You should consider the expert

15 opinions which were received in evidence in this case and give

16 them as much or as little weight as you think they deserve.  If

17 you should decide that the opinion of an expert was not based

18 on sufficient education or experience or on sufficient data, or

19 if you should conclude that the trustworthiness or credibility

20 of an expert is questionable for any reason, or if the opinion

21 of the expert was outweighed in your judgment, by other

22 evidence in the case, then you might disregard the opinion of

23 the expert entirely or in part.

24      On the other hand, if you find the opinion of an

25 expert is based on sufficient data, education and experience,

1   and the other evidence does not give you reason to doubt his

2   conclusions, you would be justified in placing reliance on his

3   testimony.

4          The government has presented exhibits in the form of

5   charts and summaries.  These charts and summaries were admitted

6   in place of the underlying documents that they represent in

7   order to save time and avoid unnecessary inconvenience.  You

8   should consider these charts and summaries as you would any

9   other evidence.

10         Now, there are some maps and they've been admitted

11  into evidence and you may consider them as you would any other

12  evidence in the case.

13         Some of the people who may have been involved in the

14  events leading to the trial are not on trial.  There is no

15  requirement that all members of a conspiracy charged be

16  prosecuted or that all members be tried together in the same

17  proceeding.

18         You may not draw any inference, favorable or

19  unfavorable, from the fact that any person in addition to the

20  defendant is not on trial here.  You also may not speculate as

21  to the reasons why other people are not on trial.  Those

22  matters are wholly outside your concern and have no function or

23  no bearing on your function as jurors.

24         There are people whose names you heard during the

25  course of the trial but who did not appear to testify.  I

JAG9HER7                    Charge

1    instruct you that each party had an equal opportunity or lack

2    of opportunity to call any of these witnesses.  Therefore, you

3    should not draw any inference or reach any conclusion as to

4    what they would have testified to had they been called.  Their

5    absence should not affect your judgment in any way.

6         You should remember my instruction, however, that the

7    law does not impose on the defendant in a criminal case the

8    burden or duty of calling any witnesses or producing any

9    evidence.

10        Under our Constitution, a defendant has no obligation

11   to testify or to present any evidence, because it is the

12   government's burden to prove the defendant guilty beyond a

13   reasonable doubt.  That burden remains with the government

14   throughout the entire trial and never shifts to a defendant.  A

15   defendant is never required to prove that he is innocent.

16   Therefore, you must not attach any significance to the fact

17   that a defendant did not testify.  No adverse inference against

18   a defendant may be drawn by you because he did not take the

19   witness stand and you may not consider it against the defendant

20   in any way in your deliberations in the jury room.

21        I instruct you that anything you may have heard or

22   seen outside the courtroom is not evidence and must be

23   disregarded.  Indeed, as I have instructed you throughout the

24   case, you may not read, view, or listen to any media or press

25   account or internet or social media posting about this case or

JAG9HER7                          Charge

1    about the people or issues referred to during the trial.  Your

2    verdict must be based solely on the evidence or the lack of

3    evidence that came out in this courtroom and the Court's

4    instructions on the law.

5              With that, ladies and gentlemen, we are going to break

6    for the day.  The case is not in your hands.  There is more to

7    come in the Court's instructions which will finish up tomorrow

8    morning and then the case will be in your hands for the

9    purposes of deliberation.

10             So, continue to keep an open mind.  Continue to

11   refrain from discussing the case among yourselves and certainly

12   do not discuss it with anyone else.

13             It's been a long day.  I appreciate your patience.

14   Rest up.  And I'll see you tomorrow morning.

15                  (Continued on next page)

16

17

18

19

20

21

22

23

24

25

JAG9HER7                        Charge

1              (Jury not present)

2              THE COURT:  On page 19 of the typed text there was an

3    extra sentence there that I'm going to delete at the end of --

4    well, it's the last full paragraph.  "The decision of that

5    witness to plead guilty was a personal decision that he made

6    about his own guilt.  It may not be used by you in any way as

7    evidence against or unfavorable to the defendant on trial

8    here," and then it goes on to say, "That is a determination

9    entirely for you."  I'm striking that, replacing the page.  You

10   know, not all minor variances need to be corrected.  That one I

11   want corrected.  Any objection?

12             MR. MALONE:  No objection, judge.

13             THE COURT:  All right.  Have a pleasant evening.

14             (Adjourned to October 17, 2019 at 10 a.m.)

15

16

17

18

19

20

21

22

23

24

25