UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

JUAN ANTONIO HERNÁNDEZ ALVARADO,
   a/k/a "Tony Hernández,"

                              Defendant.

S2 15 Cr. 379 (PKC)


**THE GOVERNMENT'S SENTENCING SUBMISSION**


AUDREY STRAUSS
United States Attorney for the
Southern District of New York
One Saint Andrew's Plaza
New York, New York 10007


Amanda L. Houle
Matthew Laroche
Jason A. Richman
Assistant United States Attorneys
   *Of Counsel*

## TABLE OF CONTENTS

BACKGROUND ...................................................................................................... 3

I.    THE DEFENDANT'S CRIMINAL CONDUCT ................................................. 3

    A.   2004 – 2008: The Defendant Joins Hector Emilio Fernandez Rosa's Drug Trafficking Organization ................................................ 3

    B.   2008 – 2009:  The Defendant Emerges as a Major Cocaine Trafficker...... 5

    C.   2009 – 2010: The Defendant Partners with Amilcar Alexander Ardon Soriano Under the Protection of National Party Leadership ..................... 7

    D.   2012: The Defendant Adapts in Response to the Prospect of Extradition 10

    E.   2013: The Defendant Accepts a Million-Dollar Bribe from Chapo Guzman On Behalf of Juan Orlando Hernandez ...................................... 11

    F.   2014:  The Defendant's Drug-Trafficking Activities as a Honduran Congressman....................................................................................... 13

    G.   2015 – 2017:  The Defendant and Others Funnel More Drug Money into National Party Campaigns ........................................................ 15

    H.   2016: The Defendant Continues to Distribute "TH"-Branded Cocaine ... 16

    I.   2018: The Defendant Participates In a 650-Kilogram Cocaine Shipment 16

    J.   The Defendant's Weapons Trafficking and Pre-Trial Violence ............... 18

        1.   The Defendant's Personal Arsenal.................................................. 18

        2.   The Defendant's Arms Trafficking.................................................. 19

        3.   2011: Murder of Franklin Arita ...................................................... 20

        4.   2013: Murder of Chino ................................................................... 21

II.    THE DEFENDANT'S OBSTRUCTION.............................................................. 22

    A.   October 2016: The Defendant Lies to the Government.............................. 22

    B.   January 2019: The Defendant Lies to Pretrial Services and the Court ....... 22

    C.   October 2019: The Defense Team Leaks Witness Names to the Media..... 23

III.   ADDITIONAL EFFORTS TO INFLUENCE THE ONGOING INVESTIGATION.................................................................................. 23

    A.   September 2019: The "Republic of Honduras" Retains a Law Firm to Lobby the Prosecution Team Following Public Disclosures Regarding the Trial Evidence .................................................................. 23

    B.   October 2019: The Murder of Nery López Sanabria ................................. 24

    C.   December 2019: The Murders of Jose Luis Pinto and Pedro Ildefonso Armas ............................................................................... 26

    D.   February 2021: The Murder of Normando Rafael Lozano ........................ 27

THE DEFENDANT'S OBJECTIONS TO THE PSR ................................................................ 27

THE SENTENCING GUIDELINES RECOMMEND LIFE IMPRISONMENT ...................... 28

    I.       COUNT ONE ................................................................................................. 28

           A.     Drug Quantity: § 2D1.1(a)(5) ........................................................ 28

           B.     Violence: § 2D1.1(b)(2) .................................................................. 29

           C.     Use of Private Aircraft: § 2D1.1(b)(3) ......................................... 29

           D.     Bribes: § 2D1.1(b)(11) ................................................................... 30

           E.     Premises for Manufacturing Cocaine: § 2D1.1(b)(12) .............. 31

           F.     Criminal Livelihood: § 2D1.1(b)(16)(E) ....................................... 32

           G.     Leadership: § 3B1.1(a) .................................................................... 33

           H.     Abuse of Trust:  § 3B1.3 ................................................................. 35

           I.     Obstruction of Justice: § 3C1.1 .................................................... 36

    II.      COUNTS TWO AND THREE:  USE OF WEAPONS ...................................... 39

    III.     GROUPING ANALYSIS ............................................................................... 39

DISCUSSION ........................................................................................................................ 40

    I.       THE COURT SHOULD IMPOSE A LIFE SENTENCE ................................. 40

           A.     The Nature and Circumstances of the Offense ............................ 40

           B.     The History and Characteristics of the Defendant ...................... 47

           C.     The Need to Afford Adequate Deterrence ..................................... 48

           D.     A Life Sentence Would Not Result in Unwarranted Sentencing Disparities ...................................................................................... 51

    II.      THE COURT SHOULD ORDER THE DEFENDANT TO FORFEIT $138.5 MILLION ...................................................................................................... 55

           A.     Applicable Law ................................................................................. 56

           B.     Discussion ......................................................................................... 57

    III.     THE COURT SHOULD ORDER THE DEFENDANT TO REPAY ALL FUNDS DISBURSED PURSUANT TO THE CRIMINAL JUSTICE ACT ................... 58

    IV.     THE COURT SHOULD ORDER THE DEFENDANT TO PAY A $10 MILLION FINE ............................................................................................................... 59

           A.     Applicable Law ................................................................................. 59

           B.     Discussion ......................................................................................... 60

CONCLUSION ...................................................................................................................... 62

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| - v. - | S2 15 Cr. 379 (PKC) |
| JUAN ANTONIO HERNÁNDEZ ALVARADO, a/k/a "Tony Hernández," | |
| Defendant. | |

The Government respectfully submits this memorandum in response to the defendant's sentencing submission (Dkt. No. 128 ("Def. Mem.")), and in connection with the sentencing in this matter, currently scheduled for March 23, 2021 at 2:00 p.m., on the defendant's trial convictions of (i) participating in a conspiracy to import cocaine into the United States, in violation of 21 U.S.C. § 963; (ii) using machineguns in furtherance of his drug-trafficking offense, in violation of 18 U.S.C. § 924(c)(1)(a)(i); (iii) participating in a conspiracy to carry and use machineguns in furtherance of his drug-trafficking offense, in violation of 18 U.S.C. § 924(o); and (iv) lying to law enforcement, in violation of 18 U.S.C. § 1001.

The defendant was a Honduran congressman who, along with his brother Juan Orlando Hernandez, played a leadership role in a violent, state sponsored drug trafficking conspiracy. Over a fifteen-year period, the defendant corrupted the democratic institutions of Honduras to enrich himself by transporting at least 185,000 kilograms of cocaine—a staggering amount of poison that he helped import into the United States. To accomplish this astonishing level of drug distribution, the defendant commanded heavily armed members of the Honduran military and Honduran National Police, including Juan Carlos "Tigre" Bonilla and Mauricio Hernandez Pineda; he sold machineguns and ammunition to drug traffickers, some of which he obtained from the Honduran military; he controlled cocaine laboratories in Colombia and Honduras; he bribed politicians,

1

including past and current presidents of Honduras; and he helped cause at least two murders.

The defendant made at least $138.5 million in blood money through this egregious course of conduct.  He also abused his political and social position to facilitate these drug-trafficking activities in a country that has been ravaged by drug-related violence.  Between 2004 and 2019, the defendant secured and distributed millions of dollars in drug-derived bribes to Juan Orlando Hernandez, former Honduran president Porfirio Lobo Sosa, and other politicians associated with Honduras's National Party.  Prior to 2012, as a politically connected Honduran citizen operating in Honduras, the defendant acted with confidence that he could not be held accountable for his crimes in the United States.  The Honduran constitution forbade it.  When Honduras amended its constitution to permit extraditions in 2012 based on pressure from the United States, the defendant sought to exploit his political connections to achieve additional protection.  The next year, he funneled a $1 million bribe from Joaquín Guzmán Loera, a/k/a "El Chapo," ("Chapo"), the leader of the Sinaloa Cartel, to Juan Orlando Hernandez.  In 2014, the defendant was caught on tape meeting with one of the most violent drug traffickers in Honduras to discuss providing Honduran government contracts to drug traffickers in exchange for massive bribes.

The defendant has done nothing to mitigate his abhorrent criminal conduct.  Instead of showing remorse for his crimes, the defendant has repeatedly lied, minimized, and obstructed justice.  To give some examples, the defendant (i) brazenly traveled to the United States in 2016 and lied to law enforcement about his drug-trafficking activities; (ii) lied about his assets during a January 2019 bail hearing; (iii) leaked sensitive witness information in violation of a protective order in October 2019; and (iv) lied again about his assets during an application for appointed counsel in February 2020.

The defendant's conduct was, and continues to be, extraordinary.  The Probation Office

has recommended a within-Guidelines sentence of life imprisonment, and such a sentence is appropriate based on the § 3553(a) factors.  The defendant trafficked cocaine on a monumental scale, corrupted his elected office, contributed to the already deteriorating conditions in Honduras, and repeatedly lied to the Court.  Accordingly, the Government respectfully submits that the Court should impose a sentence of life imprisonment and order the defendant to forfeit $138.5 million, return all funds disbursed pursuant to the Criminal Justice Act ("CJA"), and pay a $10 million fine.

## BACKGROUND

### I.      THE DEFENDANT'S CRIMINAL CONDUCT

#### A.      2004 – 2008: The Defendant Joins Hector Emilio Fernandez Rosa's Drug Trafficking Organization

The defendant entered the drug trade in approximately 2004, when a friend named Carlos Toledo introduced the defendant to Victor Hugo Diaz Morales, a/k/a "El Rojo" ("Diaz Morales"). (Tr. 136; GX 403-4).  Diaz Morales and Toledo were working at the time for a major Honduran drug trafficker named Hector Emilio Fernandez Rosa, a/k/a "Don H," and co-defendant Mario Jose Calix Hernandez also participated in this introductory meeting.  (Tr. 136; see Feb. 12, 2020 Presentence Investigation Report ("PSR") ¶¶ 24-25).[1]

During the meeting, the defendant assured the group that he would provide "information regarding checkpoints and investigations of cocaine trafficking throughout Honduran territory," which he said "would be useful . . . in preventing the seizure of the cocaine and the arrest of the people involved."  (Tr. 138).  Between 2004 and 2010, Diaz Morales used drug proceeds to pay the defendant $5,000 for each of the group's cocaine shipments, and they participated in

---

[1] In August 2019, Judge Sullivan sentenced Fernandez Rosa to life imprisonment based on a violation of 21 U.S.C. § 846 that involved over 150 tons of narcotics.  Honduras has not addressed this Office's request for the provisional arrest of Calix Hernandez.

approximately four shipments per month during nine months each year.  (Tr. 141, 210; *see* PSR ¶ 26).  The shipments typically included between 500 and 1,000 kilograms of cocaine, but approximately twice a year the defendant helped Fernandez Rosa and Diaz Morales with shipments that included approximately 2,500 kilograms.  (Tr. 210).

In 2007, in addition to the cash payments, Diaz Morales gave the defendant two pistols. (Tr. 212; *see also* PSR ¶ 26).  That year, the defendant assured Diaz Morales that there would be "zero problems" with their cocaine shipments through Honduras, including "zero risk of seizure" of cocaine and "zero risk of arrest of persons" involved with the group's drug trafficking.  (Tr. 140, 158).  Around that time, the defendant received an additional $5,000 per shipment from Diaz Morales for information regarding Honduran naval operations at the Puerto Castilla base on the Atlantic Coast and elsewhere, and $10,000 for information regarding military operations at the base in Naco, Cortés.  (Tr. 159, 167, 171).  The defendant also charged Diaz Morales $50,000 for air radar information that the traffickers used to help land cocaine-laden planes in Honduras.  (Tr. 180, 183, 196).

In 2007, the defendant told Diaz Morales that co-defendant Hernandez Pineda, a member of the Honduran police and the defendant's cousin, was available to "assist with investigations . . . targeting drug trafficking and providing information regarding checkpoints on the [cocaine] route."  (Tr. 185; *see also* PSR ¶ 27).[2]  In the same timeframe, Hernandez Pineda confirmed to cooperating witness Giovani Rodriguez that Hernandez Pineda was providing security for Diaz Morales's drug shipments, and "that they were both protected by Tony Hernandez."  (Tr. 711).

Also in 2007, Diaz Morales paid the defendant $5,000 to prevent Normando Rafael

---

[2] In September 2019, the Government charged Hernandez Pineda with the same drug-trafficking and weapons offenses as the defendant.  (Dkt. No. 83).  Following the defendant's trial, in February 2020, Hernandez Pineda surrendered in this District and he remains in custody pending trial.

Lozano—a regional police chief and fellow drug trafficker—from being transferred away from the group's base of operations in the Copán Department. (Tr. 177-80). The defendant did so by "using the connections that he had in the capital Tegucigalpa at the National Police Headquarters." (Tr. 181). In 2007 or 2008, the defendant had another officer, Mauro Flores Santos, transferred to La Entrada, Copán, which is on "the main cocaine trafficking route from Honduras to Guatemala." (Tr. 182). Once again, Diaz Morales paid the defendant $5,000 for the assistance. (Tr. 183). In exchange for another $5,000, the defendant later prevented Flores Santos from being transferred to Tegucigalpa so that he could continue to assist with drug trafficking. (Tr. 183-84).

In 2008, the defendant participated in a meeting at a restaurant in Tegucigalpa with a group of Honduran drug traffickers that included Calix Hernandez, Amilcar Leva Cabrera, a/k/a "El Sentado," and Diaz Morales. (Tr. 190).[3] The purpose of the meeting was to discuss receiving cocaine brought to Honduras using "small planes coming from Colombia." (Tr. 191). The defendant warned the group, however, that "the DEA was training pilots from the Honduran Air Force to be able to fly helicopters with night vision" and there was a "combined operation going on involving several different countries which was meant to combat the trafficking of cocaine coming from Colombia going through Honduran territory with an ultimate destination of the United States." (Tr. 191; *see also* PSR ¶ 30).

B.    **2008 – 2009:  The Defendant Emerges as a Major Cocaine Trafficker**

In 2008, the defendant sold three cocaine shipments to Diaz Morales, which consisted of 400, 500, and 1,000 kilograms, respectively, at a rate of $10,000 per kilogram. (Tr. 194, 198-200).

---

[3] Leva Cabrera was murdered in Honduras in December 2015, after participating in an operation that led to the arrests of Efrain Campo Flores and Franqi Francisco Flores de Freitas, the nephews of Venezuelan First Lady Cilia Adela Gavidia Flores. *See generally United States v. Flores*, 945 F.3d 687 (2d Cir. 2019).

The cocaine was manufactured at a "laboratory belonging to the defendant" and Rodolfo Alfredo Vergara Bonifante, a/k/a "El Cinco" ("Cinco"), which was located near El Aceitico, Colombia. (Tr. 194; *see also* PSR ¶ 31). During the same year, the defendant supplied 800 kilograms of cocaine to a major Guatemalan cocaine trafficker, Fernando Josue Chang Monroy ("Chang Monroy"), who picked up the drugs at a ranch in Copán owned by Miguel and Luis Valle Valle, the leaders of the Valle drug-trafficking organization.[4] (Tr. 913-16). Chang Monroy determined that the defendant's cocaine was 99% pure, and had the drugs transported to Mexico City so that they could be imported into the United States by the Sinaloa Cartel. (*Id.*; *see also* Tr. 932).

In 2009, the defendant told cooperating witness Amilcar Alexander Ardon Soriano that he was working with Colombian cocaine suppliers he met through the Valle brothers, *i.e.*, Cinco and his associates. (Tr. 401-02). Around the same time that the defendant told Ardon Soriano about Cinco, Chang Monroy met the defendant and Cinco at a hotel in San Pedro Sula. (Tr. 919). A Honduran trafficker named Tonito Santos invited Chang Monroy to the meeting, and warned that the defendant could kill them if they failed to do their part in a drug transaction. (Tr. 919-20). Carlos Toledo also separately told Chang Monroy that the defendant "was the kind of person who killed anybody whom [he] did not like." (Tr. 943).

At the hotel, the defendant said that he had a laboratory to "manufacture cocaine," and he described some of the cocaine stamps from his lab, including the "TH" Stamp. (Tr. 917, 920). The defendant also said that he had "many police officers working for him," and brought a four-

---

[4] In December 2013, the Valle brothers and others were charged with a cocaine-importation conspiracy in the Southern District of Florida. *See* No. 13 Cr. 20897 (S.D. Fla. Dec. 4, 2013). In June 2014, the Valle brothers and others were charged with drug-trafficking offenses in the Eastern District of Virginia. *See* No. 14 Cr. 135 (E.D. Va. June 19, 2014). Honduras extradited the Valle brothers in December 2014. The Valles pleaded guilty to the charges in both Districts in 2016, and each was sentenced principally to 30 years' imprisonment.

man security team armed with Galil assault rifles to the meeting.  (Tr. 920, 924).  During the meeting, Chang Monroy agreed to purchase 700 kilograms of cocaine from the defendant at a price of $10,000 per kilogram, and the defendant instructed Chang Monroy to inform the chief of police in Copán "that we were going to be moving Tony's seven hundred kilos."  (Tr. 924-25).  Chang Monroy spoke to the chief, and then picked up the cocaine at the Valles' ranch in Espíritu.  (Tr. 926-27).  Between 2009 and 2010, Chang Monroy bought cocaine from the defendant five more times.  (Tr. 928-29).  Each shipment consisted of 700 kilograms.

### C.    2009 – 2010: The Defendant Partners with Amilcar Alexander Ardon Soriano Under the Protection of National Party Leadership

Ardon Soriano met the defendant in approximately 2008 at a gathering of National Party politicians.  (Tr. 395-96; *see also* PSR ¶ 32).  Around the same time, Porfirio Lobo Sosa asked Ardon Soriano for $2 million to support his campaign for presidency and Juan Orlando Hernandez's reelection campaign for a position in the congress.  (Tr. 397).  Ardon Soriano agreed to provide the cash in exchange for "protection in drug trafficking" and a position for his brother, Hugo, in Lobo Sosa's administration.  (Tr. 398).  Following the meeting, Ardon Soriano sent Lobo Sosa two installments of $1 million in cash.  (Tr. 398-99, 402-03).

During a 2009 meeting at the National Party headquarters in San Pedro Sula, which included Juan Orlando Hernandez, Lobo Sosa confirmed to Ardon Soriano that he received the first million-dollar payment.  (Tr. 399).  Juan Orlando Hernandez then instructed Ardon Soriano "to tell all National Party mayors and candidates to vote the ticket line for all congressmen so that we could have the majority within Congress."  (Tr. 400).  Lobo Sosa assured Ardon Soriano that, "if the National Party did win," Ardon Soriano would be "protected" as a drug trafficker "such that the prosecutor's office would not investigate" him, and Hugo Ardon Soriano would be

appointed to run the *Fondo Vial*.  (Tr. 400).[5]

In 2009, the defendant asked Diaz Morales to provide more drug money to support National Party campaigns.  The defendant explained

> that if that payment was made to the [N]ational [P]arty [C]ampaign, and that if Pepe Lobo Sosa was elected as president and Juan Orlando was reelected into the [N]ational Congress, that we will have more connections and greater access to information, information of the national police and the Honduran Army.

(Tr. 203).  The defendant also promised Diaz Morales that "the seizure of cocaine and the arrest of those of us working in the trafficking of the cocaine would be prevented, and that the information would be of better quality and also of more importance."  (Tr. 203-04).  Based on these promises, the defendant received $100,000 in drug proceeds from Diaz Morales.  (Tr. 203). The defendant provided a similar assurance to Ardon Soriano, explaining that "if the National Party won the election that he would have access to radars in Honduras for the distribution of cocaine."  (Tr. 402).   In order to obtain similar protection, the *Cachiros* drug-trafficking organization, one of the largest and most violent in Honduras, paid Lobo Sosa approximately $500,000 in 2009.  (Tr. 770).

In June 2009, a coup displaced Liberal Party president Manuel Zelaya.  (Tr. 314-15). Shortly thereafter, the defendant told Ardon Soriano it was a "sure thing that the National Party" would win the elections scheduled for the upcoming November.  (Tr. 403).   The defendant proposed that they "wait until Pepe Lobo Sosa and Juan Orlando Hernandez took office" to firm up their drug-trafficking operations, but inquired about Ardon Soriano's ability to receive cocaine shipments in eastern Honduras and Ardon Soriano's drug-trafficking operations in the Copán Department.  (Tr. 403-04).

---

[5] *Fondo Vial* is a component of the Honduran government associated with the Ministry of Public Works charged with administering road construction contracts.  (Tr. 317).

Juan Orlando Hernandez was reelected to the Honduran congress in November 2009.  (*See* GX 501).   The next month, Juan Orlando Hernandez asked Ardon Soriano to bribe three congressmen representing the Copán Department so that they would support his efforts to become president of the congress.  (Tr. 405-06).   When Ardon Soriano confirmed that he had paid the bribes, Juan Orlando Hernandez assured him that (i) the "protection" for drug trafficking they had discussed previously with Lobo Sosa would be provided to Ardon Soriano and his family, and (ii) Hugo Ardon Soriano would be named director of *Fondo Vial*.  (Tr. 406-07).

Juan Orlando Hernandez was named president of the congress in early 2010.  (Tr. 407). Around the same time, the defendant met with Ardon Soriano, Hugo Ardon Soriano, Calix, and Hernandez Pineda.  (Tr. 408; *see also* PSR ¶ 33).  The defendant told Ardon Soriano that he could supply cocaine, which Ardon Soriano agreed to buy at $10,000 per kilogram.  (Tr. 408).  The defendant explained that his cocaine would be transported through Panama, Costa Rica, and Nicaragua; it would arrive in Honduras in the eastern Department of Gracias a Dios; and he would transport the cocaine by helicopter to Copán, where Ardon Soriano would pay for it.  (Tr. 410-11). During a 280-kilogram test shipment, Ardon Soriano observed a U.S. registration number on the helicopter the defendant sent.  (Tr. 412; *see also* PSR ¶ 33).

For the remainder of 2010, once or twice a month, the defendant sent Ardon Soriano cocaine shipments consisting of approximately 300 kilograms, which arrived in Honduras via helicopter.  (Tr. 413).  In 2011, the defendant told Ardon Soriano that helicopters were too small, and that he was transitioning to using boats so that he would "be able to ship a larger amount of cocaine."  (Tr. 417).[6]  Following that conversation, once a month until approximately 2012, the

---

[6] During this timeframe, in 2010 or 2011, Hernandez Pineda told Giovanny Rodriguez that (i) Hernandez Pineda was participating in drug trafficking with Ardon Soriano and the defendant,

defendant sent Ardon Soriano maritime cocaine shipments ranging in size from 700 to 1,600 kilograms.  (Tr. 418; *see also* PSR ¶ 34).  After the maritime shipments arrived in Gracias a Dios, Ardon Soriano and the defendant used trucks and helicopters to transport the cocaine to Copán in installments.  (Tr. 418-19).

### D.  2012: The Defendant Adapts in Response to the Prospect of Extradition

In February 2012, then-President Lobo Sosa and Juan Orlando Hernandez traveled to Miami for a meeting with U.S. officials to discuss the possibility of Honduras beginning to extradite Honduran citizens.  (Tr. 322; *see also* PSR ¶ 36).  Following the meeting, the Honduran congress—led by Juan Orlando Hernandez—amended the constitution to permit the extradition of Honduran nationals to the United States to face drug-trafficking charges.  (Tr. 322).  Years before the amendment, the defendant had assured Diaz Morales that it was "very unlikely" that Honduras would authorize extraditions, and that there were also "internal processes" at "the supreme court level" that "could be used in stopping extraditions."  (Tr. 206).  Consistent with that assurance, following the constitutional amendment, the Honduran Supreme Court was tasked with creating extradition procedures, and no Hondurans were extradited to the United States to face drug-trafficking charges until almost two years after the amendment.  (Tr. 322-23).

Nevertheless, around the time of the 2012 constitutional amendment, the defendant sought to protect himself from the possibility of prosecution in the United States.  The defendant told Ardon Soriano that he was going to run for congress, recede from selling cocaine, and "would only provide the service of renting helicopters and providing security" for Ardon Soriano's cocaine.  (Tr. 433-34; *see also* PSR ¶ 36).  The defendant said that "he would not be extradited to the United

---

and (ii) Ardon Soriano "[w]as providing Tony Hernandez with money to finance Juan Orlando Hernandez's campaign."  (Tr. 716).

States."  (Tr. 433).  He added that Ardon Soriano would not be extradited either, "as long as the National [P]arty remained in power."  (Tr. 434).

Between 2012 and 2014, approximately once or twice a month, the defendant received $50,000 from Ardon Soriano for "renting" one of the defendant's helicopters to transport 350-kilgoram cocaine shipments and to "make sure on radar that the helicopters did not get intercepted."  (Tr. 435).  During the same period, approximately once a month, the defendant received $20,000 from Ardon Soriano for renting his helicopter so that Ardon Soriano could transport drug proceeds.  (Tr. 436).

As an example of the type of "security" the defendant provided and the type of power he and his co-conspirators wielded in Honduras, in 2012, Chapo, the then-head of the Sinaloa Cartel, warned Ardon Soriano that a drug trafficker named Jairo Orellana had stolen a drug shipment and "was going to be taking over the Guatemala/Honduras border."  (Tr. 431).  The defendant instructed Ardon Soriano to discuss the issue with then-president Lobo Sosa.  (Tr. 432).  Ardon Soriano spoke to Lobo Sosa, and Lobo Sosa "sent two trucks of soldiers from the [Honduran] army to the border to El Paraiso, Copan."  (Tr. 432).  Ardon Soriano saw about 120 soldiers in total, and they were armed with M16s, M60s, and rocket-propelled grenade launchers.  (Tr. 433).

### E.    2013: The Defendant Accepts a Million-Dollar Bribe from Chapo Guzman On Behalf of Juan Orlando Hernandez

In 2013, Juan Orlando Hernandez instructed Ardon Soriano not to seek reelection as mayor of El Paraíso, Copán because "there was a lot of coverage in the media about [Ardon Soriano] being a drug trafficker."  (Tr. 444).  Juan Orlando Hernandez said that he would only continue to "protect" Ardon Soriano if he left office.  (Tr. 444).  He asked Ardon Soriano to "finance" the National Party's campaigns in the Copán Department, and said that he would make Hugo Ardon Soriano the "coordinator in Tegucigalpa at the national level" for the National Party's campaigns.

(Tr. 444).  After that conversation, Ardon Soriano used drug proceeds to pay $1.6 million in bribes in the Copán Department in order to muster support for the National Party and Juan Orlando Hernandez.  (Tr. 445).

During the campaign in 2013, Ardon Soriano introduced the defendant to Chapo at a meeting in Espíritu, Copan—the drug-trafficking territory of the Valle brothers.  (Tr. 447; *see also* PSR ¶ 37).  Other participants in the meeting included Calix, Hernandez Pineda, and the Valles.  (Tr. 447).  During the meeting, Chapo asked the defendant to "provide security for the cocaine shipments" that the Sinaloa Cartel would be transporting through Honduras to Guatemala.  (Tr. 448).  The defendant "told Chapo Guzmán that if Juan Orlando Hernandez did win the presidency that then he could be provided with that security for that cocaine shipment," and that the Valles and Ardon Soriano "would not be extradited to the United States."  (Tr. 448).  Chapo offered the defendant $1 million to support the presidential campaign of Juan Orlando Hernandez, and the defendant responded that he would "think about it."  (Tr. 449).

Days after the meeting, the defendant told Ardon Soriano "that he had spoken to Juan Orlando Hernandez and that, in fact, they did need the $1 million for the campaign," "urgently."  (Tr. 449).  The defendant also noted that Juan Orlando Hernandez had warned to "be careful with cameras and pictures because of phones."  (Tr. 449).  The message from Juan Orlando Hernandez led to a second meeting between the defendant, Chapo, and Ardon Soriano in 2013, this time in El Paraíso, Copán.  (Tr. 450).  During the second meeting, the defendant agreed with Chapo to provide "protection" for the Valles, Ardon Soriano, and "the cocaine shipment[s] through Honduran territory"—"if Juan Orlando Hernandez did win the elections."  (Tr. 451).  After reaching an agreement and exchanging telephone numbers so that they could communicate directly, Chapo handed the defendant $1 million in cash.  (Tr. 452).

When Honduran authorities provisionally arrested the Valles in 2014, the defendant explained to Ardon Soriano that the resulting extraditions were an act of vengeance, "that the Valles had been arrested because they had attempted to kill Juan Orlando Hernandez." (Tr. 455; *see also* Tr. 797-98, 894, 941)).[7]  But the defendant assured Ardon Soriano that "as long as the National Party was in power, then they were going to protect me and keep me from being arrested." (Tr. 456).  In 2015, Ardon Soriano told Juan Orlando Hernandez that the Sinaloa Cartel was applying pressure based on the extraditions of the Valles because Chapo had "paid the $1 million, to protect the Valles." (Tr. 457).  The defendant joined in Ardon Soriano's expression of concern, explaining that "that he had taken that money [from Chapo] because Juan Orlando Hernandez had authorized him to." (Tr. 457).  Juan Orlando Hernandez did not deny receiving the payment, and instead responded that "he had no obligation to anyone and that he would return the money if [Chapo] wanted it back." (Tr. 457).

### F.     2014:  The Defendant's Drug-Trafficking Activities as a Honduran Congressman

The defendant was elected to the Honduran congress in the same November 2013 national elections that led to his brother becoming president.  (*See* GX 501).  The following month, a member of the Honduran National Police named Juan Avila Meza[8] told Devis Leonel Rivera Maradiaga ("Rivera Mariadaga"), one of the leaders of the *Cachiros*, that the defendant "wanted

---

[7] When rumors regarding the assassination plot began to spread in Honduras in 2014, cooperating witness Devis Leonel Rivera Maradiaga used a corrupt Honduran congressman named Reynoldo Ekonomo to send a message to Juan Orlando Hernandez that he was not involved.  (Tr. 799-800). At the time, Rivera Maradiaga had been sanctioned by OFAC in a widely publicized action, and was also cooperating with the DEA.  Ekonomo connected Rivera Maradiaga to Juan Orlando Hernandez in a phone call, in exchange for $20,000 and a vehicle, and Rivera Maradiaga assured the Honduran president that he and his brother were not trying to kill him.  (Tr. 800-02).

[8] In April 2018, Avila Meza pleaded guilty to a cocaine-importation conspiracy charge in this District.  *See* No. 15 Cr. 174 (LGS).  He is scheduled to be sentenced on March 29, 2021.

to work" in "drug trafficking" and "help to get [*Cachiros*] front companies paid for the government contracts." (Tr. 782). Avila Meza told Rivera Maradiaga that the defendant wanted a $100,000 "advance" and a "house in Tegucigalpa" to use as his new congressional "office." (Tr. 783).

In February 2014, Rivera Maradiaga met with Avila Meza and Oscar Ramirez at a hotel in Tegucigalpa to make plans for the meeting with the defendant. (Tr. 784). Ramirez had previously rented Rivera Maradiaga a clandestine airstrip for use in connection with a drug shipment. (Tr. 784). Avila Meza described Ramirez to Rivera Maradiaga as someone who "works for Tony Hernandez," and then the group moved from the hotel to Rivera Maradiaga's vehicle so that they could speak in private. (Tr. 785). Rivera Maradiaga told the men that he had $50,000 for the defendant, and they confirmed to Rivera Maradiaga that "what [the defendant] wanted was to work . . . in drug trafficking." (Tr. 786). Rivera Maradiaga also told Avila Meza and Ramirez that he had brought copies of the government contracts with which he was seeking the defendant's assistance. (Tr. 787).

Rivera Maradiaga, Avila Meza, and Ramirez drove to a Denny's restaurant for the meeting. (Tr. 787). When Rivera Maradiaga arrived, he observed a seven-man security team wearing military uniforms and armed with AR-15 rifles. (Tr. 788). Rivera Maradiaga met the defendant inside the restaurant. (*See generally* GX 401-T). They discussed using a new front company to receive money-laundering payments from the Honduran government because OFAC had sanctioned the *Cachiros* company named in the contracts. (Tr. 792). The defendant agreed to seek assistance from several Honduran officials, including Roberto Ordóñez and Hugo Ardon Soriano (who was at that point the director of *Fondo Vial* pursuant to drug-related agreements between the defendant, Ardon Soriano, Lobo Sosa, and Juan Orlando Hernandez). At the end of the meeting, Rivera Maradiaga gave the defendant the $50,000 cash payment. (Tr. 797).

14

Also in 2014, the defendant worked with Calix, a Mexican drug trafficker named Jesus Albino Quintero Meraz,[9] and Diaz Morales to transport between 1,400 and 1,600 kilograms of cocaine using a large Gulfstream jet.  (Tr. 217, 220).  Diaz Morales and Calix paid the defendant $35,000 "as a down payment for handling radar information," but the aircraft crashed in Venezuela before it could be dispatched to Honduras.  (Tr. 221).

### G.     2015 – 2017:  The Defendant and Others Funnel More Drug Money into National Party Campaigns

In 2015, Juan Orlando Hernandez invited Ardon Soriano to a meeting in Tegucigalpa. When Ardon Soriano arrived, Roberto Ordoñez told Ardon Soriano that Juan Orlando Hernandez wanted Hugo Ardon Soriano to resign "because he could not take all of the talk in the media about Hugo and [Ardon Soriano] being drug traffickers."  (Tr. 458).  Ardon Soriano agreed that Hugo Ardon Soriano would step down, and Ordoñez told Ardon Soriano that Juan Orlando Hernandez would provide "protection for drug trafficking" if Ardon Soriano "finance[d] and bribe[d] mayors" in the Copán Department "to get them to vote for Juan Orlando Hernandez."  (Tr. 459).

Approximately six months before the November 2017 national elections, Ardon Soriano met with the defendant and Juan Orlando Hernandez in Santa Rosa, Copán.  (Tr. 460).  Juan Orlando Hernandez expressed concern that "the National Party had very low numbers in the pol[l]s," and asked Ardon Soriano to "finance" the "National Party's campaign" in the Copán and Lempira Departments.  (Tr. 460).  The defendant added that they needed $500,000 for the Lempira Department, which Ardon Soriano later provided to him from drug proceeds.  (Tr. 461).  Ardon Soriano also spent 1.6 million Lempira on bribes in Copán.  (Tr. 462).

---

[9] Quintero Meraz has been a fugitive on pending charges in this District since 2001.  *See* No. 01 Cr. 21 (VM).

**H.    2016: The Defendant Continues to Distribute "TH"-Branded Cocaine**

In June 2016, the DEA intercepted electronic communications over a Title III wiretap between a trafficker in Honduras ("Male-1") and a trafficker in Guatemala ("Male-2").  (*See* GX 402; *see also* PSR ¶ 38).  The Honduras-based trafficker indicated that there were 300 kilograms of "TH" cocaine in "SPS," *i.e.*, San Pedro Sula, "already."



**I.    2018: The Defendant Participates In a 650-Kilogram Cocaine Shipment**

On June 6, 2018, Honduran military officials stopped two vehicles in the Cortés Department.  (GX 1005).  Nery López Sanabria, a significant Honduran drug trafficker, was an occupant of one of the vehicles.  (*Id.*).[10]  Honduran authorities arrested and detained López Sanabria in connection with this incident—and he was later murdered, as described below.

---

[10] In 2012, "Nery" asked Rivera Maradiaga to help receive cocaine shipments in the Mosquitia region in eastern Honduras.  (Tr. 767). Diaz Morales knew López Sanabria by his alias, "Wilson," and explained that he provided López Sanabria with a plane in 2012 to transport 500 kilograms of cocaine from Colombia to Honduras.  (Tr. 224; *see also* GX 1005).

During the traffic stop on June 6, 2018, law enforcement identified a secret compartment underneath the rear seat that contained more than $190,000 in cash, several ledgers, and two hand grenades.  (Tr. 52-53).  A second compartment contained three pistols.  (Tr. 53-54).

 

(GXs 352, 353).

One of the ledgers was labeled "Hard Work" 2018, and reflected a 650-kilogram cocaine shipment with the defendant.  (GXs 250-A, 250-T).

The entry is dated February 27, 2018 and indicates that the defendant "sent" 650 kilograms, 490

of which belonged to the defendant and 160 of which belonged to López Sanabria.  (GX 250-T at 1-2).[11]  The defendant charged $9,300 per kilogram for the kilograms that he owned, received a million-dollar up-front payment, and was owed a total of $4.9 million in the deal.  (*Id.*).

At least one of the other ledgers seized by Honduran law enforcement in June 2018 contained references to "JOH," initials used by Juan Orlando Hernandez.  For example:



### J.       The Defendant's Weapons Trafficking and Pre-Trial Violence

### 1.       The Defendant's Personal Arsenal

The defendant was armed nearly every time that Ardon Soriano saw him beginning in 2008. (Tr. 364).  The defendant's personal arsenal included a modified AR-15 and an Uzi inscribed with the name of Juan Orlando Hernandez, "Presidente de la República":

---

[11] The ledger indicates that 10 of the kilograms in the shipment were "bad ones," *i.e.*, poor quality, damaged in transit, or both.  (GX 250-T at 2).

 

(Tr. 364-68; GXs 202-R1, 203-R4).

The defendant also owned an M60 belt-fed machinegun, which he described to Ardon Soriano in 2011:



(Tr. 368-69; GX 313 (exemplar firearm)).

### 2.   The Defendant's Arms Trafficking

In 2009, the defendant explained to Chang Monroy that he could provide "any type of weapons," including a pistol that the defendant referred to as a "cop killer" as well as "any type of heavy duty weapons" such as rocket-propelled grenade launchers.  (Tr. 913, 921-22).

In 2010, Diaz Morales obtained between 4,000 and 6,000 rounds of assault-rifle ammunition from Normando Rafael Lozano.  (Tr. 211; *see also* PSR ¶ 40).  Lozano indicated that he bought the ammunition from the defendant.  (Tr. 211).  Consistent with the defendant's prior

reference to greater access to the "Honduran Army," the bullets were packaged "in metal boxes bearing the Honduran National Army logo." (Tr. 203, 211). Diaz Morales sold the ammunition to Chang Monroy, who observed from the packaging that the materials appeared to have come from the Honduran military. (Tr. 211, 936-38).[12]

In 2012, Chang Monroy purchased 40 M16s that were supplied by the defendant. (Tr. 913, 939; *see also* PSR ¶ 40). Two people responsible for delivering the weapons to Chang Monroy confirmed, independently, that the defendant supplied them. (Tr. 939). One of the traffickers added that the defendant, "had sent a lot of rifles to be sold." (*Id.*).

### 3.      2011: Murder of Franklin Arita

In 2011, the defendant and Ardon Soriano caused the murder of a drug trafficker in the Copán Department named Franklin Arita. (Tr. 427). Arita was based in the town of Copán Ruinas, which is a strategically important town for drug trafficking because it straddles the largest, most well-maintained road to the Honduras-Guatemala border—the Central American Highway. (Tr. 305-06). In 2011, Arita tried to block Ardon Soriano from using the Highway to transport cocaine through Copán Ruinas and Santa Rita, Copán. (Tr. 427). When Ardon Soriano told the defendant about the problem, the defendant responded "that Franklin Arita had to be killed." (Tr. 428). The defendant agreed with Ardon Soriano that Juan Carlos "Tigre" Bonilla Valladares, the regional Honduran National Police chief responsible for the Copán Department at the time, should arrange for Arita's murder. (Tr. 428).[13]

---

[12] Chang Monroy recalled buying 100,000 rounds from Diaz Morales rather than the estimate that Diaz Morales provided of between 4,000 and 6,000 rounds.

[13] In April 2020, the Government charged Bonilla Valladares with the same crimes as the defendant. *See* No. 20 Mag. 4462. Honduras has not addressed this Office's request for the provisional arrest of Bonilla Valladares.

Approximately three days after the defendant agreed to have Arita murdered, the defendant told Ardon Soriano that Bonilla's people were surveilling Arita. (Tr. 428). Arita and at least three bodyguards were murdered near Santa Rita in late-July 2011. According to a news report, Arita's murder was executed using two 40-millimeter grenade launchers, M16s, and, tellingly, Israeli-made Galil assault rifles—which are issued to members of the Honduran National Police and were used by the defendant's security team. (Ex. A, *Police: Settlement of Accounts, Possible Cause of Massacre*, La Prensa (July 28, 2011)); *see also* Tr. 178 (Diaz Morales explaining that Lozano used a Galil); Tr. 924 (Chang Monroy explaining that the defendant's security team included "four people who . . . were carrying Galil rifles")).[14] After Arita was murdered, the defendant confirmed to Ardon Soriano that Bonilla was responsible. (Tr. 429; *see also* PSR ¶ 51). Bonilla remarked to the press that the murder was a "well-planned job" carried out "effectively." (Ex. A).

### 4.    2013: Murder of Chino

"Chino" was a drug trafficker operating in eastern Honduras who provided logistical support to the defendant, Ardon Soriano, and Wilter Neptalí Blanco Ruíz, a/k/a "Wilter Blanco."[15] Ardon Soriano first described Chino's role to the defendant in approximately 2009, and he later confirmed that Chino was deeply involved in helping to receive their cocaine shipments in the Gracias a Dios Department. (Tr. 410).

In 2013, Honduran authorities arrested Chino near the border between the Gracias a Dios and Colón Departments. Ardon Soriano told the defendant that "Chino, the one who received the

---

[14] For exhibits that are Spanish language articles, the Government is also including a draft translation following the original article.

[15] In 2016, Blanco Ruíz was charged in the Southern District of Florida with participating in a cocaine-importation conspiracy. *See* No. 16 Cr. 20602 (S.D. Fla. June 23, 2016). Costa Rica extradited Blanco Ruíz in approximately March 2017, Blanco Ruíz subsequently pleaded guilty, and in August 2017 he was sentenced principally to 240 months' imprisonment.

helicopters was in jail in the Department of Colón." (Tr. 437). In response, the defendant told Ardon Soriano that they had to murder Chino "because he was the one who was in charge of all the information." (Tr. 437). Following that instruction, Ardon Soriano directed Blanco to have Chino murdered. (Tr. 437). Blanco, in turn, asked Rivera Maradiaga if he "had a contact to murder Chino in the prison." (Tr. 807). Rivera Maradiaga paid Adan Montes—a member of the same drug-trafficking family that received the defendant's 2011 1,300-kilogram cocaine shipment (Tr. 422)—to murder Chino. (Tr. 807). When Ardon Soriano told the defendant that Chino was dead, the defendant was "happy." (Tr. 443; *see also* PSR ¶ 50).

## II.    THE DEFENDANT'S OBSTRUCTION

### A.    October 2016: The Defendant's 2016 Lies to the Government

By October 2016, the defendant inferred from other public aspects of the investigation that he was or would be targeted for prosecution. The defendant's then-retained counsel scheduled an interview of the defendant by a prosecutor from this Office and DEA agents. The Government conducted the interview in Miami on October 25, 2016. (Tr. 881).

At the start of the interview, after an agent showed the defendant a still image from the defendant's February 2014 meeting with Rivera Maradiaga, the defendant said he "never met" Rivera Maradiaga. (Tr. 886; *see also* PSR ¶ 42). The defendant also said that he went to the meeting "to discuss a hydroelectric project." (Tr. 889). Finally, he asserted that he had "never received any money from drug traffickers for any reason and did not provide any assistance in any way to drug traffickers." (Tr. 894). The jury convicted the defendant on Count Four based on the last two lies.

### B.    January 2019: The Defendant Lies to Pretrial Services and the Court

On January 3, 2019, the defendant filed a bail application. The Court conducted a hearing on the application on January 4, at which the defendant testified.

On direct examination, the defendant testified that he disclosed his assets to the Pretrial Services Office "to the best of [his] recollection." (Jan. 4, 2019 Tr. 12). On cross-examination, the defendant admitted that he failed to disclose that he owns a ranch with a "high value" and a second home in the Lempira Department. (*Id.* at 18-20; *see also id.* at 25 (defendant's admission that he told Pretrial Services about only two of five properties); *id.* at 30 (defendant's admission regarding third house)). After admitting the non-disclosures, the defendant lied by denying that "between late 2009 and today" he had "collected over a million U.S. dollars for campaigns in Honduras." (*Id.* at 41).

### C.     October 2019: The Defense Team Leaks Witness Names to the Media

Prior to trial, the Court entered a protective order that prohibited the defense team from transmitting or disseminating any of the Government's Jencks Act and *Giglio* disclosures outside of the United States. (Dkt. No. 80). The Government disclosed the names of its witnesses and other information related to the anticipated testimony from the witnesses in September 2019.

On October 1, 2019, a Central American media outlet published the names of five cooperating witnesses in this case before those names were disclosed to the public. When the Government raised the issue with the Court, defense counsel credibly explained, without dispute, that they had not disclosed the witness names to anyone but the defendant and defense investigators. Counsel also conceded that there had been a violation of the Court's order. (Oct. 2, 2019 Sealed Tr. 8; PSR ¶¶ 56-57).

## III.     ADDITIONAL EFFORTS TO INFLUENCE THE ONGOING INVESTIGATION

### A.     September 2019: The "Republic of Honduras" Retains a Law Firm to Lobby the Prosecution Team Following Public Disclosures Regarding the Trial Evidence

After the Government filed its motions *in limine* in August 2019, the "Republic of Honduras" retained a U.S.-based law firm ("Firm-1"). According to a September 23, 2019 filing

pursuant to the Foreign Agents Registration Act ("FARA"), Firm-1 was retained to provide advice "concerning U.S. securities and banking law in connection with financing in the international market and related due diligence." Firm-1 disclosed in the filing with the Department of Justice that it "may engage in political activities on behalf of [the Republic of Honduras], including making contact with U.S. officials in connection with due diligence for financing in the international market, including with respect to U.S. economic and technical assistance to Honduras, and matters affecting U.S.-Honduran relations."

Within days of the FARA filing, the attorneys from Firm-1 set up a call with the prosecution team. During the call, the attorneys stated that they were reaching out "as part of the due diligence" for an unspecified "transaction," and that they did not represent the defendant. The attorneys described, however, what they viewed as "collateral consequences" related to this case, including references to unrelated immigration issues and potential closures of U.S. military bases in Honduras. The attorneys also asserted that an expert witness retained by the Government was biased, and that some of the Government's evidence was too dated to be of much probative value relative to the negative collateral consequences the attorneys identified. The attorneys also made reference to contacts with the U.S. National Security Council, and told the prosecution team that they planned to contact other parts of the U.S. government regarding their concerns about this case. The prosecution team provided no information to the lawyers from Firm-1, and did not alter its trial presentation in any way based on Firm-1's efforts.

### B.   October 2019: The Murder of Nery López Sanabria

The jury returned its verdict on October 18, 2019. Eight days later, on October 26, Nery López Sanabria—the drug trafficker from whom the drug ledger bearing the defendant's name was seized—was murdered at a maximum security prison in the Santa Bárbara Department. (PSR ¶

52).  At the time, López Sanabria was in prison with charges pending in the United States.  López Sanabria's attorneys confirmed to the media that an investigator hired by the defendant's family—Chase Lalani—and Jose Amilcar Hernandez Flores (one of the defendant's brothers) had made unauthorized visits to Sanabria prior to the defendant's trial; López Sanabria had rebuffed their efforts to obtain information about whether he was cooperating with the DEA; and López Sanabria had planned to cooperate with the DEA against Juan Orlando Hernandez and the defendant.  (Ex. B, *What Did Nery Know? A Prison Murder in Honduras Deepens Suspicions of Government Involvement in Drug Trafficking*, Univision (Dec. 6, 2019)).

Leaked surveillance video of the murder shows López Sanabria talking to the warden of the facility, Pedro Ildefonso Armas, while a masked man walked past and unlocked a nearby door. Several individuals who are believed to be prisoners then storm through the door and viciously shoot and stab López Sanabria to death.





**C.      December 2019: The Murders of Jose Luis Pinto and Pedro Ildefonso Armas**

On December 9, 2019, a group of unknown assailants murdered Jose Luis Pinto, a lawyer who represented López Sanabria and the Valles.  The assailants murdered Pinto in a café in Copán.  Three days later, on December 12, 2019, a group of unknown gunmen on motorcycles murdered Ildefonso Armas, the warden of the facility in which López Sanabria was murdered, in Tegucigalpa.  (Ex. C, *A Landmark Drug Trial in the US is Leaving a Trail of Blood South of the Border*, Business Insider (Dec. 19, 2019)).  As reflected in the leaked surveillance video referenced above, Ildefonso Armas was one of the last people to speak to López Sanabria.  The President of the Committee for the Defense of Human Rights ("CODEH") stated publicly that he believes that Armas's murder was related to his involvement in López Sanabria's death.  (Ex. D, *CODEH Warns that There Will Be More Consequences for Those Involved in the Magdaleno Meza Case*, Hondudiario.com (Dec. 14, 2019)).  According to other media reports, anonymous sources have indicated that the same perpetrators are responsible for the murder of Pinto and Armas, and that the murders are both direct consequences of their involvement in López Sanabria's case.  (*See* Ex. C).

### D.      February 2021: The Murder of Normando Rafael Lozano

On February 26, 2021, Normando Rafael Lozano, a former member of the Honduran National Police who was identified as one of the defendant's co-conspirators at trial, was murdered in San Pedro Sula along with five other individuals.  At trial, witnesses testified that the defendant was bribed to prevent Lozano's transfer to another part of Honduras so that Lozano could continue transporting cocaine shipments.  (Tr. at 172-77, 206; GX 112).  Open-source reporting of Lozano's murder described it as a "massacre" by men wearing police uniforms and linked the murder to Lozano's status as one of the defendant's co-conspirators (and therefore a potential witness in the ongoing investigation).  (Ex. E, *Honduras Massacre Businessman Killed and Ex-Police Cited in "Tony" Case*, El Libertador (Feb. 26, 2021)).

## THE DEFENDANT'S OBJECTIONS TO THE PSR

The defendant objects to substantially all of the factual paragraphs in the PSR, arguing that the Probation Office relied on "conclusory statements."  (Def. Mem. at 1-2).  To the contrary, the PSR presents a thorough discussion of the defendant's conduct that is strongly supported by the trial record.  *See United States v. Ware*, No. 04 Cr. 1224 (RWS), 2009 WL 102215, at *2 (S.D.N.Y. Jan. 14, 2009) (rejecting factual objections to PSR as "contrary to the record at trial").

The defendant also objects to the discussion in the PSR of the defense's leaking of the name of a trial witness to the media and the murder of López Sanabria.  (Def. Mem. at 2; *see also* PSR ¶¶ 52, 56-57).  The defense leak, which endangered a trial witness and his relatives and associates abroad, is attributable to the defendant.  The people in a position to disseminate that information were the defendant himself, his investigators, and members of his defense team located abroad acting as his agents.  Therefore, the information is properly included in the PSR, and the Court should rely on it, as discussed below, for purposes of the Guidelines and Section

3553(a) analysis.

Nor, contrary to the defense argument, is there any basis to excise from the PSR information regarding murders after the trial.  Reported visits of López Sanabria by Amilcar Hernandez and Chase Lalani prior to the trial strongly support an inference that the murder was related to the defendant's prosecution and the ongoing investigation.  While the Government does not have evidence directly linking the defendant to the killing, this violence illustrates the nature of the conspiracy the defendant led prior to his incarceration and is a valid aggravating consideration at sentencing.  Finally, the defense objection to evidence of post-trial violence goes to the weight the Court may ultimately decide to place upon this evidence at sentencing, but these arguments are not a valid basis for excluding information from the PSR.  *See United States v. Delacruz*, 862 F.3d 163, 175 (2d Cir. 2017) ("[P]rinciples of due process do not bar the sentencing judge from consider[ing] any and all information that reasonably might bear on the proper sentence for the particular defendant." (internal quotation marks omitted)).

## THE SENTENCING GUIDELINES RECOMMEND LIFE IMPRISONMENT

Based on an offense level of 56, which is capped at 43, and Criminal History Category I, the Guidelines recommend a sentence of life imprisonment and a mandatory consecutive 30-year term on Count Two.  Although the defendant objects to the application of several of the enhancements included in the PSR, he offers no specific arguments in support of his objections and, for the reasons set forth below, the Court should reject them.

I.    COUNT ONE

A.    **Drug Quantity: § 2D1.1(a)(5)**

Pursuant to U.S.S.G. § 2D1.1(a)(5), the base offense level for Count One is 38 because the offense involved more than 450 kilograms of cocaine.  (PSR ¶ 63).  Based on the following estimates from trial witnesses, the defendant participated in the importation of more than 185,000

28

kilograms of cocaine between approximately 2004 and approximately 2019.

| Witness | Quantity Estimate | Timeframe | Tr. Cites |
|---|---|---|---|
| Diaz Morales | 140,000 kilograms | 2004 – 2016 | 130 |
| Ardon Soriano | 30,000 – 40,000 kilograms | 2010 – 2014 | 363 |
| Chang Monroy | 15,000 kilograms | 2008 – 2015 | 912, 914, 923, 930 |
| **Total** | **185,000 kilograms** | | |

### B.   Violence: § 2D1.1(b)(2)

Pursuant to U.S.S.G. § 2D1.1(b)(2), a two-level enhancement is appropriate because the defendant directed the use of violence in connection with Count One.  (PSR ¶ 64).

Tonito Santos and Carlos Toledo warned Chang Monroy about the defendant's violence. (Tr. 919-20, 943).  Toledo, for example, said that the defendant "was the kind of person who killed anybody whom [he] did not like."  (Tr. 943).  The defendant earned that reputation through his own violence, as well as his control over other violent men.  For example, the defendant described Honduran police official Bonilla Valladares as "highly trusted," by both the defendant and Juan Orlando Hernandez, and indicated that Bonilla Valladares was "very violent" and "would be able to . . . commit murders."  (Tr. 206).  At trial, the Government established that the defendant caused the 2011 murder of drug rival Franklin Arita (Tr. 427-29), and the 2013 murder of "Chino" based on concern that he could be a witness against the defendant and others.  (Tr. 437, 443, 807).

### C.   Use of Private Aircraft: § 2D1.1(b)(3)

Pursuant to U.S.S.G. § 2D1.1(b)(3), a two-level enhancement is appropriate because the defendant used private aircraft in connection with the importation of cocaine.  (PSR ¶ 65).

The defendant and other members of the conspiracy repeatedly used private aircraft to transport cocaine to and through Honduras during the process of importing those drugs into the

29

United States.  *See Flores*, 945 F.3d at 728-29 (affirming application of U.S.S.G. § 2D1.1(b)(3) based on conspiracy "to have the 800 kilograms of cocaine flown from Venezuela to Honduras on an airplane coming from the [Venezuelan] president's hangar" (internal quotation marks omitted)).  For example, in 2008, the defendant supplied cocaine for two shipments that arrived in Honduras via private planes.  (Tr. 193-200).  Between 2010 and 2012, the defendant sent cocaine shipments to Honduras using private helicopters once or twice per month.  (Tr. 412, 415).  Between 2012 and 2014, the defendant "rented" helicopters to Ardon Soriano to transport cocaine and drug proceeds approximately once per month.  (Tr. 436).  The drug ledger seized by Honduran police in June 2018 indicated that the 650-kilo shipment at issue was "sent" by the defendant using a "NAVA," *i.e.*, a private Piper Navajo aircraft:

 

(GX 250-T).

### D.    Bribes: § 2D1.1(b)(11)

Pursuant to U.S.S.G. § 2D1.1(b)(11), a two-level enhancement is appropriate because the defendant bribed law enforcement officials to facilitate Count One.  (PSR ¶ 66).

The defendant bribed a combination of political, police, and military officials for protection and safe passage of his drug shipments.  For example, Diaz Morales paid the defendant for information regarding law enforcement radar, police checkpoints, and ongoing investigations, and the defendant used some of those funds to bribe the relevant officials in order to obtain the information.  (Tr. 196, 199, 280).  In 2007, Diaz Morales paid the defendant $5,000 to prevent

Lozano, a since-murdered member of the Honduran national police, from being transferred away from one of the group's drug-trafficking zones. (Tr. 180-81). The Court can infer by a preponderance of the evidence that the defendant's ability to provide that assistance resulted from the defendant bribing others involved. In 2008, in exchange for $5,000 from Diaz Morales, the defendant caused Honduran police officer Mauro Flores Santos to be transferred to a strategically important location on "the main cocaine trafficking route from Honduras to Guatemala." (Tr. 182-83). In 2011, the defendant supplied 1,300 kilograms of cocaine to the Sinaloa Cartel, and provided a security team that included Hernandez Pineda and several other members of the Honduran national police. (Tr. 421-24). Those men were not participating in this enormous crime for free. In this regard, former Honduran police official Giovani Rodriguez explained at trial that he was one of the recipients of bribes originating from the defendant and his drug-trafficking associates, including Hernandez Pineda, and that he provided information regarding law enforcement operations and investigations. (Tr. 716).

The defendant also repeatedly funneled bribes from drug traffickers to Juan Orlando Hernandez and other National Party officials. In 2005, the defendant requested a $40,000 bribe from Diaz Morales, which the defendant paid to his brother. (Tr. 147). In 2010, the defendant declined a bribe from Diaz Morales, explaining that he was already working with Ardon Soriano, the *Cachiros*, and Honduran congressman Rodolfo Irias Navas to collect and pay bribes to members of the National Party. (Tr. 207; *see also* Tr. 390-91 (Ardon Soriano testimony regarding bribes)). In 2013, the defendant paid a million-dollar bribe from Chapo to Juan Orlando Hernandez in connection with the national election that year. (Tr. 449-54).

### E. Premises for Manufacturing Cocaine: § 2D1.1(b)(12)

Pursuant to U.S.S.G. § 2D1.1(a)(12), a two-level enhancement is appropriate because the

defendant maintained premises for the purpose of manufacturing cocaine.   (PSR ¶ 67). Specifically, the defendant and Cinco operated a cocaine laboratory near the Colombia-Venezuela border, which they used to send thousands of kilograms of cocaine to the United States via Honduras.  (*E.g.*, Tr. 148, 194, 920).  The defendant also had a separate manufacturing facility in Honduras's Lempira Department, which he used to repair kilograms of cocaine that were damaged while being transported from South America.  (Tr. 375).  The defendant's possessory interest in these facilities, as well as his control over the activities undertaken inside them, warrants application of the enhancement.  *See* U.S.S.G. § 2D1.1(a)(12) app. n.17.

### F.     Criminal Livelihood: § 2D1.1(b)(16)(E)

Pursuant to U.S.S.G. § 2D1.1(b)(16)(E), an additional two levels are added because (i) an aggravating-role enhancement is appropriate, and (ii) the defendant "committed the offense as part of a pattern of criminal conduct engaged in as a livelihood."  (PSR ¶ 68).[16]  The defendant participated in the cocaine-importation conspiracy between 2004 and 2019.  Approximately 15 years is more than sufficient to constitute a "pattern of criminal conduct" under the Guidelines. *See* U.S.S.G. § 4B1.3 app. n.1 ("'Pattern of criminal conduct' means planned criminal acts occurring over a substantial period of time.").

The defendant's drug trafficking also constituted a "criminal livelihood."  *See id.* app. n.2. First, as discussed below in the section regarding forfeiture, the Government estimates that the defendant made approximately $138.5 million in connection with Count One.  In any given year, he earned greatly in excess of $14,500, which is the Guidelines threshold determined by calculating 2,000 times the federal hourly minimum wage of $7.25.  *See id.*  Indeed, the defendant

---

[16] The defendant was also "directly involved in the importation of a controlled substance." U.S.S.G. § 2D1.1(b)(16)(C).  But that enhancement does not apply due to the application of U.S.S.G. § 2D1.1(b)(3).  *See* U.S.S.G. § 2D1.1 app. n.20.

earned $50,000 in connection with some single drug shipments in which he provided radar information, and he and Cinco charged $10,000 for each of the thousands of kilograms that they made in their laboratory in Colombia.  (Tr. 196).  Second, "the totality of circumstances shows that [the defendant's] criminal conduct was" his "primary occupation."  U.S.S.G. § 4B1.3 app. n.2. The defendant's claimed "work experience as a lawyer, a farmer, and in animal husbandry" (PSR ¶ 102), "was merely a front for the defendant's criminal conduct," U.S.S.G. § 4B1.3 app. n.2.  The point is illustrated by the fact that he did not even provide estimates to the Probation Office for his income from those purported jobs.  (*See* PSR ¶¶ 104-113).

### G.     Leadership: § 3B1.1(a)

Pursuant to U.S.S.G. § 3B1.1(a), a four-level aggravating-role adjustment is appropriate because the defendant was an organizer and leader of the criminal activity, and Count One involved five or more participants and was otherwise extensive.  (PSR ¶ 71).

First, Count One "involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a).  "A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted."  U.S.S.G. § 3B1.1 cmt. n.1.  In addition to the defendant, the Government established at trial that the offense involved numerous politicians, police officials, and other criminals depicted below, including Juan Orlando Hernandez (*e.g.*, Tr. 371-72), Lobo Sosa (Tr. 770), Juan Carlos Valenzuela (Tr. 142-43), Calix Hernandez (*e.g.*, Tr. 137-38), Oscar Ramón Nájera (Tr. 768-69), Bonilla Valladares (Tr. 206), Hernandez Pineda (Tr. 184-85), Hernan Hernandez (Tr. 186), Lozano (Tr. 177-78), Mauro Flores Santos (Tr. 181-83), Avila Meza (Tr. 713-14, 780), Chapo (Tr. 370-71), Alex and Hugo Ardon Soriano (Tr. 374), Luis and Arnulfo Valle (Tr. 401), Leonel and Javier Rivera Maradiaga (Tr. 380, 806-07), Blanco Ruíz (Tr. 380, 437), Diaz Morales (Tr. 130), and Chang Monroy (Tr. 912).

33



Second, the trial evidence demonstrated that the defendant was one of the leaders and organizers of the conspiracy. *See United States v. Gayle*, 797 F. App'x 46, 51 (2d Cir. 2019) ("The leadership enhancement applies . . . where the defendant is a leader; nowhere do the Guidelines state that there can be only one leader in a conspiracy."). The defendant employed numerous men as part of his criminal organization. *See* U.S.S.G. § 3B1.1 app. n.4 (identifying "the degree of control and authority exercised over others" as a relevant consideration). For example, during a 2009 meeting with Chang Monroy, the defendant said that he had "many police officers working for him," and brought a four-man security team armed with Galil assault rifles to the meeting. (Tr. 920, 924; *see also* Tr. 424 (describing defendant's armed, five-person security team comprised of Mauricio Hernandez Pineda and other Honduran police for drug shipment)). In 2014, when the defendant met with Rivera Maradiaga, he brought more than 10 armed military personnel. (Tr. 788). The defendant also sent emissaries, such as Hernandez Pineda and Hernan Hernandez, to deliver sensitive information to Diaz Morales and Ardon Soriano. (Tr. 186-87, 389).

34

In 2009, the defendant recruited Ardon Soriano to join him as a full-fledged partner in the conspiracy as Lobo Sosa and the defendant's brother worked to secure more powerful positions in the Honduran government.  (Tr. 404); *see* U.S.S.G. § 3B1.1 app. n.4 ("Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices.").  The defendant's decision-making authority is further illustrated by the fact that he set the terms for many of the drug shipments, such as his 2012 edict to Ardon Soriano that the defendant would no longer sell him cocaine and would instead "rent[]" helicopters for Ardon Soriano to use.  (Tr. 433).  Because the defendant was firmly in charge by that point, he set the price for use of the helicopters.  (Tr. 434-45).

Perhaps most telling of the defendant's leadership role, in 2013, when the leader of the Sinaloa Cartel and one of the most notorious traffickers in the world wanted increased security for his cocaine within Honduras, he sought out the defendant.  (Tr. 447).  During the meeting, the defendant spoke on behalf of the assembled Honduran traffickers and for his brother, the president of Honduras.  (Tr. 448).  And it was the defendant who, after briefing Juan Orlando Hernandez regarding the first meeting, gave Chapo the go-ahead and collected Chapo's million-dollar bribe to the Honduran president during a second gathering.  (Tr. 449, 451-53).

### H.    Abuse of Trust:  § 3B1.3

Pursuant to U.S.S.G. § 3B1.3, two levels are added because the defendant "abused a position of public trust" as a Honduran congressman "in a manner that significantly facilitated the commission or concealment of the offenses."  The "applicability of a § 3B1.3 enhancement turns on the extent to which the position provides the freedom to commit a difficult-to-detect wrong." *United States v. Allen*, 201 F.3d 163, 166 (2d Cir. 2000) (internal quotation marks omitted).

By 2013, based on concerns about increased law enforcement scrutiny and the possibility

of extradition to the United States, the defendant sought to insulate himself by seeking a position in the Honduran congress.  (Tr. 433-34).  In the same 2013 election in which Juan Orlando Hernandez was made president, the defendant secured a *suplente* position in the Honduran congress for the Lempira Department.  (PSR ¶ 107; Tr. 318-19).  In early 2014, the defendant's brother appointed one of the main congressmen for Lempira to another position, resulting in the defendant ascending to fill that role.  (*See* PSR ¶ 107).

The combined steps of the defendant seeking the *suplente* position, and his brother effectively elevating him to the congressman position, significantly facilitated commission of the offense because it further insulated the defendant from investigation and arrest despite the 2012 constitutional amendment contemplating extradition, gave him greater access to sensitive law enforcement information, and allowed him to establish additional contacts within the government to facilitate state-sponsored drug trafficking.  For example, shortly after obtaining the congressional seat, the defendant sent messages to Rivera Maradiaga through Avila Meza, another corrupt member of the Honduran police, that the defendant wanted to "work" in "drug trafficking." (Tr. 782).  During a 2014 recorded meeting, as a full-fledged congressman, the defendant offered to facilitate money laundering for the *Cachiros* by leveraging contacts such as Hugo Ardon Soriano and Roberto Ordóñez to cause *Fondo Vial* to issue legitimate-seeming payments to *Cachiros* front companies.  (GX 401-T; Tr. 793-94).  The defendant offered that assistance in exchange for a $50,000 bribe and so that he and the *Cachiros* could start "working" on drug trafficking "as soon as possible."  (*Id.*).

## I.    Obstruction of Justice: § 3C1.1

Pursuant to U.S.S.G. § 3C1.1, a two-level enhancement applies for the defendant's obstruction of justice.  The enhancement is warranted where obstructive conduct "was

purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction." U.S.S.G. § 3C1.1 app. n.1.  In this case, U.S.S.G. § 3C1.1 applies for several reasons.

First, the enhancement applies based on the defendant's conviction on Count Four for making false statements to the DEA.  *See, e.g.*, *United States v. Crisci*, 273 F.3d 235, 420 (2d Cir. 2001) ("In this case, [defendant's] separate count of conviction for making false statements to the FBI agent investigating the instant offense compelled the district court to apply Section 3C1.1."); *see also* U.S.S.G. § 2J1.1 app. n.3.

Second, as the Probation Office found, the enhancement applies because the defendant (or those acting as his agents) jeopardized the safety of a trial witness—thereby potentially influencing the witness's anticipated testimony—by leaking the witness's name to the media in violation of a Protective Order and protective measures at the trial.  (PSR ¶ 72; *see also* Oct. 2, 2019 Sealed Tr. 8-9).

Third, the defendant committed perjury at the January 2019 bail hearing in this case.  *See* U.S.S.G. § 3C1.1 app. n.4(F) (enhancement applies to conduct involving "providing materially false information to a judge or magistrate judge"); *see also United States v. Harris*, 741 F. App'x 823, 826-27 (2d Cir. 2018) ("A perjury enhancement is appropriate if the defendant gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.").  In an effort to obtain release on bail, the defendant sought to convince the Court that—despite having taken a private jet to his 2016 proffer in Miami and being represented by retained counsel—he lacked assets that could be used to facilitate flight from the jurisdiction.  The defendant lied to Pretrial Services about his assets, including by withholding information regarding his real estate in Honduras.  The defendant then lied under oath during direct examination at the hearing when he said that he answered questions

from Pretrial Services regarding his financial resources and property to the best of his recollection. (*Compare* Jan. 4, 2019 Tr. 12, *with id.* at 18-20, 25, 30).  The defendant also lied under oath on cross-examination when he denied having "collected over a million U.S. dollars for campaigns in Honduras."  (*Id.* at 41).  The falsity of that aspect of the defendant's hearing testimony is demonstrated most readily by Ardon Soriano's trial testimony regarding the million dollars in drug proceeds that Chapo gave the defendant for the 2013 presidential campaign of Juan Orlando Hernandez.  (Tr. 452-53; *see also* Tr. 461 (Ardon Soriano paid the defendant $500,000 for National Party campaigns in the Lempira Department in connection with 2017 national elections)).

Fourth, in February 2020, the defendant submitted a false affidavit to the Court, and swore to its accuracy under oath, in which the defendant claimed that he was unable to afford to pay for an attorney.  (*See* Feb. 24, 2020 Tr. at 3-4; *see also* Dkt. No. 132).  "The submission of a false affidavit to obtain court-appointed counsel is a serious matter."  *United States v. Blackmon*, 839 F.2d 900, 916 (2d Cir. 1988); *see also United States v. Bartok*, 472 F. App'x 25, 29 (2d Cir. 2012) (reasoning that false affidavit regarding eligibility for appointed counsel "pose[s] a serious threat to the court's processes" (internal quotation marks omitted)).

Fifth, the defendant and Juan Orlando Hernandez tried to silence Giovani Rodriguez prior to his 2016 surrender by sending a message through Hernandez Pineda.  *See* U.S.S.G. § 3C1.1 app. n.4(A) (enhancement applies to conduct involving "threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so").  Specifically, during a meeting in a parking lot in Tegucigalpa, Hernandez Pineda warned Rodriguez "to be very careful in mentioning him, Tony Hernandez, or Juan Orlando Hernandez about them being involved in drug trafficking."  (Tr. 720).

For all of these reasons, an enhancement pursuant to U.S.S.G. § 3C1.1 is appropriate.

## II.      COUNTS TWO AND THREE:  USE OF WEAPONS

Pursuant to U.S.S.G. § 2K2.4(b), the Guidelines sentence for Count Two, the defendant's use of machineguns and destructive devices in furtherance of the Count One drug-trafficking conspiracy, is the mandatory consecutive 360 months' imprisonment.  (PSR ¶ 69).

Although the offense level for the Count Three conspiracy to use machineguns and destructive devices does not impact the offense-level calculation due to the grouping analysis set forth below, several Guidelines enhancements illustrate the severity of this additional crime. Pursuant to U.S.S.G. § 2K2.1(b)(1), an enhancement of at least six levels applies because the Count Three conspiracy involved more than 100 weapons.  For example, in addition to all of the weapons possessed by the defendant and his security teams, the defendant instructed Ardon Soriano in 2012 to consult then-president Lobo Sosa regarding security for drug trafficking on the Honduras-Guatemala border, which resulted in Lobo Sosa deploying approximately 120 soldiers armed with "M16s, M60s and bazookas."  (Tr. 433).  Also in 2012, the defendant sold 40 M16s to Chang Monroy.  (Tr. 913, 939).  Because that 2012 incident involved trafficking in firearms, another four-level enhancement applies pursuant to U.S.S.G. § 2K2.1(b)(4).  Finally, a 15-level enhancement applies, pursuant to U.S.S.G. § 2K2.1(b)(4), because Count Three also involved rocket-propelled grenade launchers.  (Tr. 373, 413, 765).

## III.      GROUPING ANALYSIS

Pursuant to U.S.S.G. § 3D1.2(c), Count One and Count Three are grouped because the Count One cocaine-importation conspiracy includes a specific offense characteristic relating to use of weapons, U.S.S.G. § 2D1.1(b)(1), that is embodied in the Count Three weapons conspiracy. Pursuant to U.S.S.G. § 3D1.2(b), Count Four is grouped with Counts One and Three because the defendant's 2016 lies to the DEA, as charged in Count Four, were perpetrated as part of a common

scheme or plan to avoid disruption of the ongoing drug-trafficking and weapons conspiracies. Therefore, pursuant to U.S.S.G. § 3D1.3(a), the offense level for the group comprised of Counts One, Three, and Four is the highest offense level of the counts in the group, which is 56—capped at level 43 pursuant to U.S.S.G. ch. 5, part A, app. n.2—for Count One.  Based on Criminal History Category I, the Guidelines recommend a sentence of life imprisonment.

### DISCUSSION

I.    **THE COURT SHOULD IMPOSE A LIFE SENTENCE**

    A.    **The Nature and Circumstances of the Offense**

The defendant imported more than 185 tons of cocaine into the United States—a singularly enormous amount of cocaine that merits a life sentence standing alone.  But the seriousness of the defendant's crimes is not fully accounted for by reference to the huge quantity of poison he distributed.  Nor is the gravity of these offenses completely captured by reference to the defendant's use of military-grade weapons, violence, murder, and obstruction—as indisputably serious as those factors are in this case.  Rather, what sets the defendant apart from most, if not all, of the prolific drug traffickers convicted in the United States is the depth of his corruption and his use of Honduran institutions to facilitate his crimes.  The defendant's state sponsored drug trafficking, and the very real harms that it caused in this country as well as his own, warrant the maximum penalties available.

In his post-arrest statement, the defendant described efforts by drug traffickers to "compromise . . . the government" so that politicians "will help them":



Defendant: They always try to involve someone to be able to be in the, to have something from, from, from. . . from the State. It can be, uh, information. It can be, uh, uh, logistics. Or something like that, to rec-, to get someone in or compromise the, the government. So that they will help them.

Although he denied it at the time, the defendant was central to those efforts. As a major drug trafficker with cocaine laboratories in two countries, a politician, and an extremely well-connected member of Honduras's National Party, the defendant was a central figure in the intersection between cocaine and politics in Honduras. By 2005, the defendant was funneling drug proceeds into his brother's National Party campaigns. As the value of those trafficker-directed bribes reached millions of dollars for the campaigns of Lobo Sosa and Juan Orlando Hernandez in 2009, the defendant sought to capitalize on political instability resulting from the coup that year, and those he chose to protect became virtually untouchable. This impunity resulted in Honduras becoming one of the foremost transshipment points for U.S.-bound cocaine and unimaginable horrors for the Honduran people as they were left to reside in a crumbling narco-state. For example, in 2011, during the ascent of the defendant's corruption-fueled cocaine trafficking and as his brother was the president of the Honduran congress, Hondurans were 80 times more likely to be murdered than Western Europeans. (Ex. F, *Violence in Honduras: The Eye of the Storm*, The Economist (June 16, 2012)).

In 2013, while the defendant was campaigning for a seat in the Honduran congress, he helped the Sinaloa Cartel operate, in essence, as a covert criminal political action committee in

support of Juan Orlando Hernandez's first presidential campaign.  Chapo gave the defendant $1 million to support the defendant's brother so that the Cartel could transport even more cocaine through Honduras without interference.  As Ardon Soriano explained at the defendant's trial, that is exactly what happened.  By 2013, San Pedro Sula, the second most populous city in Honduras and one the defendant used to stage meetings with co-conspirators, had become the deadliest city in the world, with 169 annual murders per 100,000 residents, an average of more than three people killed per day.  (Ex. G, *Inside San Pedro Sula, the 'Murder Capital' of the World*, CNN (Mar. 28, 2013); Ex. H, *Honduras Murder Rate Falls in 2013, But Remains World's Highest*, Reuters, Feb. 17, 2014)).[17]

The defendant operated in the shadows as a key conduit to the National Party's constituency of traffickers while Juan Orlando Hernandez and other leaders purported to take a pro-law enforcement stance.  The National Party-Sinaloa Cartel alliance formed during secret meetings led by the defendant in the Copán Department, to which Guzman was able to travel safely despite being one of the most wanted men in the world.  During this period, however, in the wake of U.S. pressure exemplified by the 2012 meeting with Honduran officials in Florida, Lobo Sosa and Juan Orlando Hernandez portrayed themselves publicly as allies in the fight against drug trafficking prepared to extradite Honduran criminals to face prosecution in the United States.  The

---

[17] Even as Honduras's reported murder rate has decreased in recent years, Human Rights Watch recently found that "[v]iolent organized crime continues to disrupt Honduran society and push many people to leave the country."  (Ex. I, *World Report 2021, Honduras: Events of 2020*, Human Rights Watch)).  Reflecting the violent and corrupt system that has infected Honduras, eight United States Senators recently introduced legislation titled the "Honduras Human Rights and Anti-Corruption Act of 2021."  (Ex. J).  Among other things, this proposed legislation includes a finding that "[t]here is substantial evidence that President of Honduras Juan Orlando Hernandez has engaged in a pattern of criminal activity and use of the state apparatus to protect and facilitate drug trafficking, as exemplified by three high-profile corruption and drug trafficking cases," including the defendant's trial.  (*See id.*).

defendant nevertheless assured his criminal colleagues—such as Chapo, Ardon Soriano and his associates, the Valle brothers, and Diaz Morales—that Honduras would not send them to this country. And that assurance held true until the Valles violated the balance of this delicate criminal ecosystem by plotting to murder Juan Orlando Hernandez. The trial evidence established that it was that transgression, rather than the pursuit of justice, that resulted in the Valles being extradited to the United States.

Pursuant to the agreement between key significant traffickers and the National Party that the defendant brokered, he enriched himself and increased his family's power in Honduras. Juan Orlando Hernandez appointed a Lempira Department congressman to another position, which resulted in the defendant taking over that role in 2014. Prior to that, without any formal position but with the full support of his brother, Lobo Sosa, and others, the defendant engaged in breathtaking levels of corruption. When Ardon Soriano was concerned about security for drug shipments on the border with Guatemala, the defendant instructed him to contact president Lobo Sosa for a resolution, and Lobo Sosa deployed heavily armed Honduran troops to protect a key cocaine route. The defendant used uniformed members of the Honduran National Police and armed forces—the very people sworn to protect the Honduran people—to protect his drug shipments and cocaine proceeds. (*See, e.g.*, Tr. 707-08, 924). The defendant and Juan Orlando Hernandez considered senior Honduran police official "Tigre" Bonilla Valladares to be a "man of great trust" and a particularly violent ally. (Tr. 206). For example, the defendant relied on Bonilla Valladares to execute Franklin Arita in 2011, and Bonilla Valladares complimented himself and his underlings in public by describing the murder to the media as a "well-planned job." The defendant also helped his cousin, Hernandez Pineda, rise in the ranks of the Honduran National Police, and Hernandez Pineda subsequently served as a key lieutenant for providing drug security

and law enforcement intelligence.  The defendant and Hernandez Pineda helped another ally, Giovani Rodriguez, secure a promotion in the Honduran National Police despite a prior local drug-trafficking conviction.  (Tr. 186).  The defendant ensured that two other members of the Honduran National Police, Normando Rafael Lozano and Mauro Flores Santos, remained assigned to posts from which they could assist in drug shipments.  (Tr. 1799-83).  The defendant sold large amounts of ammunition from the Honduran military to drug traffickers.  (Tr. 211, 938).  The defendant provided information to traffickers regarding air radar coverage (Tr. 196), Honduran naval operations (Tr. 157-58), activities at the Puerto Castilla naval base (Tr. 167-68), and activities at a military facility in Naco, Cortés (Tr. 167-68).  He also advised traffickers to stop sending cocaine to Honduras via aircraft because the DEA was training the Honduran Air Force to interdict those flights, and he told them when it was safe to resume the shipments.  (Tr. 191-92).

In addition to the corruption attendant to the defendant's drug trafficking, his use of weapons and violence further underscore the seriousness of his crimes.  As noted, the defendant participated in the 2011 murder of Arita and the 2013 murder of "Chino."  (PSR ¶¶ 50, 51).  In addition to the sale of military ammunition, the defendant sold approximately 40 machineguns to Chang Monroy.  (PSR ¶¶ 39, 40).  The defendant also maintained a huge personal cache of dangerous and deadly weapons.  For example, Ardon Soriano testified that he saw the defendant with a modified AR-15 configured to fire as a machinegun and the defendant bragged about his M60 belt-fed machinegun.  (Tr. 368, 446).  The defendant described a particular type of pistol to Chang Monroy as a "cop killer," and offered to sell Chang Monroy "any type of weapons."  (Tr. 947).

The defendant was so confident in the protection that his own violence and the power of his family afforded him that he traveled to the United States in 2016 in order to tell brazen lies,

44

including denying any involvement in drug trafficking.  Despite being well aware of the ongoing investigation, he elected to travel to the United States in November 2018.  After he was arrested during that trip, he lied to the Court about his assets in January 2019 in connection with a bail application.  Having directed the murder of potential cooperating witness "Chino" in 2013, the defendant and his defense team took a more subtle approach in October 2019 by leaking witness information to the media in violation of a protective order.  And the defendant lied under oath, again, in connection with his application for an appointment of counsel after the trial.

The defendant's prolonged and egregious criminal conduct therefore included extensive corruption, violence, and obstruction.  It resulted in staggering consequences.  Drug trafficking of this magnitude leaves victims of all types in its wake—not just addicts, but also the individuals who live in the communities ravaged by traffickers.  When sentencing a former member of the Honduran National Police on a drug-trafficking charge that involved far less cocaine, Judge Schofield aptly summarized the harm to Honduras and the United States arising from large-scale drug trafficking:

> It is sometimes difficult in drug cases to realize how serious the crime is and its impact on people, but I am sure just from looking at the society in Honduras and how it has been ravaged by drug dealers, that you have seen how serious and how negative drugs can be on the population in many ways, and so it is not just the people in Honduras that have been affected, it is also the people in the United States who were the ultimate consumers and buyers of these drugs.

*United States v. Valladares Garcia*, No. 15 Cr. 174 (LGS) (Dkt. No. 357, Tr. 20).

The defendant helped import at least approximately 185,000 kilograms of cocaine into the United States.  *185 tons* of cocaine—not an inchoate agreement with that object, a mountain of actual drugs that the defendant helped send to this country.  "The harm that is done by a ton of cocaine is almost incalculable.  The lives affected, the families affected, the communities affected by drugs of that type and that volume is staggering."  *United States v. Palagio Suarez*, No. 16 Cr.

453 (RJS) (Dkt. No. 160, Tr. 27). "[T]he drugs at issue here cripple individuals and destroy[] families and whole communities." *United States v. Santibanez*, No. 13 Cr. 912 (RJS), 2020 WL 3642166, at *3 (S.D.N.Y. July 6, 2020) (quotations omitted). While the defendant sent tens of millions of individual-use cocaine doses to the United States, he "participated in an important way in the distribution of a substance, which creates misery in the lives of the people who use it," and he "was indifferent to the poison that was being distributed and ruining people's lives." *United States v. Aguirre Cuero*, No. 15 Cr. 125 (PKC) (Dkt. No. 36, Tr. 22, 24). And the extensive harm caused by the defendant was not limited to the United States and Honduras. This sort of cocaine trafficking harms every country the drugs transit:

> It is clear that this type of activity has an impact on Colombia, on Mexico, and other countries, the safety of people in those countries, in the strength of their institutions, including their judicial institutions, including their police and prosecutorial forces. This drug activity contributes to all of that. It is organized crime. When people decide to assist organized crime enterprises, they have to understand the consequences that are caused by that in multiple countries. It is a serious crime.

*United States v. Cabezas Garcia*, No. 17 Cr. 23 (RJS) (Dkt. No. 71, Tr. 21).

In sum, the defendant has taken lives through violence, destroyed communities through corruption, and damaged countless individuals and families. When Judge Sullivan sentenced Hector Emilio Fernandez Rosa to life imprisonment in August 2019, he explained that Fernandez Rosa's distribution of 155 tons of controlled substances and 18 murders caused "incalculable" harms and warranted "many life sentences." *See* Dkt. No. 77 59-60, *United States v. Fernandez Rosa*, No. 19-2529 (2d Cir. Feb. 22, 2021). The same is true here, and the nature and circumstances of the defendant's offenses warrant the most severe punishment available.

B.      The History and Characteristics of the Defendant

The history and characteristics of the defendant also support a Guidelines sentence of life imprisonment.  The abhorrent nature of the defendant's crimes is exacerbated by the status and privilege he and his co-conspirators abused in Honduras.

The defendant experienced "no financial difficulties during his childhood," as his father served in the Honduran military while operating a grain-production business and raising livestock. (PSR ¶ 86).  In addition to financial stability, he benefitted from an upbringing he described to the Probation Office as "stable," and therefore had no reason to perpetrate the deep betrayal of his country that the evidence in this case established.  (*Id.*).  The defendant makes much of the fact that he "served his country as a member of the military, pursued and obtained a law degree and managed his family's small hotel as well as a farm gifted to him by his deceased father."  (Def. Mem. at 11; *see also* PSR ¶¶ 100-02).  These points only serve to illustrate that the defendant was more than capable of sustaining himself and his family through a law-abiding existence.  (PSR ¶¶ 100-02).

While the defendant committed these crimes, he lived a life of luxury:

 

 

(GX 202-R, 203-R).  In contrast, and due in part to violent narcotics traffickers like the defendant, approximately two in every three Hondurans live in poverty.  (Ex. K, *Why People Flee Honduras*, Politico Magazine (June 7, 2019)).  The defendant cannot point to poverty, lack of opportunity, or a need to support his family through narcotics trafficking as an excuse or mitigating consideration for his conduct.  He cannot claim that he had no other choice or path forward.  Quite the contrary— the defendant chose one of the most destructive paths possible, and left countless others without the same chance in his wake.  The defendant's history and characteristics provide no justification for leniency in this case.

### C.     The Need to Afford Adequate Deterrence

A life sentence is also necessary to achieve deterrence.  With respect to specific deterrence, although this is the defendant's first conviction, he has only avoided arrest because he lived a protected life in a corrupt system.  The length of the defendant's crimes and the impunity he

enjoyed in Honduras speaks to the importance of specific deterrence in this case.  Moreover, certain of the defendant's co-conspirators—including, most notably, his brother—remain in Honduras, thus far having avoided culpability for their own crimes.  These co-conspirators could facilitate a return to crime by the defendant should he be released from prison.

General deterrence is even more important.  The audacity of the defendant's crimes has understandably captured the attention of the public in the United States, Honduras and elsewhere in South and Central America.  The Court's sentence will send a message to the Honduran public that the American justice system will not tolerate such abhorrent conduct.  The deterrent effect of the Court's sentence will also resonate significantly with any powerful official engaging in, or tempted to engage in, conduct similar to the defendant's.  That aspect of the message resulting from the defendant's sentence is critically important because, without corrupt politicians, the kind of drug trafficking at issue in this case is difficult if not impossible.

At the sentencing of Fabio Lobo Sosa—the son of former Honduran president Lobo Sosa, who participated in the importation of 1.4 tons of cocaine (as opposed to 185) and was not convicted on weapons charges—Judge Schofield reasoned as follows with respect to general deterrence:

> The most damning fact in your background and in your participation in this is that you are not like the police officers who have made plea agreements with the government for a much less amount of time in prison.  You were the son of the sitting president of Honduras, and you used your connections, your reputation in your political network to try to further corrupt connections between drug traffickers and Honduran government officials. And these included not only lowly officials, like customs people and military and law enforcement personnel, but also extremely high level officials.  In short, what distinguishes your case from so many is that you facilitated strong government support for a large drug trafficking organization for multiple elements of the Honduran government, and you enriched yourself in the process.

*United States v. Romero*, 904 F.3d 238, 241-42 (2d Cir. 2018) (quoting sentencing transcript).[18] Reviewing that language, the Second Circuit found that, "[c]onsidering the breadth of Lobo Sosa's corruption and the extent of his criminal activity, the district court acted well within its discretion when it imposed a sentence reflecting the need to deter government officials from using their positions of power to facilitate drug trafficking."  749 F. App'x 31, 34-35 (2d Cir. 2018).

Judge Schofield's logic speaks even more strongly in this case.  The government of Honduras retained Firm-1 to try to pressure the prosecution team to restrict its presentation of evidence at the trial.  The trial evidence established that the defendant's brother is the current president of Honduras and a key co-conspirator.  A leading candidate in the 2021 Honduran elections previously pleaded guilty in the United States to laundering drug proceeds for the *Cachiros* and was designated by OFAC as a Specially Designated Narcotics Traffickers pursuant to the Foreign Narcotics Kingpin Designation Act.  *See United States v. Rosenthal*, No. 13 Cr. 413 (JGK); *see also* U.S. Dep't of Treasury, Press Center, *Treasury Sanctions Rosenthal Money Laundering Organization* (Oct. 7, 2015), *available at* https://www.treasury.gov/press-center/press-releases/Pages/jl0200.aspx.  The need for general deterrence is underscored by the fact that the conspiracy has continued to function, including through post-trial violence against potential witnesses and others with the murders of López Sanabria, Armas, Pinto, and Lozano. Indeed, the defendant's prior promise of protection from extradition appears to abide for certain

---

[18] Unlike the defendant, Fabio Lobo Sosa accepted responsibility by pleading guilty to a cocaine-importation conspiracy, he was not convicted of weapons offenses or false-statements charges, and there was no evidence that Lobo Sosa participated in murders like the defendant.  Lobo Sosa's father was the president, but, unlike the defendant, Lobo Sosa himself was not an elected official. Judge Schofield applied a three-level role enhancement, as opposed to the four levels applicable here.  Judge Schofield also did not apply the enhancements for criminal livelihood, violence, bribes, or obstruction.

select alleged co-conspirators, including (depicted below from left to right) Mario Jose Calix, Arnaldo Urbina Soto, and "Tigre" Valladares Bonilla.

  

Each of these men is charged publicly in this District with drug-trafficking and weapons offenses, but Honduras has not extradited any of them.  A life sentence would send the only appropriate message to them and others like them—that cocaine trafficking, violence, and corruption of this magnitude has consequences and will not be tolerated in the United States—no matter the perpetrator.

### D.    A Life Sentence Would Not Result in Unwarranted Sentencing Disparities

A life sentence would not result in unwarranted sentencing disparities.  *See* 18 U.S.C. § 3553(a)(6).  Very few drug-trafficking cases involve the mix of aggravating factors that this case presents.   In fiscal year 2019, only 6.6% of 19,421 cases involving the application of U.S.S.G. § 2D1.1 included, as this case does, a base offense level of 38.[19]  Even within that 6.6%, the defendant's drug quantity is extraordinary:  his 185,000 kilograms of cocaine is more than 440 times the 450-kilogram threshold for application of Guidelines base offense level 38.   The

---

[19] The statistics set forth in this section are taken from reports prepared by the Sentencing Commission, which are available at:

(i) https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/guideline-application-frequencies/2019/Use_of_SOC_Guideline_Based.pdf; and

(ii) https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/guideline-application-frequencies/2019/Ch3_Guideline_Based.pdf.

defendant's other Guidelines offense characteristics are similarly hard to come by. For example, only 1.4% of the 19,421 cases involved an enhancement pursuant to U.S.S.G. § 2D1.1(b)(2), which applies here, based on the defendant's use of violence. And just 63 cases—0.3%—involved the enhancement relating to his criminal livelihood pursuant to U.S.S.G. § 2D1.1(b)(16)(E). Drug-trafficking cases such as this one involving enhancements for aggravating role and obstruction are also rare. Only 2.1% of cases applying U.S.S.G. § 2D1.1 also involved an obstruction enhancement pursuant to U.S.S.G. § 3C1.1. Courts applied aggravating role adjustments pursuant to U.S.S.G. § 3B1.1 in 1,419 drug-trafficking cases in fiscal year 2019, and the defendant is noteworthy among that 7.3% of defendants because the highest-available, four-level enhancement applies.

Life sentences for less-culpable defendants demonstrate the appropriateness of that sentence here. First, as noted above, in 2019, Judge Sullivan sentenced Fernandez Rosa to a life sentence. *See* 12 Cr. 894 (RJS) (S.D.N.Y.). Fernandez Rosa pleaded guilty to cocaine-distribution conspiracy, but no firearms charges. He was responsible for the importation of 155 tons of cocaine and methamphetamine, and ordered or participated in 18 murders. The defendant distributed more cocaine than Fernandez Rosa. Unlike the defendant, Fernandez Rosa was not a congressman. And some of Fernandez Rosa's most significant political contacts were through the defendant (via Diaz Morales). Thus, the defendant was one of the reasons that Fernandez Rosa thrived as a violent drug trafficker. Moreover, as Judge Sullivan recognized at Fernandez Rosa's sentencing, "[e]ach [murder] alone would merit a life sentence." (Sent. Tr. 111). The defendant is responsible for at least two murders, and his pernicious, long-running, and corrupt criminal conduct is in many respects worse than Fernandez Rosa's.

Second, in 2018, a Guatemalan drug trafficker named Waldemar Lorenzana Cordon was sentenced principally to life in prison following a trial conviction for cocaine-importation conspiracy.  *See* 03 Cr. 331 (CKK) (D.D.C.).  The Government attributed an unspecified "thousands" of kilograms of cocaine to Lorenzana Cordon's offense, and the court applied enhancements for leadership and use of weapons.  Lorenzana Cordon was not a congressman.  And the judge that sentenced Lorenzana Cordon did not apply enhancements for violence, bribery, abuse of trust, criminal livelihood, or obstruction.  Accordingly, a Guidelines sentence in this case would be consistent with Lorenzana Cordon.

Third, in 2018, a significant Honduran drug trafficker named Sergio Neftali Mejía Duarte was sentenced principally to life in prison following a trial conviction for cocaine-importation conspiracy.  *See* 15 Cr. 20540 (S.D.F.L.); *see also United States v. Mejía Duarte*, 780 F. App'x 730 (11th Cr. 2019).  Like the defendant, Mejía Duarte and his workers used firearms, including machineguns, and engaged in acts of violence, including murders.  Mejía Duarte also engaged in obstruction by threatening a cooperating witness while they were incarcerated together.  However, the defendant is substantially more culpable in terms of bribery and political corruption, and the quantity of cocaine at issue is not comparable.  The trial evidence established that Mejía Duarte was responsible for transporting approximately 20,000 kilograms of United States-bound cocaine—approximately 11% of the quantity the defendant helped import into the United States. Mejía Duarte was not an elected official, whereas the defendant abused his political position for years to foster the structural environment in Honduras that allowed drug-traffickers such as Mejía

Duarte to thrive on a monumental scale.[20]  Therefore, the Mejía Duarte's sentence also supports a life sentence for the defendant.

So too does *United States v. Suarez*, No. 11 Cr. 836 (KBF), 2014 WL 1998234 (S.D.N.Y. May 15, 2014).  In *Suarez*, Judge Forrest sentenced a Colombia-based drug trafficker who pleaded guilty to cocaine-importation conspiracy to 648 months' imprisonment, which the court intended to be "effectively a life sentence."  791 F.3d 363, 365 (2d Cir. 2015).  Judge Forrest found that the offense involved "thousands of kilograms of cocaine" and weapons possession.  The Court also applied enhancements for leadership and criminal livelihood—but not obstruction—and concluded that Suarez "caused men armed with weapons to murder two men."  2014 WL 1998234, at *3.  The defendant distributed more cocaine than Suarez, he is also responsible for at least two murders, he paid more bribes, and he was an elected official.  Thus, *Suarez* also supports imposing a life sentence here.

The defendant points to several cases that he argues support his contention that a life imprisonment would result in an unwarranted sentencing disparity.  (Def. Mem. at 13-14).  A careful comparison to these cases, however, undermines the defendant's argument and, if anything, supports the imposition of a life sentence in this case.  First, the defendant cites to the five cooperating witnesses in this case.  (*Id.* at 13).  Four of these five witnesses have yet to be

---

[20] In 2017, one of Mejía Duarte's associates, Juan Carlos Arvizu Hernandez, was sentenced principally to 30 years' imprisonment following a trial conviction for cocaine-importation conspiracy.  *See* 17 Cr. 20130 (RNS) (S.D.Fl.).  Arvizu Hernandez was not a political official, he was not convicted of § 924(c) violations, and he was responsible for the importation of 5,000 kilograms of cocaine, rather than more than 185,000 kilograms like the defendant here.  The defendant is also more culpable than Arvizu Hernandez in terms of weapons possession, bribery, political corruption, and obstruction.

sentenced, and all of these witnesses cooperated with the Government's investigation.[21]  Put simply, they do not provide relevant comparator points.  *See, e.g.*, *United States v. Ebbers*, 458 F.3d 110, 129 (2d Cir. 2006) (explaining that different sentences among co-defendants were reasonable where co-defendants cooperated and defendant did not).

The defendant also asserts that the eight remaining cases are "similar" and support his argument for the mandatory minimum 40-year sentence.  This, too, rings hollow.  None of the cases listed involved a congressman protected by the president of the country in which he operated. Rather, the defendant cites to cases involving the types of drug traffickers that he and his brother worked to protect in exchange for bribes.  Those sentences and the positions of those defendants in the hierarchy of politically connected drug trafficking at issue in his case do not merit leniency. Put simply, the defendant is a uniquely bad actor at the center of years of state-sponsored drug trafficking.  A life sentence based on this conduct will not result in unwarranted sentencing disparities.

## II.     THE COURT SHOULD ORDER THE DEFENDANT TO FORFEIT $138.5 MILLION

The Court should order the defendant to forfeit $138.5 million, which represents a conservative estimate of the proceeds co-conspirators paid to the defendant in connection with Count One.

---

[21] The defendant wrongly claims that Rivera Maradiaga has been sentenced to "Life Imprisonment."  (Def. Mem. at 14).  Rivera Maradiaga has not yet been sentenced.

| Witness | Time Period | Estimate Methodology | Defendant Proceeds | Tr. Cites |
|---------|-------------|---------------------|--------------------|-----------|
| Diaz Morales | 2004 - 2007 | Eight months per year; three shipments per month; $5,000 per shipment | $480,000 | 140, 210 |
| | 2008 - 2010 | Eight months per year; four shipments per month; $5,000 per shipment | $480,000 | 140, 210 |
| Ardon Soriano | 2010 - 2011 | Supplied 12,000 kilograms at $10,000 per kilogram (less $5,000 for logistics) | $60 mil | 363, 408, 435 |
| | 2012 - 2014 | $50,000 per month for transportation of cocine | $1.8 mil | 433-36 |
| | | $20,000 per month for transportation of drug proceeds | $720,000 | 433-36 |
| Chang Monroy | 2008 - 2015 | Supplied 15,000 kilograms at $10,000 per kilogram (less $5,000 for logistics) | $75 mil | 912, 914, 923, 930 |
| | | **Total** | **$138.5 mil** | |

## A.    Applicable Law

Pursuant to Title 21, United States Code, Section 853, "a defendant convicted of a drug crime 'shall forfeit . . . any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of' the crime of conviction." *United States v. Roberts*, 660 F.3d 149, 165 (2d Cir. 2011) (quoting 21 U.S.C. § 853(a)(1)).  "Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases where the statute applied, or broader words to define the scope of what was to be forfeited." *United States v. Monsanto*, 491 U.S. 600, 607 (1989).  The purpose of forfeiture is "punitive rather than restitutive," *Roberts*, 660 F.3d at 166, and the defendant's ability to pay is irrelevant, *United States v. Awad*, 598 F.3d 76, 78 (2d Cir. 2010).

"[T]he forfeiture statute for drug crimes is not limited to profits from those crimes." *United States v. Khan*, 761 F. App'x 43, 47 (2d Cir. 2019).  "[D]istrict courts may use general points of reference as a starting point for a forfeiture calculation and make reasonable extrapolations supported by a preponderance of the evidence." *United States v. Roberts*, 660 F.3d 149, 166 (2d Cir. 2011); *see also Khan*, 761 F. App'x at 47 (holding that forfeiture extends to "any property

constituting, or derived from, any *proceeds* the person obtained, directly or indirectly, as the result of the crime of conviction." (citing *Honeycutt v. United States*, 137 S. Ct. 1626, 1632-33 (2017); and emphasis in original)).

**B.     Discussion**

The Governments forfeiture calculation is based on trial testimony from Diaz Morales, Ardon Soriano, and Chang Monroy.

Diaz Morales testified that, between 2004 and 2010, he paid the defendant $5,000 per cocaine shipment. (Tr. 140). He estimated that (i) his group sent cocaine shipments between eight and 10 months per year; (ii) the group sent three or four shipments per month between 2004 and 2007; and (iii) the group sent four or five shipments per month between 2008 and 2010. (Tr. 210). Based on those estimates, and not including Diaz Morales's $50,000 payments to the defendant for more sensitive air-radar information (Tr. 196, 199), Diaz Morales paid the defendant at least $960,000.

Ardon Soriano explained that the defendant helped him distribute between 30,000 and 40,000 kilograms of cocaine beginning in 2010, and their last drug shipments together occurred in 2014. (Tr. 363, 435). In 2010 and 2011, the defendant supplied Ardon Soriano and others cocaine at a price of $10,000 per kilogram. (Tr. 408; *see also* Tr. 199 (Diaz Morales estimating same price)). Based on two years of the five-year period, *i.e.*, 40%, and using 30,000 kilograms, which is the lower end of Ardon Soriano's quantity estimate, the defendant sold Ardon Soriano 12,000 kilograms of cocaine for $120 million. Even discounting that figure by half to account for logistical costs associated with transporting the cocaine from the defendant's laboratory in Colombia to the buyers in Honduras, the defendant earned at least $60 million from his sales to Ardon Soriano in 2010 and 2011. The defendant stopped supplying cocaine to Ardon Soriano in

2012, and instead rented helicopters for transporting drugs and drug money.  (Tr. 433-36).  The defendant charged $50,000 per flight to transport cocaine, and $20,000 per flight to transport proceeds (presumably because the cash was not incriminating on its face and therefore presented less seizure risk).  During the three-year period between 2012 and 2014, Ardon Soriano estimated that he used the defendant's helicopters to transport cocaine once per month, and separately used this service to transport drug proceeds once per month.  (Tr. 435-36).  Based on those estimates, the defendant earned at least $1.8 million helping Ardon Soriano transport cocaine, and he earned another $720,000 for helping to transport drug money.

Finally, Chang Monroy testified that the defendant helped him distribute 15,000 kilograms of cocaine beginning in 2008 and Chang Monroy's surrender in 2015.  (Tr. 912, 914, 930).  Chang Monroy and the buyers he worked with paid the defendant the same $10,000-per-kilogram price described by Diaz Morales and Ardon Soriano.  (Tr. 923).  Once again discounting that price by half to account for logistical costs, the defendant earned $75 million for supplying cocaine to Chang Monroy.

Based on the foregoing, the Government respectfully submits that the Court should order the defendant to forfeit $138.5 million.

## III.   THE COURT SHOULD ORDER THE DEFENDANT TO REPAY ALL FUNDS DISBURSED PURSUANT TO THE CRIMINAL JUSTICE ACT

"When a defendant is able to pay for the costs of a private attorney, he is not entitled to gratuitous or subsidized legal counsel under the CJA."  *United States v. Konrad*, 730 F. 3d 343, 350-51 (3d Cir. 2013); *see also* 18 U.S.C. § 3006A(f); *United States v. Illarramendi*, No. 11 Cr. 41 (SRU), 2015 WL 8664174, at *3-4 (D. Conn. Dec. 11, 2015) (ordering defendant "to pay back the entire cost of his legal representation . . . to the CJA Fund" where "[i]t has become abundantly

clear . . . that [defendant] could easily have afforded to pay that sum out of his significant available funds").

The defendant retained counsel in 2016 and again upon his arrest in 2018, and the record establishes that the defendant earned huge sums of money as a drug trafficker. Nevertheless, on February 6, 2020, the defendant submitted a letter to the Court claiming that he had "exhausted" his "life savings and bank account" and was "without any resources to pay new attorneys at this critical time." (Dkt. No. 132). At a conference on February 24, 2020, the defendant reiterated his claim that he could not afford to pay for an attorney, submitted CJA affidavit to the Court, and perjured himself yet again by swearing under oath to the accuracy of the affidavit. (Feb. 24, 2020 Tr. 3-4). In response, the Court observed correctly that "[t]he defendant has substantial asserts," and warned the defendant that "there can be a clawback of fees from the defendant down the road if assets are reachable." (*Id.* at 4-5). Because the evidence supports the Court's position regarding the defendant's assets, he should be ordered to repay the costs of his appointed counsel.

## IV.    THE COURT SHOULD ORDER THE DEFENDANT TO PAY A $10 MILLION FINE

The defendant has not met his burden of demonstrating an inability to pay a fine and, in light of the balancing of the Section 3553(a) factors, the Government respectfully submits that the Court should impose a within-Guidelines, statutory-maximum fine of $10 million.

### A.    Applicable Law

The Guidelines provide that "[t]he court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. § 5E1.2(a). "The burden of establishing inability to pay rests on defendant." *United States v. Salameh*, 261 F.3d 271, 276 (2d Cir. 2001) (citing *United States v. Thompson*, 227 F.3d 43, 45 (2d Cir. 2000)). "Evidence of lucrative illegal activity may support an inference that such

funds, although hidden, remain at the defendant's disposal." *United States v. Fields*, 113 F.3d 313, 325 (2d Cir. 1997); *United States v. Orena*, 32 F.3d 704, 716 (2d Cir. 1994) (explaining that "evidence of lucrative illegal activity can support a judge's finding that a defend-ant is able to pay a fine"). Where a defendant fails to demonstrate an inability to pay a fine, the Court must craft one based in part on consideration of the § 3553(a) factors. *See* 18 U.S.C. § 3572(a); *see also United States v. Elfgeeh*, 515 F.3d 100, 136 (2d Cir. 2008).

### B.  Discussion

Pursuant to U.S.S.G. § 5E1.2(c)(4), the maximum Guidelines fine in this case corresponds to the maximum fine authorized by statute, which is $10 million. *See* 21 U.S.C. § 960(b). The Government respectfully submits that, based on consideration of the Section 3553(a) factors, the maximum fine prescribed by Congress and the Sentencing Commission is appropriate in this case.

The defendant has not established that he is unable to pay a fine. The defendant retained counsel for most of the proceedings in this case following his November 2018 arrest, and he also retained counsel for purposes of the 2016 proffer that resulted in his conviction on Count Four. At the January 2019 bail hearing, the defendant admitted that he flew on a private jet from Honduras to Miami to attend that 2016 meeting. (Jan. 4, 2019 Tr. 14-15). Consistent with his opaque testimony regarding the source of funds for the charter (*id.*), the defendant also admitted that third parties in Honduras hold some of his assets, but he claimed that he could not estimate the value of those assets. (*Id.* at 27, 30). Following his conviction, the defendant took a similar approach with the Probation Office by "declin[ing] to answer any questions related to the financial statement" and failing to explain "how he covers his [purportedly] negative monthly cashflow." (PSR ¶¶ 114, 118; *see also id.* ¶ 120). The PSR includes information that the defendant provided to Pretrial Services in connection with his bail application, which the Government established at the bail

hearing was materially inaccurate. *See United States v. Sasso*, 59 F.3d 341, 352 (2d Cir. 1995) (where defendant "was not forthcoming with respect to his financial circumstances, it was well within the province of the district court to find that he had not carried his burden of proving inability to pay").

In addition to the foregoing discussion of the defendant's proceeds from Count One, Giovani Rodriguez testified at trial that he observed in one of the defendant's homes a stack of vacuum-wrapped $20 bills that was about three feet tall and 1.5 feet wide. (Tr. 719). As another example, the drug ledger seized by Honduran police in June 2018 established that the defendant was "paid" more than $4.4 million in connection with a 650-kilogram cocaine shipment in February 2018:



(GX 250-T at 1-2). Thus, while $10 million is an extremely significant amount of money for most people, the defendant made almost half that amount in connection with a single, relatively small (for him) drug shipment, which occurred just nine months prior to his arrest at the end of a drug-trafficking career that dated back to at least 2004. Accordingly, the defendant has not demonstrated that he is unable to pay a fine. And for all of the reasons discussed above with respect to the nature and seriousness of the offense and the need to promote respect for the law and achieve deterrence, the statutory maximum fine of $10 million is appropriate.

## <u>CONCLUSION</u>

For the foregoing reasons, the Government respectfully submits that the Court should sentence the defendant to life imprisonment, require forfeiture in the amount of $138.5 million, and order the defendant to pay the statutory maximum fine of $10 million.

Dated: New York, New York
       March 16, 2021

Respectfully Submitted,

AUDREY STRAUSS
United States Attorney for the
Southern District of New York

By:    _____/s/_____
       Amanda L. Houle
       Matthew Laroche
       Jason A. Richman
       Assistant United States Attorneys

Cc:    Defense Counsel
       (Via ECF)