# EXHIBIT J

ROS21245 9MP                                                     S.L.C.

117TH CONGRESS
1ST SESSION

# S. _____

To suspend certain United States assistance for the Government of Honduras
until corruption, impunity, and human rights violations are no longer
systemic, and the perpetrators of these crimes are being brought to
justice.

_____

## IN THE SENATE OF THE UNITED STATES

_____

Mr. MERKLEY (for himself, Mr. LEAHY, Mr. DURBIN, Mr. MARKEY, Mr.
SANDERS, Ms. WARREN, Mr. WHITEHOUSE, and Mr. VAN HOLLEN) in-
troduced the following bill; which was read twice and referred to the Com-
mittee on _____

_____

# A BILL

To suspend certain United States assistance for the Govern-
ment of Honduras until corruption, impunity, and human
rights violations are no longer systemic, and the per-
petrators of these crimes are being brought to justice.

1    *Be it enacted by the Senate and House of Representa-*

2  *tives of the United States of America in Congress assembled,*

3  **SECTION 1. SHORT TITLE; TABLE OF CONTENTS.**

4    (a) SHORT TITLE.—This Act may be cited as the

5  "Honduras Human Rights and Anti-Corruption Act of

6  2021".

2

1        (b) TABLE OF CONTENTS.—The table of contents for

2  this Act is as follows:

Sec.  1.  Short title; table of contents.
Sec.  2.  Police or military of the Republic of Honduras defined.
Sec.  3.  Findings.
Sec.  4.  Sense of Congress.
Sec.  5.  Office of the United Nations High Commissioner for Human Rights.
Sec.  6.  Imposition of sanctions with respect to the President of Honduras.
Sec.  7.  Prohibition on commercial export of covered defense articles and serv-
          ices and covered munitions items to the Honduran police or
          military.
Sec.  8.  Suspension and restrictions of security assistance extended to the Re-
          public of Honduras unless certain conditions are met.
Sec.  9.  Sunset.

3  **SEC. 2. POLICE OR MILITARY OF THE REPUBLIC OF HON-**

4              **DURAS DEFINED.**

5        In this Act, the term "police or military of the Repub-

6  lic of Honduras" means—

7              (1) the Honduran National Police;

8              (2) the Honduran Armed Forces;

9              (3) the Military Police of Public Order of the

10       Republic of Honduras; or

11              (4) para-police or paramilitary elements, acting

12       under color of law or having received financing,

13       training, orders, intelligence, weapons, or other

14       forms of material assistance from the forces identi-

15       fied in paragraphs (1) through (3).

16  **SEC. 3. FINDINGS.**

17        Congress makes the following findings:

18              (1) Since the 2009 military coup, the Republic

19       of Honduras remains plagued by systemic corruption

20       and human rights violations, exemplified by—

1          (A) widespread collusion among govern-
2     ment officials, state and private security forces,
3     organized crime, and members of the private
4     sector, including in the knowledge and perpetra-
5     tion of physical and legal threats, assassina-
6     tions, forced disappearances, and other abuses
7     against human rights and environmental de-
8     fenders, members of the political opposition,
9     journalists, and others;

10          (B) the excessive use of force by members
11     of the police or military of the Republic of Hon-
12     duras, particularly in the context of civil society
13     protests;

14          (C) the failure of the Government of Hon-
15     duras to protect the rights, interests, and phys-
16     ical security of indigenous peoples in land and
17     natural resources disputes, in contravention of
18     its obligations under the Honduran constitution
19     and under international treaties to which it is
20     a state party; and

21          (D) the failure of the Government of Hon-
22     duras to enforce the Honduran Labor Code in
23     violation of its obligations under International
24     Labor Organization Conventions, which the
25     Government of Honduras has ratified, guaran-

ROS21245 9MP                                                    S.L.C.

4

1 teeing freedom of association, the right to col-
2 lective bargaining, and other fundamental labor
3 protections.

4 (2) There is substantial evidence that President
5 of Honduras Juan Orlando Hernández has engaged
6 in a pattern of criminal activity and use of the state
7 apparatus to protect and facilitate drug trafficking,
8 as exemplified by three high-profile corruption and
9 drug trafficking cases that were tried or are being
10 prosecuted in the United States District Court for
11 the Southern District of New York, in which the
12 President of Honduras was named as a co-con-
13 spirator, including the following:

14 (A) The October 2019 conviction of the
15 President of Honduras's brother Juan Antonio
16 Hernández, in which Federal prosecutors and
17 multiple witnesses testified that the President
18 of Honduras received $1,500,000 in drug pro-
19 ceeds that were funneled toward his successful
20 2013 presidential campaign, and that organized
21 crime had infiltrated the Honduran National
22 Police and National Party.

23 (B) The March 2020 indictment of
24 Geovanny Daniel Fuentes, a drug trafficker, in
25 which Federal prosecutors alleged that the

5

1    President of Honduras accepted $25,000 in
2    bribes in exchange for protecting the defendant
3    from law enforcement intervention against his
4    cocaine trafficking activities and facilitated the
5    use of Honduran military personnel as security
6    for the defendant's drug trafficking operations.
7    On February 5, 2021, Federal prosecutors filed
8    a court document stating that the President of
9    Honduras was under investigation in connection
10   with the case.

11       (C) The April 2020 indictment of former
12   National Director of Police Juan Carlos "El
13   Tigre" Bonilla, in which Federal prosecutors al-
14   leged that the President of Honduras accepted
15   bribes from drug traffickers, facilitated multi-
16   ton shipments of cocaine bound for the United
17   States, and entrusted the defendant with spe-
18   cial assignments, including murder.

19   (3) The President of Honduras has also dem-
20   onstrated a track record of contempt for the rule of
21   law, exhibited by—

22       (A) his support for the 2009 military coup,
23   repudiated as unlawful by the United Nations,
24   the Organization of American States, the Euro-

ROS21245 9MP                                                        S.L.C.

6

1    pean Union, and numerous foreign govern-
2    ments, while a member of Congress;

3         (B) his support for a 2012 congressional
4         measure, widely viewed as illegal, to replace
5         four Supreme Court justices while the leader of
6         Congress; and

7         (C) his 2017 candidacy for a second presi-
8         dential term, in violation of the Honduran con-
9         stitution's longstanding prohibition on presi-
10        dential reelection, which in 2015 was nullified
11        in a ruling by the justices referred to in sub-
12        paragraph (B).

13        (4) In recent months, the executive and legisla-
14        tive branches of the Government of Honduras have
15        taken significant steps to entrench corruption, block
16        oversight by national prosecutors and international
17        investigators, and shield senior officials and parlia-
18        mentarians from criminal liability, including the fol-
19        lowing actions:

20        (A) On January 19, 2020, the Government
21        of Honduras announced the closing of the Mis-
22        sion of Support against Corruption and Impu-
23        nity in Honduras (MACCIH), the anti-corrup-
24        tion mechanism established in 2015 by the Or-
25        ganization of American States and the Govern-

1    ment of Honduras. MACCIH brought 14 cor-
2    ruption-related cases against dozens of high-
3    profile criminal defendants and oversaw the cre-
4    ation of an anti-corruption judicial circuit and
5    special prosecutor's unit that was disbanded fol-
6    lowing the mission's closure.

7    (B) On June 25, 2020, the Government of
8    Honduras enacted a new penal code that re-
9    duced prison terms for corruption-related
10   crimes, including embezzlement, illicit enrich-
11   ment, obstruction of justice, and fraud. The
12   measure is retroactive, benefitting Honduran
13   officials already convicted or facing prosecution.

14   (C) On October 16, 2019, the National
15   Congress of Honduras passed a law that re-
16   stored immunity to all parliamentarians for
17   crimes related to legislative activities and a law
18   that blocked the Attorney General's office from
19   investigating cases involving the improper use
20   of state funds for up to 7 years.

21   (5) These recent measures follow a longer pat-
22   tern of congressional decrees of amnesty or immu-
23   nity for crimes perpetrated by authorities in Hon-
24   duras, including for those committed during the
25   2009 coup and its aftermath, those perpetrated by

8

1    state security forces, and those involving the misuse

2    of public funds by former and current legislators,

3    contributing to a climate of impunity.

4    (6) Space for civil society to operate in the Re-

5    public of Honduras remains severely constrained,

6    with rights activists and journalists subject to acute

7    levels of violence, surveillance, harassment, and in-

8    timidation. The Republic of Honduras ranks as the

9    deadliest country in the world for human rights and

10    environmental defenders on a per capita basis and

11    third in the number of assassinations, with 31 de-

12    fenders killed in 2019 and 204 defenders killed since

13    2009.

14    (7) The 2019 United States Department of

15    State Country Reports on Human Rights Practices,

16    international human rights bodies, and numerous

17    monitoring groups have reported that the Honduran

18    police and military commit human rights violations

19    with impunity, including unlawful killings, torture,

20    and the use of unnecessary force and lethal weapons

21    against protestors and civilian bystanders. Individ-

22    uals with documented records of human rights viola-

23    tions and links to drug trafficking continue to serve

24    in high-ranking positions within the Honduran police

25    and military, and few of the alleged cases of human

9

1    rights abuses perpetrated by police and military per-
2    sonnel are prosecuted or tried in court.

3        (8) The Office of the United Nations High
4    Commissioner for Human Rights and the Inter-
5    American Commission on Human Rights have docu-
6    mented the use of arbitrary detentions, forced dis-
7    appearances, and specious judicial proceedings to
8    criminalize indigenous and human rights activists,
9    environmental defenders, journalists, opposition poli-
10   ticians, and others, including—

11           (A) members of the Tocoa Municipal Com-
12       mittee for the Defense of Common and Public
13       Assets, who since September 2019 have been
14       detained pending trial following their protest of
15       an illegal mining concession affecting the
16       Guapinol and San Pedro rivers;

17           (B) four Afro-indigenous Garífuna land de-
18       fenders, who on July 18, 2020, were abducted
19       from their homes and reportedly forced into un-
20       marked vehicles at gunpoint by armed men in
21       police uniforms without a warrant and remain
22       forcibly disappeared; and

23           (C) opposition lawmaker María Luisa
24       Borjas, who on July 21, 2020, was convicted of
25       defamation and sentenced to nearly three years

10

1     in prison for naming Ficohsa bank president

2     Camilo Atala as an intellectual author of the

3     2016 assassination of environmental and indige-

4     nous rights activist Berta Cáceres.

5     (9) The vilification and criminalization of civil

6  society actors and human rights defenders by Hon-

7  duran authorities has continued unabated under the

8  cover of COVID–19 pandemic response. On March

9  16, 2020, the Government of Honduras first notified

10  the Organization of American States of its deroga-

11  tion from treaty obligations under the American

12  Convention on Human Rights and has since sus-

13  pended nine constitutional guarantees, including the

14  rights to freedom of assembly and expression, the

15  latter of which was restored after international out-

16  cry. At least 34,000 citizens have been detained for

17  violating curfew and lockdown restrictions, and jour-

18  nalists and human rights defenders have been im-

19  peded in their efforts to report on and expose human

20  rights abuses during the pandemic.

21  **SEC. 4. SENSE OF CONGRESS.**

22     It is the sense of Congress that—

23     (1) systemic corruption, impunity, and human

24  rights violations by national government officials,

25  private citizens, and members of the police and mili-

1    tary of the Republic of Honduras deplete public re-
2    sources and fuel widespread impoverishment, citizen
3    insecurity, and forced displacement;

4        (2) the President should impose sanctions on
5    President of Honduras Juan Orlando Hernández for
6    acts of significant corruption and human rights vio-
7    lations and determine under the Foreign Narcotics
8    Kingpin Sanctions Regulations under part 598 of
9    title 31, Code of Federal Regulations, whether the
10   President of Honduras is a specially designated nar-
11   cotics trafficker;

12       (3) the President and Secretary of State should
13   seek to ensure that security assistance from the
14   United States and exports of munitions by United
15   States entities are not complicit in human rights
16   abuses perpetrated by the police and military of the
17   Government of Honduras, or misused to impede
18   peaceful protestors, human rights and environmental
19   defenders, and others from exercising the right to
20   freedom of expression, association, or assembly;

21       (4) the Government of Honduras should imme-
22   diately initiate discussions with the United Nations
23   to negotiate the mandate for a new, independent
24   mechanism to combat corruption and impunity with

ROS21245 9MP                                                      S.L.C.

12

1     a mission comparable to that of MACCIH, equipped
2     with—

3          (A) the authority to initiate cases, in co-
4          ordination with the Specialized Prosecutor's
5          Unit against Networks of Corruption
6          (UFERCO), against any citizen of the Republic
7          of Honduras, irrespective of their office, rank,
8          position, or title;

9          (B) the unimpeded authority to inves-
10         tigate, including the authority to subpoena doc-
11         uments, interview witnesses and suspects, and
12         conduct surveillance;

13         (C) the ability to propose laws, constitu-
14         tional amendments, and regulatory changes to
15         the Attorney General's office and other institu-
16         tions within the justice sector that are assured
17         expeditious consideration and debate by the Na-
18         tional Congress; and

19         (D) the requirement to conduct regular
20         and transparent consultations with a broad
21         range of civil society members with the goal of
22         promoting the mandate's successful implemen-
23         tation;

24     (5) the Government of Honduras should con-
25     tinue to pursue MACCIH's ongoing anti-corruption

13

cases and adopt legal and institutional reforms to strengthen judicial independence and protect human rights recommended by MACCIH, the Office of the United Nations High Commissioner for Human Rights, and UFERCO;

(6) the United States should support credible national and international efforts to combat corruption and human rights violations in the Republic of Honduras, including UFERCO, the Office of the United Nations High Commissioner for Human Rights, and organizations working to defend human rights and expose and prevent corruption, with the necessary resources for holding private and government actors accountable under the law and supporting independent monitoring by a free press and civil society, provided that they demonstrate sufficient political autonomy and willingness to prosecute high-level cases, including against senior officials and legislators of the Republic of Honduras; and

(7) the Secretary of State should develop, in consultation with a broad range of representatives of civil society and human rights organizations in Honduras, as appropriate, comprehensive and specific guidelines to use United States diplomacy and assistance to protect human rights and environmental

14

1     defenders in the Republic of Honduras from phys-
2     ical, legal, or financial reprisals and threats, includ-
3     ing by government, police, and military officials or
4     their associates.

**SEC. 5. OFFICE OF THE UNITED NATIONS HIGH COMMIS-**
5
6     **SIONER FOR HUMAN RIGHTS.**

7          In addition to amounts otherwise appropriated for
8     such purposes, there is authorized to be appropriated
9     $2,000,000 in voluntary contributions to support the work
10    of the Office of the United Nations High Commissioner
11    for Human Rights in Honduras to monitor and document
12    human rights violations, issue public reports and rec-
13    ommendations, and promote international human rights
14    standards.

**SEC. 6. IMPOSITION OF SANCTIONS WITH RESPECT TO THE**
15
16    **PRESIDENT OF HONDURAS.**

17         (a) IMPOSITION OF SANCTIONS.—Not later than 180
18    days after the date of the enactment of this Act, the Presi-
19    dent shall impose the sanctions described in subsection (b)
20    with respect to the President of Honduras, Juan Orlando
21    Hernández.

22         (b) SANCTIONS DESCRIBED.—The sanctions de-
23    scribed in this subsection are the following:

24         (1) ASSET BLOCKING.—The President shall ex-
25         ercise all of the powers granted to the President

1     under the International Emergency Economic Pow-
2     ers Act (50 U.S.C. 1701 et seq.) to the extent nec-
3     essary to block and prohibit all transactions in prop-
4     erty and interests in property of Juan Orlando
5     Hernández if such property and interests in property
6     are in the United States, come within the United
7     States, or are or come within the possession or con-
8     trol of a United States person.

9          (2) INELIGIBILITY FOR VISAS, ADMISSION, OR
10     PAROLE.—

11               (A) VISAS, ADMISSION, OR PAROLE.—Juan
12          Orlando Hernández is—

13                    (i) inadmissible to the United States;
14                    (ii) ineligible to receive a visa or other
15               documentation to enter the United States;
16               and

17                    (iii) otherwise ineligible to be admitted
18               or paroled into the United States or to re-
19               ceive any other benefit under the Immigra-
20               tion and Nationality Act (8 U.S.C. 1101 et
21               seq.).

22               (B) CURRENT VISAS REVOKED.—

23                    (i) IN GENERAL.—Juan Orlando
24               Hernández is subject to revocation of any
25               visa or other entry documentation regard-

ROS21245 9MP                                                      S.L.C.

16

1          less of when the visa or other entry docu-
2          mentation is or was issued.

3                  (ii) IMMEDIATE EFFECT.—A revoca-
4          tion under clause (i) shall—

5                      (I) take effect immediately; and
6                      (II) cancel any other valid visa or
7                  entry documentation that is in Juan
8                  Orlando Hernández's possession.

9      (c) IMPLEMENTATION; PENALTIES.—

10          (1) IMPLEMENTATION.—The President may ex-
11      ercise all authorities provided under sections 203
12      and 205 of the International Emergency Economic
13      Powers Act (50 U.S.C. 1702 and 1704) to the ex-
14      tent necessary to carry out this section.

15          (2) PENALTIES.—A person that violates, at-
16      tempts to violate, conspires to violate, or causes a
17      violation of subsection (b)(1), or any regulation, li-
18      cense, or order issued to carry out that subsection,
19      shall be subject to the penalties set forth in sub-
20      sections (b) and (c) of section 206 of the Inter-
21      national Emergency Economic Powers Act (50
22      U.S.C. 1705) to the same extent as a person that
23      commits an unlawful act described in subsection (a)
24      of that section.

1    (d) WAIVER.—The President may waive the applica-

2  tion of sanctions under this section if the President deter-

3  mines and certifies to the appropriate congressional com-

4  mittees that such a waiver is important to the national

5  interest of the United States.

6    (e) EXCEPTIONS.—

7       (1) EXCEPTION TO COMPLY WITH INTER-

8    NATIONAL OBLIGATIONS AND FOR LAW ENFORCE-

9    MENT ACTIVITIES.—Sanctions under subsection

10   (b)(2) shall not apply if admitting or paroling Juan

11   Orlando Hernández into the United States is nec-

12   essary—

13        (A) to permit the United States to comply

14     with the Agreement regarding the Head-

15     quarters of the United Nations, signed at Lake

16     Success June 26, 1947, and entered into force

17     November 21, 1947, between the United Na-

18     tions and the United States, or other applicable

19     international obligations; or

20        (B) to carry out or assist law enforcement

21     activity in the United States.

22       (2) EXCEPTION RELATING TO THE IMPORTA-

23   TION OF GOODS.—

24        (A) IN GENERAL.—The authorities and re-

25     quirements to impose sanctions authorized

18

1    under this section shall not include the author-
2    ity or a requirement to impose sanctions on the
3    importation of goods.

4        (B) GOOD DEFINED.—In this paragraph,
5    the term "good" means any article, natural or
6    manmade substance, material, supply, or manu-
7    factured product, including inspection and test
8    equipment, and excluding technical data.

9    (f) TERMINATION OF SANCTIONS.—The President
10   may terminate the application of sanctions under this sec-
11   tion if the President determines and reports to the appro-
12   priate congressional committees not later than 15 days be-
13   fore the termination takes effect that—

14       (1) credible information exists that Juan Or-
15   lando Hernández did not engage in the activity for
16   which sanctions were imposed;

17       (2) Juan Orlando Hernández has been pros-
18   ecuted appropriately for the activity for which sanc-
19   tions were imposed; or

20       (3) Juan Orlando Hernández has credibly dem-
21   onstrated a significant change in behavior, has paid
22   an appropriate consequence for the activity for
23   which sanctions were imposed, and has credibly com-
24   mitted to not engage in an activity for which the
25   sanctions were imposed in the future.

1    (g) DEFINITIONS.—In this section:

2        (1) ADMISSION; ADMITTED.—The terms "ad-

3    mission" and "admitted" have the meanings given

4    those terms in section 101 of the Immigration and

5    Nationality Act (8 U.S.C. 1101).

6        (2) APPROPRIATE CONGRESSIONAL COMMIT-

7    TEES.—The term "appropriate congressional com-

8    mittees" means—

9            (A) the Committee on Foreign Relations

10           and the Committee on Banking, Housing, and

11           Urban Affairs of the Senate; and

12           (B) the Committee on Foreign Affairs and

13           the Committee on Financial Services of the

14           House of Representatives.

15       (3) UNITED STATES PERSON.—The term

16    "United States person" means—

17           (A) an individual who is a United States

18           citizen or an alien lawfully admitted for perma-

19           nent residence to the United States;

20           (B) an entity organized under the laws of

21           the United States or any jurisdiction within the

22           United States, including a foreign branch of

23           such an entity; or

24           (C) any person in the United States.

20

1  **SEC. 7. PROHIBITION ON COMMERCIAL EXPORT OF COV-**

2  **ERED DEFENSE ARTICLES AND SERVICES**

3  **AND COVERED MUNITIONS ITEMS TO THE**

4  **HONDURAN POLICE OR MILITARY.**

5  (a) IN GENERAL.—Not later than 30 days after the

6  date of the enactment of this Act, the President shall pro-

7  hibit the issuance of licenses to export covered defense ar-

8  ticles and services and covered munitions items to the po-

9  lice or military of the Republic of Honduras.

10  (b) TERMINATION.—The prohibition under sub-

11  section (a) shall terminate on the date on which the Presi-

12  dent determines and reports to the appropriate congres-

13  sional committees that the police or military of the Repub-

14  lic of Honduras have not engaged in gross violations dur-

15  ing the one-year period ending on the date of such deter-

16  mination.

17  (c) WAIVER.—The prohibition under subsection (a)

18  shall not apply to the issuance of a license with respect

19  to which the President submits to the appropriate congres-

20  sional committees a written certification that the exports

21  to be covered by such license are important to the national

22  interests and foreign policy goals of the United States, in-

23  cluding a description of the manner in which such exports

24  will promote such interests and goals.

25  (d) DEFINITIONS.—In this section:

ROS21245 9MP                                                    S.L.C.

21

1     (1) APPROPRIATE CONGRESSIONAL COMMIT-

2  TEES.—The term "appropriate congressional com-

3  mittees" means—

4        (A) the Committee on Foreign Relations

5        and the Committee on Appropriations of the

6        Senate; and

7        (B) the Committee on Foreign Affairs and

8        the Committee on Appropriations of the House

9        of Representatives.

10    (2) COVERED DEFENSE ARTICLES AND SERV-

11  ICES.—The term "covered defense articles and serv-

12  ices" means defense articles and defense services

13  designated by the President under section 38(a)(1)

14  of the Arms Export Control Act (22 U.S.C.

15  2778(a)(1)).

16    (3) COVERED MUNITIONS ITEMS.—The term

17  "covered munitions items" means tear gas, pepper

18  spray, rubber bullets, foam rounds, bean bag rounds,

19  pepper balls, water cannons, handcuffs, shackles,

20  stun guns, tasers, semi-automatic firearms, and

21  their associated munitions not included in the defini-

22  tion under paragraph (2).

22

### SEC. 8. SUSPENSION AND RESTRICTIONS OF SECURITY AS-SISTANCE EXTENDED TO THE REPUBLIC OF HONDURAS UNLESS CERTAIN CONDITIONS ARE MET.

(a) SUSPENSION OF SECURITY ASSISTANCE.—No assistance may be made available for the police or military of the Republic of Honduras, including assistance for equipment and training.

(b) LOANS FROM MULTILATERAL DEVELOPMENT BANKS AND THE UNITED STATES INTERNATIONAL DEVELOPMENT FINANCE CORPORATION.—The Secretary of the Treasury shall—

(1) instruct United States representatives at multilateral development banks to use their voice and vote to oppose any loans for the police or military of the Republic of Honduras; and

(2) instruct the United States Executive Director of each international financial institution and the Chief Executive Officer of the United States International Development Finance Corporation to promote human rights due diligence and risk management in connection with any loan, grant, policy, or strategy related to the Republic of Honduras, in accordance with the criteria specified in subsection 7029(d) of the Department of State, Foreign Operations, and Related Programs Appropriations Act,

ROS21245 9MP                                                          S.L.C.

23

1    2020 (division G of Public Law 116–94; 133 Stat.

2    2863) and accompanying report.

3    (c) CONDITIONS FOR LIFTING SUSPENSIONS AND

4    RESTRICTIONS.—The provisions of this section shall ter-

5    minate on the date on which the Secretary of State deter-

6    mines and reports to the Committees on Foreign Relations

7    and Appropriations of the Senate and the Committees on

8    Foreign Affairs and Appropriations of the House of Rep-

9    resentatives that the Government of Honduras has—

10          (1) pursued all legal avenues to bring to trial

11       and obtain a verdict of all those who ordered, carried

12       out, and covered up—

13            (A) the March 2, 2016, murder of Berta

14          Cáceres;

15            (B) the killings of over 100 small-farmer

16          activists in the Aguán Valley;

17            (C) the killings of 22 people and forced

18          disappearance of 1 person by state security

19          forces in the context of the 2017 post-electoral

20          crisis;

21            (D) the killings of at least 6 people by

22          state security forces in the context of anti-gov-

23          ernment demonstrations between March and

24          July of 2019;

ROS21245 9MP                                                              S.L.C.

24

1          (E) the killings of at least 21 journalists

2          and media workers between October 2016 and

3          July 2020;

4          (F) the July 18, 2020, forced disappear-

5          ances of 4 Garífuna community leaders from

6          Triunfo de la Cruz; and

7          (G) the December 26, 2020, killing of in-

8          digenous Lenca leader and environmental activ-

9          ist Félix Vásquez at his home in La Paz, and

10         the December 29, 2020, killing of indigenous

11         Tolupan leader and environmental activist Adan

12         Mejía in Yoro;

13     (2) investigated and successfully prosecuted

14     members of military and police forces who are

15     credibly found to have violated human rights and en-

16     sured that the military and police cooperated in such

17     cases, and that such violations have ceased;

18     (3) withdrawn the military from domestic polic-

19     ing and ensured that all domestic police functions

20     are separated from the command and control of the

21     Armed Forces of Honduras and are instead directly

22     responsible to civilian authority;

23     (4) established that it protects effectively the

24     rights of trade unionists, journalists, small farmers,

25     human rights and environmental defenders, indige-

1   nous and Afro-indigenous community members and

2   rights activists, women's and LGBTQI rights activ-

3   ists, critics of the government, and other members of

4   civil society to operate without interference or re-

5   pression; and

6        (5) taken effective steps to establish the rule of

7   law and to guarantee a judicial system that is capa-

8   ble of investigating, prosecuting, and bringing to jus-

9   tice members of the police and military who have

10  committed human rights abuses.

**SEC. 9. SUNSET.**

12  This Act shall terminate on the date that is 5 years

13  after the date of the enactment of this Act.