# SENTENCING MEMORANDUM ON BEHALF OF
# JUAN ANTONIO HERNANDEZ ALVARADO

Docket No. No. S2 15 Cr. 379 (PKC)

Honorable P. Kevin Castel

## I.     INTRODUCTION

This memorandum is respectfully submitted for the Court's consideration prior to imposing sentence on Juan Antonio Hernandez Alvarado. Mr. Hernandez Alvarado is before this Court to be sentenced following trial and a few substitutions of counsel thereafter.

Through this pre-sentence submission, we respectfully request that this Court exercise the greatest possible degree of mercy and leniency in sentencing Mr. Hernandez Alvarado to a sentence that is "sufficient, but not greater than necessary," to achieve the purposes of sentencing – in this case, a prison sentence significantly less than recommended by the Probation Department.

We—both defense counsel and Mr. Hernandez Alvarado—acknowledge the extraordinarily serious allegations against Mr. Hernandez Alvarado. However, Mr. Hernandez Alvarado has consistently denied these allegations and does not accept the jury's verdict—because he asserts that the jury was given incomplete, incorrect, and inaccurate information upon which to make its decision.

The accuracy of the jury's verdict is not, however, the decision facing this Court at sentencing. The jury has spoken, and Mr. Hernandez Alvarado will be sentenced in the coming days.

As any sentence the Court is empowered to impose is a likely life sentence, Mr. Hernandez Alvarado will repay his debt to society no matter what the Court decides. As such, he will be deterred from future criminal activity and deter others who might see in him an example. The sentence will have no rehabilitative component with any real-world consequences, as Mr. Hernandez Alvarado will likely never leave prison.

As such, we ask the Court to impose the mandatory minimum sentence of 40 years.

## II. PRESENTENCE REPORT AND ADVISORY GUIDELINE CALCULATION

Initially, we ask the Court to incorporate prior counsel's sentencing submission and its arguments into its sentencing considerations. (Document 128 in this matter is also attached hereto as Exhibit A.) Mr. Hernandez Alvarado maintains the same objections to the PSR as noted by Messrs. Malone and Tein in that submission, so there is no need to repeat them again here.

Mr. Hernandez Alvarado also maintains the same position taken then, that the unsupported evidence of the quantity and weight of narcotics attributed to Mr. Hernandez Alvarado was and could not have been corroborated by any evidence other than the testimony of cooperating witnesses. At best, their figures were estimates—educated guesses that should not form the basis of real-world calculations of recommended prison time. Even without those guesses, the minimum sentence allowable by law is certainly sufficient, but not greater than necessary, to satisfy the requirement to appropriately punish Mr. Hernandez Alvarado for the crimes of conviction. To punish him further based upon the mere speculation—supported by some generalized knowledge of the amount of narcotics attributable to Mr. Hernandez Alvarado alleged by self-interested cooperating witnesses—should not be relied upon by the Probation Department to arrive at a Guidelines calculation as it did.

## III. SENTENCING CONSIDERATIONS UNDER 18 U.S.C § 3553(a)

Mr. Hernandez Alvarado respectfully requests that this Court impose a below-Guidelines sentence of 40 years.

This case is yet another in a long line of misadventures in foreign policy intervention undertaken by the United States government, this time in pursuit of regime change at the highest levels in Honduras. By arresting and prosecuting the brother of that country's president in a clear and open attempt to implicate the president himself in his brother's alleged crimes, the United

States government worked to trample upon another nation's sovereignty on the thinnest of justifications—the specious claim that the vast marketplace for narcotics in the United States begins or runs through Honduras. The proof the government provided of this connection was thin and crooked – no uninterested witness stood before this Court to say the Mr. Hernandez Alvarado's narcotics (if they could even be believed to be Mr. Hernandez Alvarado's narcotics) ever entered this country's supply chain.

The demand for narcotics by the residents of the United States of America has proven to be uncontainable from the days of basement opium dens through the Sackler family's vast present-day exploitation of the American health care system to get millions hooked on oxycodone. That the entrepreneurs in the nations to our south, much as their seemingly endless supply of cheap labor supplies us with the clothing, appliances, and the latest plastic doodad, would venture into the production of the products that fuel the greatest demand is nothing new. The war on drugs has played out for a century or so, with no resolution in sight.

The profit of such ventures is so high, due to our incessant hunger for drugs, that the production and transport of such drugs is an extraordinarily tempting business opportunity for our neighbors to the south, and around the world. This has led to both the exploitation of and the increased standard of living of vast numbers of people, from the coca or poppy farmers, to the street corner dealers, up to the leaders of large cartels. It has also led to tremendous violence among various factions engaged in narcotics trafficking, some of it within our borders, as well as a great deal of death and misery among those who abuse these drugs by voracious choice. No one in Honduras got America hooked on drugs—we did that just fine on our own.

The impossible dream of stemming the flow of drugs into the United States is how our government justifies its pursuit and prosecution of the manufacturers and purveyors throughout

[4]

the world, extending its extraterritorial arms into any corner of the globe that can be justified as a source of the drugs we so desperately crave. Of course, we the people don't want the flow of drugs to stop, but that is beside the point.

To suggest, as they did during his entire trial, that Mr. Hernandez Alvarado directed his narcotics to the United States, though, rests on the thinnest of evidentiary grounds. The suggestion that Mr. Hernandez Alvarado directed his narcotics to the Southern District of New York is even thinner. Yet he stands convicted before this Court for activities he allegedly conducted far beyond our borders, involving few if any of our citizens.

Mr. Hernandez Alvarado's crimes touched this country in no provable way. The distaste of those in our government when this investigation began for the politics and choices of a sovereign nation, and the desire to impose our supposedly better judgment on the citizens of Honduras, rings hollow. There is no doubt that Mr. Hernandez Alvarado is not well-loved by his countrymen – far from it, judging by the statements of those who condemn him in the Honduran press and on social media—but what business is it of ours? The Honduran government was too corrupt, or Mr. Hernandez Alvarado was too connected to be stopped by his own people? This is a fallacy – Mr. Hernandez Alvarado has not spoken to his brother in years. No emissary of the Honduran government has worked back diplomatic channels to have Mr. Hernandez freed, as the Mexican government was recently documented to have done when one of its generals was detained on similar charges. Mr. Hernandez Alvarado was detained and prosecuted in a foreign land, by a foreign power, for crimes he was alleged to have committed in his own country. The days of the United States policing the world are far from over.

As noted, though, this Court has no power to impose upon Mr. Hernandez Alvarado anything short of a *de facto* life sentence, despite the reports of those who love him of his strength of character, dedication to his family, and general decency as a human being.

His brother, Jose Amilcar Hernandez Flores, speaks to Mr. Hernandez Alvarado as "a professional and businessman that longs to provide for his family" who intentionally avoided the illegal activities that his friends and acquaintances became involved in. **Exhibit B.**

A friend and attorney, Nydia Guadalupe Mejia Vaquero, describes him as "a good person, helpful, honest, hardworking and concerned about his children, their mother, his siblings, his own mother, and his friends." **Exhibit C.**

His sister, Gloria Margarita Hernandez, recalls him as "always willing to help, the relative, the friend, the co-worker and his countryman." **Exhibit D.**

His brother, Juan Arnaldo Hernandez Espinoza, states, **"**Family and friends are able to attest to the fact that Juan Antonio is not or has ever been a problem to neither society nor a criminal who has infringed the law in any way, including those of your country and his own. Therefore, your Honor, aware that serving justice is the mission of the court, is that write to you to plead MERCY for Juan Antonio when issuing his sentence so that the just rigor of the law becomes evident in the undertaking of the difficult task of administering justice." **Exhibit E.**

A long-time friend, Sofia Zelaya Cruz, describes Mr. Hernandez Alvarado in this way: "Tony has always been a respectful gentleman and I have never witnessed him involved in illegal activities. I have never seen him or been with him in an uncomfortable situation involving drugs, weapons, and never had we been in business with questionable individuals. Tony has always been a man to honor his great family name with good moral character, good family values, a loving father, brother, and son. Although you may find this hard to believe, it is a fact.

Tony and I have had mutual friends/acquaintances in which may have been of different walks of life and I can assure you that neither one of us ever engaged in illegal activity. We more so turned our heads because in Honduras that is the safe way to be if you want to live." **Exhibit F.**

A former employee, Rosa Miriam Martinez Hernandez, remembers her time working for Mr. Hernandez Alvarado as follows: "he always was a leader to us but none the less always working along side with us; every so often, after a hard day's work mostly during high busy season, he would gather us and cook up a meal merely in appreciation for our dedicated work thus motivating us and creating that bond that included and treated us workers as family members. For that we will always be grateful, for his humbleness and the ease with which he would cook and serve us in return." **Exhibit G.**

His mother, Maria Elvira Alvarado, reflects upon the suffering of Mr. Hernandez Alvarado's family: "His children everyday beg the Lord for the return of their father and the six year old little girl in church on her knees prays for the release of her father unfairly held away from her; many people today, friends as well as clerics and church authorities find themselves praying for Juan Antonio's release." **Exhibit H.** That little girl is now closer to eight than six. She will likely never see her father again.

Additional character letters are attached as **Exhibit I**. Notably, many of those who wrote in support of Mr. Hernandez Alvarado note his significant debts from taking over and running his father's farm, which is far from the image portrayed in the trial of a successful narcotics trafficker.

We have also attached a number of certificates Mr. Hernandez Alvarado has earned while incarcerated as **Exhibit J**.

We would also ask the Court to consider Mr. Hernandez's conditions of incarceration since his arrest and detention. Although the number of sentencing proceedings have been fewer in recent months, sentencing courts in this District have recognized the extraordinary conditions endured by federal pretrial detainees in connection with the virus and reduced some sentences accordingly.  See, e.g., *United States v. Morgan*, 19 Cr. 209 (RMB) (S.D.N.Y. May 5, 2020) (cutting sentence to less than half of low end of stipulated guidelines based in part on conditions at MDC during pandemic, and condemning awful conditions at both MCC and MDC even prior to current crisis); *United States v. Casillas*, 19 Cr. 863 (VSB) (S.D.N.Y. May 4, 2020) (reducing length of sentence in part based on conditions at MCC during COVID-19 crisis); *United States v. Pierson*, 14 Cr. 855 (LTS) (S.D.N.Y. May 4, 2020) (same for defendant detained at MDC).  We respectfully ask that this Court do the same.

Taking into account the factors enumerated in 18 U.S.C. § 3553(a), we respectfully suggest that a prison sentence of 40 years, with credit for time already served, is appropriate in this case. As this Court knows, the statute instructs that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth" as outlined below.  We respectfully suggest that the balance of all these factors weigh in favor of a below-guidelines sentence, which would meet the sentencing goals of punishment and deterrence.

### *The Need for Deterrence*

To the extent that criminal sanctions do have a general deterrent effect, the certainty and swiftness of punishment have a far greater deterrent effect than the severity of the sanction. A below-Guidelines sentence would be more than sufficient to deter other would-be offenders from similar criminal conduct.  Mr. Hernandez Alvarado's story makes clear the negative consequences of engaging in criminal conduct.

Under Section 3553(a)(2), it is appropriate to make adjustments to a sentence in order to promote respect for the law and adequately punish the defendant; to discourage the defendant from committing the same acts again; and to protect the public from further crimes by the defendant or by others.  *See generally*, 18 U.S.C. § 3553(a)(2)(A)-(C).  In Mr. Hernandez Alvarado's case, a below-Guidelines sentence would properly satisfy these enumerated purposes of sentencing. Probation, however, has recommended a sentence which would go far beyond the goals of sentencing, as Mr. Hernandez Alvarado will likely die in prison with even the minimum sentence.

## IV.     SENTENCING RECOMMENDATION

As noted above, we respectfully request a sentence of incarceration of 40 years, with credit for time already served.

## V.     CONCLUSION

As detailed extensively above, we believe that in this particular case, our sentencing recommendation would provide an adequately onerous sentence that is harmonious with the needs of justice: a sentence sufficient, but not greater than necessary.

Respectfully submitted,

BRILL LEGAL GROUP, P.C.
*Attorneys for Juan Antonio Hernandez Alvarado*

By:   Peter E. Brill
306 Fifth Avenue
Penthouse
New York, NY 10001
(212) 233-4141

[9]